UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DELARSE MONTGOMERY, JR.,            )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )        Civil Action No. 05-2157 (RMU)
                                    )
ELAINE CHAO, Chairwoman,            )
Pension Benefit Guaranty Corp. et al.,  )
                                    )
        Defendants.                 )
_____ )

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and LCvR 56.1, Defendants respectfully move for summary judgment on the grounds that: (1) Plaintiff fails to establish a prima facie case for his accretion of duties non-promotion claim; (2) Plaintiff fails to establish a prima facie case of discrimination for one accountant position and the Collections Analyst Position as the vacancies for which he applied were never filled; and (3) Plaintiff was not minimally qualified for both accountant positions.

Assuming Plaintiff were to establish a prima facie case of discrimination and retaliation, Defendants had legitimate, non-discriminatory and non-retaliatory reasons for all actions they took vis-a-vis Plaintiff, and Plaintiff cannot show pretext. Further, Plaintiff fails to establish a causal connection between his prior protected activity, and his non-promotion and non-selections. In support of this motion, Defendants respectfully refer the Court to the attached Statement of Material Facts Not In Genuine Dispute and to the attached memorandum of points and authorities.

Because this is a dispositive motion, Defendants have not sought Plaintiff's consent.  <u>See</u>

LCvR 7.1(m).[1]

                    Respectfully submitted,


                    _____/s/_____
                    JEFFREY A. TAYLOR, DC Bar #498610
                    United States Attorney



                    _____/s/_____
                    RUDOLPH CONTRERAS, DC Bar #434122
                    Assistant United States Attorney



                    _____/s/_____
                    KAREN L. MELNIK DC BAR # 436452
                    Assistant United States Attorney
                    555 4TH Street, N.W. Rm. E-4112
                    Washington, D.C. 20530
                    (202) 307-0338

---

[1] Defendants move to dismiss Count IV (Equal Pay Act) as Plaintiff's claim for relief potentially exceeds the $10,000 jurisdictional limit.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DELARSE MONTGOMERY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-2157 (RMU) |
| | ) | |
| ELAINE CHAO, Chairwoman, | ) | |
| Pension Benefit Guaranty Corp. et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants respectfully submit this memorandum of points and authorities in support of their motion for summary judgment.

Plaintiff alleges that he was the victim of race, color, gender and age discrimination, as well as retaliation, when the Defendants failed to promote him from a GS-12 to a GS-13, based on his accretion of duties as a Contracting Officer's Technical Representative ("COTR"). Plaintiff also claims that Defendants discriminated and retaliated against him when they did not select him for a GS-13 Accountant position, or a GS-12/13 Accountant position. Lastly, Plaintiff asserts that Defendants discriminated and retaliated against him when they cancelled the non-status Collections Analyst vacancy announcement for which he had applied.

As the Defendants explain below, Plaintiff's claims are without merit because: (1) a desk audit performed pursuant to OPM's job classification standards of Plaintiff's position revealed that his duties were more properly classified as a GS-11, a grade lower than his current GS-12 classification; (2) Plaintiff was not minimally qualified for the GS-13 Accountant position, and the position was never filled; (3) Plaintiff was not minimally qualified for the GS-12/13

Accountant position; and (4) the non-status vacancy announcement for the GS-12/13 Collections

Analyst position was canceled.  Lastly, assuming Plaintiff were to establish a <u>prima</u> <u>facie</u> case, he

has not adduced evidence showing that Defendants' action are pretextual.

## I. FACTUAL BACKGROUND

Plaintiff was employed at the Pension Benefit Guaranty Corporation ("PBGC") for

twenty years, from on or about June 1986, until he retired from federal service on September 30,

2006.  <u>See</u> Exhibit 1 (Deposition of DeLarse Montgomery, Jr.) ("Montgomery Dep.") at 140:13-

14.  He began his career at the PBGC as a GS-5 Secretary in the Premium Operations Division of

the Financial Operations Department ("FOD").  <u>See id.</u> at 141:21-25;142:1-4; <u>see also</u> Exhibit 2

(Deposition of Theodore J. Winter, Jr.) ("Winter Dep.") at 46:12-19.  Plaintiff became a GS-5

Management Assistant in 1987 and was promoted to a GS-7 Management Analyst in 1988.  <u>See</u>

Exhibit 1 (Montgomery Dep.) at 142:21-143:18.  He was promoted to a GS-9 and then to a GS-

11 Management Analyst in October 1991.  <u>See id.</u> at 141:19-142:14.  In 1992, Plaintiff became a

GS-11 Financial Specialist in FOD's Investment Accounting Branch ("IAB").  <u>See id.</u> at 141:12-

18.  Lastly, he was promoted in 1998 to a GS-12 Financial Specialist (501 series), the position

from which he retired.[2]  <u>See id.</u> at 140:24-141:11.

### A.    The Investment Accounting Branch ("IAB")

The Investment Accounting Branch ("IAB") is also referred to as the "Trust Accounting

---

[2] Plaintiff received his GS-12 promotion as a result of a settlement agreement in 1998
with PBGC, concerning a prior "EEO claim in federal court litigation (Civil Action No. 96-1333
EGS (D.D.C.))."  <u>See</u>  Complaint at ¶ 7; Montgomery Dep. at 11:10-12:2.  To implement the
promotion, a cover sheet was placed on Plaintiff's existing Position Description with an
explanation that the upgrade was due to a "settlement agreement."  <u>See</u> Exhibit 31 (Position
Description).  The PD cover sheet makes no reference to EEO, discrimination, or anything else
that would reveal the context or nature of the settlement.  <u>See id.</u>

Branch."  See Deposition of Cynthia R. Adams ("Adams Dep.") at 13:15-14:3.  The branch is

divided into two teams, each headed by a GS-13 accountant (510 series), who is referred to as a

team leader.  See id. at 17:12-19:11; Exhibit 4 (Deposition of Wayne Morris McKinnon)

("McKinnon Dep.") at 9:12-17.  During the relevant time period, the team leaders were Lisa Cho

(Asian female, age: 40s) and Sylvia Shorter (black female, age: 40s).  Exhibit 4 (McKinnon

Dep.) at 13:20-14:4; 40:16-41:1.  The two teams are comprised of approximately seventeen

accountants,[3] including the team leaders, at the GS-11, GS-12 and GS-13 grade levels, and one

GS-5 accounting technician.[4]  See Exhibit 3 (Adams Dep.) at 18:14-19:1; 20:7-25:1; Exhibit 5

(FOD Organizational chart).  Plaintiff, who was assigned to Ms. Shorter's team, was the only

Financial Specialist in IAB.  See Exhibit 3 (Adams Dep.) at 50:18-51:11; 75:7-76:3.

From 1998 to present, everyone in IAB, including Plaintiff, until his retirement on

September 30, 2006, reported to Cynthia Adams (Black female, DOB 9-12-64), IAB Branch

Chief, Supervisory Accountant (GS-14).  See Exhibit 3 (Adams Dep.) at 4:18-20; 7:1-8:20;

Exhibit 4 (McKinnon Dep.) at 13:20-14:7.[5]  Mr. Wayne McKinnon (black male), GS-15,

---

[3]  Of the fifteen accountants who comprised the two teams, there were four (4) males and
eleven (11) females; ten (10) African Americans, two (2) Caucasians, one (1) Asian, one (1)
Middle Eastern, and one (1) unknown; and eight persons older than forty-two, six persons
younger than forty-two, and one unknown.  (Plaintiff inquired about age by asking Ms. Adams
whether each person was older or younger than she).  See Exhibit 3 (Adams Dep.) at 25:13-
32:15.

[4]  In addition, there were "Stay-in Schools," which are student interns.  See Exhibit 2
(Winter Dep.) at 132:9-16.

[5]  Plaintiff testified that he had a "good rapport" with Ms. Adams.  See Exhibit 1
(Montgomery Dep.) at 27:18-20.  Ms. Adams testified that she got along well with Plaintiff, liked
him, and rated him "outstanding" and "excellent" throughout his career.  See Exhibit 3 (Adams
Dep.) at 90:1-8.

3

Division Manager/Controller, was Plaintiff's second level supervisor throughout his tenure in

IAB.  See Exhibit 4 (McKinnon Dep.) at 5:5-6:13.  In January 2002, Theodore J. Winter, Jr.

(Caucasian male, 54 years old), became FOD Director, and was Plaintiff's third line supervisor.

See Exhibit 2 (Winter Dep.) at 4:10-12; 7:3-4; Exhibit 4 (McKinnon Dep.) at 6:22-7:10.

1.    The Duties of a Trust Accountant

As noted above, the Investment Accounting Branch is comprised primarily of

accountants, who are commonly referred to as "trust accountants."  See Exhibit 3 (Adams Dep.)

at 142.  Trust accountants have a significant role in the process by which the PBGC becomes the

trustee of a terminated pension plan.  To start,

> [w]hen a trust accountant is assigned a plan, they're given
> documentation contained on what we call a trusteeship decision
> record, or TDR, that contains information about the plan.  The trust
> accountant reads it for content, finding out where the assets of the
> plan reside, what the estimated assets are as of the date of plan
> termination or DOPT.  They . . . try to obtain bank statements at
> that point to see if there is something that would substantiate
> what's in the TDR.

See Exhibit 3 (Adams Dep.) at 142:1-19.  The trust accountants then "input certain data about the

plan into PAM [Portfolio Accounting and Management] to set it up, essentially, after which they

can prepare the journal entry to record the estimated assets" of the pension plan.  See id. at 143:3-

10.  The trust accountants are next responsible for making

> a request to the custodian or the custodian bank, where the assets
> reside for the plan, and they obtain the bank statement . . . or they
> make a request to receive the bank statement as of the date of plan
> termination through the current period, and they request that the
> information be sent to them until the bank statement shows zero.
> And they follow that up with a . . . formal letter to the custodian or
> custodian of the bank . . . of the plan assets.

4

See id. at 143:18-144:8.

