Exhibit 1
MSJ

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF COLUMBIA
 3
 4  - - - - - - - - - - - - - - - - - -x
 5  DeLARSE MONTGOMERY, JR.      :
 6           Plaintiff          :
 7      vs.              : Case No: 1:05CV02157 (RMU)
 8  ELAINE L. CHAO, SECRETARY OF  :
 9  LABOR AND VINCENT SNOWBARGER,  :
10  EXECUTIVE DIRECTOR, PBGC       :
11           Defendants         :
12  - - - - - - - - - - - - - - - -x
13
14               Washington, D.C.
15             Friday, December 1, 2006
16
17
18  Deposition of:
19            DeLARSE MONTGOMERY, JR.
20  the Deponent, called for examination by counsel for the
21  Defendants, pursuant to notice and agreement as to time and
22  place, at 501 3rd Street, N.W., Fourth Floor, Washington,
23  D.C., before Timothy J. Atkinson, a Notary Public in and for
24  the District of Columbia.
25
```

Page 2

```
 1  APPEARANCES:
 2          On Behalf of the Plaintiff:
 3          DAVID H. SHAPIRO, ESQUIRE
 4          SWICK & SHAPIRO, P.C.
 5          1225 Eye Street, N.W.
 6          Suite 1290
 7          Washington D.C.  20005
 8          (202) 842-0300
 9
10          On Behalf of the Defendant:
11          KAREN MELNIK, ESQUIRE
12          Assistant United States Attorney
13          555 4th Street, N.W.
14          Washington, D.C.  20530
15          (202) 307-0338
16
17          On Behalf of the PBGC:
18          KAREN ESSER, ESQUIRE
19          1200 K Street, N.W.
20          Washington, D.C.  20005
21          (202) 326-4400, X3270
22
23
24
25
```

Page 3

INDEX

| WITNESS: | EXAMINATION: | PAGE: |
|---|---|---|
| DeLarse Montgomery | Direct - Ms. Melnik | 4 |
| | Cross - Mr. Shapiro | 157 |
| | Redirect - Ms. Melnik | 163 |

E X H I B I T S

| EXHIBIT NO.: | DESCRIPTION: | PAGE: |
|---|---|---|
| 1 | Application for Accountant, GS-13 | 64 |
| 2 | Application for Accountant GS-510 | 84 |
| | Series | |
| 3 | Vacancy Announcement JI04-0150 | 85 |
| 4 | Vacancy Announcement JI04-0143 | 85 |
| 5 | Application under Vacancy | 122 |
| | Announcement 04-139 | |
| 6 | Vacancy Announcement for 04-138 | 125 |
| 7 | Vacancy Announcement for O4-139 | 125 |
| 8 | Complaint | 138 |

Page 4

```
 1           P R O C E E D I N G S
 2                (10:00 a.m.)
 3  Whereupon,
 4           DeLARSE MONTGOMERY, JR.
 5  was called as a witness and after having been first duly
 6  sworn, was examined and testified as follows:)
 7            DIRECT EXAMINATION
 8  BY MS. MELNIK:
 9     Q. Good morning.
10     A. Good morning.
11     Q. My name is Karen Melnik. That's M-E-L-N-I-K.  You
12  know I'm with the Department of Justice.  I represent the
13  Pension Benefit Guaranty Corporation, which I'll refer to as
14  PBGC.  And with me is Karen Esser, E-S-S-E-R, who's an
15  attorney with the Office of General Counsel at PBGC.
16        Before we get started I'll note that I've served a
17  copy of Defendant's First Request for Production of Documents
18  which has a Certificate of Service of September 6th, 2006,
19  which is the same date that the Request for Interrogatories
20  were sent to Plaintiff.  If for some reason there is something
21  that comes up during the deposition that may require
22  additional inquiry of Plaintiff, I'd like to reserve that
23  opportunity now.
24        MR. SHAPIRO: Well, wait a minute.  You make a
25  record of this.  Let's make a full record.  We did not get
```

Page 5

1 this document request. We got interrogatories. And the
2 reason why this comes up now is because something that Ms.
3 Melnik said to me when I was questioning the witness earlier
4 in the week in deposition made reference to a document
5 request, I thought, and I checked my records and today I told
6 her we never got any document request, and that there was some
7 confusion about whether there even were document request, so
8 Ms. Melnik has now produced something that was a document
9 request. Apparently it didn't get to me or it wasn't sent or
10 something but, in any case, I'm happen to respond to these
11 document requests, but we did not get them in time.
12     The whole reason why this issue came up is because I
13 -- it triggered in me going to get it when you said something,
14 so I looked and I realized, so I disclosed that to you today
15 and that's why we have this on the record today. But I'm
16 happy to answer these, but we didn't get them back in
17 September when we got the interrogatories.
18     BY MS. MELNIK:
19     Q. Okay. Mr. Montgomery, first of all, it's very
20 important that your answers are clear verbal answers, and what
21 I mean by verbal, I mean actual words, not gestures or sounds.
22 A shrug or a uh-hum or a uh-uh is not acceptable, so I want
23 you to try to always remember to just give a verbal answer.
24 Do you understand that?
25     A. Yes.

Page 6

1     Q. It's also very important that you wait until I
2 finish a question before you start responding, and that's
3 important for two reasons. First, the court reporter
4 obviously can't record both of us at the same time because
5 he's obligated to take everything exactly as said, so it will
6 be less confusing -- a less confusing record if we are able to
7 wait for each other.
8     The second reason is that you may anticipate
9 incorrectly what I'm asking about. I may start a question and
10 you might think I'm going one place with it when I'm actually
11 going another place, so it works to your benefit, as well, if
12 you wait until I finish asking my question before you answer
13 it. Do you understand that?
14     A. Yes.
15     Q. In the record of transcript that I just referred to,
16 you will have an opportunity to review it and make changes to
17 that if you deem necessary after we complete this deposition,
18 but you should bear in mind that if there's changes or
19 material changes, I'm allowed to comment on your changes at
20 trial, and by material I just mean a change that affects a
21 significant aspect of your testimony. Do you understand that?
22     A. Yes, I do.
23     Q. And perhaps most important, the court reporter
24 administered an oath to you just before we started. From that
25 point on you are under oath under penalty of perjury just as

Page 7

1 if you were testifying in court. Do you understand that?
2     A. Yes.
3     Q. If I ask a question and you don't understand it, ask
4 me to rephrase it because, for the record, I will assume that
5 you understood the question if you answer. Sometimes I don't
6 ask the best questions, so just feel free to tell me to
7 rephrase. Do you understand that?
8     A. Yes.
9     Q. Now may be times when your lawyer, Mr. Shapiro, may
10 object to a question. He's making an objection for the
11 record, but you should be answering all the questions
12 regardless of whether your counsel objects. Do you understand
13 that?
14     MR. SHAPIRO: That's not true.
15     MS. MELNIK: We'll get to the exceptions next, Mr.
16 Shapiro.
17     BY MS. MELNIK:
18     Q. Do you understand that?
19     A. Not fully.
20     Q. Okay. Well, what I was about to say is the only
21 exception to that is if your counsel believes that there is
22 some privilege and he instructs you not to answer. That's the
23 only exception to that rule. Do you understand that?
24     MR. SHAPIRO: I don't agree with that either.
25     MS. MELNIK: All right. Well --

Page 8

1     BY MS. MELNIK:
2     Q. If you feel it's necessary at some point to take a
3 break during your deposition, that's fine. I would just ask
4 if there's a question pending you wait until after you answer
5 the question before you ask to go on a break. Do you
6 understand that?
7     A. Yes.
8     Q. Have you taken any -- had any alcohol or drugs in
9 the past 24 hours?
10     A. Yes.
11     Q. What drugs?
12     A. Prescription medication.
13     Q. For what?
14     A. High blood pressure.
15     Q. Okay. What's the name of the drug?
16     A. Lofinipril (phonetic sp.) or Lofiniprel, Hytrin. I
17 think it's H-Y-T-R-I-N.
18     Q. Okay.
19     A. And I'm not sure of the name of the third one.
20     Q. And when did you take them?
21     A. The last one, between 10 and midnight.
22     Q. Oh, last evening, last night?
23     A. Yes.
24     Q. Okay. Would any of those medications affect your
25 ability to provide truthful and accurate testimony here today?

## Page 9

1    A. Not to my knowledge.

2    Q. Did you review any documents in preparation for your

3  testimony today?

4    A. Yes.

5    Q. What documents were those?

6    A. My answers to the interrogatory.

7    Q. Anything else?

8    A. No.

9    Q. Have you kept any kind of journal or diary during

10  the past -- relating to these events that brings you here

11  today in the past five years?

12    A. I don't understand that question.

13    Q. Do you keep a journal or a diary?

14    A. No.

15    Q. Did you meet with your attorney in preparation for

16  your deposition here today?

17    A. I don't understand.

18    Q. Have you met with Mr. Shapiro regarding -- in

19  preparation for your testimony that you're giving here today?

20    A. Yes.

21    Q. Okay. And how many times have you met?

22    A. Once.

23    Q. Only once?

24    MR. SHAPIRO: In preparation for this.

25    WITNESS: In preparation.

## Page 10

1    MS. MELNIK: Mr. Shapiro, let him answer.

2    MR. SHAPIRO: Well, wait a second. If you're going

3  to ask confusing questions, you're going to get objections.

4  You're talking about --

5    MS. MELNIK: Okay. Object and I'll rephrase, Mr.

6  Shapiro, okay?

7    MR. SHAPIRO: Fine.

8    MS. MELNIK: Okay.

9    BY MS. MELNIK:

10    Q. How many times have you met in preparation for the

11  deposition?

12    A. This deposition?

13    Q. Correct.

14    A. Once.

15    Q. Okay. Other than with Mr. Shapiro, did you discuss

16  your deposition testimony with anyone?

17    A. Yes.

18    Q. With whom?

19    A. My wife.

20    Q. And what's her name?

21    A. Barbara Montgomery.

22    Q. And how long have you two been married?

23    A. Thirty-one years.

24    Q. Mr. Montgomery, have you had your deposition taken

25  before today at any time?

## Page 11

1    A. Rephrase -- restate the question, please.

2    Q. Have you ever been deposed?

3    A. Yes.

4    Q. When was that?

5    A. About the mid-90s.

6    Q. And what was that in reference to.

7    A. An EEO complaint.

8    Q. Yours or someone else's?

9    A. My complaint.

10    Q. What was the end result of that EEO complaint that

11  you're referring to?

12    A. It was settled.

13    Q. And what was the nature of the settlement?

14    A. When you say nature of the settlement --

15    Q. What were the terms in -- not all the terms, but

16  were the -- did you receive any money as a part of the

17  settlement?

18    A. Yes.

19    Q. How much money?

20    A. $20,000.

21    Q. And did you receive or -- receive a benefit or --

22  any other benefit as part of that settlement?

23    A. Yes.

24    Q. And what was that?

25    A. A promotion.

## Page 12

1    Q. From what to what?

2    A. GS-11 to GS-12.

3    Q. Have you ever been convicted of a crime other than a

4  minor traffic?

5    A. No.

6    Q. One of the claims you bring in this case is that you

7  believe you were improperly or illegally denied an accretion

8  of duties promotion because of your increased COTR duties, is

9  that correct?

10    A. Yes.

11    Q. And tell me what are the duties of a COTR that you

12  think warranted an increase from a GS-12 to a GS-13.

13    A. I didn't understand the question. Would you restate

14  it, please?

15    Q. Sure. I understand that you -- one of the reasons

16  you brought this suit is because you believed you were denied

17  a accretion of duties promotion, is that right?

18    A. Correct.

19    Q. And the accretion of duties relates to increased

20  COTR, and that's C-O-T-R, duties, is that right?

21    A. That's correct.

22    Q. And for the benefit of the court reporter, what does

23  COTR stand for?

24    A. Contracting Officer, Technical Representative.

25    Q. So I need you to explain to me what that -- what

Page 13

1 duties you believe warranted the accretion of duties
2 promotion.
3     A. COTR duties are assigned to professional series
4 employees at the Pension Benefit Guaranty Corporation. When I
5 say professional series employees, you have accountants,
6 attorneys, actuaries, professional employees. Then you have
7 technical and you have staff and then support employees based
8 on an agreement with the union and PBGC, COTR duties were only
9 to be assigned to professional series employees. It was also
10 agreed that their performance standards would include the COTR
11 duties as part of their performance. I am a Financial
12 Specialist, 501 financial series. My performance standards
13 nor the position description state that I --
14     MR. SHAPIRO: Sorry. Excuse me. Oh, my goodness.
15     MS. MELNIK: oh, my goodness?
16     MR. SHAPIRO: Yeah. I have -- one of my daughters
17 is sick and she just called.
18     MS. MELNIK: shall we go off the record.
19     MR. SHAPIRO: Yeah.
20         (OFF THE RECORD)
21         (ON THE RECORD)
22     BY MS. MELNIK:
23     Q. I believe, Mr. Montgomery, you were -- I think you
24 last were talking about the fact that you're a Financial
25 Specialist, 501 series, and it was in response to my question

Page 14

1 of what accretion of duties do you believe warranted a
2 promotion from a GS-12 to a GS-13. Can you answer that
3 question?
4     A. Yes. I believe my last statement was that my
5 performance standards nor my position description have
6 assigning COTR duties.
7     Q. They did or did not?
8     A. Did not.
9     Q. Okay.
10     A. My immediate supervisor, Cynthia Adams,
11 supervisor/accountant/branch chief, asked me to take on COTR
12 duties from a previous employee who was Christine Thomas, a
13 former accountant/supervisory -- supervisor/team leader.
14     Q. Let me just interrupt and ask you this, you were
15 trained to be a COTR, is that right?
16     A. No.
17     Q. You've never taken the COTR classes or training?
18     MR. SHAPIRO: When, before he was asked or after,
19 what time period?
20     BY MS. MELNIK:
21     Q. Before you were asked to take on the COTR duties
22 that were being performed by the supervisor/accountant --
23 /accountant, Christine Thomas --
24     A. Correct.
25     Q. -- had you had your COTR training?

Page 15

1     A. Yes.
2     Q. Okay. And weren't you actually acting as a COTR but
3 with respect to different contracts than the ones you took
4 over from Ms. Thomas?
5     A. Yes.
6     Q. Okay. How many contracts were you already a COTR
7 for before Cynthia Adams asked you to be the COTR for the one
8 that Ms. Thomas gave up?
9     A. One.
10     Q. And what was the one?
11         (Phone rings)
12     MR. SHAPIRO: I have to call you back.
13     BY MS. MELNIK:
14     Q. I'm sorry. What was the one?
15     A. COTR for the Missing -- Program.
16     Q. And that was the one contract you were COTR for
17 before Cynthia Adams asked you take on Ms. Thomas' COTR duty?
18     A. Yes.
19     Q. Okay. And when was this when Ms. Adams asked you,
20 what year?
21     A. Asked me?
22     Q. Asked you to take on the COTR duties that had been
23 done by Christine Thomas.
24     A. October of 2002.
25     Q. And so what were the contracts -- contract or

Page 16

1 contracts that Ms. Adams asked you to be a COTR for?
2     A. The professional accounting service contract for the
3 Bert Smith (phonetic sp.) certified public accountants firm
4 employees.
5     Q. And when she asked you, did you object to that or
6 were you amenable to doing that?
7     A. Amenable? I'm not sure how you determine amenable.
8     Q. Well, did you object to taking on the Bert Smith
9 contract as a COTR?
10     A. We discussed it.
11     Q. Okay. Did you object to it? Did you say, Ms.
12 Adams, no, I don't want to do this, no thank you?
13     A. My comment was providing I performed the COTR duties
14 as required.
15     Q. I'm sorry. I don't understand your response.
16     A. I made it clear to her that as a COTR I would do the
17 duties of the COTR and not according to the desires of anyone
18 else. COTR duties are important responsibilities, and I know
19 that I were to inherit those duties, I would carry them out
20 according to the responsibilities of the contracting officer.
21     Q. I understand that, but that wasn't answering my
22 question. My question was did you say no, I won't do this?
23     A. No.
24     Q. And describe for me what your duties were as a COTR
25 for the Bert Smith professional accounting contract.

## Page 17

1     A. They were to reconcile the expenses from the
2  invoices, to receive monthly reports from the contractor
3  jobs or tasks they performed, to make reports to the
4  Procurement Office about the contract, to inquire with the
5  contract employees of issues concerning performance of the
6  contract.
7     Q. Anything else?
8     A. Also basic responsibilities.
9     Q. I don't know what you mean by that.
10    A. I don't have the complete list of all COTR duties in
11 front of me to elaborate various roles that the COTR had to
12 fulfill.
13    Q. Well, just based on your recollection, are the ones
14 you just listed the ones you can recollect right now that you
15 were performing?
16    A. I'm sorry?
17    Q. The ones you just listed for us just now, the
18 specific ones you've listed --
19    A. Yeah.
20    Q. -- are those the only ones that come to mind right
21 now as you sit here?
22    A. That I -- yes.
23    Q. Now those duties that you listed don't include
24 reviewing the actual accounting work that is produced by the
25 contract employees of Bert Smith, correct?

## Page 18

1     A. No. No, that's not correct.
2     Q. That's not correct? Okay. Explain to me what you
3  did in terms of reviewing their actual accounting work. I
4  mean like their facts and their figures and numbers they
5  produced for reports for terminated plans.
6     A. That's supervising contracts -- contractors. That's
7  not the COTR's role.
8     Q. Okay. So you didn't do that, correct?
9     A. Didn't do?
10    Q. What I just described, reviewing the actual
11 accounting work in terms of the numbers that they analyzed and
12 evaluated for their plans that they were working on.
13    A. You want to rephrase the question? Are you talking
14 day to day?
15    Q. Yeah. I'm talking day to day and overall.
16    A. Okay. Would you restate the question, please?
17    Q. Sure. It was not your responsibility or role to
18 review the work product of what the accountants produced in
19 terms of reviewing or checking for accuracy the numbers that
20 they entered into the plans, the terminated plans, that they
21 received as their assignment of trust accountants -- contract
22 trust accountants in your branch that you work in? That was
23 not your role, correct?
24    A. No, that's not correct.
25    Q. Okay. What review did you do of their work product?

## Page 19

1     A. As part of their task order and to record plan
2  assets or liquidations for each plan into the general ledger,
3  they had to be reconciled monthly. Then the Accounting Branch
4  generated a report called Acquisition Liquidation Report for
5  all accountants, contractors and government employees that had
6  to be reconciled --
7     Q. Oh, well, you --
8     A. -- used by each plan, by each plan. The report had
9  the case number and the plan's assets and liabilities for each
10 case required to be reconciled. For month end I completed
11 that reconciliation with each entry that was put into the
12 general ledger.
13    Q. But the entries that were put in by the trust
14 accountants and the contract trust accountants, you didn't
15 review the work product that produced that number, correct?
16    A. No, I did not.
17    Q. The numbers that you were reconciling were already
18 put in the ledger by the accountants, correct?
19    A. Correct.
20    Q. You didn't put those numbers there?
21    A. No.
22    Q. And when you used the word reconcile, essentially
23 you're making sure by using addition and subtraction that the
24 numbers added up accurately, so to speak, layman's terms?
25    A. Restate the question, please.

## Page 20

1     Q. Sure. To "reconcile", the word you used, the
2  reports from the entries -- ledge entries that were put in by
3  the trust accountants and the contract trust accountants, that
4  required you to use addition and subtraction to make sure that
5  the numbers added up or -- I don't know what word you'd use,
6  but to make sure that it all worked out, correct? You didn't
7  use accounting treatments other than addition and subtraction
8  to make sure that the numbers were reconciled, correct?
9     A. I disagree.
10    Q. Okay. What accounting treatments did you use?
11    A. Accounting assets and liabilities --
12    Q. Okay.
13    A. -- or assets and liability equity. There is an
14 accounting equation that's adding and subtracting plus and
15 minus. Assets are pluses. Liabilities are minus. Equity is
16 the sum of the total, so it is an accounting function.
17    Q. Okay. And the numbers you were using were already
18 provided to you, correct?
19    A. Through the report.
20    Q. Now what other additional duties do you claim
21 justified a promotion from a GS-12 to a GS-13 with respect to
22 COTR duties?
23    A. In October of 2002 when asked by Ms. Adams to be the
24 COTR for the Bert Smith contract, I inherited files previously
25 held by Christine Thomas that had not been reconciled for

## Page 21

1 months. I had to do reports to the General Accounting Branch
2 to reconcile them to the financing accounting to put in the
3 system which is the Agency general ledger. At that time the
4 staff for the contractors was approximately three.
5    Q. So you had three contract accountants working in the
6 branch?
7    A. Yes.
8    Q. Okay.
9    A. Subsequent to taking over as COTR, I had -- as COTR
10 I had to generate a Statement of Work to relet the contract
11 out in 2003. I completed the Statement of Work. In order to
12 let the contract, it had to be evaluated. I led the
13 evaluation of the contract. The staffing for the contract was
14 increased twofold.