Once the trust accountants receive the banks statements "to develop a balance sheet as of the date of plan termination, they have to determine what the market values are of all of the assets contained in the plan." See id. at 144:16-20. Determining the market values of the assets may involve a two-step process, if the DOPT of the plan is on a date other than at the end of the month. See id. at 144:21-145:1. First, the trust accountants

> have to figure out what the exact holdings were of assets as of the date of plan termination. For instance, if the date of plan termination is the middle of the month, say the 15th, they can take a bank statement for the end of the month and they have to . . . do the analysis to figure out exactly what - - how many shares of a certain stock . . . were held . . . as of the 15th of the month. After they figure out what the exact holdings were, they use Bloomberg, Wall Street Journal, or another pricing source to find out what the market values of those assets were as of the date of plan termination. They prepare worksheets [or spreadsheets] for each asset type, and those asset types are rolled into one big worksheet that summarizes all the assets.

See id. at 145:5-22. After this part of the process is completed, "they have to prepare the correct journal entries to post it to our general ledger." See id. at 146:13-15.

Once the balance sheet is created for the plan as of the DOPT, the trust accountants are responsible for

> analyzing and recording . . . all of the financial activity that occurs on the plan from the day after DOPT through the time that the plan is trusteed and all of the assets are transferred to the PBGC's custodian bank. By recording all the financial transactions, that means they are recording any sales and purchases of additional assets on the sale of the assets that already exist. They have to calculate what the realized gains and losses are. They have to record income that is earned[,] expenses that are paid, and they have to record . . . market changes in the assets for the plan. . . . [J]ournal entries have to be prepared for all of that [activity] to be

5

posted to the general ledger.

See id. at 147:12-148:8.  At this point, the plan becomes trusteed.  When PBGC become trustee

of the plan, the trust accountants are responsible for notifying the Treasury Division within the

Financial Operations Department that the plan has been trusteed, where the assets are located, the

contact person, the current asset level, and what the benefit payments are every month.  See id. at

148:17-149:2.  Once the assets are transferred to the PBGC's custodian bank, the trust accountant

"has to record the transfer of the assets from the interim custodian to PBGC's custodian bank,

and again they are responsible for . . . calculating any of the associated gains and losses to those

specific assets that were transferred."  See id. at 149:10-15.

### 2.  Plaintiff's Financial Specialist Duties In IAB

Plaintiff did not perform *any* of the above-described accounting duties.  See Exhibit 3

(Adams Dep.) at 143:11-17; 144:9-15; 146:3-11; 147:2-7; 148:9-14; 149:16-22.  To the extent

his duties included using an "accounting treatment,"[6] it was strictly limited to cash assets.  This is

significant because "the person that's handling cash does not have to do any related, or calculate

any related gains or losses that may be associated with it, and they don't have to figure out . . .

what particular asset that belongs to, because it is cash."  See Exhibit 3 (Adams Dep.) at 135:18-

136:3.  For example, with respect to the Missing Participant Program, Plaintiff had "to prepare

---

[6] Accounting treatment for the trust accountants "has to do with determining how you go
about recording changes in value, sales, gains, and losses, purchases on specific assets."  See
Exhibit 3 (Adams Dep.) at 138:7-12.  The assets that trust accountants use accounting treatments
on are "[c]orporate stock, corporate bonds, derivatives, asset-backed securities, in addition to
how to accrue income on the corporate stocks and bonds, dividends, how to record expenses, and
recording accruals or accounts payable for expenses incurred and not yet paid . . ."  See id. at
138:13-21.  It is undisputed that Plaintiff *never* used accounting treatments for these kinds of
assets.  See Exhibit 1 (Montgomery Dep.) at 78:11-79:1; Exhibit 3 (Adams Dep.) at 138:22-
139:3.

the journal entries to record the cash being received at State Street Bank . . ." <u>See</u> <u>id.</u> at 135:13-17.  To prepare the quarterly report for the program, Plaintiff "starts with the beginning balance in certain general ledger accounts for the missing participant, and again, it's cash, and he's tracing all of the ins and outs . . ." <u>See</u> <u>id.</u> at 137:8-12.  To the extent there is accounting involved in this duty, it consists of addition and subtraction.  <u>See</u> <u>id.</u> at 137:14-17.

Similarly, on a monthly basis, Plaintiff "downloads information from the general ledger. It's in Dbase, and he uses Report Writer [software that used to create reports from Dbase] to create various reports, one of which was the non-commingled asset report." <u>See</u> <u>id.</u> at 133:19-134:4.  The numbers Plaintiff downloaded to create his report already existed, so that all he was required to do is basic addition and subtraction.  <u>See</u> <u>id.</u> at 134:11-22.  In sum, the "accounting" duties Plaintiff performed consisted of simple addition and subtraction, which could be performed by a GS-7 accountant.  <u>See</u> <u>id.</u> at 132:5-10; 134:16-22.

By his own admission, the numbers that Plaintiff used in various reports were supplied by the trust accountants or determined by him using addition or subtraction.  For example, Plaintiff testified as follows:

> Q:      So you're basically comparing those two numbers . . . what
> the trust accountants enter in and what the custodian say [sic] is in
> there . . . to make sure they marry up?
> A:      Yes.
> Q:      Okay.  And, again, the numbers that you're referring to that you
>  have to make sure marry up are already provided?
> A:      By the custodian to the accountants.
> Q:      And the work that the accountants do is already entered into
> the ledger?
> A:      Yes.

<u>See</u> Exhibit 1 (Montgomery Dep.) at 67:1-11.  Similarly, with respect to preparing the summary

trial balance report, Plaintiff testified as follows:

> Q:      . . . So when you say to arrive at the financial data, I analyze and summarize various accounts, what do you mean by that?
> A:      Okay.  Summary trial balance of - - the summary trial balance is a report that's generated from the trust plan ledger, and it has every account's plan assets - - as well as expenses.  And - - is taken and come up with figures by grouping, and that information is used as part of the - - a report that goes out to just about everybody in FOD . . . for determining . . . the future plan assets . . .
> Q:      Oh, okay.  And the figures that you're coming up with by grouping, those are all numbers that are already provided?  They're in the system?
> A:      They're in the system.  They have to be extracted out of the system in proper account of structure.  Otherwise, you have numbers. . . .
> Q:      I understand that, but the numbers are already there?
> A:      Yes.
> Q:      You don't create them yourself?
> A:      No.

See id. at 76:19-77:20.

In addition to doing some accounting with cash assets, Plaintiff had other duties that were not considered accounting.  For instance, Plaintiff was "responsible for preparing a quarterly report that - - actually, he was verifying what was in the Controller Operations Division's safe, and what that entailed was, he went into the safe, there's a log maintained in the safe with a list of items in the safe.  He removed the log.  He removed the contents of the safe, [a]nd he verified that . . . what is on the log is actually in the safe."  See Exhibit 3 (Adams Dep.) at 132:20-133:6.  According to Plaintiff's supervisor, Cynthia Adams, "[t]hat's not accounting."  See id. at 133:7-9.

Notably, on at least two occasions, Ms. Adams offered Plaintiff  the opportunity to do

8

some of the trust accountant's duties, but he was not interested in her offer.  See Exhibit 3

(Adams Dep.) at 102:1-10; 154:11-157:6; see also Exhibit 4 (McKinnon Dep.) at 58:21-59:7 ("I

was supportive of moving him" into the 510 series Accountant position).  Specifically, on the

earlier occasion, Ms. Adams recalls "having a conversation with Mr. Montgomery offering him

to switch from the series number that he was in to the 510 series," but he stated that he "didn't

want to do it."  See Exhibit 3 (Adams Dep.) at 102:1-10.  More recently, Ms. Adams again

offered Plaintiff "an opportunity for him to do some of the work, or do the work that the other

trust accountants were doing in the group," because she "thought that might have been interesting

to him."  See id. at 156:16-22.  In response, Plaintiff told Ms. Adams "that he was too close to

the end of his career and he didn't want to do that kind of complicated work . . ."  See id. at

155:4-12.  Plaintiff admits having this conversation with Ms. Adams, and telling her that since he

"was already at the [GS]-12, how I wanted a promotion, and without a promotion I didn't see any

merit in doing the work."  See Exhibit 1 (Montgomery Dep.) at 149:9-18.

    4.  Plaintiff's COTR Duties

On or about March or October 2002, Plaintiff started performing COTR responsibilities

under the Bert Smith professional accounting service contract.[7]  See Exhibit 1 (Montgomery

Dep.) at 14:10-13; 15:19-21; 20:23-25.  He was officially appointed as COTR by PBGC's

Contracting Officer, Robert Herting, on July 1, 2002.  See Exhibit 5 (July 1, 2002

Memorandum).  The COTR duties associated with the Bert Smith contract were previously

---

    [7]  Plaintiff testified that he started performing COTR duties under the Bert Smith contract in October of 2002.  See Exhibit 1 (Montgomery Dep.) at 15:19-24.  However, in his Complaint, Plaintiff provides that Ms. Adams asked him to assume the duties in October 2001, and that he took COTR training, and assumed the COTR duties in March 2002.  See Complaint at ¶ 8.

performed by Christine Thomas, a GS-13 Supervisory Accountant.  See Exhibit 3 (Adams Dep.) at 69:5-70:3.  When Ms. Thomas left PBGC, Ms. Adams asked Plaintiff to take over the COTR duties, and he did not object.  See Exhibit 1 (Montgomery Dep.) at 14:10-13; 16:11-23.

As COTR, Plaintiff's duties were "to reconcile the expenses from the invoices, to receive monthly reports from the contractor of jobs or tasks they performed, to make reports to the Procurement Office about the contract, [and] to inquire with the contract employees of issues concerning performance of the contract."  See Exhibit 1 (Montgomery Dep.) at 16:24-17:22.  His duties did *not* include reviewing the accounting work generated by the contract accountants "[b]ecause he's not an accountant."  See Exhibit 3 (Adams Dep.) at 141:13-22;110:2-9; see also Exhibit 4 (McKinnon Dep.) at 97:9-16 (Plaintiff did "the administrative review, not the accounting review").  The substantive review of the work performed by the contract accountants was done by Lisa Cho, because "she's an accountant and all of the accounting work has to be reviewed by the lead accountant before it's posted to the ledger."  See Exhibit 3 (Adams Dep.) at 152:17-153:1.