15    Q. To how many?
16    A. Six initially.
17    Q. When did that happen?
18    A. The contract was awarded in October 2003.
19    Q. And are we referring to Bert Smith prevailing in the
20 recompete?
21    A. That's correct.
22    Q. Okay. So once Bert Smith won the contract for
23 accounting services in your branch, the branch required three
24 additional accountants, trust accountants, to work in the
25 branch, so it went from three to six, is that accurate?

## Page 22

1    A. Two accountants and a project manager.
2    Q. And I believe you said initially. What do you mean
3 by initially?
4    A. The contract staffing increased almost annually
5 after a let of the contract.
6    Q. Okay. So in 2003 you had five accountants and one
7 project manager?
8    A. Correct.
9    Q. Okay. And so describe for me whatever changes
10 occurred in terms of staffing say for 2004.
11    A. 2004, we brought on two temporary staff, two
12 temporary contract employees.
13    Q. Accountants?
14    A. Accountants.
15    Q. And when you say temporary, that's different from
16 the other contract employees?
17    A. Based on needs of the branch and funding we
18 requested two additional accountants.
19    Q. Okay. So is it accurate to say in 2004 you had
20 seven contract accountants and one project manager?
21    A. There about.
22    Q. How about in 2005?
23    A. The Bert Smith contract increased, I think, by two.
24    Q. So nine contract trust accountants and one project
25 manager?

## Page 23

1    A. I believe eight contract accounts, one accounting
2 technician and a project manager.
3    Q. What's an accountant technician do?
4    A. For whom?
5    Q. I mean generally what are their responsibilities?
6    A. Would you like to restate the question? For whom?
7    Q. Well, for the branch. Why are they there? Why are
8 they brought in?
9    A. For the branch or the contractor?
10    Q. Well, I assume that the branch has contractors, both
11 accountant contractors, an accountant tech and a project
12 manager, because the branch needs these services or else they
13 wouldn't have a contract at all, so I'm asking why -- what
14 duties or services does the accountant tech perform for the
15 branch such that they're needed?
16    MR. SHAPIRO: But you mean the contractor accounting
17 technician?
18    MS. MELNIK: Right.
19    MR. SHAPIRO: Okay, because there's also a
20 technician who's not a contractor.
21    MS. MELNIK: Well, I'm --
22    MR. SHAPIRO: That's what he was asking. See, he
23 was asking you to say which one did you want.
24    BY MS. MELNIK:
25    Q. I'm only talking about the contractors right now, so

## Page 24

1 the contract accounting technician.
2    A. Thank you for the clarification. The contract
3 accounting technician was hired to log in bank statements.
4 The lack of control of that bank statement was a concern of
5 the IG. It was an issue. As part of the clean opinion.
6    Q. I'm sorry, as part of --
7    A. As part of a clean opinion by our auditors of
8 financial functions, it was noted that there was a lack of
9 control of bank statements and so efforts to get another
10 position -- government position failed, and so the Agency
11 allowed us to hire another contractor for that role.
12    Q. What was the date of your retirement?
13    A. September 30th, 2006.
14    Q. And were you still the COTR for the Bert Smith
15 contract until your retirement?
16    A. Yes.
17    Q. Okay. So then how about in 2006, what were the
18 numbers of contract employees in IAB?
19    A. Seven accountants and one accountant tech, project
20 manager.
21    Q. Other than the Bert Smith contract starting in 2002,
22 what other -- what, if any, other contracts were you the COTR
23 for?
24    A. The Missing Participant Program.
25    Q. Is that it?

Page 25

1    A. Yes.
2    Q. Okay. The 2002 Missing Participant Program, Bert
3 Smith contract, those are the two?
4    A. Yes.
5    Q. Okay. How about for 2003?
6    A. The same.
7    Q. And how about 2004?
8    A. The same.
9    Q. How about 2005?
10    A. Briefly three.
11    Q. So still Missing Participants and Bert Smith?
12    A. Yes.
13    Q. And you said briefly three. What was the third?
14    A. The State Street Custodian Bank contract.
15    Q. And you served as a -- like an interim COTR on that?
16    A. Yes.
17    Q. For how long?
18    A. Less than a month.
19    Q. And then 2006 until your retirement which contracts?
20    A. Bert Smith and Missing Participants.
21    Q. Now with respect to the Missing Participants
22 contract -- I want to ask with respect to both of them first,
23 Missing Participants and Bert Smith. Your work load with
24 respect to those contracts varied depending upon the time of
25 the month and also the time of the year, is that correct?

Page 26

1    A. Yes.
2    Q. So it wasn't the same level of work? Whether it be
3 great or small, it didn't stay consistent throughout the year
4 or the month?
5    A. Stay consistent?
6    Q. Sure. I'll rephrase. For instance, one day you may
7 be working on your duties as COTR for a large part of the day,
8 is that fair?
9    A. Yes.
10    Q. And then three months later you may have more of
11 your other duties as a Financial Specialist taking up the
12 largest part of your day compared to your COTR duties,
13 correct?
14    A. I would disagree.
15    Q. Okay. Well, explain that, why do you disagree?
16    A. As a Grade 12 employee, it was left up to me to
17 prioritize my work as to how I want to get it done as long as
18 I met the deadline, so I wanted to spend two days doing COTR
19 work and three days doing my other work, I controlled the
20 complexity or the depth of how I did my job.
21    Q. So your COTR duties, though, did not take up the
22 majority of every day of every week, is that fair?
23    A. Yes.
24    Q. And so, as you explained to me, some days -- since
25 you were the one who had control over how you prioritized your

Page 27

1 duties, there were some days where your Financial Specialist
2 duties, separate and apart from COTR, you'd work on those all
3 day, correct?
4    A. Yes.
5    Q. And there were some days maybe it was 50 percent
6 COTR, 50 percent Financial Specialist days?
7    A. If I prioritized it that way.
8    Q. Okay. Or 75 percent Financial Specialist, 25
9 percent COTR for a day?
10    A. If the requirements precipitated that.
11    Q. But you had -- I'm sorry. But you had control over
12 that?
13    A. Yes.
14    Q. Okay. When did you first go to Ms. Adams to -- or
15 who did you go to to express your interest in having an
16 accretion of duties promotion? First who?
17    A. My immediate supervisor, Ms. Adams.
18    Q. And did you -- you were on good terms with Ms.
19 Adams, is that right?
20    A. A good rapport.
21    Q. And did you go to her personally or did you do it
22 via memorandum?
23    A. Personally.
24    Q. And as best you can recollect, what was the
25 conversation?

Page 28

1    A. That I felt that I should get an accretion of
2 promotion -- accretion of duties promotion because of the
3 increased work load of COTR duties.
4    Q. And in that you're referring to the Bert Smith
5 contract and the number of contract employees -- the increase
6 in contract employees that were working in your branch?
7    A. And tasks.
8    Q. And --
9    A. As well as the tasks of a COTR, the COTR tasks.
10    Q. Tasks, T-A-S-K-S?
11    A. Yes.
12    Q. Okay. And with respect to that conversation that
13 you're referencing or we're referencing, what is your best
14 recollection of Ms. Adams' response to your initial verbal
15 request?
16    A. I don't blame you, Monty. I would do the same also.
17    Q. Did she say anything else with respect to how that
18 could be accomplished or did you take the lead? How did that
19 conversation go?
20    A. She said she would look into it.
21    Q. If you can recall, what's the -- after Ms. Adams
22 said that she would look into an accretion of duties promotion
23 for you, what's the next event or movement or response that
24 occurred in connection with that?
25    A. Some time expired without getting feedback from Ms.

Page 29

1  Adams and I approached her again and asked her what she found
2  out about accretion of duties.
3      Q. Do you remember approximately how much time went by,
4  weeks, months?
5      A. A couple of weeks.
6      Q. Do you remember her response when you approached her
7  the second time?
8      A. As I recall, she stated that she had to talk with
9  Wayne McKennon (phonetic sp.) regarding the accretion of
10  duties.
11      Q. And who was Wayne McKennon in connection to you?
12      A. He would be my second level supervisor.
13      Q. So he's Ms. Adams' supervisor?
14      A. Immediate supervisor.
15      Q. What's the next event or conversation regarding your
16  request? What was the next thing that happened?
17      A. There was another lapse of time without getting a
18  response back from Ms. Adams and I approached her again.
19      Q. And are we talking weeks or months?
20      A. Well, a couple of months.
21      Q. And, forgive me, when was it that you first -- you
22  might have said the date or the month and the year, but what
23  was the month and year that you first went to Ms. Adams and
24  asked?
25      A. The year, 2003. I can't give you a month. I have

Page 30

1  no idea.
2      Q. You can't remember if it was cold outside or hot
3  outside? Sometimes season sparks a memory.
4      A. Approximately March of 2003, and I bring that up
5  because of the quarterly review.
6      Q. And why is that significant, quarterly review?
7      A. That's when we discuss how well I do my job and get
8  assessment.
9      Q. Oh, I see, quarterly review of yourself?
10      A. Yes.
11      Q. Like an evaluation.
12      A. Yes.
13      Q. Okay. So I interrupted you. Another lapse of time
14  of a couple of weeks and --
15      MR. SHAPIRO: No, months.
16      MS. MELNIK: Oh, months. It was months?
17      MR. SHAPIRO: Yeah, a couple months. First if was a
18  couple of weeks, then a couple of months.
19      MS. MELNIK: Mr. Shapiro, I can ask him.
20      MR. SHAPIRO: Well, you were misstating the record.
21      MS. MELNIK: Well, then object and I'll restate if
22  necessary if he doesn't understand.
23      BY MS. MELNIK:
24      Q. So a couple of months went by?
25      A. Yes.

Page 31

1      Q. Is that about two?
2      A. Two, three months.
3      Q. So sometime around the summer of 2003, would that be
4  fair?
5      A. Yes.
6      Q. And what happened this time when you spoke to her?
7      A. I asked her had a decision been made regarding my
8  accretion of duties and she indicated she had talked to Wayne,
9  but he had not gotten back to her and, as I recall, Mr.
10  McKennon was on leave or out of the office, and she indicated
11  she had a meeting with Mr. Winter and she would bring it up
12  with him.
13      Q. She had a meeting with Mr. Winter that was upcoming
14  --
15      A. Yes.
16      Q. -- and at that time she would discuss your accretion
17  of duties with him?
18      A. Yes.
19      Q. What's the next event or conversation with respect
20  to your original accretion of duties request? What was the
21  next thing?
22      A. I allowed a few days to go by to see if Ms. Adams
23  would give me input regarding the discussion with Mr. Winter
24  on my accretion of duties.
25      Q. And then what did you do or what happened?

Page 32

1      A. I believe I discussed the situation with an EEO
2  counselor.
3      Q. So you had not heard back yet from Ms. Adams
4  regarding her conversation that she said she was going to have
5  with Mr. Winter before going to see an EEO counselor about it?
6      A. That's correct.
7      Q. Okay. Do you remember when you first visited an EEO
8  counselor, month? Is this still in the summer of 2003?
9      A. The latter part of 2003.
10      Q. What's the next event or conversation that occurred
11  with respect to your request for accretion of duties after you
12  visited the EEO counselor about it?
13      A. I'm sorry. Would you restate the question?
14      Q. Sure. What's the next event or conversation or
15  things that occurred regarding your accretion of duties
16  request after you visited the EEO counselor, which is the last
17  thing you described happening?
18      A. With whom?
19      Q. With anyone. Well, with you. What's the next
20  communication that was given to you or the next action you
21  took or what's the next event?
22      A. The next event I can recall was being approached by
23  Ms. Adams regarding updating my PD.
24      Q. Before we move forward from that, why did you go to
25  an EEO counselor?

Page 33

1    A. I was seeking a promotion through accretion of
2 duties that is allowed by the Agency directives and the
3 Collective Bargaining Agreement, and I felt I had given
4 justification for the accretion of duties and no action had
5 been taken.
6    Q. So why EEO as opposed to, I don't know, writing a
7 memorandum to Mr. McKennon directly or contacting officials in
8 your chain? Why EEO?
9    A. There were promotions going on in FOD – accretion
10 of duties promotions going on in FOD for other employees, and
11 my attempt to get accretion of duties promotion was stifled
12 and I felt that was being discriminatory.
13    Q. Who can you recall received accretion of duties in
14 FOD -- an accretion of duties promotion in FOD?
15    A. There were several that I knew had gotten an
16 accretion of duties promotion. Franklin Tate.
17    Q. Do you remember what branch he's in?
18    A. Treasury Division.
19    Q. Is there a branch underneath that or --
20    A. I'm sorry. You said branch?
21    Q. Well, division's fine. Do you know what branch he
22 was in within Treasury Division?
23    A. No, I do not.
24    Q. Okay. Do you know what grade he was before he
25 received his accretion of duties promotion?

Page 34

1    A. He was a Financial Analyst 12.
2    Q. And so did he go from a Financial Analyst 12 to a
3 Financial Analyst GS-13?
4    A. Yes.
5    Q. And was the accretion of duties for Mr. Tate COTR
6 duties only?
7    A. I have no idea.
8    Q. And who else do you recall getting an accretion of
9 duties promotion in FOD?
10    A. Sam Yeng (phonetic sp.).
11    Q. And what was his position?
12    A. Accountant.
13    Q. Was he a trust accountant?
14    A. No.
15    Q. Okay. Do you recall what grade he accreted from and
16 to?
17    A. An Accountant 12 to an Accountant 13.
18    Q. And was he accreted for COTR -- increased COTR
19 duties?
20    A. I have no idea.
21    Q. Do you recall what kind of accountant Mr. Yeng was
22 if he wasn't a trust accountant?
23    A. He interfaced with the State Street Bank personally.
24    Q. Is he in your branch?
25    A. No.

Page 35

1    Q. Okay. And Mr. Tate, what race was he?
2    A. White male.
3    Q. Guesstimate on an age range, 40s --
4    A. Frank Tate?
5    Q. -- 30s, 40s, 50s?
6    MR. SHAPIRO: He's asking Frank Tate?
7    BY MS. MELKIN:
8    Q. Yes, Frank Tate. I'm sorry.
9    A. Currently or --
10    Q. At the time, I guess, in 2003 when you were also
11 seeking accretion of duties?
12    A. Late 40s.
13    Q. And Mr. Yeng, what nationality or race?
14    A. Korean, Asian.
15    Q. Okay. Age range in terms of decade, 30s, 40s, 50s?
16    A. 30s.
17    Q. Besides Mr. Tate and Mr. Yeng, who else received
18 that you can recall an accretion of duties promotion?
19    A. Melinda Fitzpatrick (phonetic sp.).
20    Q. Melinda?
21    A. Melinda Fitzpatrick.
22    Q. Okay. What position did she hold?
23    A. Secretary.
24    Q. And do you recall what division or branch she was
25 in?

Page 36

1    A. Collection and Compliance Division.
2    Q. Referred to often as CCD?
3    A. CCD.
4    Q. Okay. And white female?
5    A. Black female.
6    Q. Okay. Age range, 30s, 40's, 50s?
7    A. 50s.
8    Q. And was she accreted because of increased COTR
9 duties?
10    A. No.
11    Q. And do you recall what grade she got promoted from
12 to?
13    A. I believe GS-6.
14    Q. From a GS --
15    A. From a GS-6.
16    Q. To GS-7?
17    A. I think GS-8.
18    Q. GS-8. Anyone else besides Mr. Tate, Mr. Yeng and
19 Ms. Fitzpatrick that you recall that got an accretion of
20 duties promotion?
21    A. Yes.
22    Q. And who's that?
23    A. I can't recall her name right now.
24    Q. Can you picture them?
25    A. Yes.

Page 37

1  Q. Okay. Male or female?
2  A. Female.
3  Q. Okay. Race?
4  A. Black.
5  Q. Age range, 30s, 40s, 50s?
6  A. 50s.
7  Q. Where did she work?
8  A. Collections -- CCD.
9  Q. And what -- she got a promotion from what grade to
10 what grade?
11 A. 12 to 13.
12 Q. Was it for increased COTR duties?
13 A. No.
14 Q. Do you recall what her position was or her --
15 A. Yes.
16 Q. What was she?
17 A. Quality Assurance Analyst.
18 Q. Do you know what branch that was in?
19 A. Excuse me. Shirley Jones is her name.
20 Q. If we talked about her enough, you'd remember the
21 name. Where was Ms. Jones working?
22 A. CCD.
23 Q. Oh, I'm sorry. Did you say -- you did say that
24 already. Do you know what her job title was?
25 A. Quality Assurance --

Page 38

1  Q. Analyst.
2  A. -- Analyst.
3  Q. Sorry. Now the last thing I think I left on before
4  -- well, is there anyone else you can recall actually while
5  we're still on this? We have --
6  A. Yes.
7  Q. All right. Who else?
8  A. Tonya Jones.
9  Q. Race?
10 A. Black.
11 Q. Black female, correct, just based on the name?
12 A. Yes.
13 Q. I'm guessing Tonya's a woman. Age range, 30s, 40s,
14 50s?
15 A. 40s.
16 Q. Her position?
17 A. Administrative Officer.
18 Q. In what branch, if you know?
19 A. Administrative Division.
20 Q. And she went from what grade to what grade?
21 A. 13 to 14.
22 Q. And was for increased COTR duties?
23 A. No.
24 Q. Oh, maybe I didn't. Did I ask you with respect to
25 Ms. Jones, just to go back a name -- no, I did ask. We've got

Page 39

1  six. Anyone else?
2  A. Not to my knowledge.
3  Q. Okay. Now the last -- before we started naming the
4  folks you just named, we were talking about the fact that you
5  went to the EEO counselor because you felt like your accretion
6  of duties request was being stifled, I think is the word you
7  used. Do you remember answering that question?
8  A. Yes.
9  Q. Okay. For what protected classes do you feel you
10 were being discriminated against?
11     MR. SHAPIRO: Objection. That's vague.
12     BY MS. MELNIK:
13 Q. Well, do you feel like you were being discriminated
14 against because of your race?
15 A. Yes.
16 Q. Okay. And, for the record, you're a black male?
17 A. Yes.
18 Q. Okay. Why do you feel you were being discriminated
19 against because of your race?
20 A. Black males in FOD were not receiving promotions in
21 comparison to other groups of employees.
22 Q. Any other reason?
23 A. Reason?
24 Q. Any other reason why you believe you were being
25 discriminated against because of your race with respect to

Page 40

1  your accretion of duties promotion request?
2  A. Would you mind stating the -- restating the
3  question, please?
4  Q. Sure. You've said that you believe you were being
5  discriminated against because of your race with respect to
6  your accretion of duties promotion request, is that fair?
7  A. Yes.
8  Q. Okay. So I'm now asking you why you believe you
9  were being -- you, personally, why were you being -- why do
10 you believe you were being discriminated against because of
11 the fact that you're African-American?
12 A. Okay. Other COTRs in FOD were higher grades. I
13 believe males, white males.
14 Q. Okay. What white males in FOD who were COTRs were a
15 higher grade than you are?
16 A. John Leonard.
17 Q. And do you recall what branch he was in, division or
18 branch?
19 A. Treasury Division.
20 Q. Treasury Division. And do you recall what his title
21 was, what his job was?
22 A. Financial Analyst.
23 Q. And what his grade was?
24 A. 13.
25 Q. Any other non-African-Americans -- we're just

## Page 41

1 talking about race here for now. Any other non-African-
2 Americans who were COTRs?
3    A. Yes, Cory. I don't know his last name. His first
4 name is Cory.
5    Q. Do you know where Cory worked?
6    A. Treasury Division.
7    Q. So was he a Financial Analyst also?
8    A. Yes.
9    Q. And what was his grade?
10    A. 13.
11    Q. And correct me if I'm wrong, in the Treasury
12 Division, are Financial Analysts the --
13    MS. MELNIK: What was the word you used after that?
14    MR. SHAPIRO: Foot soldier.
15    BY MS. MELNIK:
16    Q. Are they the foot soldiers of the Treasury Division
17 like trust accountants are to the IAB and those? Do they make
18 up, in other words, the worker bees in the Treasury Division?
19    A. That's a vague comparison. Their positions are
20 under the Treasury Division.
21    Q. Okay. In the Treasury Division, is there a branch
22 that Cory and John Leonard were both in? Were they in the
23 same branch within Treasury Division?
24    A. As I recall, they have groups, not branches.
25    Q. Okay. Not as a formal division as a branch, is that

## Page 42

1 what you mean?
2    A. Structured like most divisions.
3    Q. Oh, okay. Now do you know whether or not Cory or
4 Mr. Leonard received their 13 because of increased COTR
5 duties?
6    A. I do not know.
7    Q. You just know that they were COTRs and that they
8 were GS-13s?
9    A. Yes.
10    Q. Anyone else who was not an African-American who was
11 a COTR that had a higher grade than you?
12    A. Yes.
13    Q. Who else?
14    A. Ken Kofsey (phonetic sp.).
15    Q. Give it a try. How do you spell it, C or K?
16    A. K, Kofsey. I'm drawing a blank.
17    Q. Okay.
18    A. K-O-F-S-E-Y. That's as close as I can think of.
19    Q. Okay. And where did Ken work?
20    A. Collection and Compliance Division, CCD.
21    Q. And what did he do in CCD? What was his job?
22    A. COTR.
23    Q. That was his full-time job?
24    A. I can't say.
25    Q. You know he did COTR duties?

## Page 43

1    A. Yes.
2    Q. But you don't know if he had another -- what his
3 title was or what his job was other than COTR?