Plaintiff served as Chair of a Technical Review Panel (also known as a Technical Evaluation Panel or  "TEP") when the Bert Smith contract was re-competed, and then he continued as the COTR of the new contract after it was awarded.[8]  See Exhibit 3 (Adams Dep.) at 83:1-13; 89:3-13.  When Plaintiff first took over as COTR, there were three contract accountants.  Montgomery Dep. at 21:5-7.  In October 2003, after a new contract was awarded, the staffing increased to six contractors - -  five accountants and one project manager.  See Exhibit 1

---

[8]  The new contract was awarded to the same company - Bert Smith.  See Exhibit 3 (Adams Dep.) at 89:7-13.

(Montgomery Dep.) at 21:15-22:1.  In 2004, two additional temporary accountants were added, for a total of seven contract accountants and one project manager.  <u>See</u> <u>id.</u> at 22:9-21.  In 2005, another contract accountant and an accounting technician were added.  <u>See</u> <u>id.</u> at 22:22-23:2.  Plaintiff testified that when he retired in 2006, there were a total of nine contract employees, these included seven accountants, one accounting technician, and one project manager.  <u>See</u> <u>id.</u> at 24:14-20.

In addition to the Bert Smith contract, Plaintiff was COTR for the Missing Participant Program from 2002 until his retirement.  <u>See</u> Exhibit 1 (Montgomery Dep.) at 25:2-20.  The Missing Participant Program, however, "was not a contract in the sense of other contracts, where you had . . . a set order of duties, reporting and responsibility.  The Missing P[articipant] had reporting, but is was an account, more of a depository."  <u>See</u> Exhibit 4 (McKinnon Dep.) at 33:16-20.  Lastly, Plaintiff was COTR for less than one month on the State Street Custodian Bank contract.  <u>See</u> Exhibit 1 (Montgomery Dep.) at 25:13-18.

Plaintiff admitted that his COTR duties did not take up the majority of his time during every day of every week.  <u>See</u> Exhibit 1 (Montgomery Dep.) at 26:21-23.  As Plaintiff explained, "it was left up to me to prioritize my work as to how I want to get it done as long as I met the deadline, so I wanted to spend two days doing COTR work and three days doing my other work, I controlled the complexity or the depth of how I did my job."  <u>See</u> <u>id.</u> at 26:16-22.  Ms. Adams did not think that Plaintiff's COTR duties, on average, comprised more than 25 percent of his workload.  <u>See</u> Exhibit 3 (Adams Dep.) at 160:5-10.  Mr. Richard M. Lattimer, manager of Services Division within the Human Resources Department of PBGC during the relevant time period, recalled that Plaintiff's COTR duties "was less than 25 percent of his job."  <u>See</u> Exhibit 5

11

(Deposition of Richard M. Lattimer, Jr.) ("Lattimer Dep.") at 5:14-17; 36:11-37:2.

**B**.    **Plaintiff's Request For Promotion Based Upon Accretion Of Duties**

1.  Plaintiff's Discussions with Cynthia Adams

On or about March 2003, during a quarterly performance review with Ms. Adams, Plaintiff requested that his Position Description ("PD") be updated to reflect his COTR duties. See Exhibit 1 (Montgomery Dep.) at 27:14-25; 28:1-11; 29:21-25; 30:1-12; Exhibit 3 (Adams Dep.) at 78:2-73:3.  Plaintiff told Ms. Adams that he should "get an . . . accretion of duties promotion because of the increased workload of COTR duties."  See Exhibit 1 (Montgomery Dep.) at 28:1-3.

In April 2003, Plaintiff gave Ms. Adams a written request for promotion based on an accretion of duties.  See Exhibit 6 (April 28, 2003 Memorandum); see also Complaint at ¶ 11.  In the memorandum, Plaintiff requests a promotion to the GS-13 grade level "based on an increase of assigned duties and responsibilities as Contracting Officer Technical Representative (COTR)." See Exhibit 6.  In support of this request, Plaintiff provides that his assumption of COTR duties under the Bert Smith professional accounting contract had "increased both the scope and complexity of [his] work assignments." See id.  Ms. Adams, who was supportive of Plaintiff's request, told him that she would raise the issue with her supervisors.  See Exhibit 3 (Adams Dep.) at 91:9-15.[9]  Thereafter, a person in management, although Ms. Adams could not recall who, suggested conducting a desk audit of Plaintiff's position.  See id. at 94:21-96:2.  Ms. Adams told Plaintiff about the desk audit suggestion and she does not recall him being opposed

_____

[9]  Ms. Adams remembers discussing Plaintiff's accretion of duties promotion request with FOD Director, Ted Winter, however, she could not recall the substance of that specific conversation.  See Exhibit 3 (Adams Dep.) at 92:10-93:11.

to it.  See id. at 96:3-5; 157:7-15.  In June 2003, before PBGC had made a decision about

whether to perform a desk audit, Plaintiff "contacted an EEO counselor concerning his claim of

discriminatory failure to promote based on accretion of duties."  See Exhibit 1 (Montgomery

Dep.) at 31:25-32:6.[10]

On September 9, 2003, Ms. Adams advised Plaintiff in writing that she was willing to

rewrite his PD "with the addition of COTR responsibilities."  See Exhibit 7a (September 9, 2003

Memorandum); Complaint at ¶ 12.  In that same memorandum, she asks Plaintiff to update his

PD to include "any additional duties and responsibilities not covered," and to provide the update

to her, so that she could incorporate the changes and forward it to HRD for classification.  See id.

On October 14, 2003, Plaintiff provided Ms. Adams with an updated description of his duties.

See Exhibit 7b (October 14, 2004 Memorandum).   He identified three new tasks that he started

performing in March 2002: (1) overseeing "funding accountability for the Missing Participant

Program;" (2) serving as COTR for the professional accounting services contract; and (3)

"monitoring the integrity of the Trust funding and expenditure Data Base."  See id.

2.  The Desk Audit

On December 31, 2003, a desk audit was performed at Plaintiff's work station.  See

Exhibit 7c (Desk Audit Evaluation Report) ("Report") at Section V.  The audit was conducted by

Cynthia Kyle, a contract position classification specialist in PBGC's Human Resources

Department ("HRD").  See Exhibit 5 (Lattimer Dep.) at 20:18-19; 24:9-14; 35:1-8.  Ms. Kyle did

_____

[10]  Plaintiff sought EEO counseling because "no action had been taken" on his request for
an accretion of duties promotion, see Exhibit 1 (Montgomery Dep.) at 33:1-5, and he believed
the reason for this inaction was discrimination based on his race (black), gender (male), age, and
participation in prior EEO activities.  See id. at 39:13-17; 44:10-17; 48:15-21; 51:22-25.

not limit her review to Plaintiff's written Position Description.  She interviewed Plaintiff as well

his supervisor, Ms. Adams.  See Exhibit 7c (Report) at 3 and Employee Interview Questionnaire

(attached thereto).  This enabled Ms. Kyle to obtain a "full picture" of Plaintiff's job duties,

including the COTR duties which he requested be added to his PD.  See Exhibit 5 (Lattimer

Dep.) at 44:8-17.  Ms. Kyle prepared a Report, which she submitted to Jacqueline Isaac (white

female), PBGC Human Resource Specialist.  See Exhibit 8 (Deposition of Jacqueline Isaac)

("Isaac Dep.") at 8:17-9:7; 138:1-8;[11] Exhibit 9 (Affidavit of Jacqueline Isaac) ("Isaac Affidavit")

at 3:21-4:1.

Before signing the Report on February 19, 2004, see Exhibit 7c at 3, Ms. Isaac, who is a

qualified classification specialist, discussed it with Plaintiff's supervisor, Ms. Adams, to make

sure that Ms. Kyle had accurately reported Plaintiff's duties.  See Exhibit 8 (Isaac Dep.) at

103:21-104:7; 143:14-144:3.  Ms. Adams recalls communicating to Ms. Isaac that the duties

Plaintiff performed were "[n]ot trust accounting."  See Exhibit 3 (Adams Dep.) at 107:13-

108:16.  Ms. Isaac's supervisor, Mr. Lattimer (white male), thereafter transmitted the Report to

Plaintiff.  See Exhibit 10 (Affidavit of Rick Lattimer) ("Lattimer Affidavit") at 3:12-17; Exhibit

5 (Lattimer Dep.) at 38:12-15; Exhibit 11 (March 11, 2004 Memorandum).

The Report concludes that Plaintiff's Financial Specialist position is a GS-11, which is a

grade lower than his actual classification of a GS-12.  See Exhibit 7c (Report) at Section IV, VII.

With respect to COTR duties, the Report states that all PBGC employees assigned as COTRs

have the same tasks or responsibilities, regardless of their position or grade level.  See Exhibit 7

---

[11]  During her deposition, Ms. Isaac incorrectly identified Janet Brickey (instead of
Cynthia Kyle) as the contractor who conducted the desk audit.  See Exhibit 8 (Isaac Dep.) at
103:12-15.

(Report) at Section VI.  Significantly, the COTR tasks Plaintiff performed were not deemed to be

"grade-controlling."  <u>See id.</u>  Specifically, the Report provides the following:

> Mr. Montgomery is not directly involved in the day-to-day
> oversight of the contractor's work because he is not an Accountant.
> <u>In order for the work to rise to the level of actually affecting the
> grade of his position, he would have to possess the qualifications to
> "oversee" the work from a completely "technical" aspect or be an
> Accountant which according to his supervisor of record, Ms.
> Adams, he is "not."</u>  Therefore, no grade can be attached to what
> Mr. Montgomery is doing since he is providing "administrative"
> oversight over the work of the contractors.  Thus, any real
> "technical or professional" guidance is not provided by this
> employee.

Id. at 3, Section VI (emphasis added).