4    A. He was an accountant.
5    Q. Oh, an accountant. And what grade was he?
6    A. 13.
7    Q. Do you know if he received his 13 because of
8 increased COTR duties?
9    A. I do not know.
10    Q. But you know he was an accountant that had COTR
11 duties?
12    A. Yes.
13    Q. Any other person who's not African-American, but who
14 had COTR duties at a higher grade than yourself?
15    A. Not that I can recall.
16    Q. Okay. Now do you also believe you were -- this is
17 just with the accretion of duties because of increased COTR
18 responsibilities claim with respect to being a male. Do you
19 believe you were discriminated against because you were a
20 male?
21    MR. SHAPIRO: I'm going to object to that. That's
22 the race question. You said black male.
23    MS. MELNIK: Well, I said actually each time with
24 respect to him being African-American.
25    MR. SHAPIRO: But then you said black male. Then

## Page 44

1 you added male to it.
2    MS. MELNIK: Well, I'm asking now specifically just
3 as to gender, male.
4    MR. SHAPIRO: I object to the segregation of the two
5 things.
6    BY MS. MELNIK:
7    Q. Okay, but you can answer, with respect to being a
8 male.
9    A. What was the question?
10    Q. Sure. With respect to your accretion of duties
11 promotion request and your belief that you were being
12 discriminated against, one of the reasons that's a part of
13 your claim is that because you're a male, so my question is
14 why do you believe you were being discriminated against
15 because you are male?
16    A. The predecessor for the COTR function was a white
17 female.
18    Q. And that was Christine Thomas?
19    A. That's correct.
20    Q. And she was a -- what position did she hold?
21    A. Team lead, team leader, accountant.
22    Q. And what grade was she?
23    A. 13, GS-13.
24    Q. Were you in the branch when she was hired?
25    A. No.

Page 45

1   Q. So she was there in the branch before you were, is
2 that right?
3   A. I don't understand the question.
4   Q. Okay. I asked you if you were in the branch before
5 she got to the branch.
6      MR. SHAPIRO: That's not what you asked.
7      MS. MELNIK: I asked if you were hired. I'll ask a
8 different question then.
9      BY MS. MELNIK:
10   Q. Did she come to the branch after you?
11   A. Not that I recall.
12   Q. Okay. So then she was already there when you came
13 to the branch?
14   A. Yes.
15   Q. Okay. And what grade was she when you got there, if
16 you can recall?
17   A. 12 or a 13.
18   Q. You can't recall which?
19   A. No.
20   Q. Do you recall if she got an accretion of duties
21 promotion because of COTR duties?
22   A. State the question again.
23   Q. Did Ms. Thomas get a promotion because of increased
24 COTR duties?
25   A. I don't know.

Page 46

1   Q. Any other reason why you feel you were discriminated
2 against because you are male with respect to your accretion of
3 duties promotion claim?
4   A. Not that I recall.
5   Q. Do you have any -- other than what you just
6 described, the fact that Ms. Thomas was a higher graded
7 person, female, doing COTR duties, any other documents or
8 evidence that demonstrates you were discriminated against
9 because you are male?
10      MR. SHAPIRO: With regard to the COTR duties, an
11 accretion of duties?
12      BY MS. MELNIK:
13   Q. That's all we're talking about right now, COTR
14 duties, accretion of duties promotion request.
15   A. Can you restate the question?
16   Q. Sure. With respect to accretion of duties, COTR
17 duties promotion request, do you have any other evidence or
18 documents that demonstrates you were discriminated against
19 because you are male?
20      MR. SHAPIRO: Object to documents. We just got the
21 document request now and, you know, to ask a person at his
22 deposition do you have any documents is like just unfair.
23 He's got to go back and look through records, as do I, so it's
24 just an unfair question. We object to the question.
25      BY MS. MELNIK:

Page 47

1   Q. Subject to that caveat or objection, do you know of
2 any documents or evidence which demonstrates that you were
3 discriminated against because you are male with respect to
4 accretion of duties promotion request?
5   A. I'm not sure I understand your line of questioning,
6 so I'd just prefer you give me pieces of it if you would,
7 please.
8   Q. Sure. With respect to your accretion of duties
9 promotion, do you have any -- in your mind do you have any
10 evidence, proof, that demonstrates that you were discriminated
11 against because you are a male, and I can add in there
12 African-American, too, so as to either one?
13      MR. SHAPIRO: Objection. It leads to a legal
14 conclusion and he's not able to -- he's not a lawyer. He
15 doesn't -- you're asking if he -- before you asked him did he
16 know of any documents. Now you're changing it to does he have
17 any evidence?
18      MS. MELNIK: Well, he asked me to rephrase. I'm
19 trying to rephrase.
20      BY MS. MELNIK:
21   Q. Do you know of any -- I'm sorry.
22   A. Go ahead.
23   Q. No, you answer. I think you ready to answer.
24 What's your answer?
25   A. Not that I can recall.

Page 48

1   Q. Okay.
2      MS. MELNIK: Mr. Shapiro, do you want to take -- are
3 you all right?
4      MR. SHAPIRO: No. How far have you gotten? You
5 haven't gotten very far.
6      MS. MELNIK: I know.
7      MR. SHAPIRO: I'd like you to finish the accretion
8 of duties. Are you close to finishing that?
9      MS. MELNIK: We can get through COTR.
10      MR. SHAPIRO: It seems to me we ought to get through
11 one thing and then we can take a break and start something
12 else.
13      MS. MELNIK: All right. That's fair.
14      BY MS. MELNIK:
15   Q. With respect to your belief that you were
16 discriminated against with respect to your accretion of duties
17 promotion request because of your age, why do you believe you
18 were discriminated against because of your age?
19   A. Based on the list of COTRs assigned in the Agency.
20 Most appear to be younger than myself who were assigned COTR
21 duties.
22      MS. MELNIK: Aaah --
23      MR. SHAPIRO: What?
24      MS. MELNIK: Coaching.
25      MR. SHAPIRO: What coaching?

Page 49

1    MS. MELNIK: Well, I --
2    MR. SHAPIRO: He finished his answer.
3    MS. MELNIK: All right. Well --
4    BY MS. MELNIK:
5    Q. Well, I'm confused. What do you mean by the fact
6    that most of the COTRs were younger than you?
7    A. The Agency has a list of all its COTRs by name whom
8    I know most of.
9    Q. And many are younger than yourself, is that what
10   you're saying?
11   A. And higher grade, yes.
12            (OFF THE RECORD)
13            (ON THE RECORD)
14   BY MS. MELNIK:
15   Q. Who are the COTRs who are -- other than the ones you
16   may have already mentioned, who are the COTRs who are younger
17   than yourself and have a higher grade if FOD?
18   A. Could you restate the question, please?
19   Q. Sure. Who at FOD is a COTR younger than yourself
20   and at a higher grade?
21   A. Ken Kofsey, Shirley Mathis, Cory -- I can't remember
22   the last name, Frank Tate. I don't recall.
23   BY MS. MELNIK:
24   Q. Okay. And tell me about Shirley Mathis. What's her
25   race?

Page 50

1    A. White female.
2    Q. And what branch?
3    A. Collection and Compliance Division.
4    Q. And what's her job?
5    A. Accountant.
6    Q. Pardon?
7    A. Accountant.
8    Q. Accountant. And she is what grade?
9    A. 14.
10   Q. Is she a supervisor?
11   A. Only.
12   Q. And do you know if she got her GS-13 or 14 because
13   of COTR duties, increased COTR duties?
14   A. 13, I believe.
15   Q. Do you know if Ken Kofsey is a team lead?
16   A. The question?
17   Q. Is Mr. Kofsey in CCD, is he a team lead?
18   A. I believe so.
19   Q. And what's your basis of knowledge that Shirley
20   Matthews [sic] went from a 12 to a 13?
21   MR. SHAPIRO: I think it's Mathis.
22   MS. MELNIK: Mathis. I'm sorry, Mathis.
23   BY MS. MELNIK:
24   Q. What's your basis of knowledge that Ms. Mathis went
25   from a 12 to a 13 because of increased COTR duties?

Page 51

1    A. Vacancy announcement put out by the Agency December
2    2003 detailed COTR duties for that position.
3    Q. So that position as an accountant -- no, I'm sorry
4    -- yes, as an accountant had COTR duties associated with it,
5    is that right?
6    A. Yes.
7    Q. So in light of the fact that there was a vacancy
8    announcement, Ms. Mathis competed for that position, correct?
9    A. Yes.
10   Q. And if I'm clear, she competed for the GS-13? That
11   was what the vacancy announcement was for? She went from a
12   GS-12 to a GS-13.
13   A. I'm not sure.
14   Q. Okay. But there was a vacancy announcement, you
15   remember that?
16   A. Yes.
17   Q. And that the vacancy announcement had COTR duties
18   contained in it?
19   A. Yes.
20   Q. An accountant position?
21   A. Yes.
22   Q. And, lastly, with respect to your accretion of
23   duties promotion request, you believe you were retaliated
24   against because of prior EEO activity, is that right?
25   A. Yes.

Page 52

1    Q. So who do you believe was retaliating against you
2    with respect to your accretion of duties?
3    A. Theodore Winters.
4    Q. Anyone else?
5    MR. SHAPIRO: Well, if he has to name somebody, I
6    mean the Agency is the defendant here. Do you mean -- do you
7    want him to personalize it?
8    MS. MELNIK: I want to know who he believes
9    retaliated against him with respect to --
10   MR. SHAPIRO: Oh, you're asking a personalized
11   question, but not the Agency, you know.
12   MS. MELNIK: No, no.
13   MR. SHAPIRO: You want to know if there's a person?
14   MS. MELNIK: Correct.
15   MR. SHAPIRO: Okay. And he said Ted Winter, and you
16   want to know if there's anybody else?
17   MS. MELNIK: Correct.
18   MR. SHAPIRO: Okay, I understand.
19   BY MS. MELNIK:
20   Q. Is there anyone else besides Mr. Winter?
21   A. I don't know.
22   Q. Other than your own belief, do you have any other
23   basis to believe that Mr. Winter was retaliating against you?
24   A. I'm sorry. What was the question?
25   Q. Other than your belief that Mr. Winter retaliated

Page 53

1 against you with respect to your accretion of duties promotion
2 request, do you have any other reason or basis to believe he
3 retaliated against you?
4    A. No.
5    Q. And almost done. I just need to go back and ask you
6 with respect to being African-African, being black, who
7 specifically do you believe discriminated against you with
8 respect to your accretion of duties promotion request?
9    A. Who specifically?
10   Q. Who, who do you believe discriminated against you
11 because of your race with respect to your accretion of duties
12 promotion request?
13   A. Are you asking me for a name?
14   Q. Yes.
15   A. I gave you a name, Ted Winter.
16   Q. Okay, and I understand. The last question was about
17 retaliation and you answered Ted Winter. I'm asking you now
18 -- I'm just going back. I'm backtracking just for a second
19 with respect to race. Remember we went through why you
20 believe you were being discriminated against because of your
21 race?
22   A. Correct.
23   Q. Okay. So I'm asking you now who specifically do you
24 believe was discriminating against you because of your race?
25   A. My management officials.

Page 54

1    Q. Who specifically?
2    A. My immediate, intermediate and my third level
3 supervisors.
4    Q. So Ms. Adams, Wayne McKennon and Ted Winter?
5    A. Correct.
6    Q. And why do you believe Cynthia Adams discriminated
7 against you because of your race?
8    A. I'm a black male.
9    Q. Any other reason?
10   A. Not that I know of.
11   Q. Okay. And with respect to -- all right, that kind
12 of answers male. Is that your same response with respect to
13 being a male, that it's your first, second and third line
14 management?
15   MR. SHAPIRO: I object to the segregation of male.
16 It's sex and race. Go ahead and answer the question.
17   MS. MELNIK: Well, sex and gender are the same
18 thing.
19   WITNESS: What was the question?
20   MS. MELNIK: Sure.
21   MR. SHAPIRO: It's sex and race.
22   BY MS. MELNIK:
23   Q. Same question as the last, who specifically do you
24 believe discriminated against you in your accretion of duties
25 promotion request with respect to being male?

Page 55

1    A. Isn't that the question you asked me last?
2    MR. SHAPIRO: That was race.
3    BY MS. MELNIK:
4    Q. I'm breaking it down.
5    A. Okay.
6    Q. So now it's male, because you're a man.
7    A. Okay. I stick with my immediate supervisors.
8    Q. Okay. And your reason for believing that?
9    A. The accretion of duties were not approved.
10   Q. Any other reason for your belief?
11   A. I continued to do the duties. There was no feedback
12 and I was performing the duties. I was not expected to
13 perform the duties. There was no reason to take the duties
14 from me. So the Agency regulations allow accretion of duties
15 promotion and I felt that I was meeting the requirements
16 according to those regulations.
17   Q. And, lastly, with respect to your age, who
18 discriminated against you because of your age?
19   A. I'm older than all three of my immediate
20 supervisors.
21   Q. So, again, Ms. Adams, Mr. McKennon and Mr. Winter?
22   A. That's correct.
23   Q. And what's your reason for believing that they
24 discriminated against you because of your age?
25   A. I thought I answered that question.

Page 56

1    Q. Well, I just need you to answer it with respect to
2 age.
3    MR. SHAPIRO: I'm going to object. He's already
4 said what the age discrimination -- why he believes it was age
5 discrimination.
6    MS. MELNIK: I'm asking with respect to these
7 individuals.
8    BY MS. MELNIK:
9    Q. What -- did they ever say anything to you with
10 respect to your age like --
11   A. Mr. McKennon.
12   Q. Mr. McKennon has said something to you about your
13 age?
14   A. Yes.
15   Q. Which caused you to believe he was discriminating
16 against you because of your age?
17   A. In response to the question who did I think
18 discriminated against me because of my age, as I recall I said
19 my immediate supervisors. Mr. McKennon is one of those
20 immediate supervisors.
21   Q. I understand, and I'm asking you -- you just said
22 that Mr. McKennon said something to you. Did he say something
23 to you that caused you to believe that he was discriminating
24 against you in your accretion of duties promotion because of
25 your age?

Page 57

1    A. My age was mentioned several times by Mr. McKennon.
2    Q. When?
3    A. I can't -- I don't -- I can't give you a time frame.
4    Q. What's your best recollection of what he said?
5    A. Related to retirement, age and retirement.
6    Q. Anything more specific?
7    A. Not that I can recall.
8    Q. That GS-13 position that Ms. Mathis got that had
9    COTR duties associated with the accountant position, did you
10    apply for that position?
11    A. No, I did not.
12    Q. Okay. Why don't we take that break?
13        MR. SHAPIRO: Okay. What time -- it's now almost
14    12:15.
15        MS. MELNIK: We'll take a break until 12:30.
16        MS. ESSER: 12:30? Oh, you just want a break?
17    Okay.
18        MS. MELNIK: Yeah, yeah, we can break until 12:30,
19    maybe go from 12:30 to 1:15 or so and take -- you know, we've
20    been taking at your place about 45, 50 minutes for lunch.
21    There's places real close by.
22        MR. SHAPIRO: Okay.
23            (OFF THE RECORD)
24            (ON THE RECORD)
25    BY MS. MELNIK:

Page 58

1    Q. Now shifting gears a bit, now I'm going to be
2    talking to you about the trust accountant position that you
3    submitted applications for and were not found to be minimally
4    qualified for, the 04-105 vacancy announcement and the 04-143
5    vacancy announcement, just to let you know where my questions
6    are coming from, Mr. Montgomery.
7    A. Okay.
8    Q. Okay. Now with respect to your applications for
9    those accountant positions, and they were for accountant
10    positions, is that correct?
11    A. That's correct.
12    Q. Okay. And you agree that the accountant position is
13    a different position from the one you occupy, correct?
14    A. Yes.
15    Q. Okay. It's a different series than you position?
16    A. Yes.
17    Q. Okay. Now you heard yesterday your supervisor,
18    Cynthia Adams, describe the basic duties and functions of what
19    the trust accountants do in IAB, right?
20    A. Yes.
21    Q. And what I'd like to do is go through those duties
22    that she described and ask some follow-up questions with
23    respect to those. Now the first thing she described is that
24    the trust accountants get assigned a plan, a pension plan.
25        MR. SHAPIRO: I'm going to object to the term trust

Page 59

1    accountant. I think the vacancy announcement --
2        MS. MELNIK: Is this a speaking objection?
3        MR. SHAPIRO: Yeah. I think accountant is what it's
4    called.
5        MS. MELNIK: Well, let me ask the witness, Mr.
6    Shapiro, all right, rather than you testifying.
7    BY MS. MELNIK:
8    Q. The kind of accountant that works in IAB, are they
9    called trust accountants?
10    A. No.
11    Q. What are they called?
12    A. Accountants.
13    Q. Okay. That's their formal title, correct?
14    A. Yes.
15    Q. But the kind of accounting that they do is referred
16    to in your branch as a trust accountant, correct?
17    A. I really don't know.
18    Q. How long have you worked in IAB?
19    A. 12, 13 years.
20    Q. And you don't know whether or not the accountants in
21    your office are referred to as trust accountants?
22    A. You mean slangly or officially?
23    Q. How they're referred to. I'm not saying it's their
24    formal title down in IAB necessarily. Yeah, how do you all in
25    your branch refer to what kind of accountant that works in

Page 60

1    your branch? Is it not trust accountant?
2    A. No.
3    Q. How do you refer to each other?
4    A. Accountants.
5    Q. Never trust accountants?
6    A. At some time, yes.
7    Q. Okay. So the first thing that happens is that the
8    accountants in IAB receive -- they're assigned a plan,
9    correct?
10    A. Correct.
11    Q. Okay. And what's your understanding -- when I say
12    that they're assigned a plan, what's that mean to you?
13    A. The team leader determines who gets a plan.
14    Q. A plan meaning a potential pension plan that is to
15    be -- eventually become under the trustee of the Pension
16    Benefit Guaranty Corporation?
17    A. If the plan has been terminated as determined by the
18    Pension Benefit Guaranty Corporation.
19    Q. Okay. And one of the other things that Ms. Adams
20    described is that the assets with respect to those plans are
21    entered into what's called a Portfolio Accounting and
22    Management System or PAM. Do you recall her mentioning PAM
23    yesterday?
24    A. Yes.
25    Q. Okay. And is that something that the accountants in

Page 61

1  IAB perform?
2      A. At what step?
3      Q. Well, at any step is that something that they do?
4      A. Yes.
5      Q. Okay. You agree with that?
6      A. Yes.
7      Q. Okay. And she also mentioned a Trusteeship Decision
8  Record or a TDR. Do you know what a TDR is?
9      A. Yes.
10     Q. And what's a TDR?
11     A. It's after the attorneys have met with the company
12 and they agree that the Agency -- or the court has ruled that
13 the Agency should take over the plan. The Agency prepares a
14 TDR and it establishes a -- date of planned termination, as
15 well as a trusteeship date.
16     Q. Okay. I missed the last part of that sentence
17 basically.
18     A. When the date of planned termination, the official
19 date of planned termination and the trusteeship date are
20 established.
21     Q. Okay. And so you agree that is something that the
22 trust -- that the accountants, or I'm using the trust
23 accountants, in your branch, IAB, do perform?
24     A. Yes.
25     Q. Okay. Another thing that Ms. Adams described is

Page 62

1  that the accountants in IAB have contact with other people in
2  PBGC like auditors and they're in touch with those folks. Do
3  you recall her talking about that?
4      A. She could have.
5      Q. Okay. Do you agree that that's something that the
6  accountants in IAB do, they have contact with auditors that
7  are in PBGC?
8      A. Yes.
9      Q. Okay. And that the accountants analyze bank
10 statements for the plans?
11     A. Yes.
12     Q. Okay. And this may be part of what you just
13 finished explaining, but they have -- the accountants have
14 contact with the custodian bank, the bank statements and
15 analyze that with respect to the date of planned termination,
16 the assets?
17     A. Yes.
18     Q. Okay. And they then use either the Wall Street
19 Journal or something called Blumbergs. Do you know what she
20 was referring to when she said Blumberg?
21     A. Bloomberg (phonetic sp.).
22     Q. Bloomberg.
23     A. Um-hum.
24     Q. Okay. What's Bloomberg?
25     A. It's a computer that al⁻ ... you access to stock

Page 63

1  portfolios -- in stocks and determine their value?
2      Q. Okay. And that they then determine a schedule for
3  each asset type. Do you recall that that's what they do or
4  something to that effect?
5      A. Would you state the question again?
6      Q. Sure. That they determine like a schedule in terms
7  of value for each asset type.
8      A. They determine each asset value.
9      Q. Okay. And that they prepare a worksheet to
10 summarize all the plan's assets that you can include, stocks,
11 bonds, short term investments, derivatives, all the --
12     A. What's the question?
13     Q. That the accountants in IAB prepare a spreadsheet or
14 a worksheet with respect to all the assets and the value of
15 the assets of the terminated plan.
16     A. Data entry into a spreadsheet.
17     Q. Okay. And also that the accountants do monthly and
18 quarterly reports that show or demonstrate the realized gains
19 or losses with respect to the assets.