### C.  The Accountant Positions For Which Plaintiff Applied

1.  <u>GS-13 Accountant Position (Vacancy Announcement JI04-0105)</u>

The GS-13 Accountant position was advertised from June 1, 2004 through June 30, 2004,

by Vacancy Announcement No. JI04-0105.[12]  <u>See</u> Exhibit 12 (Vacancy Announcement JI04-

0105) at 1.  Ms. Isaac, the HRD specialist, evaluated Plaintiff's application to determine if he

was minimally qualified for the position.  <u>See</u> Exhibit 8 at 51:19-20:5.  To be found minimally

qualified under OPM's Accountant standard, applicants, like Plaintiff, who do *not* have a four-

---

[12]  The "JI" in JI04-0105 stands for "Jacqueline Isaac," who was the Human Resources
Department staffing specialist assigned to do all FOD vacancy announcements and staffing.  <u>See</u>
Exhibit 8 (Isaac Dep.) at 48:5-49:18.

year degree,[13] need "at least 4 years experience[14] in accounting or an equivalent combination of

accounting, college level education, and training that provided professional accounting

knowledge," plus one of the following:

> (1) twenty-four semester hours in accounting or auditing courses;
>
> (2) A certificate as Certified Public Accountant; or
>
> (3) substantial course work in auditing or accounting which does
> not fully satisfy the 24 semester-hour requirement, provided that
> (a) the candidate has successfully worked at the full performance
> level in accounting or a related field, (b) a panel of at least two
> higher level professional accountants or auditors has determined
> that the candidate has demonstrated a good knowledge of
> accounting and of related and underlying fields that equals in
> breadth, depth, currency, and level of advancement that which is
> normally associated with successful completion of the 4-year
> course of study; and (c) except for literal nonperformance to the
> requirement of 24 semester hours in accounting, the applicant's
> education, training, and experience fully meet the specified
> requirements.

See Exhibit 13 (OPM Qualification Standards for GS-510: Accounting Series); Exhibit 8 (Isaac

Dep.) at 73:15-74:13.  This OPM standard appears in Vacancy Announcement JI04-0105.  See

Exhibit 12.

Another minimum qualification for the position is "one year of specialized experience at

or equivalent to the GS-12 grade level that demonstrates the ability to analyze and provide advice

regarding accounting programs, financial systems, etc."  See id.  Lastly, the Vacancy

---

[13]  Since Plaintiff did not have a four-year college degree, he sought to qualify for the accounting position by demonstrating that he completed 24 credit hours in accounting.  See Exhibit 1 (Montgomery Dep.) at 102:5-7; 158:7-159:19.

[14]  The Vacancy Announcement only required at least 2 years experience.  See Exhibit 12 at 2.

16

Announcement provides that college transcripts must be submitted with the application "if you wish college work to be considered in qualifying you for this position." <u>See</u> Exhibit 12 (Vacancy Announcements for JI04-0105) at 5.

Plaintiff admits that he did not submit any college transcripts with his application. <u>See</u> Exhibit 1 (Montgomery Dep.) at 102:21-103:13; 105:6-19. Thus, when Ms. Isaac reviewed his application, and found no evidence that he completed 24 semester hours in accounting, she properly determined that he was not minimally qualified. <u>See</u> Exhibit 8 (Isaac Dep.) at 52:2-20. Further, it is insufficient to type on the application, like Plaintiff did here, that he has 24 credit hours, when the vacancy announcement requires the submission of transcripts. <u>See</u> Exhibit 5 (Lattimer Dep.) at 70:21-71:11; Exhibit 14 (Application for JI04-0105) at Section 29. Moreover, even if Plaintiff had submitted college transcripts with his application, he did not "have the one-year [of] specialized experience as [an] accountant" at the GS-12 grade level. <u>See</u> Exhibit 8 (Isaac Dep.) at 72:7-73:1; Exhibit 12 at 3; Exhibit 20 (July 6, 2004 Letter).

To fill the position, Ms. Adams wanted an applicant "that had experience with accounting for investment instruments . . . like common stocks, bonds, and that kind of thing." <u>See</u> Exhibit 15 (Affidavit of Cynthia Adams ("Adams Aff.") at 6:17-20. [15] Additionally, she "needed someone that had more experience . . . with more complex investment instruments as in derivatives and futures and options" as well as "financial statement preparation." <u>See id.</u> at 6:20-25. However, since Ms. Adams was not "satisfied with the experience level" of the applicants, she did not select anyone for the position. <u>See id.</u> at 4:1-19. Therefore, the vacancy

---

[15] Since Plaintiff was not minimally qualified, his application was not forwarded to Ms. Adams. <u>See</u> Exhibit 15 (Adams Aff.) at 4:20-22.

announcement was cancelled and no one was hired for that position.  See Exhibit 9 (Isaac Aff. at 9:6-11; Exhibit 14a.

2.  GS-12/13 Accountant Position (JI04-0143 and JI04-0144)

The GS-12/13 Accountant Position was advertised from September 8, 2004 to October 7, 2004, under two different vacancy announcements, one for status candidates (No. JI04-0143) and one for non-status candidates (No. JI04-0144).[16]  See Exhibit 16 (Vacancy Announcement JI04-0143); Exhibit 17.   Plaintiff submitted an application for Vacancy Announcement JI04-0143. See Exhibit 18 (Application for JI04-0143); Exhibit 1 (Montgomery Dep.) at 102:8-13.  The difference between this vacancy announcement and the one described above, JI04-0105, is the change in grade level from GS-13 to GS-12/13.  See Exhibits 16 and 17.

Ms. Isaac evaluated eight applications, including Plaintiff's, to determine if the applicants met the minimum qualifications for the position.  See Exhibit 19 (POLARS list of applicants); Exhibit 8 (Isaac Dep.) at 55:6-57:1.  For the same two reasons described above, Ms. Isaac found Plaintiff not minimally qualified for the position: (1) he did not submit college transcripts with his application, as the vacancy announcement required, see Exhibits 16 and 18; Exhibit 8 (Isaac Dep.) at 57:2-12; Exhibit 21 (November 1, 2004 Letter); and (2) he did not have the requisite experience.[17]  See Exhibit 8 (Isaac Dep.) at 75:16-76:3.

---

[16]  "Status" applicants are current or former permanent federal employees who have completed a probationary period on career or career-conditional appointments. "Non-Status" applicants are other applicants (i.e. those who have not worked for the federal government on a career or career-conditional appointment).  5 C.F.R. Sec. 212.301 (Competitive Status Defined).

[17]  The vacancy announcement for the GS-12/13 Accountant position requires "[o]ne year of specialized experience at or equivalent to the next lower grade level that demonstrates the ability to analyze and provide advice regarding accounting programs, financial systems, etc." See Exhibit 16 at 2.

No selection was made under Vacancy Announcement 04-0143.  See Exhibit 9 (Isaac Aff.) at 10:2-16; Exhibit 14a.  Instead, Ms. Adams selected a highly qualified accountant from a separate group of applicants from the non-status vacancy announcement, JI04-0144.  See Exhibit 3 (Adams Dep.) at 119:9-18; Exhibit 15 (Adams Aff.) at 11:8-21.  The selectee, Ms. Lafaye Graham (Black female), had a four-year degree in finance, a Masters in accounting, 15 years of experience in the accounting field, and specific accounting experience in investment accounting, none of which Plaintiff had.  See Exhibit 3 (Adams Dep.) at 120:1-8; 160:11:20; 161:16-17.

### D.  The GS-12/13 Collection Analyst Position

The Collections Analyst position was advertised from August 30, 2004 to September 29, 2004, under two vacancy announcements, one for status candidates, No. JI04-0138, and one for non-status candidates, No. JI04-0139.  See Exhibit 22 (Vacancy Announcements Nos. JI04-0138) and Exhibit 23 (Vacancy Announcement JI04-0139).  All job applications received by HRD are logged into a computer system called "POLARS."  See Exhibit 8 (Isaac Dep.) at 133:18-134:4.  The HRD receptionist who receives the application, first, time and dates stamps the application, and then logs into POLARS the applicant's name, address, and vacancy announcement for which they applied."  See id. at 133:21-134:6.  Applications are then placed into folders "corresponding to [the] vacancy announcement number."  See id. at 134:7-8.  When an announcement closes, the staffing specialist pulls the log sheet from the POLARS System, and reviews the corresponding applications to determine who has met the minimum qualifications for the position.  See id. at 134:9-13.

Plaintiff applied for the Collections Analyst position via the non-status vacancy announcement (JI04-0139), and his name appears on the POLARS log sheet for that

19

announcement.  See Exhibit 25 (Log Sheet for JI04-0139).  Plaintiff's name does not appear for

the status vacancy announcement (JI04-138).  See Exhibit 26a (Log Sheet for JI04-0138); Exhibit

8 (Isaac Dep.) at 135:19-136:22.  The non-status vacancy announcement for which Plaintiff

applied was cancelled.  See Exhibit 25; Exhibit 26b (November 8, 2004 Letter); Exhibit 9 (Isaac

Aff.) at 19:1-19.  While Ms. Isaac rated Plaintiff minimally qualified for the position, the non-

status certificate of eligibles never reached the selecting official because an in-house, qualified,

status applicant had already been selected.  See Exhibit 9 (Isaac Aff.) at 17:8-18; 19:1-7.  If a

selection is made "off of the status one, we just automatically cancel the non-status or visa versa.

If they would have made a selection off of the non-status, they would have cancelled the status

one due to the fact they only have one vacancy."  See id. at 19:11-19.

## II.    PROCEDURAL HISTORY

This case originates from three separate formal Equal Employment Opportunity (EEO)

Complaints filed by Plaintiff with PBGC's EEO Office.  Formal Complaint 03-10, filed October

1, 2003, alleged that PBGC discriminated against Plaintiff based on race, color, sex, and age, by

not promoting him to the GS-13 grade level after he was assigned additional COTR duties.  See

Exhibit 27 (EEO Complaint 03-10).  He did not identify "reprisal" as a basis for the complaint.

See id.  By letter dated April 2, 2004, Plaintiff was notified by letter that the complaint had been

accepted for investigation.  See Exhibit 28 (4/2/04 Letter).  The letter states that the following

claim had been accepted for investigation: "[w]hether PBGC unlawfully discriminated against

DeLarse Montgomery, Jr., based on race, color, national origin, sex and age, by not promoting or

compensating Mr. Montgomery based upon Mr. Montgomery's performance of higher graded

duties."  See id.  The letter also provides that if "[i]f you disagree with this characterization of

20

your claims, please set out your concerns in writing to me within 15 days of receipt of this letter."
See id.  There is no evidence that Plaintiff disagreed with the characterization of his claims.