20     A. Some assets.
21     Q. Okay. And also expenses for the benefit payments?
22     A. Yes.
23     Q. Okay. Market adjustments with respect to all the
24 assets?
25     A. Some assets.

Page 64

1      Q. Okay. What do you mean by some?
2      A. Market adjustments are related to stocks, bonds.
3  There may be some hard to determine assets.
4      Q. As opposed to say cash?
5      A. Yes.
6      Q. Now it's your claim that the work you were doing as
7  a Financial Specialist was qualification enough for becoming
8  an accountant, a GS-13 accountant, in IAB, correct?
9      A. Yes.
10     MS. MELNIK: Now I'd like to have this marked as
11 Deposition Exhibit 1.
12             (Whereupon, the document that
13             was referred to as Deposition
14             Exhibit Number 1 was marked for
15             identification.)
16     BY MS. MELNIK:
17     Q. Okay. Mr. Montgomery, you'll agree with me that
18 Deposition Exhibit 1 is a copy of your application for the
19 vacancy announcement that is for J-I as in Ida-04-0105,
20 Accountant, GS-13, and you can look through it if you like.
21     A. Yes.
22     Q. Okay. If you could turn to page 3 of the document.
23     A. Page 3 as in page number or page 3 of --
24     Q. Well, actually the bottom of it, it says page 2, but
25 it's the third page of the document as it sits before you.

Page 65

1   A. Okay.
2   Q. Okay. Starts with letter A.
3   A. All right.
4   Q. All right. You notice that there is a space there
5   for description of work and it says describe your duties,
6   responsibilities and accomplishments in this job, including
7   the job title or titles of any employees you supervise. If
8   describe more than one type of work, for example, carpentry
9   and painting or Personnel and Budget, write the approximate
10  percentage of time you spend doing each. Do you see where I'm
11  referring to?
12  A. Yes.
13  Q. Okay. And you say as a Financial Specialist, on a
14  monthly basis I complete analysis and reconciliation of over
15  $120 million in financial transactions of commingled trust
16  funds entered into the trust plan ledger by 20 trust
17  accountants and support contractors. Now could you sort of
18  break that down a little bit for me? When you say complete
19  analysis and reconciliation, what are you talking about, what
20  do you mean, what are you actually doing in as plain a way as
21  can you describe?
22  A. In the record Ms. Adams related that trust
23  accountants get acquisitions and liquidations from the
24  custodian and it states three things that identify movement of
25  assets within each plan. The trust accountants have to put

Page 66

1   those entries into the trust plan ledger which helps them
2   generate this spreadsheet that we mentioned earlier. That
3   asset for each plan -- monthly State Street has provided the
4   Agency a report of the plan, the trust fund total amount, what
5   came in and what went out.
6       The trust accountants or accountants have to enter
7   that information to make sure that it's then booked. Then you
8   have to reconcile that the assets have been accounted for and
9   then properly entered into the system. In any given month the
10  assets can exceed $120 million for that month. The trust
11  accountants' entries have to tie out or prove itself.
12  Q. What was the last thing?
13  A. To prove itself, reconcile --
14  Q. Okay.
15  A. -- and cannot be out of balance. Otherwise, your
16  cash flow is off. So part of the reconciliation is the
17  accountant did enter everything in the proper account, and
18  after entering the proper account, you have to do what are
19  called memo accounts with the system -- the month and equity,
20  the 8011 memo account. It indicates that they have put
21  everything into the proper account and it balances. Then it
22  has to be proved. I come and do the reconciliation for every
23  entry the accountant has put in for that month to prove that
24  it, in fact, balances according to what the custodian said was
25  the movement of assets.

Page 67

1   Q. So you're basically comparing those two numbers,
2   what you said, what the trust accountants enter in and what
3   the custodian say is in there, as well, to make sure they
4   marry up?
5   A. Yes.
6   Q. Okay. And, again, the numbers that you're referring
7   to that you have to make sure marry up are already provideD?
8   A. By the custodian to the accountants.
9   Q. And the work that the accountants do is already
10  entered into the ledger?
11  A. Yes.
12  Q. Okay. And you give an explanation. You say this
13  analysis serves as a cross-check and verification of both
14  shared contributions and withdrawals reported at month end on
15  the Share Activity Report. Then you say to bring the
16  reconciliation to balance between the trust plan ledger I must
17  identify, investigate and resolve any out of balance
18  transaction enter and discuss discrepancies and findings with
19  the appropriate trust accountant or a contractor, and when you
20  say contractor, you mean a contract accountant?
21  A. Contractor -- the professional accounting service,
22  contractor in the -- Accounting Branch.
23  Q. Okay. So if you are marrying up these two numbers,
24  one from the -- what the custodian has and says is accurate
25  and what your accountant has entered into as the numbers as

Page 68

1   being accurate, if there's a difference between those two
2   numbers, in other words, they are not in balance, then you
3   have to discuss that or it's one of your duties to discuss
4   that with either a trust accountant or the contractor
5   accountant who's on that plan?
6   A. Yes.
7   Q. Okay. Under B on the same page -- give me one
8   moment -- you describe -- the duties you just described that
9   we just -- I just read off and you further explained were from
10  June of 1986 to present, is that correct?
11  A. Approximately, yes.
12  Q. Okay. And then it looks like you further describe
13  your duties or you describe your duties -- you separated them
14  out as when you were a GS-11, and you have that being from
15  March of 1994 to February of 1996 in Part B. Do you see that?
16  A. Yes.
17  Q. Okay. And you have you assisted in completion of
18  annual financial report, obtained financial data relevant to
19  the defined (phonetic sp.) benefit plans evaluated as
20  probables for termination. And when you say you obtained
21  financial data, what financial data are you obtaining, what do
22  you mean by that?
23  A. At that time it was called -- I believe it was
24  called the -- Department, and the Agency had the
25  responsibility to monitor the defined benefit plan.

Deposition of                    CondenseIt!                    DeLarse Montgomery

Page 69

1    Q. I'm sorry, what was that?
2    A. The Agency has the responsibility to monitor the
3 defined benefit plan to insure that they have assets to pay
4 out benefits to employees and determine the strength of its
5 assets.
6    Q. The what of its assets?
7    A. The strength.
8    Q. Strength.
9    A. The strength. If it's determined that the plan may
10 run into difficulty in meeting its responsibility to its
11 employees, they're going to watch. It may be a possibility
12 that PBGC has to take over that plan, so they're called
13 probables.
14    Q. I see. And so when you say obtain financial data,
15 what exactly did you do, if you remember?
16    A. I think we had a list of plans who were on the
17 probable list and we submitted that list to a department
18 within the Agency with that data because as part of the
19 financial statement you have to indicate the risk the Agency
20 may have to incur taking over the plan, so that information
21 had to go into the financial statement, probable liabilities.
22    Q. So I'm a little confused. Were you forwarding a
23 list of probables to another part of the Agency?
24    A. They provided data.
25    Q. Pardon?

Page 70

1    A. They provided data, financial data.
2    Q. Who's they?
3    A. At this point I can't tell you what department it
4 was or what office --
5    Q. Okay.
6    A. -- but this office.
7    Q. Okay.
8    A. And they would provide the information we needed to
9 extract data for the financial statement.
10    Q. Okay. Okay. So the information was provided to
11 you?
12    A. Yes.
13    Q. All right. Reviewed and captured financial data in
14 the fiscal year file used to develop balance sheets, income
15 statement and footnote in the financial report. You say
16 reviewed and captured financial data in the fiscal year file.
17 What are you talking about here?
18    A. Again, part of the information pertaining to the
19 probables, there's a huge database that allows you to extract
20 numbers to do a certain part of the financial statement. I
21 inputted data into this FY file.
22    Q. Where did you get the data from, the data that you
23 just said you could extract from the database?
24    A. Correct.
25    Q. Okay. And you inputted that data --

Page 71

1    A. Into the fiscal year file. We call it the FY file.
2    Q. Okay.
3    A. And then various reports are extracted out of the
4 database based on queries or instructions, if you want to call
5 them instructions, that you set out or the parameters you set
6 out --
7    Q. Okay.
8    A. -- to pull down the data.
9    Q. So you're extracting various -- you're extracting
10 information from the database to then put into -- or to help
11 prepare either balance sheets, income statement, and what's a
12 footnote in the financial report?
13    A. Footnotes are, excuse me, are narratives within the
14 financial statement or financial report. It deals with the
15 management's evaluation or assessment in various areas as to
16 --
17    Q. Evaluation of? I'm sorry. Management evaluation of
18 --
19    A. The projections of the overall state of the defined
20 benefit plan.
21    Q. Okay. Prepared file input for monthly operating
22 reports and assisted in preparing draft comments for the
23 management's discussion and analysis of financial conditions
24 and results of operations reported in the annual financial
25 report. If you'd break that down for me.

Page 72

1    A. Okay, I'll break that down.
2    Q. Put it in as simple language as you can.
3    A. This is the financial -- in here, the Financial
4 Reporting and Accounts Analysis, at that time, Branch. It's a
5 branch.
6    Q. Oh, okay.
7    A. So as part of the branch responsibility, it's just a
8 reporting requirement of the Financial Operation Department
9 and -- well, I'm sorry, of the Collections -- sorry, of the
10 Comptroller's Division, i.e, what has happened in general
11 accounting, what has occurred in trust accounting, report
12 information and the financial report. It goes to the division
13 manager. Then it's sent up to the department head who uses it
14 to brief the chief financial officer who uses it to brief
15 other senior level officials.
16    Q. Okay.
17    A. So within that I have prepared the draft comments,
18 as well as certain figures, debt figures or amounts, that goes
19 into that report.
20    Q. Okay. And that's with respect to the financial part
21 rather than the comments part? It's from the data or
22 information number you extracted from various databases or the
23 database. I guess I got to ask you about that. Is there --
24 we refer to Dbase, database. Are we talking about the same
25 base, database, or are we talking about a couple different

Page 73

1  things?
2      A. You mean corporation or --
3      Q. I don't know what I mean. When you say database,
4  what are you talking about, or Dbase.
5      MR. SHAPIRO: Objection. I don't think they're the
6  same thing.
7      MS. MELNIK: Oh, he can answer that.
8      WITNESS: IAB, Investment Accounting Branch, has its
9  own database when I was part of being in IAB. And the
10  Financial Reporting and Accounts Analysis Branch, it had its
11  own database.
12      BY MS. MELNIK:
13      Q. I'm sorry. Who also had their own database?
14      A. Financial Reporting and Accounts Analysis Branch --
15      Q. Okay.
16      A. -- or FRAAB, F-R-A-A-B.
17      Q. Okay. Certain aspects of the job done in Investment
18  Accounting Branch are fed into the database in Financial
19  Reporting and Accounts Analysis Branch --
20      Q. Okay.
21      A. -- because they do the reporting --
22      Q. I see.
23      A. -- of everything for the financial statement.
24      Q. And did you mostly work with the database that is
25  unique to IAB?

Page 74

1      A. Yes.
2      Q. That's the primary database we're talking about when
3  you --
4      A. Yes.
5      Q. -- talk about database?
6      A. Yes.
7      Q. The numbers you're extracting?
8      A. Yes.
9      Q. Okay. On the next page it's a -- it looks like a
10  further description of the work that you were doing, and you
11  say that I complete the monthly trust activity report that is
12  used in the monthly operating report provided to department
13  executive level staff. And I think -- isn't that what you
14  kind of just described, how the info is -- goes from the
15  branch to the division managers, department heads and chief
16  financial officer? Is that what you're referring to there in
17  that first sentence?
18      A. Different assignments. The first one --
19      MR. SHAPIRO: You're --
20      MS. MELNIK: Mr. Shapiro, he can answer.
21      MR. SHAPIRO: But he mixed two things up.
22      MS. MELNIK: Well, then he can clarify for me.
23      MR. SHAPIRO: We're not going to do this if you're
24  going to try to be like that. Now you read from two different
25  things and then you skipped a page.

Page 75

1      MS. MELNIK: So is there an objection?
2      MR. SHAPIRO: Yes, there's an objection.
3      MS. MELNIK: What's the objection? What is it?
4      MR. SHAPIRO: My objection is that you're being
5  deceptive for no purpose.
6      MS. MELNIK: Well, I don't think I'm being
7  deceptive. I think I may not know that there's a difference
8  because I am not an accountant and I'm going to need Mr.
9  Montgomery to --
10      MR. SHAPIRO: We're not talking about accounting
11  here. We're talking about A and B. One sheet contains A --
12      MS. MELNIK: Okay.
13      MR. SHAPIRO: -- and the other -- and you were
14  reading from B --
15      MS. MELNIK: Okay, okay.
16      MR. SHAPIRO: -- instead of continuing from B, and
17  that's what he's talking about.
18      MS. MELNIK: Okay. Relax, Mr. Shapiro.
19      MR. SHAPIRO: I'm perfectly relaxed.
20      MS. MELNIK: All right.
21      BY MS. MELNIK:
22      Q. Mr. Montgomery, the continuation sheet as it refers
23  to your description of work for 24.A, when you were referring
24  earlier about -- and it was sort of off -- you were providing
25  explanation to me in response to my question. You described

Page 76

1  sort of the flow of the information up the chain, so to speak.
2  Is that what you're referring to in that first sentence or is
3  that something else?
4      A. It's part of the responsibility of the Investment
5  Accounting Branch because that's who has responsibility for
6  the funds, and so my involvement with the database is to
7  extrapolate information that feed into the activity report.
8  It's the initial draft that ultimately goes to FRAAB who puts
9  it in an original report that goes to the comptroller and
10  further up the echelon.
11      Q. Okay. And you describe -- and the next sentence, I
12  think, elaborates. This report defines changes in fund
13  balance activities between pending plan assets and trustee to
14  plan assets. And then in further description of your work you
15  say to arrive at financial data, I analyze and summarize
16  various account from the summary trial balance report. I
17  prepare financial data used in determining the future value of
18  plan assets of guaranteed benefits to be paid by the Pension
19  Benefit Guaranty Corporation. So when you say to arrive at
20  the financial data, I analyze and summarize various accounts,
21  what do you mean by that?
22      A. Okay. Summary trial balance of -- the summary trial
23  balance is a report that's generated from the trust plan
24  ledger, and it has every account's plan assets -- as well as
25  expenses. And -- is taken and comes up with figures by

## Page 81

1 questionable as to you meeting your obligations. We take
2 those plans over.
3    Q. Okay.
4    A. Under defined benefit plan, it's strict termination.
5 If that plan decides that they want to become a 401 plan and
6 get out from defined benefit --
7    Q. Okay.
8    A. -- then they have to prove certain levels of
9 financial stability. They have to meet those obligations.
10    Q. Okay.
11    A. And then the Agency will authorize them to terminate
12 their plan, okay? The Standard Termination and Compliance
13 Division checks to make sure the plan is in compliance with
14 ERISA to terminate itself.
15    Q. Okay.
16    A. So I have to notify them when receipts come in.
17    Q. Who's them?
18    A. Well, Standard Termination and Compliance Division.
19    Q. Okay.
20    A. I notify the division manager. I report to the
21 division manager, reports that affect terminated plans.
22    Q. Okay.
23    A. And when they -- when that division determines that
24 monies have been received, if they've overpaid or, i.e., there
25 are certain plans that are not covered by the -- plan, church

## Page 82

1 plans, just other public plans that are not defined, that are
2 covered by ERISA. But because the law allows them to send
3 money to the Agency, they will do that, and if they're not
4 eligible, we just send them the money back. We're not going
5 to -- research.
6    Q. I see.
7    A. So those are non-eligible filings.
8    Q. Okay. I see. And you prepare the authorization?
9    A. They notify me to make a refund. I prepare the
10 letter that goes to Treasury Division who gets the
11 authorization from the department head and treasury officer to
12 issue the refund at State Street Bank.
13    Q. Okay. And, lastly, you say as Contracting Officer
14 Technical Representative or COTR, I'm responsible for
15 overseeing compliance statements of work requirement for
16 professional accounting services performed by contract
17 employees, and I think we've already talked about what your
18 duties are with respect to COTR.
19        Now rather than reading through every single page of
20 your application because obviously the document will speak for
21 itself, why don't you sort of in your own words -- if there's
22 anything additional than what we've just gone over, your
23 responsibilities. Is there any others? We've gone through
24 COTR. We've g... through paragraph A -- 24.A and B of your
25 application for like 104 -- 0, '05, excuse me, accountant job.

## Page 83

1 Is there any sort of additional sort of duties that you can
2 recall that were primary for you?
3        MR. SHAPIRO: In addition to what he's already said?
4        MS. MELNIK: Oh, exactly.
5        MR. SHAPIRO: So if there's anything you want to say
6 in addition to this.
7        WITNESS: I think I answered the requirements for
8 the vacancy announcement.
9        MS. MELNIK: Okay.
10        MR. SHAPIRO: Are you done with this document?
11        MS. MELNIK: Yes -- just a moment. I'm not done
12 yet.
13        MR. SHAPIRO: Because if we are done, now it's 1:15,
14 so -- I mean I'm just -- I don't want you to -- I don't want
15 to interrupt an area. That's why I asked. If you're done
16 with the document, then let's take our break now rather than
17 starting something new.
18        MS. MELNIK: All right, we can do that. Let's do
19 that.
20        MR. SHAPIRO: Good.
21        MS. MELNIK: Off the record.
22        (OFF THE RECORD)
23        (ON THE RECORD)
24        MS. MELNIK: I'd like to have this marked as
25 Deposition Exhibit Number 2.

## Page 84

1        (Whereupon, the document that
2        was referred to as Deposition
3        Exhibit Number 2 was marked for
4        identification.)
5 BY MS. MELNIK:
6    Q. And, Mr. Montgomery, I've had marked and been handed
7 to you is Deposition Exhibit Number 2, and if you'd take a
8 look at that. Would you agree with me that it's your
9 application for the vacancy announcement JI04-0143,
10 Accountant, GS-510 series?
11    A. Yes, it is.
12    Q. Okay. And --
13        MR. SHAPIRO: I'm sorry. Isn't this the same
14 document that we marked as 1?
15        MS. MELNIK: Well, it's interesting you should ask
16 that, Mr. Shapiro.
17 BY MS. MELNIK:
18    Q. Mr. Montgomery, if you'll look at Exhibits 1 and 2,
19 each of the applications, and turn to page 2 which has A and B
20 on the third page and has continuation of 24A, description of
21 work. Would you compare them and agree that with respect to
22 what you wrote as your description of work they're identical?
23    A. Yes. The dates are wrong, but yes.
24    Q. Well, the dates are different because those are two
25 different applications, right?

Page 85

1    A. Well, I'm looking at the date of employment, but
2  yes, these are the same applications. The date of employment
3  under A is incorrect.
4    Q. On which --
5    A. Well, both of them seem to have the same date.
6    Q. Okay.
7    A. It should be -- this date is incorrect.
8    Q. Okay.
9    A. Okay.
10   Q. But with respect to your description --
11   A. Yes, um-hum.
12   Q. -- they are the same?
13   A. Yes.
14   Q. Okay.
15     MS. MELNIK: Now I'd like to have these marked as
16  Deposition Exhibits 3 and 4.
17              (Whereupon, the documents that
18              were referred to as Deposition
19              Exhibit Numbers 3 and 4 were
20              marked for identification.)
21     MS. MELNIK: Deposition Exhibits 3 and 4 --
22     REPORTER: Are you marking --
23     MS. MELNIK: Well, 3 -- let's -- well --
24     REPORTER: The one that says Pension Benefit
25  Guaranty at the top?

Page 86

1     MS. MELNIK: Those two.
2     REPORTER: The one with the big lettering.
3     MS. MELNIK: Oh, okay. Okay, that's fine.
4     BY MS. MELNIK:
5    Q. Now that you'd had just a moment to look at those,
6  Mr. Montgomery, if you'll agree with me that Number 3 is the
7  vacancy announcement for the JT04-0105, Accountant, GS-13, and
8  Exhibit 4 is the JT04-0143 Accountant, GS-12/13. Would you
9  agree with me that that's what they are?
10     MR. SHAPIRO: That's what it says.
11     MS. MELNIK: Mr. Shapiro, let the witness answer.
12  If he doesn't understand, he can ask me.
13     BY MS. MELNIK:
14   Q. Would you agree with me that those are the vacancy
15  announcements for those two positions?
16   A. Yes, they appear to be.
17   Q. Now if you'll turn to page 2 of Exhibit 3 and page 3
18  of Exhibit 4 where it says --
19   A. Let me get there.
20   Q. Oh, I'm sorry.
21   A. Page 43 of Exhibit 3?
22   Q. No, no. Page 2 of Exhibit 3.
23   A. Right.
24   Q. Okay. And then page 3 of Exhibit 4.
25   A. Okay.

Page 87

1    Q. Okay. I just screwed up. I'm sorry.
2    A. Start again.
3    Q. But one's still the same. Page 2 of Exhibit 3.
4    A. Page 2, Exhibit 3, okay.
5    Q. And page -- the first page, page 1, of Exhibit 4
6  where it says duties.
7    A. Page 1?
8    Q. Yes, front page, so we're just basically on duties
9  on both vacancy announcements.
10   A. Okay.
11   Q. Okay. And looking at the number 1 listed duty for
12  Exhibits 3 and 4, they say analyzes financial activity of
13  PBGC's commingled fund as reported by the corporation's
14  custodian bank via working trial balances, transactions,
15  reports, composite trial balances, et cetera. And do you
16  agree that both vacancy announcements, they read identically
17  with respect to that?