In early 2005, while the above complaint, 03-10, was still in the administrative investigation stage, Plaintiff filed two additional complaints claiming PBGC discriminated against him on the bases of race, color, sex, age, and reprisal, when it did not select him for four posted vacancies. In Formal Complaint 05-04, filed January 3, 2005, Plaintiff alleged PBGC discriminated and retaliated against him by not selecting him for Vacancy Announcements JI104-0105 (GS-13 Accountant) and JI04-0143 (GS-12/13 Accountant).  See Exhibit 30 (EEO Complaint 05-04).  In Formal Complaint 05-07, filed March 1, 2005, Plaintiff alleged that PBGC discriminated and retaliated against him by not selecting him for Vacancy Announcements JI104-0138 (GS-12/13 Collections Analyst) and JI104-0139 (GS-12/13 Collections Analyst).  See Exhibit 31 (EEO Complaint 05-07).

On November 3, 2005, Plaintiff filed the instant Civil Complaint alleging discrimination (based on race, sex, and age) and retaliation in connection with the non-promotion and non-selection claims raised in all three Formal Complaints (03-10, 05-04, and 05-07).  See Complaint at ¶ 2.

## III.   ARGUMENT

### A.   Legal Standards For Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio

21

Corp., 475 U.S. 574, 587 (1986).

In determining whether there exists a genuine issue of material fact, the Court must view all facts, and reasonable inferences to be drawn from them, in a light most favorable to the non-moving party. Anderson, 477 U.S. at 255. If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50. Indeed, in order to withstand summary judgment, the non-moving party may not rest solely upon allegations or denials. Id. at 248. The mere existence of some factual dispute is insufficient to withstand summary judgment; there must be a genuine issue of material fact. Id. at 247-48. There is no genuine issue of material fact if the relevant evidence of record, taken as a whole, indicates that a reasonable factfinder could not return a verdict for the party opposing summary judgment. Id. at 248. If the submitted evidence is of such a character that it would not permit a reasonable fact finder to find in favor of the non-moving party, summary judgment is appropriate. Id. at 251.

Rule 56 does not require the moving party to negate the non-movant's claim or to show the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Rather, when the movant files a properly-supported summary judgment motion, the burden shifts to the nonmoving party to show "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-movant cannot manufacture genuine issues of material fact with "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., 475 U.S. at 586, or with "conclusory allegations," "unsubstantiated assertions,""or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

22

**B.    Legal Standards Applicable To Claims Of Employment Discrimination**.

The ultimate issue in an employment discrimination case is whether the plaintiff has met his or her burden of demonstrating that the adverse employment action, if discrimination, or materially adverse consequences, if retaliation, complained of was motivated, at least in part, by intentional discrimination or retaliation.  Where, as here, a plaintiff offers no direct evidence of discrimination, plaintiff may create a triable issue of discrimination or retaliation by relying on the familiar framework first enunciated by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-805 (1973).  See also Cones v. Shalala, 199 F.3d 512, 516 (D.C. Cir. 2000).

It should be remembered, however, that at all times the burden of proof remains with the plaintiff even when the plaintiff's case is built on inferential evidence under the McDonnell Douglas analysis.  In the summary judgment context, the central inquiry remains the evidence, or lack thereof, of discrimination or retaliation in a particular case.  The Court should weigh whether the plaintiff has proof that would permit a reasonable jury to conclude that discrimination was a motivating factor for the challenged action, looking to defendant's legitimate, non-discriminatory or non-retaliatory reasons for the challenged decision and the evidence as a whole, in order to determine whether there is a need for trial.  See, e.g., Holcomb v. Powell, 433 F.3d 889, 896-97 (D.C. Cir. 2006) (quoting Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).  See also Brown v. Small, 2006 WL 1888562 at *5 (D.D.C. July 7, 2006) (RBW) (plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment action was made for a discriminatory reason).

Under the McDonnell Douglas test, Plaintiff has the initial burden of proving by a

23

preponderance of the evidence a <u>prima facie</u> case of discrimination.  <u>Texas Dep't of Community</u>

<u>Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981).  If the Plaintiff is able to establish a <u>prima facie</u>

case, then the Court should weigh Defendant's legitimate, nondiscriminatory reason or reasons

with any evidence plaintiff presents that defendant's stated reason merely was a pretext for

discrimination.  <u>Id.</u>  At all times, plaintiff retains the ultimate burden of persuasion to

demonstrate that she was in fact the victim of intentional discrimination or retaliation.  <u>Burdine</u>,

450 U.S. at 252-53.

Before turning to the merits, a brief word is in order concerning the scope of review in

employment discrimination cases.  Though Plaintiff might wish it otherwise, the employment

discrimination statutes did not transform federal courts into review boards for local employment

decisions.  "Title VII, it bears repeating, does not authorize a federal court to become 'a super-

personnel department that reexamines an entity's business decisions.'"  <u>Barbour v. Browner</u> 181

F.3d 1342, 1346 (D.C. Cir. 1999) (quoting <u>Dale v. Chicago Tribune Co.</u>, 797 F.2d 458, 464 (7th

Cir. 1986)).  To the contrary, a court "may not 'second-guess an employer's personnel decision

absent demonstrably discriminatory motive.'"  <u>Fischbach v. District of Columbia Dep't of</u>

<u>Corrections</u>, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting <u>Milton v. Weinberger</u>, 696 F.2d 94,

100 (D.C. Cir. 1982)).  <u>See also</u> <u>Barnette v. Chertoff</u>, 453 F.3d 513, 517-18 (D.C. Cir. 2006).

**C.**    **Plaintiff Fails To Establish Discrimination With Respect To The Accountant**
         **Positions And The Collections Analyst Position**

In order to survive a motion for summary judgment on his Title VII and ADEA claims,

Plaintiff must first introduce evidence to support a <u>prima facie</u> case of discrimination.  In order to

make out a prima facie case of discrimination, Plaintiff must demonstrate:  (1) he is a member of

24

a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  Chappell-Johnson v. Powell, 440 F.3d 484, 488 (D.C. Cir. 2006); George v. Levitt, 407 F.3d 405, 412 (D.C. Cir. 2005); Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002); Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999).[18] "Furthermore, [Plaintiff] must at least establish that his rejection was not based on 'the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.'" Stewart v. Ashcroft, 352, F.3d 422, 428 (D.C. Cir. 2003) (citing Morgan v. Federal Home Loan Mortgage, 328 F.3d 647, 651 (D.C. Cir. 2003)).

> 1.    The GS-13 Accountant Position (Vacancy Announcement JI04-0105) was cancelled.

Plaintiff cannot establish that the position was filled by someone outside the protected class.  It is undisputed that Vacancy Announcement JI04-0105 expired, the position was cancelled, and no one was selected.  Exhibit 9 (Isaac Aff.) at 9:6-11; Exhibit 14a..  The fourth prong of a prima facie case for discriminatory non-selection requires that after plaintiff's non-selection, "the position remained open and the employer accepted applications from similarly qualified individuals."  See Olezene v. Ashcroft, Memorandum Opinion (January 18, 2005 - Civil Action No. 04-0633 (JDB)) (attached hereto as Exhibit 32) at 8 (citing McDonnell Douglas,

---

[18] As a general matter, employees must establish a prima facie case in accordance with the framework established in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973), by showing that: (i) he is a member of a protected class; (ii) he applied and was qualified for an available position; (iii) despite his qualifications he was not selected; and (iv) either someone not of his protected class filled the position or the position remained vacant and the employer continued to seek applicants.  Cones v. Shalala, 199 F.3d 512, 516 (D.C. Cir. 2000).  The McDonnell Douglas formulation is applied in "typical failure to hire cases."  Chappell-Johnson, 440 F.3d at 488; Tenyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1150 (D.C. Cir. 2004).

411 U.S. at 802; <u>Carter v. George Washington Univ.</u>, 387 F.3d 872, 878 (D.C. Cir. 2004); and

<u>Teneyck v. Omni Shoreham Hotel</u>, 365 F.3d 1139, 1149 (D.C. Cir. 2004).

There is no evidence that Defendants cancelled the vacancy announcement for

discriminatory reasons. <u>See</u> <u>Jones v. Tanoue</u>, 131 F. Supp.2d at 222.  To the contrary, the

selecting official, Ms. Adams testified that she cancelled the announcement because she "wasn't

satisfied with the experience level" of anyone on the certificate of eligibles.  <u>See</u> Exhibit 15

(Adams Aff.) at 4:16-19.   Since Plaintiff was not on the certificate of eligible candidates that

Ms. Adams reviewed, <u>see</u> <u>id.</u> at 4:20-22 there is no reasonable basis to infer that she cancelled

the position to avoid selecting him.

   2.   <u>Vacancy Announcement JI04-0139 Collections Analyst Was Cancelled</u>

Plaintiff cannot establish that he suffered an adverse employment action with respect to

the Collections Analyst position because no selection was made pursuant to the non-status

Vacancy Announcement (JI04-0139).[19]  <u>See</u> Exhibit 9 (Isaac Aff. at 17:6-18; 19:4-19); Exhibit

14a.  The cases cited above are somewhat analogous to the situation here, because Plaintiff

applied pursuant to a vacancy announcement that was ultimately cancelled and through which no

selection was made.  <u>See</u> Exhibit 25; Exhibit 26, and Exhibit 9 (Isaac Aff.) at 19:1-19.  Notably,

the non-status certificate of eligibles never reached the selecting official because an in-house,

qualified, status applicant had already been selected.  <u>See</u> Exhibit 9 (Isaac Aff.) at 17:8-18; 19:1-

7.  Moreover, when HRD cancelled the vacancy announcement, Plaintiff was treated no

differently from anyone else that had applied.  Further, even assuming Plaintiff's allegation that

_____

   [19]  A selection was made for the status Vacancy Announcement (JI04-138), however,
Plaintiff's name did not appear on the POLARS log sheet for that vacancy.  <u>See</u> Exhibit 26.

he applied for the status vacancy announcement, it is immaterial because he cannot demonstrate that he would have been selected over all of the other candidates.   Lastly, Plaintiff admits that he has no reason to believe that the receptionist to whom he gave both applications discriminated against him.  See Exhibit 1 (Montgomery Dep.) at 157:1-3.