18   A. They appear to be, yes.
19   Q. Okay. Now in your job as a Financial Specialist,
20  were you performing that duty?
21   A. These are accountant duties. I was a Financial
22  Specialist.
23   Q. Okay. So the answer is you were not performing that
24  duty, is that correct, with respect to number 1?
25   A. I had similar duties.

Page 88

1    Q. Okay. Similar how? What were you doing that's
2  similar?
3    A. I don't understand the question.
4    Q. Okay. Well, I asked you if you were performing the
5  duty that's listed in number 1 in both vacancy announcements.
6  You said no, I was doing something similar. And now I'm
7  asking you what's similar that you were doing with respect to
8  number 1?
9    A. They were stated in Exhibit 1 and 2.
10   Q. Okay. Could you be more specific?
11   A. I would appreciate it if -- these are duties that
12  would be hired for this job and that I do these jobs. These
13  are the duties for these positions and I applied to perform
14  these duties. I want to answer your question. I think you
15  need to understand that they're describing the duties for this
16  particular position, okay, and if I get selected, these will
17  be the duties that are expected of me. It's not saying that I
18  do these duties, so I'm not understanding where you're trying
19  to go with your question.
20   Q. Well, it's not really important that you know where
21  I'm trying to go. It's just a matter of whether or not you
22  can answer my question yes or no, if that's an appropriate
23  answer. And perhaps it is no based on what you just told me,
24  but I don't want to put words in your mouth. Were you
25  performing the duty that's described in number 1?

Page 89

1    A. No.
2    Q. Okay. The next one is listed on both vacancy
3 announcements as reconciles investment balances between PBGC's
4 custodian bank and individual investment managers. Were you
5 performing that duty?
6    A. Similar duties.
7    Q. Okay. What do you mean by similar?
8    A. At the end of my -- when the custodian bank and in
9 their statement, different report, in what's called a Blue
10 Book and it has composites of all the accounts that ties into
11 the acquisitions and liquidations that they sent to the user,
12 the Investment Accounting Branch. It requires reconciliation
13 between the Blue Book and the acquisitions.
14    Q. And so -- I understand that. So what aspect of what
15 you just described did you perform or what about it is
16 similar?
17    A. Reconciling investment balances.
18    Q. Okay. And you did that with the numbers that were
19 in the database?
20    A. Yes.
21    Q. Okay. Number 3, and it's the same for both,
22 prepares all monthly/quarterly reports reflecting financial
23 activity and balances of a commingled fund as reported by
24 PBGC's custodian bank. Did you perform that duty?
25    A. Yes.

Page 90

1    Q. Okay. In what respect did you perform that duty?
2    A. We're on number 2 duties?
3    Q. I'm actually -- I think we're on number 3.
4    A. In Exhibit 1, page -- third page.
5    Q. I'm sorry. Third page?
6    A. Yes.
7    Q. Okay. What part of it, where on the page?
8    A. Midway to -- reconciliation of balances between the
9 trust and --
10    Q. Okay. Under A?
11    A. Yes.
12    Q. Okay. And you explained that previously, that --
13    MR. SHAPIRO: I'm sorry.
14    MS. MELNIK: Is there an objection?
15    MR. SHAPIRO: Yes. I have to object because you
16 gave me two 1s instead of giving me -- you gave me what you
17 marked as Exhibit 2. That's why I asked that question. I
18 said they're the same thing.
19    MS. MELNIK: Relax.
20    MR. SHAPIRO: You handed me two copies -- a second
21 copy of what was 1, and that's why I said they're identical --
22    MS. MELNIK: Okay.
23    MR. SHAPIRO: -- and you said don't interrupt.
24 Well, now I'm interrupting because I think it was intentional.
25    MS. MELNIK: Oh, Jesus, you're unbelievable.

Page 91

1    MR. SHAPIRO: Thank you very much.
2    MS. MELNIK: You know, no one's perfect, Mr.
3 Shapiro. There's no need to get belligerent.
4    MR. SHAPIRO: Well, I wasn't belligerent, but you
5 nastily said that I was trying to interfere and I wasn't. You
6 handed me documents that were identical, the wrong documents.
7    MS. MELNIK: Okay. Now do you have the correct
8 documents, Mr. Shapiro?
9    MR. SHAPIRO: I don't know. I don't know. I
10 suppose it will clarify over time.
11    MS. MELNIK: Okay. Well, you let us know.
12    MR. SHAPIRO: Oh, don't worry, I will.
13    MS. MELNIK: Okay. We're on number 3 still, the
14 duty. You had me at page 3 in the middle, and that's under A.
15 And, by the way, Mr. Shapiro, they're identical, so whether
16 you had 1 or 2, they're --
17    MR. SHAPIRO: No, they're not identical. They have
18 different names. When it says vacancy announcement number --
19    MS. MELNIK: Yes.
20    MR. SHAPIRO: -- mine didn't say what this one says.
21 Mine said exactly what 1 says.
22    MS. MELNIK: Right, and I was referring to the
23 description of duties.
24    MR. SHAPIRO: Well, how could I know that when you
25 handed me the wrong document.

Page 92

1    MS. MELNIK: All right, Mr. Shapiro. I don't want
2 to waste time with this, all right?
3    MR. SHAPIRO: Well, you already have.
4    MS. MELNIK: Yes, I have, not you. Well, anyway --
5    MR. SHAPIRO: You gave me the wrong document.
6    MS. MELNIK: Can we go off the record because I'm
7 not wasting time with this?
8         (OFF THE RECORD)
9         (ON THE RECORD)
10    BY MS. MELNIK:
11    Q. Mr. Montgomery, could you point out to me with
12 respect to duty number 3 for the vacancy announcements in what
13 way you were performing that duty, or you can just describe it
14 to me. You know, it doesn't have to be from the document. It
15 can be in your own head if you know, fine, as well.
16    A. I understand that the 171 that was submitted for
17 this position entails the duties under A. I complete --
18 analyzes and reconciliation over $120 million in financial
19 transactions of commingled funds, and it says here prepare all
20 monthly/quarterly reports reflecting financial activity and
21 balance of the commingled funds. I think that answers that
22 question.
23    Q. Okay. And number 4 with respect to both says
24 analyzes balance sheets, income statements and transaction
25 ...isters submitted by ...minated pension plans in order to

Page 93

1  reconcile and record financial data of large and complex
2  pension plans. Did you perform that duty?
3      A. No.
4      Q. Okay. And 5 -- you'll have to turn the page in
5  Exhibit 4. Both read serves as lead in contacting PBGC's
6  custodian bank to discuss and resolve issues regarding
7  investment activity, accounting direction and daily transfers
8  to the commingled fund by interim custodians of terminated
9  pension plans. Did you perform that duty?
10     A. Yes.
11     Q. Okay. In what way?
12     A. As part of the reconciliation of the daily transfers
13  and getting acquisition/liquidations, if the accountants noted
14  there was an error made by the custodian, i.e., State Street,
15  in identifying the proper assets, they had to notify me and I
16  would be the go between or liaison to call the State Street
17  Bank. That was instructed by Cynthia Adams to all
18  accountants.
19     Q. And so it would be the accountants that would notice
20  a mistake and they would relay it back to you, and it was your
21  responsibility to relay that to -- did you say the custodian
22  bank?
23     A. In response to this person it says at lead, and I
24  was designated the lead to act on Investment Accounting Branch
25  liaison with the custodian bank, yes.

Page 94

1      Q. Okay. And in that capacity that you just described,
2  you were relaying concerns that the trust accountants had, is
3  that correct?
4      A. Would you restate the question, please?
5      Q. Sure. In performing that duty that you just
6  described as being the liaison, you were relaying the trust
7  accountants' concerns? You were lead in doing that?
8      A. That was the duties, yes.
9      Q. Okay. And, lastly, 6, prepares accounting entries
10  for input into the accounting system. Did you perform that
11  duty?
12     A. Yes.
13     Q. In what respect?
14     A. Doing entries in the Missing Participants, into the
15  trust fund ledger.
16     Q. And that was with respect to just cash, correct?
17     A. Correct.
18     Q. Okay. If you turn now in Exhibits 3 and 4 to pages
19  3 of each of those exhibits, and to the heading where it says
20  quality ranking factors, and it says with respect to quality
21  ranking factors -- with respect to Exhibit Number 3, there's a
22  little more of a little paragraph there, but both say as the
23  last sentence the most important quality ranking factor or
24  factors are marked with an asterisk. Do you see where I'm
25  referring to?

Page 95

1      A. Yes.
2      Q. Okay. And the first one that's listed, and it has
3  an asterisk at the end, says skill in the analysis and
4  interpretation of financial reports for the purpose of
5  preparing secondary reports and journal entries on
6  monthly/quarterly basis. Do you agree that that's what it
7  says for each quality ranking factor?
8      A. It appears to be.
9      Q. Okay. Now what skill are you -- now you applied for
10  both these positions, correct?
11     A. That's correct.
12     Q. Okay. Now what skill that you have that you were
13  performing as a Financial Analyst -- I'm sorry, Financial
14  Specialist, excuse me -- do you believe is relevant to that
15  first quality ranking factor?
16     A. As relates to Exhibit 3 and 4 or just 3?
17     Q. Pardon?
18     A. As it relates to Exhibits 3 and 4 or just Exhibit 3?
19     Q. Well, they're both the same, so I'm actually doing
20  both just to save time since they're identical.
21     A. All right. I think they are addressed in Exhibit 1
22  and 2 as an attachment as required by these exhibits.
23     Q. Can you tell me which one you're -- what you're
24  referring to exactly? And since the attachments, I believe,
25  are the same for both, we could probably pick one or the other

Page 96

1  and it would be the same.
2      A. It says page 118 under Exhibit 4E.
3          MR. SHAPIRO: I think it's the seventh page down is
4  what he's referring to.
5          BY MS. MELNIK:
6      Q. Where it says quality ranking factors?
7      A. Yes.
8      Q. Okay. Okay. And could you point out to me or
9  describe for me what it is that you say are -- what
10  specifically with respect to that first quality ranking
11  factor?
12     A. I'll read my duties as listed there. During the
13  course of five years I have prepared the monthly operating
14  report of financial transactions on commingled and non-
15  commingled trust funds in support of the executive summary.
16  This report provides details -- assets and liabilities of
17  terminated and trustee defined benefit plans, obtain data from
18  the summary -- report to serve as a cross-check to -- interest
19  posted to the trust plan ledger. Utilizing this data, I have
20  -- various reports in support of the monthly operating report.
21     Q. Okay. And as you described previously with respect
22  to reconciling and analyzing with respect to your
23  responsibilities, that had to do with essentially marrying up
24  numbers that were provided to make sure that there was a
25  balance, that there wasn't a shortfall or a difference in the

Page 97

1 numbers that you were tallying? You had to make sure they
2 reconciled?
3    A. I don't understand your question.
4    Q. Okay. With respect to analysis, okay, what kind of
5 analysis in your mind were you performing with respect to what
6 you just read?
7    A. The -- definition or are you just looking at mine?
8    Q. Well, you said that you were doing an analysis, and
9 I'm trying to find out what you mean by analysis, yes, as it
10 relates to your duties? I mean do you mean the same as
11 reconciling?
12    A. If you're doing and determining if, in fact, the
13 transactions are accurate.
14    Q. Okay. Okay. The next quality ranking factor as to
15 both exhibits, 3 and 4, number 2 says knowledge of derivatives
16 and various complex investments instruments to include the
17 accounting treatment under GAAP. And I'm first going to ask
18 you what is -- if you know, what is GAAP?
19    A. GAAP. It's General Accounting -- Acceptable
20 Accounting Principles.
21    Q. I'm sorry, what is that?
22    A. General Acceptable Accounting Principles.
23    Q. Joint Acceptable Accounting --
24       MR. SHAPIRO: General.
25       WITNESS: General.

Page 98

1 BY MS. MELNIK:
2    Q. General Acceptable --
3    A. Accounting Principles.
4    Q. -- Accounting Principles. Okay. And what of your
5 job duties, responsibilities, as a Financial Specialist relate
6 to quality ranking factor number 2?
7    A. It doesn't require. It says knowledge. It does not
8 say that I needed to perform the job or perform the skill.
9 Skills has me having the ability or doing it. Knowledge means
10 having a classroom orientation according to OPM standards of
11 identifying whether you have knowledge, skills and ability.
12 The ability is capable of learning. Knowledge means you have
13 classroom or some type of training. And skills means you have
14 had a hands on. So in addressing knowledge, I think I
15 indicated that through training materials prepared by CP, Inc.
16 that the Agency hired to provide training material on
17 derivatives gave me the knowledge to understand derivatives.
18    Q. Okay. With respect to working with derivatives,
19 however, and various complex investment issues, you personally
20 as a Financial Specialist, you were not handling those, is
21 that correct, working with them, analyzing them?
22    A. No.
23    Q. Okay. And with respect to number 3 which is listed
24 in both vacancy announcements, skill in applying accounting
25 practices and procedures in order to properly account for all

Page 99

1 financial activity and very large investment holdings held by
2 custodian institutions. Were you performing -- I mean were
3 you -- what, if anything, in your job relates to quality
4 ranking factor number 2 -- 3, excuse me?
5    A. I refer to my quality ranking factor response in
6 Exhibits 1 and 2. It asks for very large investment holdings
7 by custodian institutions. The Missing Participants was an
8 asset classified under 3801 which is cash that's held at
9 custodian bank worth over $50. In my mind that's a large
10 investment, $50 million.
11    Q. Okay. And, again, with respect to when it says all
12 financial activity, again with your responsibilities as a
13 Financial Specialist, that was related specifically to cash,
14 not other assets, bonds, stocks, derivatives, and things we've
15 listed before.
16    A. As far as practice and procedure is -- I stated at
17 month end I reconciled monthly bank statements of itemized
18 deposits and withdrawals, and transferred to the fund report
19 as received -- 801 commingled funds account held by the trust
20 fund custodian. I prepared joint interest to record the
21 receipt of assets in the joint ledger. So not only did it
22 pertain to Missing Participants, it also pertained to the work
23 that I did as far as reconciling the accountants' entries.
24    Q. But they were the trust accountants who were dealing
25 with or accounting with respect to doing the accounting

Page 100

1 treatments with respect to other assets in addition to cash,
2 correct?
3    A. The requirement says -- applying accounting
4 practices and procedures, and I think my -- address that.
5    Q. Well, you didn't answer my question, I'm afraid.
6 What I asked you was that the accountants, the trust
7 accountants, were the ones who were dealing with the assets,
8 either in addition to or and including in addition to cash?
9    A. I can't answer that.
10    Q. You don't know what kind of assets the trust
11 accountants were --
12    A. You were asking me about the quality ranking factor
13 under number 3, and your question does not ask me what number
14 3 says, so I cannot answer you with a response.
15    Q. Well, it may --
16    A. I don't know.
17    Q. you don't know what the trust accountants -- that
18 they were working -- you don't know that they were working
19 with other assets in addition to --
20    A. I cannot respond to what they did.
21       MR. SHAPIRO: Just answer whatever she asks now.
22       WITNESS: What was the question?
23       MS. MELNIK: The question was -- because it mentions
24 in number 3 about properly accounts for all financial
25 activity, so I'm saying that the -- I'm asking you about the

Page 101

1  trust accountants. When it comes to all financial activity,
2  they're dealing with other assets like stocks, bonds,
3  derivatives, short term investments, that kind of asset in
4  addition to cash?
5       MR. SHAPIRO: What's the question now?
6       MS. MELNIK: I'm asking if he understands that
7  that's --
8       WITNESS: No, I do not.
9       BY MS. MELNIK:
10      Q. You don't understand that the trust accountants were
11  doing that?
12      A. You're asking me to respond to Exhibit 3 and a
13  question, okay, and your questioning of that particular
14  requirement I think are totally unrelated.
15      Q. Well, be that as it may. I'm now asking you the
16  question that's been put before you twice, okay? You can
17  forget number 3 for a second if you like if it helps to answer
18  the question.
19      A. All right. Then let's leave off number 3, and your
20  question being?
21      Q. The question being that when it comes to the kinds
22  of assets that the trust accountants were responsible for,
23  they included stocks, bonds, derivatives, short term
24  investments in addition to cash?
25      A. Yes.

Page 102

1       Q. Okay.
2            (OFF THE RECORD)
3            (ON THE RECORD)
4       BY MS. MELNIK:
5       Q. Now you don't have a four year college degree, is
6  that correct?
7       A. That's correct.
8       Q. Okay. So in order to be qualified for the positions
9  that we're talking about here, the GS-13 accountant position,
10  04-105, and the GS-12/13/14 -- I'm sorry, 12/13 accountant
11  position, 04-143, there were other ways to be qualified other
12  than just a four year degree, correct?
13      A. Yes.
14      Q. Okay. And one of those ways is by having 24 hours
15  -- that is 24 semester hours in accounting, correct?
16      A. Yes.
17      Q. Okay. And when you handed in these applications
18  they were not accompanied by any proof of the 24 hour
19  accounting -- semester hours in accounting, is that right?
20      A. Will you restate the question?
21      Q. Sure. When you turned in these applications there
22  was no attachments or evidence that you had completed the 24
23  semester hours of accounting, correct?
24      A. No.
25      Q. Okay. What's the documentation that you provided?

Page 103

1       A. My 171 where it asked for education and to list --
2  let's go back to Exhibits 1 and 2, please. I think it's page
3  3 in the 171. I'm not sure what page it would be -- I think
4  page 2 of Exhibit 1.
5       Q. Under 29, number 29, where it says accounting --
6       A. Yes.
7       Q. -- number of credit hours --
8       A. Yes.
9       Q. -- completed, semester 24.
10      A. Yes.
11      Q. Okay. Other than you typing in your 24, did you
12  provide any proof or evidence of that?
13      A. No.
14      Q. Okay. If you look on page 4 of Exhibit 4 and on
15  page 5 of Exhibit 3 under education --
16      A. I got --
17      MR. SHAPIRO: Why don't you just do one of them?
18      MS. MELNIK: I'm just saying --
19      MR. SHAPIRO: Why don't you just do one of them
20  instead of flipping two things each time?
21      MS. MELNIK: I'm running the deposition, Mr.
22  Shapiro.
23      MR. SHAPIRO: That can be confusing and the witness
24  is getting confused and the confusion owes itself to counsel's
25  insistence on being confusing.

Page 104

1       MS. MELNIK: Thank you for the speaking objection.
2  If Mr. Montgomery is confused, he can tell me. I'm asking you
3  not to do the speaking objections, Mr. Shapiro. You know
4  they're not appropriate.
5       WITNESS: What page --
6       MR. SHAPIRO: I don't take instruction from lawyers.
7       MS. MELNIK: Well, you seem to want to give it to
8  me.
9       MR. SHAPIRO: Well, some lawyers needs instruction.
10      MS. MELNIK: All right, whatever.
11      BY MS. MELNIK:
12      Q. Mr. Montgomery, it's on page 5 of Exhibit 3 --
13      A. I have that.
14      Q. -- and on page 4 of Exhibit 4, and it's under what
15  it says, Education. Do you see where I'm talking about?
16      A. I see education under Exhibit 5 and I see education
17  under Exhibit 4, yes.
18      Q. Okay. It's actually 2 and 3, but those are the
19  right pages. Do you see where it says on page 4 of Exhibit 4
20  with respect to transcripts of all college course work?
21      A. Yes.
22      Q. If you wish college course work to be considered in
23  qualifying you for this position, the transcripts have to be
24  submitted.
25      A. I'm sorry. Provide transcripts of all college

Page 105

1  course work is where you're reading?

2  Q. Exactly.

3  A. Okay.

4  Q. You must submit a transcript for each.

5  A. I follow you.

6  Q. Okay. And you didn't submit any transcripts,

7  correct?

8        MR. SHAPIRO: Meaning with the application?

9        MS. MELNIK: Correct.

10       WITNESS: In response to that, it parenthetically

11  said if you attended two or more colleges, you must submit a

12  transcript for each or an OPM Form 11/17 if you wish college

13  work to be considered and qualify you for this position. Last

14  sentence, however, before you are hired, you must provide an

15  official transcript. So in response to your question, did I

16  attach a transcript -- is that the question?

17       BY MS. MELNIK:

18  Q. That is the question.

19  A. No.

20  Q. Okay.

21       MR. SHAPIRO: Excuse me. No question's pending.

22  I'd like to talk to my client, if you don't mind. No

23  question's pending, right?

24       MS. MELNIK: Well --

25       MR. SHAPIRO: Is there a question pending?

Page 106

1        MS. MELNIK: There's not a question pending.

2        MR. SHAPIRO: Thank you. We'll take a break then.

3        MS. MELNIK: Okay.

4        MR. SHAPIRO: We'll consult.

5        MS. MELNIK: That's fine. How much time?

6        MR. SHAPIRO: A couple minutes.

7        MS. MELNIK: Okay.

8              (OFF THE RECORD)

9              (ON THE RECORD)

10       MS. MELNIK: With respect to the two accounting

11  positions, in addition to having 24 semester hours of

12  accounting in order to qualify, you needed that plus

13  specialized experience -- what's the exact language?