### 3.    Plaintiff fails to establish that he was minimally qualified for the accountant positions.

All of Plaintiff's discrimination claims relating to the two accountant positions fail because he was not minimally qualified.  The minimum qualifications, as set forth in OPM's Standards for General Schedule Positions, GS-510, Accounting series, appear in the vacancy announcements for both the GS-13 Accountant position and the GS/12-13 Accountant position. See Exhibits 12, 13, and 16.  To be found minimally qualified, applicants who do not have a four-year degree, need at least 2 years "experience in accounting or an equivalent combination of accounting, college level education, and training that provided professional accounting knowledge . . . plus twenty-four semester hours in accounting or auditing courses."[20]   See Exhibits 12 and 16.  Notably, both vacancy announcements provide that college transcripts be submitted with the application "if you wish college work to be considered in qualifying you for this position." See Exhibit 12 at 5; Exhibit 16 at 4.

According to Human Resources Specialist Jackie Isaac, Plaintiff was not minimally qualified under OPM standards.  He did not have the requisite experience in accounting, and he did not demonstrate that he had completed 24 credit hours in accounting.  See Exhibit 8 (Isaac Dep.) at 72:7-73:1; 75:16-76:3; 100:9-21; 101:15-103:4.  Plaintiff does not dispute that he failed

---

[20]There are two other credentials which may substitute for the 24 semester hours, however, Plaintiff does not allege that he sought to qualify based on those credentials.

to submit college transcripts with his applications.  See Exhibit 1 (Montgomery Dep.) at 102:21-103:13; 105:6-19; Exhibits 14 and 18.  Plaintiff also admits that since he "was already at the [GS]-12 . . .[he] didn't see any merit in doing the [accounting] work."  See Exhibit 1 (Montgomery Dep.) at 149:9-18.

The Court of Appeals recently reaffirmed that it has "consistently declined to serve as a 'super-personnel department that reexamines an entity's business decisions."  Holcomb v. Powell, supra 433 F.3d at 897 (quoting Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting Dale v. Chi. Tribune Co., 797 F.2d 458, 464 (7th Cir.1986)) (internal quotation marks omitted)); see also Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates.").  In Holcomb, the Court of Appeals affirmed the district court's grant of summary judgment to the FDIC in part, holding, inter alia, that "the evidence fails to establish that [plaintiff's] qualifications were sufficiently superior to those of [the selectee] to allow a jury to infer discrimination."  Id. at 898.

Here, Plaintiff was not even found to be a minimally qualified candidate.  His contention that he is qualified for the accountant positions is based solely on his opinion of his duties.  See Exhibit 1 (Montgomery Dep.) at 92:11-101:25.  This fails to establish a triable issue of fact.  See Buggs v. Powell, 293 F.Supp. 2d 135, 144 (D.D.C. 2003) ("the plaintiff's opinion of the relative merits of [his] credentials as opposed to those of the selected individuals are irrelevant.") see also Choates v. Powell, 265 F. Supp.2d 81, 95 (D.D.C. 2003).  Moreover, the person who was selected for the GS-12/13 Accountant Position, Ms. Lafaye Graham, had a four-year degree in finance, a Masters in accounting, 15 years of experience in the accounting field, and specific

28

accounting experience in investment accounting, none of which Plaintiff had.  See Exhibit 3

(Adams Dep.) at 120:1-8; 160:11:20; 161:16-17.

> **D.**     **Plaintiff Fails To Establish Discrimination With Respect To His Accretion Of Duties Promotion Claim.**

Applying the traditional McDonnell Douglas framework to establish a Title VII prima

facie case of discrimination for a denial of promotion, Plaintiff must demonstrate that:  (1) he is a

member of a protected class; (2) he was qualified for the position at the time he was eligible for

the promotion; (3) he was not promoted; and (4) other similarly situated employees received

promotions who were not members of his protected class. Bundy v. Jackson, 641 F.2d 934, 951

(D.C. Cir. 1981) (adapting the prima facie case requirements of McDonnell Douglas to

promotion claims); Woodruff v. Dimario, 164 F.Supp.2d 1, 5 (D.D.C.2001).   To establish a

prima facie case of age discrimination, plaintiff must prove that:  (1) he is a member of the

ADEA's protected class of persons over forty years of age; (2) he was qualified for his position

and was performing his job well enough to meet his employer's legitimate expectations; (3) he

suffered an adverse employment action despite his qualifications and performance; and (4) he

was disadvantaged in favor of a similarly situated substantially younger employee.  Mianegaz v.

Hyatt Corp., 2004 WL 1157709 (D.D.C. 2004) (quoting Reeves v. Sanderson Plumbing

Products, Inc., 530 U.S. 133, 142 (2000) and citing Hall v. Giant Food, Inc., 175 F.3d 1074, 1077

(D.C. Cir 1999)); O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 310-311 (1996).

Here, Plaintiff fails to establish a prima facie case of discrimination under both Title VII

and the ADEA, because there is no evidence that a similarly situated person outside of Plaintiff's

protected class requested and received a promotion based exclusively on increased COTR duties.

29

See Cones v. Shalala, 199 F.3d 512, 517 (D.C. Cir. 2000) (citing Bundy v. Jackson, 641 F.2d 951.  Even assuming Plaintiff establishes a prima facie case, he fails to adduce evidence showing that Defendants' legitimate non-discriminatory reasons for not promoting him are pretextual, or that a reasonable jury could conclude from all of the evidence that the decision was made for a discriminatory reason.  See Holcomb, 433 F.3d at 897.

        1.     Plaintiff fails to identify any "similarly-situated" individual promoted from GS-12 to GS-13 based on COTR duties.

Under the third prong of the McDonnell Douglas framework, "one method by which a plaintiff can satisfy the third prong of the prima facie test is by demonstrating that [he] was treated differently from similarly situated employees who are not part of the protected class . . ." Czekalski v. Peters, — F.3d —, No. 05-522, slip op. at 9  (D.C. Cir. February 7, 2007) (citation and quotation omitted).  Under this theory, Plaintiff is required to show that all of the relevant aspects of his employment situation are "nearly identical" to the identified comparators.  Neuron v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995).  Although identifying similarly situated employees is "not the only way" to establish a prima facie case, it is the theory upon which Plaintiff relies.  See Czekalski v. Peters, supra, at 9.

Plaintiff seeks a promotion based on increased COTR duties.  See Exhibit 1 (Montgomery Dep.) at 12:19-24.  In his deposition, Plaintiff identifies several individuals working in different branches of the Financial Operations Department (FOD), who he believes received promotions based on accretion of duties.  See Exhibit 1 (Montgomery Dep.) at 33:13-45:25.  None of these individuals held the same position as Plaintiff.  See id.  For example, Plaintiff identifies Franklin Tate (Financial Analyst/GS-12), Sam Yeng (Accountant/GS-12),

Melinda Fitzpatrick (Secretary/GS-6), Shirley Jones (Quality Assurance Analyst/GS-12), Tonya Jones (Administrative Officer/GS-13), John Leonard (Financial Analyst/GS-13), Ken Kofsey (Accountant/GS-13), and Christine Thomas (team lead-Accountant/GS-13).  See id. Moreover, Plaintiff admits that Ms. Fitzpatrick's, Ms. Shirley Jones's, and Ms. Tonya Jones's promotions were not based on increased COTR duties.  See id.  Further, Plaintiff admits that he has no idea whether Mr. Tate's, Mr. Yeng's, Mr. Leonard's, Mr. Kofsey's, or Ms. Thomas's promotion was based on increased COTR duties.  See id.

Lastly, Plaintiff identifies Shirley Mathis as someone who was promoted from a GS-12 to a GS-13 Accountant in the Collections and Compliance Division (CCD).  See id. at 49:25-51:21. Plaintiff admits, however, that Ms. Mathis was not promoted based on an accretion of duties. Rather, she competed for the accountant position that contained COTR duties as part of the vacancy announcement.  See id. at 51:1-21.[21]  Ms. Mathis's employment is clearly dissimilar to Plaintiff's.  She is an accountant in a different division (CCD), and she obtained that position via a competitive process.  See id.

In sum, because Plaintiff cannot show that all of the relevant aspects of his employment situation are "nearly identical" to the identified comparators, he fails to establish a prima facie case of discriminatory non-promotion based on a comparator theory under Title VII and the ADEA.  See Neuron v. Adduci, Mastriani, Meeks & Schill, 43 F.3d at 1514; Barbour v. Browner, 181 F.3d 1342 (D.C. Cir. 1999)

---

[21]  Plaintiff admits that he did not apply for that position.  See Exhibit 1 (Montgomery Dep.) at 57:8-11.

2.     Plaintiff fails to adduce evidence showing Defendants' legitimate non-discriminatory reasons for not promoting him are pretextual.

If the Court concludes that Plaintiff can establish a prima facie case of discrimination, Plaintiff still cannot prove that the agency's legitimate, non-discriminatory reasons for not promoting him are a pretext for discrimination.

The classification specialist who performed the audit, Cynthia Kyle, was a contractor, not a PBGC employee. See Exhibit 5 (Lattimer Dep.) at 20:18-19; 24:9-14; 35:1-8. In preparing her report, Ms. Kyle met with Plaintiff to discuss the responses he provided in the Employee Interview Questionnaire. See Exhibit 7c (Report). Ms. Kyle prepared a Position Evaluation Statement that states that Plaintiff's position "is being evaluated using a combination of the position description #8435, the audit notes provided by the incumbent, and the supervisor's comments." See id. Ms. Kyle's evaluation concluded that Plaintiff's Financial Specialist position was properly classified at the GS-11 grade level. With respect to Plaintiff's COTR duties, Ms. Kyle found that Plaintiff "is not directly involved in the day-to-day oversight of the contractor's work because he is not an Accountant. In order for the work to rise to the level of actually affecting the grade of his position, he would have to possess the qualifications to 'oversee' the work from a completely 'technical' aspect . . ." See id. at 3.[22]

Plaintiff's non-promotion claim rests solely on his own speculation that his supervisors discriminated against him because of his race, gender, and age. For example, Plaintiff testified as follows:

---

[22] Ms. Kyle's finding is corroborated by Mr. McKinnon, Plaintiff's second level supervisor, who testified that Plaintiff did the "administrative review, not the accounting review" of the contractors' work. McKinnon Dep. at 97:9-16.