14       MR. SHAPIRO: Is that a question?

15       MS. MELNIK: I'm getting to a question, Mr. Shapiro.

16  Give me a moment. I'm trying to get the exact language.

17  Here.

18       BY MS. MELNIK:

19  Q. With respect to -- in addition to the 24 hours,

20  semester hours of accounting, the candidate must also have on

21  year of specialized experience at or equivalent to a GS-12

22  grade level that demonstrates the ability to analyze and

23  provide advice regarding accounting programs, financial

24  systems, et cetera. So my question to you, Mr. Montgomery, is

25  what do you consider to be your spec_____ exper____ at or

Page 107

1  to the GS-12 grade level that demonstrates the ability to

2  analyze and provide advice regarding accounting programs,

3  financial systems, et cetera?

4  A. A GS-12, Step 10 -- I've been a 12, Step 10, for

5  more than one year as a Finance Specialist, and as a Finance

6  Specialist, that I've done the work for over five years in

7  various aspects of the Investment Accounting Branch.

8  Q. And is that --

9  A. Clearly that was --

10  Q. I'm sorry. I'm sorry.

11  A. I felt that it was broad for the Agency to say et

12  cetera, and I missed et cetera.

13  Q. I'm sorry. I didn't understand the last part about

14  the et cetera.

15  A. The minimum qualification of the candidate must also

16  have one year of specialized experience at or equivalent to

17  the GS-12 grade level. I was a GS-12, Step 10, for more than

18  five years --

19  Q. Okay.

20  A. -- so certainly I had one year of specialized

21  experience. The Agency looks for experience in areas of

22  accounting programs, financial systems, and et cetera. I've

23  been in the Investment Accounting Branch for ten years and

24  felt that I met the qualifications.

25  Q. With respect to the two accounting positions we've

Page 108

1  been talking about, the GS-13 which is 04-105, and the 12/13

2  which is 04-143, you claim that you were discriminated against

3  based on your race, and my first question is who do you

4  believe discriminated against you with respect to these --

5  well, let me back up one second. You were found to be not

6  qualified for each of these two accounting vacancies, is that

7  correct?

8  A. Yes.

9  Q. Okay. And you claim that there was -- racial

10  discrimination was a factor, was a cause?

11  A. Yes.

12  Q. Okay. Who do you believe discriminated against you

13  because of your race?

14       MR. SHAPIRO: If you know.

15       MS. MELNIK: That's implied in every question.

16       MR. SHAPIRO: And you reminded every one c⁴ your

17  witnesses the same thing every time, so I'm simply reminding

18  him, if you know a person.

19       WITNESS: What was the question?

20       MS. MELNIK: Sure. With respect to you not being

21  found qualified or being found not qualified with respect -- I

22  don't hear.

23       REPORTER: It's the speakers.

24       MS. MELNIK: Oh, sorry.

25       REPORTER: I'll turn them down.

Page 109

BY MS. MELNIK:

Q. Mr. Montgomery, with respect to the two accounting positions and you not being found qualified, who do you believe discriminated against you because of your race?

A. The Human Resources Department.

Q. Anyone in particular?

A. I don't know the inner workings of their staff.

Q. So you can't name anyone individually as you sit here today that discriminated against you that you know of because of your race?

A. The Personnel Specialist who handled my application had to do the processing.

Q. Okay. Do you know -- are you saying that the Personnel Specialist discriminated against you because of your race?

A. She is one of the employees in the Human Resources Department.

Q. Okay. You haven't answered -- I'm sorry.

A. That's one of the individuals in the Human Resources Department who discriminated against me because of my race.

Q. Okay. And what's her name?

A. Jacqueline Isaac (phonetic sp.).

Q. And why do you believe that she discriminated against you because of your race?

A. As the Personnel Specialist who reviewed all of my

Page 110

applications since about 2004 for advancement within the Pension Benefit Guaranty Corporation, she handled my applications, some facets, and found that I was not qualified, as she did among many black males in PBGC who applied for positions.

Q. Do you have examples of where she was the Personnel Specialist and she found black males not qualified for a particular position?

A. Yes.

Q. Okay. What are they?

A. Are you asking for individual position or are you asking --

Q. I'm asking for the name of the person you feel was discriminated by Jackie Isaac because they were black.

A. Robert Shepherd, and there were others in discussion, black males, whom I cannot recall their names.

Q. Okay. Besides the two bases that you just explained, do you have any other evidence or proof that she discriminated against you because of your race?

MR. SHAPIRO: I cannot understand the bases.

WITNESS: I didn't understand the question.

BY MS. MELNIK:

Q. Anything else you're basing it on, your conclusion, your claim. You're claiming that they discriminated or she discriminated against you because of your race and I'm asking

Page 111

you the reasons for that, if there are any others besides the two you listed or explained.

A. The two, what, individuals, or the two areas?

Q. No, no.

A. I don't understand your question.

Q. Okay. I'll explain it. You've stated that you believe Jackie Isaac discriminated against you because of your race, correct?

A. Yes.

Q. Okay. And I asked you why you believed that or the reasons for that, and you said that she had reviewed a number of your applications since 2004, correct --

A. Yes.

Q. -- and had found you not qualified for those positions.

A. Or not receiving consideration for the positions.

Q. Okay. And that was one of your reasons?

A. Yes.

Q. Okay. And the other reason that you just explained was because you know from other black men that you've spoken to, and you named specifically a Robert Shepherd, that a similar -- you believe a similar situation is being experienced by other black men, correct?

A. Yes.

Q. Okay. I'm asking is there anything else besides

Page 112

those two things for the reason for your claim of race discrimination?

A. Yes.

Q. Okay. What's that?

A. Ms. Isaac assisted a white female in resubmitting his application -- her application when she did not meet the initial qualifications.

Q. And that's a third bases for your belief that she discriminated against you because of your race?

A. Yes.

Q. Okay. And other bases, any other reason?

A. Not that I'm aware of.

Q. Okay. Again, we're still for this discussion just talking about the two accounting positions that we've been talking about for awhile now. You're also alleging a claim of gender, sex discrimination, being male. What's your reason for your claim that you were discriminated against for being male?

A. Each position that I applied for, the selectees were females.

MR. SHAPIRO: Excuse me. We've been going about an hour. Could we take a break, rest room break? Sorry, I didn't --

MS. MELNIK: It's okay by my.

(OFF THE RECORD)

Page 113

1    (ON THE RECORD)
2    MS. MELNIK: Mr. Montgomery, I believe when we left
3  off we were talking about the two accounting positions and
4  your claim of gender discrimination with respect to not being
5  found qualified. Can you explain to me why you believe
6  discriminated against you because of your gender, being male?
7    MR. SHAPIRO: If you know somebody.
8    WITNESS: I thought that was the last question I
9  responded to. Did I mention Jackie Isaac?
10    BY MS. MELNIK:
11   Q. Okay. So it's Jackie Isaac?
12   A. Yes.
13   Q. Okay.
14   A. Within the HRD area.
15   Q. Do you believe anyone else discriminated against you
16  with respect to those two positions, HRD or otherwise?
17   A. I feel that she's --
18   Q. With respect to anyone -- oh, I'm sorry if you're
19  answering that question.
20   A. I'm trying to --
21   Q. I'm sorry.
22   A. Ms. Isaac, has a reporting official, a superior, who
23  is aware of her job, and who condones her practice. I feel
24  she also discriminated against me.
25   Q. But as you sit here today you don't know that

Page 114

1  person's name?
2    A. My understanding of her reporting is -- if you look
3  in the -- within the division, manager who reports to the
4  Human Resource Director who has changed hands over several
5  years.
6    Q. Do you recall who it was at this time, the time
7  period we're talking about when your applications were
8  pending?
9    A. Michelle Balivanch (phonetic sp.), Rick Lattimer.
10    REPORTER: What was that name?
11    WITNESS: Rick Lattimer, Cynthia Adams, and Ted
12  Winter. Those names I felt were involved with the
13  announcement.
14    BY MS. MELNIK:
15   Q. I'm sorry. Those names -- I didn't hear the end of
16  your sentence.
17   A. Who were involved with the vacancy announcement in
18  some aspects.
19   Q. With respect to Cynthia Adams and the two accounting
20  positions that, of course, we're talking about here, with
21  respect to her, why do you say that you believe she
22  discriminated against you because of your gender, being male?
23   A. Ninety plus percent of the staff are female.
24   Q. What staff?
25   A. Investment Accounting Branch.

Page 115

1    Q. Okay.
2    A. She is the selecting official for any vacancy
3  announcement.
4    Q. And with respect to Ted Winter, who do you believe
5  he discriminated against you because you're male?
6    A. Mr. Winter is also responsible for the manpower in
7  his department and authorizes grades and assignment of grades
8  within his department.
9    Q. Any other reason you believe he discriminated
10  against you because of your gender?
11   A. No.
12   Q. Okay. You also allege age discrimination with
13  respect to being not found qualified for the two accounting
14  positions we've been discussing. Why do you believe you were
15  discriminated against because of your age?
16   A. Hires for the position which I applied for were
17  younger than myself.
18   Q. And that would have been for 04-143 because 04-105
19  no one was hired, correct?
20   A. Correct.
21   Q. Any other reason or basis for believing your were
22  discriminated against because of your age?
23   A. No.
24   Q. Okay. And who do you believe discriminated against
25  you because of your age?

Page 116

1    A. My immediate and intermediate supervisors.
2    Q. That would be --
3    A. -- second and third level supervisors.
4    Q. So Wayne --
5    A. My branch chief, my division manager and the
6  department director.
7    Q. Wayne McKennon, Ted Winter. I know that's second
8  and third. I'm not sure who --
9    A. Cynthia Adams was my immediate.
10   Q. Oh, you're including Cynthia Adams as one of the
11  people. And, lastly, you claim that you were retaliated
12  against for prior EEO activity with respect to not being found
13  qualified for the two accounting positions. First, who do you
14  think was retaliating against you?
15    MR. SHAPIRO: If you know a person. The EEO regs
16  don't say you have to know a person anymore.
17    BY MS. MELNIK:
18   Q. I'm asking, please.
19   A. What was the question?
20   Q. Sure. Who do you believe retaliated against you for
21  your prior EEO activity with respect to you not being found
22  qualified for the two accounting positions?
23   A. Theodore Winter.
24   Q. And why do you believe -- what's your basis or
25  reason for believing that Mr. Winter retaliated against you?

Page 117

1    A. He knew of previous EEO activity.
2    Q. Anything else?
3    A. There are other management officials within the EEO
4 structure.
5    Q. I guess my question was actually just related to Mr.
6 Winter and if you knew of any other -- you had any other basis
7 or reason for believing or supporting your claim of
8 retaliation with respect to him. I know you said he --
9    A. As to Mr. Winter [sic]?
10   Q. Right. You mentioned his previous knowledge, he
11 knew of your previous EEO activity.
12   A. Correct.
13   Q. Was there anything else with respect to him?
14   A. No.
15   Q. Okay. Were you about to tell me other people that
16 you believe retaliated against you?
17   A. Yes.
18   Q. Okay. Who else?
19   A. I have no name, but Mr. Winter conferred with other
20 people about my complaints, previous complaints. And as to my
21 -- there was some connection in my application to my -- of
22 discrimination.
23   Q. You weren't present when Mr. Winter spoke to these
24 other people, correct?
25   A. No, I was not.

Page 118

1    Q. And is it information you learned through other
2 people that there was some communication between Mr. Winter
3 and some other people?
4    A. No.
5    Q. All right. I'm confused then.
6    A. As part of this deposition Mr. Winter stated that he
7 conferred with other people about my previous EEO activities.
8 Having that knowledge, I'm stating that he has discriminated
9 against me because of prior EEO activities.
10   Q. Okay. Anything else with respect to retaliation --
11 your retaliation claim?
12   A. No.
13   Q. The person who was selected for the GS-12/13
14 accounting position, LeFaye Graham (phonetic sp.) are you
15 familiar with LeFaye Graham?
16   A. Yes, I am.
17   Q. Okay. Were you aware that Ms. Graham had 15 years
18 of accounting experience, investment accounting experience?
19   A. No, I was not.
20   Q. Okay. Were you aware that she had a four year
21 degree in finance?
22   A. No.
23   Q. Were you aware that she was in the process of
24 completing her masters in accounting?
25   A. Would you restate the question, please?

Page 119

1    Q. Sure. Were you aware that Ms. Graham was in the
2 process of completing her masters in accounting at the time
3 she applied for that GS-12/13 accounting position?
4    A. No.
5    Q. No?
6    A. No.
7    Q. Okay. Do you think Ms. Adams was unreasonable in
8 selecting her in light of that experience?
9        MR. SHAPIRO: Objection.
10       WITNESS: I have no idea.
11       BY MS. MELNIK:
12   Q. Okay. Before we leave this area, you mentioned a
13 Mrs. Shepherd [sic] who you believe Ms. Isaac discriminated
14 against. Do you recall? With respect to his race you
15 mentioned a Robert Shepherd.
16   A. Yes.
17   Q. Okay. What was -- what's his title? Do you know
18 what job he had or has?
19   A. I would be speculating.
20   Q. Okay. As far as you know, what was -- why do you
21 say that she discriminated against Mr. Shepherd?
22   A. I'm sorry. What's the question?
23   Q. Sure. What causes you to say Jackie Isaac
24 discriminated against Robert Shepherd? What are you basing
25 that on?

Page 120

1    A. Mr. Shepherd was a black male with a masters degree,
2 I believe in finance, and she determined he was not qualified
3 for a position he applied for.
4    Q. And you don't know what position -- do you know what
5 position that is?
6    A. No.
7    Q. Okay. Do you know if Mr. Shepherd filed an EEO
8 complaint?
9    A. I don't know.
10   Q. Okay. You mentioned that you -- that you believe
11 Ms. Isaac helped a white female with respect to her
12 application when she was initially found not qualified. What
13 white female are you referring to?
14   A. I believe that's Ms. Lynn Christopher.
15   Q. And what position did she seek to become qualified
16 for?
17   A. An accountant.
18   Q. And do you know in what way Ms. Isaac helped her?
19   A. She found that she lacked something in her 171 or
20 her application.
21   Q. And how did she help her?
22   A. She had someone to contact her to provide the
23 information so her application could be reviewed or rated.
24   Q. You're saying, and correct me if I'm wrong, that Ms.
25 Isaac contacted Ms. Christopher herself or had someone --

Page 121

1 directed someone else to contact Ms. Christopher to --
2    A. Directed someone else.
3    Q. To contact Ms. Christopher about the deficiency in
4 her 171, her application?
5    A. Yes.
6    Q. You said that Ms. Christopher was seeking to become
7 an accountant, is that right, or an accountant position?
8    A. Yes.
9    Q. Do you know what Ms. Christopher -- what her job was
10 at the time she was trying to become -- get the accountant
11 position?
12    A. Yes.
13    Q. What's that?
14    A. Contractor.
15    Q. Was she a contract accountant?
16    A. No.
17    Q. Do you know what she was?
18    A. I seem to recall analyst.
19    Q. Would it be a financial analyst or some other kind?
20    A. I'm not sure.
21    Q. Okay. And do you know of her -- being Ms.
22 Christopher I'm referring to -- because she was a contract
23 analyst at PBGC?
24    A. What's the question?
25    Q. Are you familiar with Ms. Christopher because she

Page 122

1 was a contract analyst at PBGC?
2    A. Yes.
3    Q. Okay. Do you know whether -- as a contract analyst,
4 do you know what division she was working in?
5    A. Yes.
6    Q. What's that?
7    A. Collection and Compliance Division.
8    Q. Let's move on from our discussion of the two
9 accountant vacancies and go on to the collection and analyst
10 positions which were advertised under vacancy announcements
11 138 and 139. Now I understand that you claim that you
12 submitted applications for the Collection Analyst positions
13 under both vacancy announcements, 138 and 139, correct?
14    A. Yes.
15    Q. Okay.
16    MS. MELNIK: I'm going to have this marked as
17 Deposition Exhibit Number 5.
18              (Whereupon, the document that
19              was referred to as Deposition
20              Exhibit Number 5 was marked for
21              identification.)
22    MS. MELNIK: And if you'd just, Mr. Montgomery, just
23 look through Exhibit Number 5 and let me know if that's an
24 accurate copy of your applications under vacancy announcement
25 with respect... 04-139.

Page 123

1    MR. SHAPIRO: This is Exhibit 5?
2    MS. MELNIK: Yes.
3    WITNESS: Yes.
4    BY MS. MELNIK:
5    Q. Okay. Mr. Montgomery, tell me about the day that
6 you submitted these applications. Describe that for me.
7    MR. SHAPIRO: Describe the day? Was it sunny and
8 warm?
9    MS. MELNIK: Are you going to object, Mr. --
10    MR. SHAPIRO: I think we can do a little better and
11 move it along a little faster if you don't ask a question like
12 that. That's all I'm complaining about.
13    BY MS. MELNIK:
14    Q. Well, I kind of want to know about the day. Tell me
15 what time of day you recall submitting these applications, the
16 applications for the Collection Analyst position.
17    A. Around 12 noon on September 28th I was in the
18 process of preparing two applications on my lunch hour between
19 12:30 and 1:30. Basically I had arrived in the Collection and
20 Compliance Division to do the standard 171 forms. I used my
21 computer to do the quality ranking factors and the narrative.
22 Then I got involved with my job and arrived at -- I think it
23 was the last day for submission of the applications. Actually
24 around 4:30 or 5:00 I had two copies and took them down to the
25 Human Resources Department, and upon entering the office the

Page 124

1 lady, the receptionist, asked me if she could help me and I
2 said yes, I want to turn an application in for a vacancy
3 announcement that closed -- I believe it was that date, as I
4 recall. And she received them and -- do you have the vacancy
5 announcement?
6    Q. I do.
7    MS. MELNIK: I ask that you mark it as Exhibit 6.
8 Now, Mr. Shapiro, we're going to make a -- since the witness
9 is sworn, I am allowed to ask about all the conversations
10 you've had with him. We're not going to go --
11    MR. SHAPIRO: No, you're not.
12    MS. MELNIK: I --
13    MR. SHAPIRO: No, you're not.
14    MS. MELNIK: And I know you disagree with me on
15 that, but I've been assured that he's sworn and I am allowed
16 to ask. I'm not going to, but I'd appreciate if, you know,
17 you try and keep it to a minimum. Just give me a second. I
18 have to find the vacancy for 143 -- I meant 138, 139. My
19 mistake. Well, I'm going to mark this. We'll see if it helps
20 you, Mr. Montgomery. If it doesn't, say so. This is Exhibit
21 6. No, I have 139.
22    MR. SHAPIRO: So this will be -- that will be 7?
23    MS. MELNIK: Yeah. Let's make 6, and let's make
24 this 7. 6 is 04-138 and 7 is 04-139. We don't have 139 here?
25    MR. SHAPIRO: Why don't you make some copies of

Case 1:05-cv-02157-RMU    Document 14-2    Filed 02/13/2007    Page 32 of 42

Page 125

1 this? Then we'll have it.

2     MS. MELNIK: Wait, I got it.

3     MR. SHAPIRO: Okay. That's 139. Now I need 138.
4 This is X5 and this is -- I want to make sure I got the right
5 one. They look identical. Let's see. Yes, okay, so this is
6 and this is marked -- oh, no, you gave me two of the same.

7     MS. MELNIK: No.

8     MR. SHAPIRO: Oh, 138 and 139, all of it non-
9 bargaining. 138 and 139. Okay, I got it. They're both non-
10 bargaining. Go ahead.

11              (Whereupon, the documents that
12              were referred to as Deposition
13              Exhibit Numbers 6 and 7 were
14              marked for identification.)

15 BY MS. MELNIK:

16     Q. Okay. I'm sorry, Mr. Montgomery. You asked for the
17 vacancy announcements and I have marked and provided 138 and
18 139. Of course, I don't remember what my question was. I
19 think I'm asking you about your day and you're submitting it,
20 and I think you said that you went to HRD and the receptionist
21 asked you if she could be of some assistance, and I -- just
22 take me from there. That's the last I recall.

23     A. I had indicated that I knew it was the last day to
24 submit my applications and I was working on it between noon
25 and 1:00, went back to doing my regular work and tried to keep

Page 126

1 up with the time. It had to be turned in by 5:00. That was
2 the last day. Between 4:30 and 5:00 I went to HRD with two
3 applications and upon entering the receptionist asked if she
4 could assist me and I said yes, I wanted to turn in the
5 vacancy announcements. She extended to receive them and I
6 indicated I wanted to get the receipt for the particular
7 announcement, and I pointed to her which one I wanted the
8 receipt for.

9     Q. And which one was that?

10     A. The one that -- the non -- something that's called
11 the position -- all U.S. citizens. I think they refer to it
12 as non-status.

13     Q. I think you're correct. Okay. And did she do that
14 for you?

15     A. She went to the copier. She stamped it in, went to
16 the copier and came back and gave me a copy and she kept it,
17 too, and according to the date of receipt, she said the 28th.