32

> Q:      And why do you believe Cynthia Adams discriminated
> against you because of your race?
> A:      I'm a black male.
> Q:      Any other reason?
> A:      Not that I know of.

See Exhibit 1 (Montgomery Dep.) at 54:6-10.  Similarly, when asked why he thought Ms.

Adams, Mr. McKinnon, and Mr. Winters discriminated against him because of his gender,

Plaintiff responded as follows:

> A:      The accretion of duties was not approved.
>
> Q:      Any other reason for your belief?
> A:      I continued to do the duties.  There was no feedback and I
> was performing the duties.  I was not expected to perform the
> duties.  There was no reason to take the duties from me.  So the
> Agency regulations allow accretion of duties promotion and I felt
> that I was meeting the requirements according to those regulations.

See id. at 55:6-16.

     Moreover, when Plaintiff was asked who discriminated against him because of his age, he

responded that he is "older than all three of [his] immediate supervisors."  See id. at 55:17-20.

Plaintiff did not provide any additional bases for his claim of age discrimination, except to say

the following:

> Q:      [Y]ou just said that Mr. McKennon [sic] said something to
> you.  Did he say something to you that caused you to believe that
> he was discriminating against you in your accretion of duties
> promotion because of your age?
> A:      My age was mentioned several times by Mr. McKennon
> [sic].
> Q:      When?
> A:      I can't . . . give you a time frame.
> Q:      What's your best recollection of what he said?
> A:      Related to retirement, age and retirement.
> Q:      Anything more specific?
> A:      Not that I can recall?

33

See id. at 57:1-7.  Evidence of discrimination "does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decision makers unrelated to the decisional process itself." Kalekiristos v. CTF Hotel Management Corp., 958 F. Supp. 641, 665 (D D.C. 1997) (citations and internal quotations omitted).  While a stray remark may be "probative of discrimination, there must be a nexus between the stray remark and the adverse employment decision." Id. (citation omitted).  Moreover, "the federal courts have cautioned that a remark said in one context should not be torn from that context to prove 'discrimination' that may exist only in the mind of an imaginative hearer who is attempting to make out a case for the unfairness of how he was treated." Hanan v. Corso, 1999 WL 320858 (D.D.C. May 18, 1999) at *15.  However, "it can be said that the closer in time the statement is to the decision at issue, the more likely the federal courts will find it probative of a discriminatory intent." See id. Assuming arguendo, Mr McKinnon made such a statement concerning retirement, Plaintiff has no evidence of when or in what context it was made.

Lastly, there is no evidence that:  (1) Mr. McKinnon or Mr. Winter played any role whatsoever in Ms. Kyle's evaluation of Plaintiff's position, or (2) Ms. Adams's role was tainted by discriminatory animus.  In fact, all of the evidence suggests that they supported Plaintiff's efforts to be promoted. See Exhibit 3 (Adam Dep.) at 90:1-91:20; Exhibit 2 (Winter Dep.) at 143:4-144:19.

The only relevant and material inquiry is whether the classification decision was motivated by a prohibited factor. See e.g.  Kulumani v. Blue Cross-Blue Shield Assn., 224 F.3d 681 (7th Cir. 2000).  The Supreme Court has used words like "mendacity" and "dissembling" to describe pretext. See Reeves v. Sanderson Plumbing Products, Inc., 550 U.S. 133, 147 (2000);

34

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). These words are indicative of deceit or a cover-up. Such "pretext" is not demonstrated by any facts in this case. Plaintiff's reliance on speculation and guesswork is not enough to create a genuine dispute of material fact. See Schumann v. O'Keefe, 314 F.Supp.2d 515, 529 (D.Md. 2004) ("Schamann's own statements as to the duties he had accreted . . . are insufficient to create a material factual dispute").

In sum, there is no evidence to suggest that gender, age, or race were factors in determining that Plaintiff's position did not qualify for a GS-13 grade, and Plaintiff cannot "show that a reasonable jury could conclude from all of the evidence that this determination was made for a discriminatory reason." Holcomb v. Powell, supra, 433 F.3d 889 (D.C. Cir. 2006).

### E.    Plaintiff Did Not Exhaust His Administrative Remedies

The Court should dismiss Plaintiff's retaliation claim with respect to the accretion of duties non-promotion as he failed to exhaust his administrative remedies. A plaintiff who claims a Title VII violation must file an administrative claim with the EEOC to allow the agency time to act on the alleged violation. See 42 U.S.C. § 2000e-5(f)(1); see also Marshall v. Fed. Express Corp, 130 F.3d 1095, 1098 (D.C. Cir. 1997); Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995). The requirement that a plaintiff first pursue administrative remedies is a mandatory prerequisite to bringing suit. See 29 C.F.R. § 1614 et seq.; see also Bowden v. United States, F.3d 433, 437 (D.C. Cir. 1997). Exhaustion of administrative remedies is required "in order to give federal agencies an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary." Brown v. General Servs. Admin., 425 U.S. 820, 833 (1976).

Accordingly, the scope of any subsequent Title VII lawsuit is limited to the

"administrative investigation that can reasonably be expected to follow the charge of discrimination." Marshall, 130 F.3d at 1098 (citation and internal quotation omitted). The District of Columbia Circuit has consistently dismissed cases where plaintiffs have failed to exhaust administrative remedies prior to filing challenges under Title VII. See e.g., Rann v. Chao, 346 F.3d 192, 194-95 (D.C. Cir. 2003) (upholding district court's dismissal of plaintiff's claim for failure to exhaust administrative remedies); Stewart v. Ashcroft, 352 F.3d 422, 425-26 (D.C. Cir. 2003) (affirming lower court's dismissal for failure to satisfy requirements for timely exhaustion of administrative remedies).

The D.C. Circuit has stated that "the requirement of some specificity in a charge is not a 'mere technicality.'" Park, 71 F.3d at 908 (quoting Rush v. McDonald's Corp., 966 F.2d 1104, 1111 (7th Cir. 1992)). "Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role," as well as to deprive defendant notice of the charge. Marshall, 130 F.3d at 1098 (quoting Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 127 (7th Cir. 1989)). Thus, the administrative complaint must be sufficiently specific to allow the agency to perform its statutory duty. Mianegaz v. Hyatt Corp., 319 F.Supp.2d 13, 17 (D.D.C. 2004).

Here, Plaintiff's Formal Complaint 03-10, filed October 1, 2003, does not identify reprisal as a basis for the complaint. See Exhibit 27. Moreover, on April 2, 2004, Defendants delivered a letter to Plaintiff stating that the following claim had been accepted for investigation: "[w]hether PBGC unlawfully discriminated against DeLarse Montgomery, Jr., based on race, color, national origin, sex and age, by not promoting or compensating Mr. Montgomery based upon Mr. Montgomery's performance of higher graded duties." See Exhibit 28. The letter also

36

provides that if "[i]f you disagree with this characterization of your claims, please set out your concerns in writing to me within 15 days of receipt of this letter." See id. There is no evidence that Plaintiff disagreed with the characterization of his claims. Thus, Plaintiff's retaliation claim must be dismissed for failure to exhaust his administrative remedies because he did not file a complaint with an EEO counselor alleging retaliation. See Adams v. Mineta, 2006WL367895, *4 (D.D.C. 2006) (unreported) ("[A] plaintiff must first exhaust h[is] administrative remedies before filing a [sic] action in federal court alleging retaliation in violation of Title VII.").

### F.    Plaintiff Cannot Establish A Prima Facie Case Of Retaliation

Title VII provides, in part, that it is unlawful for an employer to discriminate against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Title VII's anti-retaliation provision seeks to prevent an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. Burlington N. & Santa Fe Ry. Co. v. White, --- U.S. ---, 2006 WL 1698953, *8 (June 22, 2006).

A prima facie case alleging retaliation or reprisal under Title VII is established when the plaintiff demonstrates that (1) he or she engaged in protected behavior; (2) the employer took an action against plaintiff with material consequences such that it would dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) there is a causal link between the action and the protected activity. Rochon v. Gonzales, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006). See also Burlington Northern, 2006 WL 1698953, *8. That is, a plaintiff must

demonstrate "materially adverse consequences . . . such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm" which would have dissuaded a reasonable employee from making or supporting a charge of discrimination.  Rochon, 438 F.3d at 1219 (citing Brown, 199 F.3d at 457).  If plaintiff is able to establish a prima facie case of retaliation, then the Court should apply the familiar McDonnell Douglas analysis applicable to discrimination claims.

Here, Plaintiff's retaliation claim is based solely on protected activity that occurred in 1998, specifically, the settlement of Plaintiff's first discrimination lawsuit.[23]  See Complaint at ¶¶ 7, 13, 20.  As part of the settlement agreement, Plaintiff was promoted from a GS-11 to a GS-12 Financial Specialist.  To implement the promotion, a cover sheet was placed on Plaintiff's existing Position Description with an explanation that the upgrade was due to a "settlement agreement."  See Exhibit 31 (Position Description).  The PD cover sheet makes no reference to EEO, discrimination, or anything else that would reveal the context or nature of the settlement. See id.  Nevertheless, Plaintiff makes a retaliation claim by arguing that anyone who had access to his Official Personnel Folder (OPF), namely personnel in the Human Resources Department, would have seen the reference to a settlement agreement attached to his PD.  See, e.g., Exhibit 1 (Montgomery Dep.) at 135:16-25; 136:1-19; Complaint at ¶¶ 17, 13, 20.