18 I turned it in the last day of closing, the 29th.

19     Q. Why didn't you ask for her to give you receipt of
20 both applications since you were there and she was there and
21 it would have been a matter of copying the other one, as well?

22     A. I'm a career status employee. For each position
23 I've applied for I've always wanted to get the application in,
24 not worry about getting a receipt for an application, but
25 because of the previous incident in applying for a position

Page 127

1 that was non-status selection, I wanted to cover my -- that I
2 did have a receipt that I applied for the non-status position.

3     Q. And what's the prior occasion you're talking about?

4     A. An EEO case dealing with promotions -- about 1993.

5     Q. Okay, but what's the connection between that and
6 getting a receipt for your non-status and not your status?

7     A. The position was filled by a non-status person,
8 although I had applied as a status person so, again, I wasn't
9 concerned about my status application. I wanted to make sure
10 that I had a non-status in case there was consideration given
11 to the non-status applicants.

12     Q. So you felt that you only needed to get a receipt
13 for the non-status?

14     A. That was my desire.

15     Q. And with respect to -- now it's your understanding
16 that they made a selection for the Collection Analyst
17 position, correct?

18     A. Yes.

19     Q. And you're aware that that selection was made from
20 the status applications? Are you aware of that or are you not
21 aware of that?

22     MR. SHAPIRO: I'm going to object to the term -- I'm
23 going to object to the word aware. Do you mean has he been
24 told it or does he understand it to be so? What does aware
25 mean?

Page 128

1     BY MS. MELNIK:

2     Q. Do you know?

3     A. I'm sorry. What's the question?

4     Q. Do you know that a selection was made for that
5 position off the status -- from the status applications?

6     A. At what point? I mean I don't understand your
7 question.

8     Q. At any point. When did you learn that, if you
9 learned it?

10     A. I learned there was a selection made when the
11 employee showed up for work.

12     Q. Okay. Is that the first you learned?

13     A. Yes.

14     Q. Okay. Now with respect to the Collection Analyst
15 position, you're alleging discrimination. Who do you think
16 discriminated against you on the Collection Analyst situation?

17     MR. SHAPIRO: If you know of a person.

18     WITNESS: The question being?

19     BY MS. MELNIK:

20     Q. The question being you claim that you were
21 discriminated against with respect to the Collection Analyst
22 position. Well, I'll ask -- why don't I put it this way? In
23 what way do you believe you were discriminated against with
24 respect to the Collection Analyst position?

25     A. Well, the basis of my claim that I was discriminated

## Page 129

1 because I did not get fair and due consideration under the
2 merit staffing process.
3    Q. Didn't get fair consideration under --
4    A. The merit staffing process.
5    Q. And in what respect did you not get fair and due
6 consideration?
7    A. I learned upon inquiring that the application that I
8 had turned in did not get considered for review by the
9 selecting official.
10    Q. And it's correct that you're claiming that that
11 happened because of your being a black male who's above 40 and
12 because of retaliation?
13    A. Yes.
14    Q. And who do you believe discriminated against you
15 with respect to not receiving fair and due consideration?
16    MR. SHAPIRO: If you know.
17    WITNESS: I would have to say employees of the
18 Pension Benefit Guaranty Corporation dealing with the staffing
19 process.
20    BY MS. MELNIK:
21    Q. At this time you can't name anyone specifically?
22    A. It's my basis it's the Personnel Operation Division
23 who processes the applications.
24    Q. So it's your belief that the Personnel or HRD
25 purposely or intentionally lost or destroyed one of your

## Page 130

1 applications because you're a black male over 40 with prior
2 EEO activity?
3    A. Yes.
4    Q. But you don't make that allegation with respect to
5 your non-status application that you got a receipt for?
6    MR. SHAPIRO: Make what allegation, that they lost
7 it?
8    MS. MELNIK: If he doesn't understand, I'll tell
9 him.
10    BY MS. MELNIK:
11    Q. My question is you don't make those same allegations
12 of discrimination with respect to the application or the
13 processing of the application that you have a receipt for?
14    A. Yes.
15    Q. Again, still talking about the Collection Analyst
16 position, with respect to your race, what's your basis for
17 believing that you were discriminated upon because you're
18 African-American?
19    A. As relating to this vacancy announcement?
20    Q. Well, I think you just said that you're only
21 claiming discrimination with respect to the one that --
22    MR. SHAPIRO: Objection. He said the opposite. He
23 said the opposite. He said yes. Did you not understand that?
24    MS. MELNIK: I haven't even finished the question.
25    MR. SHAPIRO: But he --

## Page 131

1    MS. MELNIK: Speaking objections --
2    MR. SHAPIRO: No. You just misstated the record.
3 He said yes.
4    MS. MELNIK: You said your objection and I'll
5 rephrase, Mr. Shapiro.
6    MR. SHAPIRO: Sure.
7    BY MS. MELNIK:
8    Q. Mr. Montgomery, it was my understanding that you are
9 raising allegations of discrimination based on the fact that
10 you didn't get fair and due consideration with respect to an
11 application because it was intentionally lost or destroyed by
12 PBGC. Am I wrong or am I right about that?
13    A. That's correct. I'm alleging discrimination as
14 regards vacancy number 138.
15    Q. Okay. So now I'm asking with respect to that what's
16 your evidence or basis for belief that that happened, not
17 getting the fair and due consideration, because you're
18 African-American?
19    A. Because of knowledge within the Human Resources
20 Department my application was lost or -- well, lost because I
21 turned one in, therefore, denying me due consideration under
22 that vacancy announcement.
23    Q. And with respect to -- the same question with
24 respect to your being male, what's your basis for believing
25 that you were discriminated against with respect to the

## Page 132

1 vacancy announcement that was, you allege, intentionally lost
2 of destroyed because you were male?
3    A. I don't understand the question.
4    Q. Okay. It's sort of the same question as the
5 previous one having to do with race, except now I'm asking
6 with respect to being male. Do you allege discrimination
7 based upon being protected classes, being race, sex or gender,
8 age, retaliation. I'm just going through each one of those
9 just to find out what your basis is or your evidence. So I'm
10 on gender, also sex, and so my question is what's your basis
11 for discrimination based upon being male?
12    A. Ultimately, the selectee for that position was
13 female.
14    Q. Anything else besides that?
15    A. Besides what?
16    Q. What you just stated, that the ultimate selectee was
17 female.
18    A. Because of my gender?
19    Q. Gender, right. Any other evidence or basis or
20 reason?
21    A. No.
22    Q. Okay. Same question with respect to age, what's
23 your basis or reason for your claim that you were
24 discriminated against with respect to the Collection Analyst
25 vacancy announcement because of your age?

Page 133

1 A. Being that the individual selected for the position,
2 and I never found out who it was, was a younger female.
3 Q. Okay. Anything else with respect to age?
4 A. You say anything else --
5 Q. Any other basis, any other comments that were made
6 or -- you know, from officials or -- I'm just looking for --
7 you made this claim in your complaint, discrimination based
8 upon age with respect to the Collection Analyst position, so
9 I'm trying to find whatever from you. One of the reasons you
10 said was because the selectee was younger, so that's one
11 reason. I'm asking is there any other reasons or evidence or
12 anything else that you can think of right here.
13 A. The individual was white.
14 Q. Okay. That has to do with the race part, so are you
15 saying -- we'll go back to that. Are you saying because she
16 was white you were discriminated against because you're black
17 because white -- I'm on gender or I'm on age.
18 A. Um-hum.
19 Q. That's fine, but you're saying that's another
20 reason?
21 A. I believe you stated earlier that there are
22 similarities in how you -- in the questioning I think you said
23 at first you were doing it with male and then you said race.
24 Then I think you came back and said gender. So my
25 understanding that as a black male and my age, I allege

Page 134

1 discrimination because a younger white female was hired for
2 positions other than --
3 Q. And other than the fact that the person selected was
4 a younger white female, do you have anything else to support
5 your claim?
6 A. What part of my claim are you referencing?
7 Q. Your -- that you didn't get fair and due
8 consideration for the Collection Analyst position for vacancy
9 announcement 138. I'm just going through your bases for your
10 claim. We went through first your race, then your gender. We
11 did age. The person was younger. I'm just asking if there's
12 anything else before I move on to retaliation.
13 A. The fact that I'm a black male, as I said, and I'm
14 not sure where you're trying to. I'm not going into the
15 realm that you've presented to me, but, you know, sometimes
16 people extrude things about well, African-American makes you
17 automatically black, but you are going by their color, so if
18 you want to say a black male, but I'm African-American, so I'm
19 not sure that we're covering the bases here.
20 Q. Okay. Well, as an African-American, what color do
21 you consider yourself?
22 A. Black.
23 Q. Okay. So all I'm getting at -- I'm not trying to
24 confuse you. I'm sorry if I am. I'm just trying to get at
25 your reasons or evidence of bases, whatever word you want to

Page 135

1 use, to support your claim that you were discriminated
2 against, race, gender, age, with respect to this Collection
3 Analyst position, and you've give me some so far. All I'm
4 doing is just making sure I've got it all.
5 A. Okay. No --
6 Q. Okay. And then you also make a claim of retaliation
7 for prior EEO activity.
8 A. Yes.
9 Q. Okay. And what's your bases or reason for that
10 claim with respect to the Collection Analyst position,
11 vacancy?
12 A. Because of my attempt to seek promotions, all
13 efforts were stifled within the Human Resources Department
14 that had knowledge of my previous EEO activity by way of my
15 PD.
16 Q. With respect to the folks in HRD, who do you alleged
17 had knowledge of your prior EEO activity?
18 A. Anyone that HR allowed to see my OFP [sic]. I don't
19 control who has access. They can see my OFP. I cannot say.
20 I don't know.
21 Q. Official Personnel File?
22 A. Official Personnel File.
23 Q. OPF.
24 A. OPF.
25 Q. And it's your claim that because of HRD's knowledge

Page 136

1 of your OPF that reflected that you had a prior settlement,
2 that that's the reason or one of the reasons that you didn't
3 receive a fair and due consideration of your Collection
4 Analyst application?
5 A. Would you restate the question?
6 Q. Sure. I've been asking you about your bases or your
7 reasons for your retaliation claim with respect to the
8 Collection Analyst position, and you've just explained that
9 your efforts to seek promotion had been stifled by HRD and
10 that they had knowledge of your prior EEO activity, is that
11 fair?
12 A. Yes.
13 Q. Okay. So other than the knowledge that you say they
14 had with respect to your prior EEO activity, do you have any
15 other reason or bases or evidence to support your claim that
16 they retaliated against you because of that prior EEO
17 activity?
18 A. Evidence would be a lack of due process in my
19 applications.
20 Q. Okay.
21 A. I need to take a break if you don't mind, please.
22 Q. Oh, that's fine. Want to take ten?
23 A. Sure, that's fine.
24 Q. Okay.
25           (OFF THE RECORD)

Page 137

1          (ON THE RECORD)
2     BY MS. MELNIK:
3     Q. Mr. Montgomery, another claim you are making in your
4  complaint has to do with the Equal Pay Act, and that has to do
5  with -- well, the Act says no employer shall discriminate
6  between employees on the basis of sex by paying wages to
7  employees in such establishment at a rate less than the rate
8  at which he pays wages to employees of the opposite sex in
9  such establishment for equal work on jobs, the performance of
10 which requires equal skill, effort and responsibility, and
11 which are performed under similar working conditions.
12 Basically you're doing the same work as someone else who's a
13 woman and they're getting paid more than you in simpler terms.
14 Do you understand what I mean by the Equal Pay Act, the claim
15 you made in your complaint?
16    A. I believe so.
17    Q. Okay. And what are you alleging this Equal Pay Act
18 claim is based on?
19    A. Performing higher graded duties at the 12 that were
20 previously done by a Grade 13 female, white female.
21    Q. And specifically who are we talking about?
22    A. Christine Thomas when she performed the role of
23 COTR, Investment Accounting Branch.
24    Q. And she was the COTR for the Bert Smith contract?
25    A. Correct.

Page 138

1     Q. Okay. And then you took over as the COTR for the
2  Bert Smith contract, correct?
3     A. Correct.
4     Q. And so it's the duties associated with the Bert
5  Smith contract that you were performing that you say that the
6  violation of the Equal Pay Act is Christine Thomas, who's a
7  female and is higher graded, was also performing those same
8  duties, COTR?
9     A. Yes, as well as Ms. Adams performed the COTR duties
10 as a GS-14.
11    Q. With respect to your Equal Pay Act claim, is that
12 the sole basis for the claim? Is there any other bases?
13    A. Under which complaint are we talking about?
14    Q. Well, actually your complaint that was filed in U.S.
15 District Court. I think that is the basis of your claim, but
16 I just want to cover the bases and if there's something else
17 -- why don't I make -- why don't I mark a copy of the
18 complaint?
19    MS. MELNIK: And it is number --
20    MR. SHAPIRO: 8. It's number 8.
21    MS. MELNIK: Yes, number 8.
22    MR. SHAPIRO: Thank you.
23          (Whereupon, the document that
24          was referred to as Deposition
25          Exhibit Number 8 was marked for

Page 139

1          identification.)
2     MS. MELNIK: And, Mr. Montgomery, if you'd just look
3  at number 8 which is a copy of your complaint, and -- which
4  one did we say here? I think it might be page 8. No, I was
5  wrong.
6     MR. SHAPIRO: You want the actual place where it
7  says Claim 4? Is that what you're looking for?
8     MS. MELNIK: Equal Pay Act claim.
9     MR. SHAPIRO: Yeah, it says. I don't how it could
10 be clearer. I don't know why you're asking that question.
11    MS. MELNIK: We don't have the document in front of
12 us. This is the only document that I have at this point.
13    MR. SHAPIRO: Yeah, you need to come look. Be my
14 guest. Let the record reflect that I'm showing her her
15 exhibit. It's okay. Let's just get moving on it, huh?
16    MS. MELNIK: Okay.
17    MR. SHAPIRO: I mean I don't know what you're asking
18 this for, but go ahead.
19    BY MS. MELNIK:
20    Q. Mr. Montgomery, just look at paragraphs 22 and 23 on
21 page 10.
22    A. Okay. What was the question?
23    Q. Okay. The question is other than Ms. Christine
24 Thomas and Cynthia Adams doing the COTR duties on the Bert
25 Smith contract and they were at a higher grade at the time

Page 140

1  they were doing it, other than that, is there anything else
2  that forms the basis of your Equal Pay Act claim?
3     A. In reference to different salary, no.
4     Q. Okay. Now you are in terms -- I'm going to go --
5  now I'm going to start a new area and just do your -- go
6  through your employment and education history. You're a
7  Financial Specialist, 501 Series, GS-12, is that correct?
8     A. Yes.
9     Q. Okay.
10    MR. SHAPIRO: He was that.
11    MS. MELNIK: All right.
12    BY MS. MELNIK:
13    Q. And you retired September 30th of '06?
14    A. Yes.
15    Q. And that's after how many years of service in the
16 federal government?
17    MR. SHAPIRO: You want to say civilian employment,
18 don't you?
19    MS. MELNIK: Okay, civilian employment. Well, see,
20 now he doesn't understand the question, Mr. Shapiro. Let me
21 ask my question.
22    MR. SHAPIRO: Sure.
23    BY MS. MELNIK:
24    Q. Let's just do this. Prior to retiring, your last
25 job was a Financial Specialist, 501 Series, GS-12 at PBGC,

Page 141

1 correct?
2   A. Yes.
3   Q. Okay. Prior to that, what position did you hold?
4   A. Prior to retiring?
5   Q. Prior to the Financial Specialist position. You
6 were with -- you were a Financial Specialist at a GS-12 from
7 when to when?
8   A. A GS-12?
9   Q. Correct.
10   A. Approximately October of '98, I believe, until
11 September 30, 2006.
12   Q. Okay. And prior to being a GS-12 Financial
13 Specialist, what position were you?
14   A. Financial Specialist, GS-11, from October '92 to
15 '96.
16   Q. Well, wait a minute because the last thing was from
17 '98.
18   A. Or '98.
19   Q. Okay. And then prior to October '92, prior to being
20 a GS-11 Financial Specialist, what position did you hold?
21   A. Management Analyst, GS-11. I'm going to say about
22 October '91 to -- October '91.
23   Q. Okay. And is also at PBGC.
24   A. At PBGC.
25   Q. And was that in a different branch or division than

Page 142

1 IAB?
2   A. Yes.
3   Q. Where was that?
4   A. Premium Operations Division.
5   Q. A branch or that was sort of the lowest category of
6 --
7   A. They've since reorganized. I just said Premium
8 Operations Division, but it was reorganized.
9   Q. Okay. Is that now CCD?
10   A. Yes.
11   Q. Okay. And prior to 1991, before the Management
12 Analyst, what job did you perform or title?
13   A. Management Analyst, GS-9, from '91 -- that's in the
14 '90s. I don't know the month.
15   Q. Okay. We left off at GS-11 '91 to '92, so it would
16 have had to have been before '91, so was it just like '90 to
17 '91 or was it the tail end of the '80s?
18   A. I'm not sure what month that occurred in.
19   Q. Okay. How about before the GS-9 Management Analyst
20 position?
21   A. Management Analyst, GS-7. I would probably guess
22 about 1988 --
23   Q. I'm sorry?
24   A. 1988 when I was a GS-7.
25   Q. Okay. And then prior to the Management Analyst GS-7

Page 143

1 position?
2   A. Management Assistant.
3   Q. Do you remember the grade?
4   A. I believe it was a 5.
5   Q. Do you recall when? We're in the '80s now.
6   A. February of '86. I think I competed and became a
7 Management Analyst, I think, in '87. I believe that's
8 correct.
9   Q. And prior to the Management Assistant position, GS-
10 5?
11   A. Secretary.
12   Q. And obviously this is all in the PBGC, is that
13 correct?
14   A. Yes.
15   Q. Okay. And the secretary position?
16   A. August -- June of '86.
17   Q. Do you recall what grade?
18   A. GS-5.
19   Q. And prior to that?
20   A. I was employed outside of the Agency.
21   Q. And where was that?
22   A. Search and Recruit International.
23   Q. Where was that located?
24   A. Springfield, Virginia.
25   Q. And what was your primary duty for them?

Page 144

1   A. Recruiter.
2   Q. For how long did you do that?
3   A. About nine months, nine or ten months.
4   Q. Was that in the mid-80s, '84?
5   A. '85, about September of '85, so I guess it was May,
6 April, May of '86.
7   Q. And prior to that?
8   A. Military service, United States Navy.
9   Q. And what rank did you end at?
10   A. E-8.
11   Q. E as in Edward?
12   A. E as in Edward, 8.
13   Q. With respect to your education, you graduated from
14 high school, correct?
15   A. Yes.
16   Q. And where did you graduate from high school?
17   A. Peter G. Appling.
18   Q. What's the last word?
19   A. Appling.
20   Q. Appling.
21   A. A-P-P-L-I-N-G.
22   Q. Where's that?
23   A. Macon, Georgia.
24   Q. And then what college credits -- well, you took some
25 college credit classes since that time, correct?

Page 145

1     A. Which time?
2     Q. Since you graduated high school.
3     A. Yes.
4     Q. Okay. If you could tell me where you went to school
5  since graduating from high school and what courses you took or
6  got credit for.
7     A. '69 or '70, I'm not sure of the year -- the
8  University of Maryland Extension Course, Europe, Business
9  Loans.
10    Q. Is that something you did while you were working?
11    A. In the military.
12    Q. Okay. And --
13    A. And from March 1972, Strayer College.
14    Q. Strayer?
15    A. Strayer College.
16    Q. Strayer.
17    A. In Washington, D.C.
18    Q. Okay. What did you take there?
19    A. I completed like 32 course hours, English courses,
20  communication, writing, probably Introduction to Economics,
21  math course, Introduction to Math. That's basically what I
22  can recall at this time.
23    Q. Okay. And thereafter?
24    A. I guess in '74 Northern Virginia Community College
25  -- Principles of Psychology. I completed one other course. I

Page 146

1  don't recall the name of it.
2     Q. Okay. And after NOVA?
3     A. In 1981, Prince George's Community College,
4  completed an accounting course. I believe that's three,
5  Principles of Management, Principles of Marketing, finance
6  course. I'm not sure if it's Principles of Finance,
7  Introduction to Finance. I think I completed Economics II. I
8  received my associate degree in marketing from Prince George's
9  Community College.
10    Q. When was that?
11    A. May of '83.
12    Q. And after you got that degree, what other courses do
13  you recall taking?
14    A. I'm not sure of the year. I'm going to say '86. I
15  believe that's the time frame. University of Maryland,
16  University College, College Park, attempted Introduction of
17  Statistics.
18    Q. That sounds like fun.
19    A. I believe I completed Accounting I.
20    Q. Okay.
21    A. Okay. In '98 --
22    Q. 1998 approximately?
23    A. '98.
24    Q. Okay.
25    A. Summer 1998, June 1998, Charles County Community

Page 147

1  College.
2     Q. Charles County?
3     A. Charles County Community College, Principles of
4  Accounting I. Fall, September -- I believe the year was '98,
5  Intermediate Accounting I and Intermediate Accounting II.
6     Q. Is this still Charles County?
7     A. Yes.
8     Q. Okay.
9     A. Tax accounting. That's all I can recall.
10    Q. Okay. Anything else beyond 1998?
11    A. No.
12    Q. Okay.
13    A. I'm sorry, yes, there is.
14    Q. Okay. All right.
15    A. University of Maryland, University College, Waldorf,
16  Government Accounting. I think that was between 2001 and
17  2002, best I can recall.