The Supreme Court has instructed the lower courts that, in the absence of direct evidence,

---

[23]Plaintiff also engaged in protected activity in June 2003, when he sought EEO counseling in connection with his accretion of duties promotion request, and in October 2003, when he filed a formal EEO complaint in connection with that promotion request.  He engaged in protected activity in 2004 when he sought EEO counseling, and filed a formal EEO complaint in connection with his non-selection for the accounting positions.  However, when he was asked to explain the bases for his reprisal claims, he mentioned only the 1998 settlement agreement.  See Exhibit 1 (Montgomery Dep.) at 135:6-15; 136:16-25.

a period in excess of three months is too long to establish a causal connection between protected

activity and the alleged discriminatory or retaliatory action.  See Clark County School District v.

Breeden, 532 U.S. 268, 273-74 (2001).  That is, in the absence of direct evidence of retaliation,

courts require a "very close" temporal proximity between the protected activity and the alleged

adverse action.  Patterson v. Johnson, 391 F.Supp.2d 140, 149 (D.D.C. 2005) (citing Clark

County School District v. Breeden, 532 U.S. at 273-74) (citing with approval cases finding that

temporal proximity of more than three months insufficient to demonstrate causal connection

between protected activity and adverse action)); Gustave-Schmidt v. Chao, 360 F.Supp.2d 105,

118-19 (D.D.C. 2004) (three months is the "outer limit" of the "temporal requirement in a

retaliation case"); Broderick v. Donaldson, 338 F.Supp.2d 30, 43 (D.D.C. 2004) (same); Buggs

v. Powell, 293 F.Supp.2d 135, 148 (D.D.C. 2003) (same).

 Here, Plaintiff cannot establish the causation element because the 1998 settlement was far

too remote in time from the alleged retaliatory events, which occurred six years later in 2004.

See Complaint at ¶ 7; Montgomery Dep. at 11:10-12:2.  Even assuming Plaintiff is able to

establish a prima facie case of retaliation, he cannot demonstrate that Defendants' legitimate non-

discriminatory reasons for not promoting or selecting him are pretextual.  See supra at 29-30, 33-

36; McDonnell Douglas, 411 U.S. at 802-04; Burdine, 450 U.S. at 252-53.  "[A] reason cannot

be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false,

and that discrimination was the real reason."

### G. This Court Lacks Subject Matter Jurisdiction Over Plaintiff's Equal Pay Act Claim

 Count IV is brought under the Equal Pay Act [EPA], 29 U.S.C. §§206 and 215. The EPA

"prohibits payment of unequal wages for equal work on the grounds of sex." Lathram v. O'Neill,

Civil Action No. 00-2442 (D.D.C. 2001), quoting Thompson v. Sawyer, 678 F.2d 257, 263 (D.C. Cir. 1982). Because Plaintiff's claim for relief under the EPA potentially exceeds the $10,000 jurisdictional limit applicable in District Court, it must be dismissed or transferred to the Court of Federal Claims.

        1.    <u>Applicable Law</u>

An analysis of this Court's jurisdiction to hear claims under the Equal Pay Act must begin with recognition of the impact of the doctrine of sovereign immunity: It is elementary that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . ., and *the terms of its consent to be sued in any court define that court's jurisdiction* to entertain the suit." United States v. Mitchell, 445 U.S. 535, 538 (1980) (emphasis added), quoting United States v. Sherwood, 312 U.S. 584, 586 (1941). Thus, for Plaintiff to bring his EPA claims against the federal government in this Court, he must identify the specific waiver of sovereign immunity that applies, and demonstrate that it "defines [this] court's jurisdiction" so as to include his claims. The Equal Pay Act does not include any jurisdictional grant. Absent any other grant of jurisdiction, a Court's jurisdiction over lawsuits against the federal government depends on the Tucker Act, 28 U.S.C. § 1346(a)(2) and 28 U.S.C. § 1491(a)(1). 28 U.S.C. § 1346(a)(2), commonly referred to as the Little Tucker Act, expressly limits the jurisdiction of this Court to any non-tort "civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress." See e.g., Doe v. Dep't of Justice, 753 F.2d 1092, 1101 (D.C. Cir. 1985). Accordingly, most courts considering this issue have concluded that the Federal Court of Claims has exclusive jurisdiction over Equal Pay Act claims exceeding $10,000. See e.g., Lathram, Slip op. at 6-8; see also Barnes v. Levitt, 118 F.3d 404,

410 (5th Cir. 1997) ("Under the Tucker Act, 28 U.S.C. § 1491, a plaintiff asserting an EPA cause

of action must bring the action in the Court of Federal Claims if the claim, including the fees

sought, exceeds $10,000."); Huddleston v. Donovan, 524 F. Supp. 179 (N.D. Ill. 1981) (same);

Warren v. Alexander, 1979 WL 15358, 21 F.E.P. 664 (N.D. Ga. 1979) (same).

        2.    Analysis

        Plaintiff claims that Defendants violated the Equal Pay Act ("EPA") by "paying plaintiff

less than his female predecessor in the COTR role since March 2002." See Complaint at ¶¶ 22,

23.  It is clear that Plaintiff is seeking back pay of more than $10,000 for his EPA claim.  In

answer to Defendants' Interrogatories, Plaintiff estimated, using Salary Tables for the General

Schedule and Locality Payment for the Washington-Baltimore-Northern Virginia area, that he

sustained "$14,000 in loss [sic] salary alone" for the years 2002 through 2006.  See Exhibit 33

(Plaintiff's Answer Interrogatory No. 15) at 13.[24]  Moreover, Plaintiff explained that this is a low

estimate, as it  is based only on "not getting a GS-13 level promotion," and does not "include

---

[24]Even when a plaintiff does not specify the amount of back pay sought, the Court may
infer that the plaintiff is seeking more than $10,000.  Doe v. Dep't of Justice, 753 F.2d at 1101
(inferring that the plaintiff sought more than $10,000 in back pay because she was a GS-14
attorney earning approximately $45,000 each year and seeking back pay for more than two years
of unemployment after discharge); Schrader v. Tomlinson, 311 F.Supp.2d 21, 25 (D.D.C.2004)
(inferring that the plaintiff's claim for back pay from 1997 through 2004 exceeded $10,000
because the annual difference between the plaintiff's GS-12 salary and her male comparator's
GS-13 salary was approximately $10,000); De Leon v. England, 2003 WL 21767504 (D.D.C.
2003) (unreported) (dismissing plaintiff's EPA claim for an unspecified amount because "[w]hile
plaintiff's complaint lacks specificity as to the dollar amount of her Equal Pay Act claim, a
comparison of her GS-13 salary for the relevant period with that she would have received at the
GS-14 level shows that her claim "is well in excess of $10,000").  Compare Wiggins v. Powell,
2005 WL 555417 (D.D.C. 2005) (unreported) (district court retained jurisdiction of EPA claim
because "Plaintiff expressly waives any recovery exceeding $10,000.00 under the Equal Pay Act
only, so that this Court can maintain jurisdiction of Count I under the Little Tucker Act, 28
U.S.C. § 1346(a)(2).")

potential losses from his not getting further promoted." See id. It also does not "take into consideration continued salary for staying on at PBGC ... rather than taking early retirement in October 2006." See id. Accordingly, as Plaintiff is seeking more than $10,000 in back pay, this Court lacks subject matter jurisdiction over the EPA claim and must dismiss it.[25]

In any event, Plaintiff cannot establish a prima facie case of discrimination under the EPA because he cannot show that his work as a financial specialist was "substantially equal" to the work performed by the female accountants with whom he compares himself.[26] See Jenkins v. United States, 46 Fed.Cl. 561, 563 (2000) ("The test is whether the work performed by plaintiff and the comparable [female] employee is substantially equal.").

Here, Plaintiff admits that the two women who previously performed COTR duties under the same contracts as he, were Christine Thomas, a GS-13 Supervisory Accountant, and his immediate supervisor, Ms. Adams, a GS-14 accountant and Chief of the Investment Accounting Branch. Complaint at ¶ 8; Exhibit 8 (Adams Dep.) at 7:1-5; 69:11-15. Unlike Plaintiff, both women were accountants and supervisors. See Exhibit 8 (Adams Dep.) at 7:1-5; 69:11-15. Because the two women Plaintiff identifies as comparators did not occupy positions "substantially equal" to his own, he cannot establish a prima facie case under the EPA. See

---

[25] Defendants are not requesting transfer of the EPA claim to the Court of Federal Claims. However, this Court, may sua sponte transfer it to the Court of Federal Claims or may give Plaintiff the option to do so. See Schrader v. Tomlinson, 311 F. Supp.2d 21, 26 n.4 (D.D.C. 2004).

[26] See Nyman v. FDIC Corp., 967 F.Supp. 1562, 1577 (D.D.C.1997); Corning v. Glass Works v. Brennan, 417 U.S. 188 (1974) (to establish a prima facie violation of the EPA, a plaintiff must prove that (1) he was doing substantially equal work on a job, the performance of which required substantially equal skill, effort, and responsibility as jobs held by members of the opposite sex; (2) the job was performed under similar working conditions; and (3) he was paid at a lower wage than members of the opposite sex doing equal work).

Jenkins v. United States, 46 Fed.Cl. at 563.

Even assuming, arguendo, that Plaintiff could establish a prima facie case, his claim fails because he cannot refute Defendants' legitimate explanation for the pay differential between himself and Ms. Thomas and Ms. Adams.  Notably, they were supervisory accountants, whereas Plaintiff was neither a supervisor nor an accountant.  See Schrader v. Tomlinson, 311 F. Supp.2d 21 (D.D.C. 2004) (dismissing EPA claim because "plaintiff has failed to refute the defendant's legitimate explanation for the pay differential between herself and Maniscalco-namely, that Maniscalco had different required duties than plaintiff.")

## CONCLUSION

Based upon the foregoing, Defendant respectfully requests that the Court grant him judgment on all claims herein and dismiss Plaintiff's complaint with prejudice.

Respectfully submitted,

_____

JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney

_____

RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney

_____

KAREN L. MELNIK, DC Bar #436452
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0338

43