18    Q. Anything since then?
19    A. No.
20    Q. Okay. Mr. Montgomery, you recall hearing Ms. Adams'
21  deposition and a little bit actually of Mr. McKennon's
22  deposition, too, that according to each of them they gave you
23  an opportunity to start doing the work of the trust
24  accountants, and by that I mean accounting work that involved
25  assets beyond cash, and start doing the -- working on the

Page 148

1  plans that they worked on, the same sort of -- it started at
2  the beginning of the same process that they worked on, to take
3  a terminated plan all the way through to trusteeship at PBGC.
4  Do you have any recollection of them offering you
5  opportunities to do that kind of work?
6        MR. SHAPIRO: Objection to the form of the question.
7  It misstates what the prior deposition testimony way.
8        WITNESS: Would you give me the question again,
9  please?
10       BY MS. MELNIK:
11    Q. Sure. Now that I've said all that, I can probably
12  make it shorter. Do you recall Ms. Adams at least once, if
13  not twice, discussing with you an opportunity to do more
14  complicated accounting work, i.e., specifically -- a little
15  more complicated accounting work, trust accounting work?
16    A. I didn't follow the question, so I need to know
17  which one you're asking me.
18    Q. Okay. I'll break it down. It's all right. It's
19  late and we're all tired. Ms. Adams had testified that she at
20  least on two occasions spoke to you in reference to taking on
21  additional trust accounting type duties. Do you recall her
22  testifying about that?
23    A. Yes.
24    Q. Okay. Do you recall having conversation or
25  conversations with her with respect to her giving you an

Page 149

1 opportunity to take on those additional duties?

2 A. Yes.

3 Q. Okay. Do you recall Mr. McKennon in a similar vein

4 having conversation or conversations with you with respect to

5 taking on more complicated accounting work that the trust

6 accountants were doing? Do you recall having any conversation

7 with him about that?

8 A. No.

9 Q. Do you recall how you responded on the occasion that

10 Ms. Adams came to you in reference to offering trust

11 accountant type duties?

12 A. Yes.

13 Q. What's your best recollection of how you responded?

14 A. At the time she asked me I was a Financial Analyst

15 -- Financial Specialist, GS-12, and I expressed to her that

16 the grade structure, seeing that I was already at the 12, how

17 I wanted a promotion, and without a promotion I didn't see any

18 merit in doing the work.

19 Q. I've got one more area and then my colleague, Ms.

20 Esser, might have some additional sort of cleanup questions if

21 I've forgotten anything. Since you've retired, have you

22 applied for any positions, employment? Got to ask.

23 A. No.

24 Q. Okay. And I assume you are receiving some sort of

25 pension or retirement from the Pension Benefit Guaranty

Page 150

1 Corporation?

2 A. Not yet.

3 Q. Oh. You're entitled to it, though?

4 A. Yes.

5 Q. Okay.

6 A. No.

7 Q. No?

8 A. You said from the Pension Benefit Guaranty

9 Corporation.

10 Q. Oh, from the federal government?

11 A. Yes.

12 Q. Okay. Do you happen to know how much that will end

13 up being per -- I don't know how it's distributed, either --

14 A. Monthly.

15 Q. Monthly? Do you know what you'll be getting

16 monthly?

17 A. Roughly.

18 Q. Roughly? Can you tell me roughly what you'll be

19 getting?

20 A. I believe after tax 1750.

21 Q. 17,500?

22 A. No, $1,750 a month.

23 Q. All right. With respect to your claims of

24 discrimination and retaliation, you claim that you suffered

25 and continues to suffer economic losses, lost promotional and

Page 151

1 bonus opportunities with attendant loss of pay and other

2 benefits associated with the promotions. Can you tell me what

3 you mean by that, and I can give you back the complaint if you

4 need to read the language again. It's at the end of every

5 paragraph for each claim. I just want to understand what

6 you're referring to.

7 A. Is it at the end of every paragraph?

8      MR. SHAPIRO: Here, the end of this paragraph is

9 what she means. This loss of pay and other benefits, is that

10 what you're talking about, that language?

11      MS. MELNIK: suffers and continues to suffer

12 economic loss.

13      WITNESS: Excuse me. Lost promotional opportunity?

14 BY MS. MELNIK:

15 Q. Right.

16 A. By not receiving promotions at a higher grade, GS-13

17 or higher, it impacts how my retirement pay will be

18 calculated. It denies a matching -- what I put in my

19 retirement plan. It subsequently caused my standards to be

20 less than what I could have lived at should I have been

21 promoted to a higher grade. My -- would have been higher.

22 And, consequently, based on actuarial tables over a long time, .

23 it's just a matter of how much money I would use over the

24 course of my lifetime.

25 Q. Okay. You also mentioned this in the complaint at

Page 152

1 the end of every claim paragraph about bonuses and awards for

2 exceptional performance. What are you referring to there that

3 you didn't receive or suffered from because of --

4 A. Each year we receive performance appraisals and,

5 based upon your rating, you receive a bonus based on whether

6 you get an outstanding or an excellent. According to union

7 agreement, if you get an outstanding, it's 3 percent of your

8 annual salary. An excellent, I believe is 2 percent of your

9 annual salary. It's a bonus. Had I been promoted to a higher

10 grade and continued performance -- I did not receive the

11 higher amount than I received at the GS-12.

12 Q. You also claim -- make a claim of emotional

13 distress. Have you sought a mental health professional for

14 that?

15 A. No, I have that.

16 Q. Okay. You also make a claim of pain and suffering.

17 What do you mean by that?

18 A. The subjection of retaliation and discrimination

19 exaggerated my high blood pressure causing me to seek medical

20 attention, to be prescribed additional medication that at

21 times has left me lethargic, affected my quality of life.

22 Q. How long have you had high blood pressure?

23 A. About 13 or 15 years.

24 Q. And did you receive treatment for it when you were

25 first diagnosed?

Page 153

1    A. As I recall, yes.
2    Q. And is there a family history of high blood pressure
3 in your family?
4    A. I'm trying to recall. I have a small family. Not
5 to my knowledge.
6    Q. Okay. And the medications you were prescribed for
7 your high blood pressure, did they help treat the problem?
8    A. Yes.
9    Q. And other having to take or being prescribed
10 additional medication -- when were you prescribed additional
11 medication? You mentioned something about getting additional.
12    MR. SHAPIRO: I just want to make sure, additional
13 medication --
14    MS. MELNIK: For blood pressure.
15    MR. SHAPIRO: Different medications or do you mean
16 more frequently or higher dosages or both?
17    MS. MELNIK: Well, I'm using his words. He said he
18 was prescribed additional medication.
19    BY MS. MELNIK:
20    Q. So I'm asking you what you meant by additional,
21 meaning more? Did you have to take --
22    A. My regimen was changed. I was taken off my
23 medication to try and control it and put on more. That's what
24 I mean by more medication, either the dosage or change, 2004
25 or 2005 time frame.

Page 154

1    Q. And has the change in regimen helped your high blood
2 pressure?
3    A. Based on my talking with my doctor, it has
4 stabilized.
5    Q. Stabilized?
6    A. Yes.
7    Q. Okay. And I didn't want to take up the time, Mr.
8 Montgomery, of going through every claim and -- individually
9 with respect to these damages since these are damages that are
10 listed at the end of every claim in your complaint, so am I
11 correct to assume that these are the damages that you claim
12 you suffered with respect to each of your claims, the age
13 discrimination, the race discrimination, gender
14 discrimination, retaliation, the high blood pressure?
15    A. Yes.
16    Q. Okay. Those apply to all of those claims?
17    A. Yes, and compounded.
18    Q. Okay, but it's with respect to all of those claims?
19    A. Yes.
20    Q. Okay. Also part of the same -- what we've been
21 talking about that's in every claim paragraph with respect to
22 damages, you mentioned personal and professional humiliation.
23 What are you referring to there?
24    A. I think it's known with the Financial Operation
25 Department of my not getting selected for a position that I

Page 155

1 applied for, and then other people get those positions. It
2 brings about, I guess, having to maintain my humility, you
3 know, the discrimination. I felt discriminated against, but,
4 you know, how other perceive what's been done to me
5 professionally, why I'm being subjected to discrimination in
6 PBGC.
7    Q. And you probably already answered this. You
8 mentioned career damage also, and am I correct that that has
9 to do with not getting a higher grade, so not getting the
10 money that's associated with the higher grade or is career
11 damage some other -- something else that you had in mind?
12    A. Would you give me that question again?
13    Q. Yes. It wasn't asked very well. In the complaint
14 in addition to emotional distress, pain and suffering,
15 economic loss, the things we've been talking about over the
16 last 15, 20 minutes or so, you also mentioned career damage
17 and I just wondered what you're referring to with respect to
18 that.
19    A. I retired September 30th, 2006, but had I not been
20 discriminated and received promotions, I would still possibly
21 be employed with PBGC for many more years, but after the
22 continuous discrimination and retaliation, it damaged my
23 career to remain a good employee, professional employee of the
24 Pension Benefit Guaranty Corporation.
25    MS. MELNIK: Can I suggest we take five minutes.

Page 156

1    MR. SHAPIRO: You're closing down, aren't you?
2    MS. MELNIK: We are, we are -- yes.
3    MR. SHAPIRO: Good.
4    MS. MELNIK: I just want to get one last look-see,
5 and then --
6    MR. SHAPIRO: Sure, we'll do that.
7    MS. MELNIK: Okay.
8        (OFF THE RECORD)
9        (ON THE RECORD)
10    BY MS. MELNIK:
11    Q. Mr. Montgomery, with respect to the time that you
12 went to HRD and dropped off your applications for the
13 Collection Analyst positions, do you recall who it was that
14 helped you, who offered to help you and did that for you when
15 you dropped them off?
16    A. Not by name.
17    Q. Okay. Was it a male or a female?
18    A. Female.
19    Q. And do you remember her race?
20    A. White.
21    Q. And are you alleging that the receptionist is
22 someone who discriminated against you because of your various
23 protected classes, race, gender, age and retaliation, the
24 receptionist?
25    A. Would you rephrase the question?

Page 157

1  Q. Are you alleging that the receptionist discriminated
2 and retaliated against you?
3  A. No.
4  Q. Okay.
5  MS. MELNIK: All. We are done.
6  MR. SHAPIRO: I have some questions.
7  CROSS EXAMINATION
8  BY MR. SHAPIRO:
9  Q. Mr. Montgomery, you know who Sharon [sic] Mathis is,
10 correct?
11  A. Yes.
12  Q. She got a 13, didn't she?
13  A. Yes.
14  Q. And then she got a 14, yes? So if you get one
15 promotion, you might actually get another, correct?
16  MS. MELNIK: Objection to the form and also leading.
17  BY MR. SHAPIRO:
18  Q. Sir?
19  A. May I have the question again?
20  Q. Yes. I said so when somebody gets a promotion, they
21 get in line for another promotion, don't they?
22  MS. MELNIK: Objection, speculation.
23  MR. SHAPIRO: Yes, it is speculation.
24  BY MR. SHAPIRO:
25  Q. One can be promoted, can't one?

Page 158

1  A. It's possible.
2  Q. Yes. You had no possibility of getting a 14, did
3 you?
4  A. No.
5  Q. Because you didn't get a 13, correct?
6  A. Correct.
7  Q. Now do you know what the College of Southern
8 Maryland is?
9  A. Yes.
10  Q. And did you attend accounting -- take accounting
11 courses there?
12  A. Yes.
13  Q. And do you recall your transcript that we provided
14 copies of?
15  A. Yes, I do.
16  Q. Do you recall taking Automated Accounting Systems
17 there?
18  A. Yes.
19  Q. Principles of Accounting II?
20  A. Perhaps.
21  Q. Interim Accounting -- sorry, Intermediate
22 Accounting?
23  A. Yes.
24  Q. I and II?
25  A. Yes.

Page 159

1  Q. Federal Tax Accounting?
2  A. Yes.
3  Q. Principles of Accounting I?
4  A. Yes.
5  Q. And Intro to Data Processing?
6  A. I'm sorry. What was the course?
7  Q. Introduction to Data Processing?
8  A. I don't recall. I took several courses.
9  Q. Okay. In addition, that's a college that you went
10 to in addition to the other colleges that you mentioned?
11  A. There was a name change. It's Charles County
12 Community College and they changed the name to the College of
13 Southern Maryland.
14  Q. I see, okay, good. And this Government Accounting
15 course, that was the last accounting course that you took?
16  A. Yes.
17  Q. And that was at the University of Maryland, College
18 Park?
19  A. The Waldorf office.
20  Q. Oh, the Waldorf campus, okay. Now these accounting
21 courses that you took in the late '90s and in 2001, that time
22 frame, who paid for those accounting courses?
23  A. Pension Benefit Guaranty Corporation.
24  Q. Now when the Pension -- that was part of -- out of
25 their training funds?

Page 160

1  A. Yes.
2  Q. And when you take a college course and the
3 government pays, that is the PBGC pays, do they get to have
4 proof that you did take the course --
5  A. Yes.
6  Q. -- and pass the course?
7  A. Yes.
8  Q. You have to provide that, don't you?
9  A. Yes.
10  Q. To HRD, isn't it?
11  MS. MELNIK: I object to the leading, Mr. Shapiro.
12  BY MR. SHAPIRO:
13  Q. One of the units in HRD?
14  A. Yes.
15  Q. All right. When did you apply for the GS-13
16 accountant position that Ms. Mathis got?
17  A. I don't recall -- during the announcement period.
18  Q. Nobody called you to tell you that was a 13
19 accounting job vacant?
20  A. I knew it was out, but it closed before I was able
21 to apply.
22  Q. Okay. There was some talk on examination this
23 afternoon about Ms. Cynthia Adams offering you higher duties,
24 accounting type duties. I think counsel said more complex
25 accounting type duties, offered to have you do those. Do you

Page 161

1  recall that questioning?
2      A. Yes.
3      Q. Ms. Adams offered to promote you to a 12 accountant,
4  didn't she -- I mean, that is, convert you to a 12 accountant,
5  a Grade 12 accountant, didn't she?
6      A. Yes.
7      Q. And when did she do that, what time frame?
8      A. Maybe 2004, 2005.
9      Q. Do you recall a conversation with -- never mind.
10 When you had your earlier EEO complaint, the one that was
11 settled, where did you work? Which unit did you work in?
12     A. Financial Reporting and Accounts Analysis Branch.
13     Q. In the --
14     A. Comptroller, Operation Division.
15     Q. Which is --
16     A. FOD.
17     Q. Which is FOD. And Mr. Winter was an official in
18 FOD, wasn't he?
19     A. Yes.
20     Q. And the HR Department, that particular case involved
21 HR, as well, didn't it?
22     MS. MELNIK: Objection as to vague and leading.
23     BY MR. SHAPIRO:
24     Q. Who processes changes to PDS, which part of the PBGC
25 processes changes to PDs?

Page 162

1      A. The Human Resources Department.
2      Q. And the Human -- who has possession of official
3  personnel files, which part of PBGC?
4      A. The Human Resources Department.
5      Q. And who has possession of the PDs?
6      A. The Human Resources Department.
7      Q. And the processing of vacancies and the filling of
8  vacancies, which department of PBGC does that?
9      A. Human Resources Department.
10     Q. Jackie Isaac, you know who I'm talking about in the
11 Human Resources Department?
12     A. Yes.
13     Q. Is she -- she was the Staffing Specialist involved
14 in all the selections here? She did the staffing work?
15     MS. MELNIK: Objection as to vague.
16     BY MR. SHAPIRO:
17     Q. She did the staffing work in HRD for the various
18 positions that are at issue here that you applied for?
19     A. Yes.
20     Q. She also was the person who signed off on the desk
21 audit report?
22     A. Yes.
23     Q. Okay. And your first EEO complaint involved here,
24 involved in this case, not the earlier one, the first one
25 involved in this case involved what incident?

Page 163

1      A. I'm sorry. Can you --
2      Q. When you first went to EEO this time, not the
3  earlier case that you settled but the first time you went to
4  EEO, it was over what?
5      A. Accretion of duties.
6      Q. That you weren't getting your accretion of duties --
7      A. I wasn't getting that.
8      Q. And that ultimately led to this desk audit question?
9      MS. MELNIK: Objection, leading.
10     WITNESS: Yes.
11     MR. SHAPIRO: And these promotions that are at issue
12 here, that happened after the desk audit?
13     MS. MELNIK: Are you referring to the 04-105 --
14     BY MR. SHAPIRO:
15     Q. All those different promotions, right, that you
16 applied for, the applied for positions. Whether you were held
17 eligible or qualified or not, they happened after the desk
18 audit issue?
19     A. Yes.
20     MR. SHAPIRO: I don't have anything further.
21     MS. MELNIK: I think I just have one.
22     REDIRECT EXAMINATION
23     BY MS. MELNIK:
24     Q. When Ms. Adams offered to give you or offered to
25 convert you to a 510 Accountant GS-12, that was at the time

Page 164

1  that she offered to give you accounting duties of a GS-12
2  accountant, correct?
3      A. I don't understand that question.
4      Q. Just in response to Mr. Shapiro's questions, you
5  said that or agreed that he put -- Mr. Shapiro said Ms. Adams
6  offered to convert you to a GS-12 accountant. Do you recall
7  him asking you that --
8      A. Yes.
9      Q. -- and you saying yes?
10     A. Yes.
11     Q. Okay. And that is at the time that she was offering
12 to give you duties of a GS-12 accountant so that you would
13 have the 510 Accounting Series title and grade to go with the
14 duties that go along with a GS-12 accountant, correct?
15     A. That sounds good.
16     Q. Okay.
17     MR. SHAPIRO: We'll read and sign. Also, I would
18 like a copy of all the exhibits to follow the transcript,
19 okay?
20     REPORTER: They're attached.
21     MR. SHAPIRO: Right. So make sure you have them
22 all. There are eight of them.
23     REPORTER: I will.
24     MS. MELNIK: We've got a Protective Order, so we
25 need the HIPAA.

Page 165

1        MR. SHAPIRO: Right, so you'll do a Protective

2   Order?

3        MS. MELNIK: I will do a Protective Order.

4        MR. SHAPIRO: The only thing I require in a -- well,

5   it's fine. If you make it limited because there's nothing

6   else really floating around here --

7        MS. MELNIK: Right.

8        MR. SHAPIRO: -- just limit it to his medicals, and

9   if you want to get his medicals, you can write a very

10  straightforward order that all we want is -- I don't care if

11  you see them, I don't care if you see them, I don't care if

12  your colleagues here in the office see them, I don't care if

13  you show them to some expert, but I don't want these things

14  out floating around the Agency. They're private medical

15  information. And we want them destroyed or returned after the

16  end of the case., but we want it during the pendency of the

17  case. It's very important to us that it not get out there

18  because we've heard rumors that other people have had their

19  medical stuff spread around. And medical stuff is -- as you

20  know, you wouldn't want your medical stuff spread around.

21       MS. MELNIK: I understand, Mr. Shapiro.

22       MR. SHAPIRO: That's it, and then we'll be happy to

23  sign the form. Soon as we have an order, we'll be happy to

24  sign the form.

25       MS. MELNIK: If I can just get from Mr. Montgomery -

Page 166

1   --

2        BY MS. MELNIK:

3   Q. If I can ask you, what's the name of the doctor that

4   you've been seeing for your high blood pressure?

5   A. Richard A. Farfon, F-A-R-F-O-N.

6   Q. Okay.

7        MR. SHAPIRO: Where's his office?

8        WITNESS: St. Patrick Drive in Waldorf, Maryland.

9        MS. MELNIK: Okay.

10       MR. SHAPIRO: Okay?

11  (Reading and signature not waived.)

12  (Whereupon, at 5:33 p.m., on Friday, December 1,

13  2006, the deposition was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 167

1              CERTIFICATE

2        I, Timothy J. Atkinson, a Shorthand Reporter and a Notary

3   Public, do hereby certify that the foregoing witness,

4   DeLARSE MONTGOMERY, was duly sworn on the date indicated, and

5   that the foregoing is a true and accurate transcription of my

6   stenographic notes and is a true record of the testimony given

7   by the foregoing witness.

8        I further certify that I am not employed by or related to

9   any party to this action by blood or marriage and that I am in

10  no way interested in the outcome of this matter.

11       In witness whereof, I have hereunto set my hand this

12  20th day of December, 2006.

13

14                        /S/

15  _____

16       Timothy J. Atkinson, Jr.

17       Notary Public in and for the

18       District of Columbia

19

20

21

22  My commission expires:

23  February 28, 2011

24

25