Exhibit 8
MSJ

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
                                  :
DeLARSE MONTGOMERY, JR.,          :
                                  :
                                  :
                Plaintiff,        :
                                  :
      v.                          :   Civil Action No.
                                  :   05-2157 (RMU)
ELAINE L. CHAO, et al.,           :
                                  :
                Defendants.       :
                                  :
- - - - - - - - - - - - - - - - - x

                        December 6, 2006

                        Washington, D.C.

      Deposition of

             JACQUELINE ISAAC

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before ANDREW

N. SCHACHTER, Notary Public in and for the District of

Columbia, at SWICK & SHAPIRO P.C., 1225 Eye Street,

N.W., Suite 1290, Washington, D.C. 20005, commencing at

12:22 p.m.

             Diversified Reporting Services, Inc.
                     (202) 467-9200

Page 2

APPEARANCES:

On Behalf of the Plaintiff:
DAVID SHAPIRO, ESQ.
Swick & Shapiro, P.C.
1225 Eye Street, N.W., Suite 1290
Washington, D.C. 20005
(202) 842-0300

On Behalf of Defendants:
KAREN ESSER, ESQ.
Pension Benefit Guaranty Corp.
Office of the General Counsel
1200 K Street, N.W.
Washington, D.C. 20005
(202) 326-4400 x. 3275

KAREN MELNIK, ESQ.
U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0338

Also Present:

DeLARSE MONTGOMERY, Plaintiff

---

Page 3

CONTENTS

WITNESS:    DIRECT CROSS REDIRECT RECROSS

Jacqueline Isaac    4    131  148, 163  162, 164

PLAINTIFF'S EXHIBITS:                PAGE

1 - Announcement No. JI04-0105        64

2 - OPM Qualification Standards for General Schedule
      Positions for GS-510 Accounting Services  73
3 - Letter from J. Isaac to D. Montgomery re
      Announcement No. JI04-0105, dated 7/6/04  76

4 - Letter from D. Montgomery to M. Pilpovich
      dated 7/12/04              78
5 - Letter from M. Pilpovich to D. Montgomery
      dated 8/2/98             80

6 - Position Description for 8940 dated 8/2/98    92

DEFENDANTS' EXHIBITS:

A - Announcement No. JI04-0139        131

B - Announcement No. JI04-0138        131

C - POLARS listing for Announcement JI04-0139    135

D - POLARS listing for Announcement JI04-0138    135

E - Desk audit for D. Montgomery        137

---

Page 4

1              P R O C E E D I N G S
2    Whereupon,
3              JACQUELINE ISAAC
4    was called as a witness and, having been duly sworn,
5    was examined and testified as follows:
6              DIRECT EXAMINATION
7      BY MR. SHAPIRO:
8    Q   Could you state your full name, please, ma'am?
9    A   Jacqueline Anne Isaac.
10   Q   Ms. Isaac, where do you live?
11   A   Fredericksburg -- actually, Locust Grove,
12   Virginia.
13   Q   And can you give me an address?
14   A   413 Yorktown Boulevard, Locust Grove, Virginia
15   22508.
16   Q   And it's a private home?
17   A   Yes.
18   Q   Any plans to move?
19   A   No.
20   Q   Can you give me the telephone number there?
21   A   540-972-6562.
22   Q   How long have you lived there?

---

Page 5

1    A   Five years.
2    Q   And you're not planning to move.
3    A   No.
4    Q   Good.  Are you a college graduate, ma'am?
5    A   No.
6    Q   Did you have any college credits at all?
7    A   No.
8    Q   Where did you go to high school?
9    A   Santa Monica High School, Santa Monica,
10   California.
11   Q   And when did you graduate?
12   A   1973, June.
13   Q   And how long have you lived in the Washington
14   area?
15   A   I'd have to say 12 years.
16   Q   So since about the mid-'90s?
17   A   Yes.
18   Q   And are you a federal employee now?
19   A   Yes.
20   Q   And where do you work, ma'am?
21   A   I work for the Millennium Challenge
22   Corporation.

---

| | Page 6 |
|---|---|
| 1 | Q  And how long have you worked there? |
| 2 | A  Since October 15 of this year. |
| 3 | Q  So it's a new job. |
| 4 | A  Yes. |
| 5 | Q  Not quite two months on the job. |
| 6 | A  Not quite. |
| 7 | Q  And what is the job that you have there? |
| 8 | A  Senior H.R. program specialist. |
| 9 | Q  And you're a GS? |
| 10 | A  No. |
| 11 | Q  What is your — |
| 12 | A  MC. |
| 13 | Q  MC? |
| 14 | A  Yes. |
| 15 | Q  Is there a series with that job? |
| 16 | A  It's a 201. |
| 17 | Q  And is there a grade? |
| 18 | A  No. |
| 19 | Q  No grade.  MC is — what does that stand for? |
| 20 | A  Millennium Challenge. |
| 21 | Q  I see.  It's their own program.  But 201 is |
| 22 | the series used in the federal government? |

| | Page 7 |
|---|---|
| 1 | A  Yes. |
| 2 | Q  So you do use the federal series. |
| 3 | A  Yes. |
| 4 | Q  So you use the handbook from H.R. — in |
| 5 | H.R. — the H.R. handbook issued by OPM? |
| 6 | A  I'm not sure I follow. |
| 7 | Q  Well, do OPM regulations apply to the |
| 8 | Millennium Challenge Corporation? |
| 9 | A  Yes, they do. |
| 10 | Q  And what is this MC 201 that you have — what |
| 11 | is it equivalent to in terms of the general schedule? |
| 12 | A  It's equivalent to a 201 series H.R. |
| 13 | specialist in the rest of the federal government. |
| 14 | Q  Right.  And the grade? |
| 15 | A  The grade — GS 13. |
| 16 | Q  That's your pay level. |
| 17 | A  Yes. |
| 18 | Q  It's equivalent to a GS 13? |
| 19 | A  Yes. |
| 20 | Q  So how much do you get paid? |
| 21 | A  93,000. |
| 22 | Q  And was this a promotion for you when you |

| | Page 8 |
|---|---|
| 1 | took — a raise for you when you took this job? |
| 2 | A  No. |
| 3 | Q  No.  So it was like a lateral. |
| 4 | A  Yes. |
| 5 | Q  Okay.  Prior to taking this job at the |
| 6 | Millennium Challenge, where were you employed? |
| 7 | A  Pension Benefit Guaranty Corporation. |
| 8 | Q  And for how long were you there? |
| 9 | A  Six years. |
| 10 | Q  Since 2000? |
| 11 | A  Yes. |
| 12 | Q  What month? |
| 13 | A  October. |
| 14 | Q  And did you have the same job while you were |
| 15 | there? |
| 16 | A  Yes. |
| 17 | Q  Okay.  What was your job? |
| 18 | A  H.R. specialist. |
| 19 | Q  And is that a 201 job? |
| 20 | A  Yes. |
| 21 | Q  So that was GS 201, and what was your grade? |
| 22 | A  13. |

| | Page 9 |
|---|---|
| 1 | Q  Were you always a 13 while there? |
| 2 | A  Yes. |
| 3 | Q  So you worked for the H.R. department — HRD. |
| 4 | A  Yes. |
| 5 | Q  Okay.  And were you always in the same unit at |
| 6 | HRD? |
| 7 | A  Yes. |
| 8 | Q  When you first got there in October of 2000, |
| 9 | what was the unit that you were in? |
| 10 | A  Services division. |
| 11 | Q  And was there a branch that you were in or was |
| 12 | it just all the division? |
| 13 | A  It's always division. |
| 14 | Q  Who headed the division? |
| 15 | A  Stephanie Russell. |
| 16 | Q  So she would have been the manager. |
| 17 | A  Yes. |
| 18 | Q  Like division manager.  That's what they call |
| 19 | it there, right? |
| 20 | A  Yes. |
| 21 | Q  And how many people were in the division, |
| 22 | federal employees? |

Page 10

1     MS. MELNIK: Specific as to 2000 or --
2     MR. SHAPIRO: Yes. If it's different --
3     BY MR. SHAPIRO:
4     Q   Has it changed over the course of time?
5     A   Yes.
6     Q   What was the highest and the lowest?
7     A   Twelve is the highest.
8     Q   Okay. And what was the lowest?
9     A   Five.
10    Q   And when you first got there, was it five?
11    A   About 12.
12    Q   So it's gone down over the course of time?
13    A   Yes.
14    Q   Ms. Russell was the only supervisor?
15    A   Yes.
16    Q   And these 5 to 12 federal employees who worked
17    there, were they all 201s?
18    A   No.
19    Q   Were they all in the 200 series?
20    A   Yes.
21    Q   So they were specialists.
22    A   No.

Page 11

1     Q   No? What were the other people's series?
2     A   They were 235, which is assistants; H.R.
3     assistants.
4     Q   Sort of para-professionals; not full H.R.
5     people.
6     A   I don't --
7     Q   They're not fully qualified to be 201s.
8     A   Right.
9     Q   When you're a 235, you're like an assistant to
10    an H.R. specialist.
11    A   Yes.
12    Q   Were there any other specialties, like
13    classification specialist, staffing specialist?
14    A   No.
15    Q   And the services division did staffing?
16    A   Yes.
17    Q   Recruitment?
18    A   Yes.
19    Q   Classification?
20    A   Yes.
21    Q   Discipline?
22 .  A   Yes.

Page 12

1     Q   Employee relations?
2     A   Yes.
3     Q   Labor relations?
4     A   Yes.
5     Q   Training?
6     A   No.
7     Q   How about the records? Did they
8     maintain -- did the services division maintain the
9     official personnel records?
10    A   Yes.
11    Q   How about the performance system, performance
12    evaluation system?
13    A   Yes.
14    Q   Did the service division do that?
15    A   Yes.
16    Q   Anything else? Just to recount, we have
17    staffing and recruitment, position classification,
18    discipline, employee relations, labor relations, the
19    maintenance of the official personnel folders and
20    performance evaluation system.
21    A   Processing of personnel actions.
22    Q   All right. Did there come a time

Page 13

1     where -- this was so during the entirety of your time
2     at -- in the services division?
3     A   No.
4     Q   Okay. When did it change?
5     A   June 1, 2003.
6     Q   And you were still in the services division
7     afterwards?
8     A   Yes.
9     Q   Who headed the services division after June 1,
10    2003?
11    A   Michele Pilpovich.
12    Q   And what were the duties there?
13    A   Staffing, recruitment, classification,
14    maintaining of OPFs, processing personnel action. The
15    employee and labor relations was moved to -- out from
16    under her and put into kind of a program area off by
17    itself.
18    Q   Okay. What about the performance evaluation
19    system?
20    A   Same thing. It went with the other --
21    Q   What about discipline?
22    A   Discipline went over there also.

Page 14

1    Q   To where?

2    A   To a separate section.

3    Q   What section?

4    A   Employee and labor relations.

5    Q   Okay. And who headed that?

6    A   Michele headed it but it was separate from

7    services.

8    Q   So Michele headed two sections.

9    A   Yes.

10   Q   So she was the section manager of two

11   sections.

12   A   Yes.

13   Q   Okay. And you stayed with the services

14   section.

15   A   Yes.

16   Q   Which had staffing, recruitment,

17   classification --

18   A   Right.

19   Q   -- OPF maintenance and processing of actions.

20   A   Yes.

21   Q   Did that come a time when that changed before

22   you left?

Page 15

1    A   No.

2    Q   So that's the way it was 'til 10/15/06.

3    A   Yes.

4    Q   Okay. But Michele Pilpovich, she left. She

5    went to a different job.

6    A   Yes.

7    Q   So when did you get a new boss?

8    A   I don't remember.

9    Q   Who was the new boss?

10   A   Rick Lattimer.

11   Q   Now, when Mr. Lattimer had the division, it

12   would have had staffing, recruitment, classification,

13   OPF maintenance and processing of actions, correct?

14   A   Correct.

15   Q   Did he also head the other section as well?

16   A   Yes.

17   Q   And that section you don't remember what it

18   was called.

19   A   It was all part of employee and labor

20   relations.

21   Q   But it was a separate and distinct division

22   from your division.

Page 16

1    A   Yes.

2    Q   Okay. And Mr. Lattimer was your supervisor.

3    A   Yes.

4    Q   There was no intervening subordinate

5    supervisor to him that oversaw your work.

6    A   No.

7    Q   And the same was true for Ms. Pilpovich? She

8    was your immediate supervisor?

9    A   Yes.

10   Q   As had been Ms. Russell.

11   A   Yes.

12   Q   And when did -- was there a time when Mr.

13   Lattimer left?

14   A   Yes.

15   Q   And when was that?

16   A   Either August or September of 2006. I believe

17   it was August of 2006.

18   Q   And who became the manager?

19   A   We really didn't have one until they selected

20   Paul Nomocos.

21   Q   Paul Nomocos; can you spell that?

22   A   N-o-m-a-s-o-c -- c-o?

Page 17

1    Q   C-o. Cos.

2    A   Yeah. Cos. I believe so.

3    Q   C-o-s instead of s-o-c? C-o-s?

4    A   I -- I --

5    Q   Okay. And where did Mr. Nomocos come from,

6    from the section?

7    A   No.

8    Q   He was from outside?

9    A   Yes.

10   Q   From outside of PBGC?

11   A   Yes.

12   Q   Did you apply for that job?

13   A   Yes.

14       MS. MELNIK: That job meaning head of services

15   division?

16       MR. SHAPIRO: Yes.

17       THE WITNESS: No.

18       BY MR. SHAPIRO:

19   Q   You didn't apply for the job that Mr. Nomocos

20   got?

21   A   No.

22   Q   Well what job did you think I was asking you

Page 18

1  about?

2  A  I –

3  Q  I said did you apply for that job.

4  A  The job he got selected for --

5  Q  Yes.

6  A  -- was as lead H.R. specialist.

7  Q  Did you apply for that job?

8  A  Yes.

9  Q  So he was originally selected as lead.

10  A  Yes.

11  Q  And who was selected -- who was running the

12  services division at that time?

13  A  No one.

14  Q  No one. So it would have been lead personnel

15  specialist?

16  A  H.R. specialist.

17  Q  Lead H.R. specialist.

18  A  Yes.

19  Q  Okay. Then that would have been sometime

20  before August.

21  A  Yes.

22  Q  When did you apply for that job? When was

Page 19

1  that job filled? That job being the lead H.R.

2  specialist job.

3  A  April of 2006.

4  Q  So that was a new job. That had not been

5  around before?

6  A  Yes.

7  Q  Okay. And how many leads were advertised?

8  A  One.

9  Q  So what was envisioned was a services division

10  manager and a lead and then H.R. specialists and

11  assistants under that.

12  A  Yes.

13  Q  Okay. And Nomocos got the lead. When did Mr.

14  Lattimer leave, stop being the head of services?

15  A  Right after his wife had her baby, which was

16  August of '06.

17  Q  So he was involved in the selection of

18  Nomocos.

19  A  No.

20  Q  Who selected Nomocos?

21  A  Michele Pilpovich.

22  Q  And Mr. Lattimer was not involved at all?

Page 20

1  A  No.

2  Q  Okay. Where did Mr. Nomocos come from?

3  A  IRS.

4  Q  And how did he become the -- he must

5  have -- there must have been an application for the

6  vacancy as manager.

7      MS. MELNIK: Objection as to form.

8      BY MR. SHAPIRO:

9  Q  Was there an application process for the

10  vacancy for manager, services division?

11  A  No.

12  Q  That job was filled without -- not

13  competitively?

14  A  Yes.

15  Q  And who filled that job, Michele --

16  A  Michele Pilpovich.

17  Q  The job as lead, what grade was that at?

18  A  13/14.

19  Q  And what job is the division manager?

20  A  It's a 15.

21  Q  And does Mr. -- Mr. Nomocos was

22  selected -- was named manager?

Page 21

1  A  Yes.

2  Q  Is he acting manager or is he named manager?

3  A  Named.

4  Q  And is he a 15?

5  A  No.

6  Q  He's serving as a 14?

7  A  Yes.

8  Q  And when he took the job as lead, did he take

9  the job as a 13 or a 14?

10  A  14.

11  Q  Your grade was what?

12  A  13.

13  Q  13. And you held the 13 grade for how long?

14  A  Since arriving at PBGC in 2000.

15  Q  Were you rated as eligible --

16  A  Yes.

17  Q  -- for the lead job?

18  A  Yes.

19  Q  Okay. So you were on the cert.

20  A  Yes.

21  Q  And were you interviewed for the job?

22  A  Yes.

Page 22

1    Q   By Ms. Pilpovich?
2    A   Yes.
3    Q   Mr. Lattimer didn't interview you.
4    A   No.
5    Q   Were you told why you didn't get that job?
6    A   Yes.
7    Q   By whom?
8    A   Michele.
9    Q   And what did she tell you?
10   A   Because of my longevity.
11   Q   Because of your longevity?
12   A   Yes.
13   Q   Those were her exact words?
14   A   Yes.
15   Q   Did she explain what she meant by longevity?
16   A   Yes.
17   Q   What did she say?
18   A   She informed me that I didn't get selected
19   because I have been there too long.
20   Q   Because of your age?
21   A   No.
22   Q   Well, what's been there too long mean?

Page 23

1    A   She then proceeded to say that it was — she
2    was looking for somebody with fresh ideas and new
3    approaches.
4    Q   Is that why you left, because you didn't get
5    this job?
6    A   No.
7    Q   Why did you leave?
8    A   I was ready for a change.
9    Q   Okay. Who else was on the cert, do you know?
10   A   I have no idea.
11   Q   Were any of your colleagues on the cert,
12   people from the service division?
13   A   No.
14   Q   Okay. Now the cert, was it — it was a
15   status — it was announced as a status job?
16   A   Yes.
17   Q   Only.
18   A   Yes.
19   Q   So you had to be a government employee to take
20   this job.
21   A   Yes.
22   Q   Or at least have status.

Page 24

1    A   Yes.
2    Q   Okay. And was there any inquiry made as to
3    how this job sort of morphed into the — let me ask you
4    this. Has the lead job been filled since Mr. Nicoso —
5    A   Nomocos.
6    Q   — Nomocos — since Mr. Nomocos moved up into
7    the division manager job?
8    A   No.
9    Q   Was there any explanation as to how this job
10   was filled non-competitively?
11   A   No.
12       MS. MELNIK: Objection to the form, use of the
13   word non-competitively.
14       MR. SHAPIRO: Yeah. She said it was
15   non-competitively filled, the manager job was
16   non-competitively filled.
17       MS. MELNIK: Oh, not -- I'm sorry; not the
18   initial hiring.
19       MR. SHAPIRO: She understood.
20       MS. MELNIK: Oh, I'm sorry. I didn't
21   understand.
22       MR. SHAPIRO: Right. I meant the manager

Page 25

1    job --
2        MS. MELNIK: Okay.
3        MR. SHAPIRO: -- and she said there was no
4    explanation as to how it was filled.
5        MS. MELNIK: Okay.
6        BY MR. SHAPIRO:
7    Q   But it's a 15 job.
8    A   Yes.
9    Q   And he went from a 13/14 job to a 15 job
10   non-competitively.
11   A   Yes.
12   Q   Although he's filling it at the 14 level right
13   now.
14   A   Yes.
15   Q   Because he's not eligible for a 15 yet.
16   A   No.
17   Q   Correct?
18   A   Correct.
19   Q   But he's not acting. You understand that he
20   was named to the job.
21   A   Yes.
22   Q   And that the job is a 15 job.

7 (Pages 22 to 25)

## Page 26

1   A   Yes.

2   Q   Okay. Now, I'm wondering about your personnel

3   training. So prior to coming to PBGC, were you

4   employed by the government?

5   A   Yes.

6   Q   What was the job you had just before you came?

7   A   Smithsonian Institution.

8   Q   And what was your job there?

9   A   H.R. specialist.

10   Q   And that's also a federal agency, isn't it?

11   A   Yes.

12   Q   So that would be a 200 family job?

13   A   Yes.

14   Q   What was your series there?

15   A   201.

16   Q   And you were a 12?

17   A   Yes.

18   Q   How long did you serve in the Smithsonian?

19   A   Two years.

20   Q   So that would have been '98, '99 or '99 to

21   2000?

22   A   That sounds about right.

## Page 27

1   Q   What did you do before that?

2   A   I worked for the VA Hospital up in Castle

3   Point, New York.

4   Q   And what was your job there?

5   A   H.R. specialist.

6   Q   And you were a GS 201?

7   A   Yes.

8   Q   What was your grade there?

9   A   I started as a 9 and went to an 11.

10   Q   And how long were you there?

11   A   Three years.

12   Q   Something like '96 to '99?

13   A   Sounds about right.

14   Q   And prior to that?

15   A   The Environmental Protection Agency.

16   Q   Where?

17   A   Philadelphia.

18   Q   That a regional office for that —

19   A   Yes.

20   Q   And what was your job there?

21   A   H.R. assistant.

22   Q   GS 235?

## Page 28

1   A   235.

2   Q   Grade?

3   A   7.

4   Q   So you got your 9 by going to the VA Hospital?

5   A   Yes.

6   Q   And how long were you an H.R. assistant for

7   the EPA?

8   A   Seven years.

9   Q   So '89 to '96?

10   A   Sounds about right.

11   Q   Good. Prior to that?

12   A   H.R. assistant at VA Hospital, West Los

13   Angeles.

14   Q   I know that hospital well. Beautiful place.

15   A   Very nice.

16   Q   And how long were you — you were an H.R.

17   assistant.

18   A   Yes.

19   Q   GS 235?

20   A   Yes.

21   Q   And grade?

22   A   5.

## Page 29

1   Q   And for how long were you an H.R. assistant

2   grade 5 at the West L.A. VA Hospital?

3   A   For 5 years.

4   Q   '84 to '89?

5   A   Yes.

6   Q   And prior to that?

7   A   Worked for Department of Defense, Navy, out at

8   Burbank Airport doing procurement. Procurement

9   assistant.

10   Q   Burbank Airport in the Los Angeles area?

11   A   Los Angeles, yes.

12   Q   And you were procurement assistant?

13   A   Yes.

14   Q   GS?

15   A   I started as a 2 and went to 3, 4 -- 3 or 4.

16   It was two years.

17   Q   And that's — what's the series on that?

18   A   I don't remember.

19   Q   But it's not in the personnel field.

20   A   No.

21   Q   So it's not a 200 series, that job.

22   A   No.

## Page 30

1  Q  Good. And how long were you there?

2  A  Two years.

3  Q  '82 to '84?

4  A  Yes.

5  Q  And before that?

6  A  Private industry.

7  Q  So your first federal job was with DOD Navy?

8  A  Yes.

9  Q  At the Burbank Airport.

10  A  Yes.

11  Q  When you say private industry, what did you do

12  in the private industry?

13  A  Retail.

14  Q  Retail sales?

15  A  Yes.

16  Q  In the Los Angeles area?

17  A  Yes.

18  Q  And how long did you do that?

19  A  Ten years.

20  Q  '72 to '82?

21  A  Yes.

22  Q  Any particular store or just different stores?

## Page 31

1  A  Different stores.

2  Q  Any particular area of sales?

3  A  All different types.

4  Q  Okay. Now, I'm going to ask you about your

5  training in personnel. You know that courses are

6  offered by the Office of Personnel Management. Also,

7  on contract approved by OPM there are courses in

8  various personnel. Have you taken any courses in

9  personnel?

10  A  Yes.

11  Q  Can you tell us what courses you've taken?

12  A  Basic staffing and recruitment.

13  Q  And where was that given?

14  A  OPM.

15  Q  When did you take that?

16  A  Right after I got into the field of H.R. as an

17  assistant.

18  Q  So this would be back when you were with

19  the — this would be when you were with the VA Hospital

20  in West L.A.

21  A  Right.

22  Q  Sometime between '84 and '89.

## Page 32

1  A  Yes.

2  Q  And was that a course for personnel

3  assistants?

4  A  It's a course to — for personnel, not just

5  assistants.

6  Q  Entry personnel.

7  A  Right. Yes.

8  Q  Okay. Any other courses?

9  A  Delegated examining unit.

10  Q  That's a course?

11  A  Yes.

12  Q  And who gives that?

13  A  OPM.

14  Q  And when did you take that?

15  A  When I went to the VA Hospital in New York.

16  Q  When you became —

17  A  A specialist.

18  Q  — a specialist. That would have been — you

19  took that in '96, '97, thereabouts.

20  A  Yes.

21  Q  One course was in L.A., the other course was

22  in New York?

## Page 33

1  A  Yes.

2  Q  Okay. Any other courses?

3  A  Classification training.

4  Q  That's what the course was called,

5  classification training?

6  A  Yes.

7  Q  Okay. And who gave that?

8  A  OPM.

9  Q  And when did you take that?

10  A  '94.

11  Q  So when you were in L.A.

12  A  I'm sorry; '96. I apologize. '96 when I went

13  up to the VA Hospital.

14  Q  Any other courses?

15  A  Correspondence courses. It's basic

16  pay-setting for both GS and wage grade employees.

17  Q  That was a correspondence course?

18  A  Correspondence courses.

19  Q  Courses? How —

20  A  Courses. There's two different courses, one

21  for GS and one for federal wage system, blue collar.

22  Q  Wage grade.

## Page 34

1    A   Right.

2    Q   WG.

3    A   Yes.

4    Q   Okay. And when did you do that?

5    A   I've had it three times. I want to say the

6  first time was when I was working at the VA Hospital --

7    Q   In?

8    A   -- in West Los Angeles. The next time I took

9  it, we took it at the VA Hospital in upstate New York

10  as a refresher and I'm taking the newest version now in

11  2006.

12    Q   Okay. Any other courses?

13    A   If I've had them, I don't remember.

14    Q   So these are the ones you recall.

15    A   These are the ones I recall.

16    Q   Basic staffing and recruitment when you were a

17  GS-5 in West L.A., delegated examining unit when you

18  were first in New York as a 7 --

19    A   Yes.

20    Q   -- and classification training also when you

21  were first in New York as a 7.

22    A   Yes.

## Page 35

1    Q   And several times this correspondence course

2  on pay-setting.

3    A   Yes.

4    Q   What is pay-setting?

5    A   Pay-setting is when somebody goes from one

6  locality area to another. You have to set their

7  salary, matching up what they used to make to what

8  they're making now. If they get promoted in another

9  locality area, there's all kinds of -- it's a whole

10  course of figuring out where you want to set somebody's

11  pay correctly.

12    Q   Okay.

13    A   Can I add something in here?

14    Q   Sure. Sure. Please.

15    A   I've also had to be re-certified for delegated

16  examining every three years.

17    Q   So that's not a course; that's a test?

18    A   It's a re-certification. You go to OPM for

19  two days and they go over new information, anything

20  that's come up with veterans preference, any kind of

21  new information we have to have to update all of our

22  stuff.

## Page 36

1    Q   So you've been doing this since '96, '97?

2    A   Yes.

3    Q   Okay. You've never held a job as a staffing

4  specialist, that is, with the series for staffing

5  specialist, correct?

6    A   Correct.

7    Q   And you've never held a job for classification

8  specialist.

9    A   Correct.

10    Q   You're not qualified to be a classification

11  specialist, are you?

12    A   Yes.

13    Q   You believe you are qualified based on the one

14  course back when you were a GS-9?

15    A   Yes.

16    Q   Okay. And you believe yourself qualified to

17  be a staffing specialist?

18    A   Yes.

19    Q   Qualified to get that specialized grade.

20    A   Yes.

21    Q   And series. Okay. Good. And prior to being

22  in private industry as you said, you were in high

## Page 37

1  school?

2    A   Yes.

3        MR. SHAPIRO: Let's take a short break.

4        (A brief recess was taken.)

5        BY MR. SHAPIRO:

6    Q   Now, I'm dealing with the time frame roughly

7  2003 -- 2001 to 2006, okay?

8    A   Okay.

9    Q   While you were in the services division.

10    A   Okay.

11    Q   Okay. Who actually did position

12  classifications -- audits -- job audits, when you had a

13  classification audit?

14    A   We had contractors.

15    Q   Contractors. So you didn't actually audit.

16    A   No.

17    Q   I'm correct?

18    A   Correct.

19    Q   Did anyone who was a federal employee actually

20  audit during that period at PBGC?

21    A   Certain positions we would; most of the

22  positions we had a contractor do.

10 (Pages 34 to 37)

Page 38

1    Q   Who did the auditing when you did do it
2  in-house without a contractor? By in-house I mean by a
3  federal employee who conducted the audit.
4    A   Gigi McDaniel And myself.
5    Q   But you said you didn't audit during that time
6  frame.
7    A   Certain positions I would classify and audit;
8  certain positions I would not. We would have a
9  classifier do that.
10   Q   Okay. So what was the break point? What
11 positions would you do and what positions wouldn't you
12 do?
13   A   Clerical positions.
14   Q   You would do.
15   A   Yes.
16   Q   Okay. Any other positions?
17   A   No.
18   Q   Okay. So the -- Ms. McDaniel?
19   A   Yes.
20   Q   And yourself were both federal employees.
21   A   Yes.
22   Q   And you were both 201s?

Page 39

1    A   Yes.
2    Q   Series 201s. And you actually classified or
3  audited clerical jobs.
4    A   Yes.
5    Q   But when it was other than a clerical job, it
6  would go to a conductor to conduct the audit.
7    A   Yes.
8    Q   Now, when you say classify, that's when you
9  have a new job and you're trying to determine its
10 series and grade?
11   A   Yes.
12   Q   As opposed to audit, which is of an
13 already-existing job with an incumbent, correct?
14   A   Correct.
15   Q   And there, you might be trying to determine
16 the grade or even the classification -- which series.
17   A   Yes.
18   Q   Where duties might have been added or
19 changed --
20   A   Correct.
21   Q   -- you might wanted it audited.
22   A   Yes.

Page 40

1    Q   All right. But on anything other than
2  clerical jobs, if there was an audit or a
3  classification, it would be done by contractors.
4    A   Correct.
5    Q   Why is that, if you know?
6    A   Our workload with announcing positions,
7  qualifying individuals who had applied, just basic
8  paperwork, it was easier to have a contractor who was
9  originally a federal classifier be -- come back in
10 after they had retired and came back as contractors to
11 do the job so we didn't have to get into that part of
12 the position.
13   Q   That part of personnel work.
14   A   Right.
15   Q   Okay. So what you're telling me is that you
16 and Ms. McDaniel were very busy in staffing and
17 recruiting.
18   A   Yes.
19   Q   And so, except for simple classification, that
20 is, clerical jobs, you went outside for it.
21        MS. MELNIK: Objection as to form.
22        BY MR. SHAPIRO:

Page 41

1    Q   Is that right?
2         MS. MELNIK: You can answer, if you can.
3         THE WITNESS: Yes.
4         BY MR. SHAPIRO:
5    Q   Okay. Who were the contract classifiers that
6  you worked with?
7    A   We had a gentleman by the name of Glen Hogel.
8    Q   Glen Hogel?
9    A   Yes.
10   Q   H-o --
11   A   G-e-n. I think it was g-e-n, g-e-l. He was
12 there from when I started --
13   Q   Hogan.
14   A   No, Hogel. It was Hogel.
15   Q   H-o-g-e-l?
16   A   Yes. He was there when I started in 2000. He
17 left 2002. He had been there prior to that also. He
18 was the only classifier they had. I think Glen had
19 been there about 5 years, so 7 years total. He was the
20 only classifier we had at the time I started.
21   Q   So he left in 2002, didn't come back.
22   A   No, did not.

11 (Pages 38 to 41)

Page 42

1    Q  Okay. So he was the only contract classifier.

2    A  No. After he left --

3    Q  No, no. I'm saying during his time, he was

4  the only one.

5    A  Yes.

6    Q  And when he left, somebody else came in.

7    A  Somebody came in.

8    Q  Who was that?

9    A  Janet Brikey J-a-n-e-t B-r-I-k-e-y.

10    Q  She was a contractor.

11    A  Yes.

12    Q  And was she still there when you left?

13    A  She left and came back, so she is there now.

14    Q  Okay. When did she work — she came in and

15  replaced Mr. Hogel.

16    A  Right.

17    Q  So she came in in 2002.

18    A  She was there for about a year.

19    Q  2002 to 2003.

20    A  Yes. And then she left and came back in 2005,

21  I believe.

22    Q  And she's there now.

Page 43

1    A  Yes.

2    Q  All right. So in the interim, who was the

3  classifier, the contract classifier?

4    A  We had about two other people.

5    Q  Contractors?

6    A  Yes. I don't remember their names.

7    Q  So they did the classification and audit work

8  in that hiatus between — during Ms. Janet Brikey's

9  absence.

10    A  Yes.

11    Q  And you don't remember their names. Who

12  provided these folks? You have to say yes or no. You

13  can't shake your head —

14    A  Yes. I'm sorry.

15    Q  You can't remember their names.

16    A  I can't remember their names.

17    Q  And who provided these contractors?

18    A  A contracting firm.

19    Q  And which firm was that?

20    A  STʲ.

21    Q  And these other contractors, they worked

22  together or part-time?

Page 44

1    A  The other contractors we had, we had one and

2  then they left and then we hired another one and then

3  they left. There was only one on staff all up until

4  about the beginning of this year.

5    Q  And that's when Ms. Brikey came back.

6    A  She came back and they hired two more

7  contractors.

8    Q  To do classification work?

9    A  Yes.

10    Q  So now you have three on board.

11    A  Yes.

12    Q  Whereas you used to just have one at a time.

13    A  Yes.

14    Q  Why more contractors now?

15    A  They had decided to look at all the position

16  descriptions and they were doing a massive

17  reorganization of the corporation. And at that time we

18  had people that weren't on PDs that we needed to get

19  classified, so they brought in contractors to do the

20  work.

21    Q  You're not supposed to have people without

22  PDs, right? That's a personnel hallmark in the federal

Page 45

1  government, right?

2    A  Correct.

3    Q  And PDs are supposed to, within reason,

4  reflect the work that's actually being done in the job.

5    A  Yes.

6    Q  So that if a position changes over time or

7  isn't what it's originally planned to be when it's

8  created, you're supposed to review PDs regularly.

9    A  Yes.

10    Q  Were there regular reviews of PDs at the PBGC?

11    A  No.

12    Q  How many employees are there at PBGC?

13    A  There's I believe 850.

14    Q  Now, you know DeLarse Montgomery.

15    A  Yes.

16    Q  Have you ever met him before today?

17    A  Yes.

18    Q  Okay. Do you recall the first time you dealt

19  with him professionally?

20    A  No, I do not.

21    Q  Did you know him before that, like to say

22  hello to him?

Page 46

1  A  Yes.

2  Q  So you met him casually as one of the people

3  who works in that building.

4  A  Yes.

5  Q  Okay. But you do recall that you

6  came -- there came a time when you did deal with him

7  professionally from your point of view, personnel,

8  H.R., professionally?

9  A  Yes.

10  Q  And can you recall the time -- the occasions

11  that you dealt with him for me? The subject matters on

12  which you dealt with him.

13  A  Vacancy announcements.

14  Q  Only?

15  A  Yes.

16  Q  Okay. And can you recall the first one?

17  A  No, I do not.

18  Q  You never dealt with him on anything other

19  than vacancy announcements.

20  A  No.

21  Q  Is that correct?

22  A  That's correct.

Page 47

1  Q  Okay. How many vacancy announcements did you

2  deal with him on?

3  A  I don't know.

4  Q  Okay. Tell me about the time that you do

5  remember. Each time -- about how many times did you

6  deal with him -- I mean matters did you deal with him

7  on?

8  A  I believe it was twice.

9  Q  Okay. Can you recall the first one?

10  A  No.

11  Q  Okay. Tell me about one of them.

12  A  He had applied for a position.

13  Q  Do you recall the position?

14  A  Accountant.

15  Q  So he was an accountant.

16  A  Yes.

17  Q  Do you remember the grade?

18  A  GS-13.

19  Q  Okay. And you were the personnel -- the H.R.

20  specialist who was doing this -- who was staffing this.

21  A  Yes.

22  Q  Okay. Just happened to you. Could have been

Page 48

1  another person but this one happened to be you.

2  A  No.

3  Q  No?

4  A  No.

5  Q  Okay. You were assigned to do the staffing

6  for accounting jobs?

7  A  I was assigned to do staffing for the

8  financial operations department.

9  Q  I see. So you were the servicing H.R.

10  specialist for the financial operations --

11  A  Department.

12  Q  -- department, for staffing.

13  A  Yes.

14  Q  Okay. Were you only for FOD or were you the

15  staffing specialist assigned to service other

16  departments as well?

17  A  Yes.

18  Q  Which other departments?

19  A  Procurement, FASD --

20  Q  What's that?

21  A  It's a facilities services division.

22  Q  Division or department?

Page 49

1  A  A department. Office of General Counsel. I'm

2  trying to remember all the departments. I can tell you

3  this much; I handled about six or seven of them.

4  Q  Who handled the others?

5  A  Gigi McDaniel.

6  Q  Did you always have FOB?

7  A  FOD?

8  Q  FOD?

9  A  Yes.

10  Q  And how did you come to divide these up? Just

11  not based on expertise, I take it.

12  A  It was based on what our supervisor thought we

13  could -- they just divided up the corporation.

14  Q  So to even out the workload.

15  A  Yes.

16  Q  Okay. So all FOD vacancy announcements came

17  through you during your time there.

18  A  Yes.

19  Q  Okay. And this one -- it was an accounting

20  job. Do you remember in which unit it was?

21  A  No.

22  Q  In which division?

## Page 50

1    A   No.

2    Q   Which branch?

3    A   No.

4    Q   Okay. And do you recall the year that this

5    happened?

6    A   No.

7    Q   It wasn't 2006.

8    A   No.

9    Q   And it wasn't 2005, was it?

10   A   No.

11   Q   It was earlier than that.

12   A   Yes.

13   Q   Okay. Do you recall who the supervisor of the

14   vacancy was going to be?

15   A   I believe it was Cynthia Adams.

16   Q   So that would be the investment accounting

17   branch?

18   A   Either the investment accounting branch or the

19   general accounting branch.

20   Q   Okay. And how did you come to deal with Mr.

21   Montgomery? Just his name was on an application?

22   A   Yes.

## Page 51

1    Q   Now, how would somebody get the applications

2    there – get them to you?

3    A   They would bring them down to our front office

4    area, hand them to the receptionist --

5    Q   The business center.

6    A   If this was before 2005, it wasn't a business

7    center; it was just the front office of H.R.

8    Q   Okay.

9    A   And they would hand the person the vacancy

10   announcement and they would log them in the system, put

11   them in a folder that corresponded with the vacancy

12   announcement number and then the folder would come to

13   me.

14   Q   All of that would be done by

15   paraprofessionals, clerical employees?

16   A   Yes.

17   Q   But H.R. employees.

18   A   Yes.

19   Q   All Right. So what was your dealings with Mr.

20   Montgomery on this occasion?

21   A   I don't really remember dealing with him --

22   Q   I don't mean dealing with him. I mean dealing

## Page 52

1    about him.

2    A   Just reviewing his application to see if he

3    was qualified or not.

4    Q   Did you find him qualified?

5    A   No, I did not.

6    Q   And why was that?

7    A   He didn't have the 24 semester hours in

8    accounting.

9    Q   Okay. And how did you determine that?

10   A   He did not submit his transcripts.

11   Q   And that was the long and short of it, no

12   transcripts, no credit.

13   A   Exactly.

14   Q   I see. And if a person claims to have been

15   graduated in accounting, do they submit transcripts

16   also?

17   A   Yes.

18   Q   I see. That's what's required for accounting

19   jobs.

20   A   Yes.

21   Q   Now, at the time you did this, Ms. Pilpovich

22   was the head of H.R.?

## Page 53

1    A   Yes.

2    Q   And Ms. Pilpovich – under H.R. there's also

3    training, isn't there?

4    A   Yes.

5    Q   There's training, correct?

6    A   Yes.

7    Q   And you know, don't you, that the government

8    pays for employee training from time to time, college

9    courses, that sort of thing? Did you know that?

10   A   Yes.

11   Q   Okay. And when the government -- has the

12   government ever paid for you?

13   A   No.

14   Q   Okay. Have you ever been involved in training

15   at all?

16   A   Yes.

17   Q   Okay. Do you know that when the government

18   pays for outside training, like a college course, they

19   require the curriculum, the course curriculum?

20   A   Yes.

21   Q   It has to be job-related; correct?

22   A   Correct.

## Page 54

1    Q   Otherwise they won't pay, right?

2    A   Correct.

3    Q   And it has to be — they require you to submit

4    that you've successfully completed it. They monitor

5    your performance in the course.

6    A   Yes.

7    Q   Okay. All right. And you found him

8    unqualified because he didn't have 24 hours in

9    accounting.

10   A   Correct.

11   Q   Okay. Was that the end of your dealings with

12   him on that occasion?

13   A   Yes.

14   Q   And when I say dealings with him, I don't mean

15   necessarily personal dealings. I mean dealings about

16   him.

17   A   Yes.

18   Q   Did you have any personal dealings with him

19   over that?

20   A   I don't remember.

21   Q   You don't remember any.

22   A   No.

## Page 55

1    Q   I'm correct?

2    A   Correct.

3    Q   Okay. And that ends the matter? That's all

4    you remember about this?

5    A   Yes.

6    Q   Okay. You said there were two matters, both

7    involving vacancy announcement matters. What was the

8    other matter?

9    A   Another accountant's job.

10   Q   What grade?

11   A   I believe it was a 12/13.

12   Q   And was it later or earlier than the first

13   one, than the 13?

14   A   Later.

15   Q   All right. So the first one you can recall is

16   that 13 that you just told us about, correct?

17   A   Correct.

18   Q   And then the next one, and the only other one

19   that you — incident that you can recall dealing about

20   Monty Montgomery, was another accountant vacancy for a

21   GS-12/13.

22   A   Correct.

## Page 56

1    Q   Now that means that the job can be filled at a

2    12 or a 13, correct?

3    A   Correct.

4    Q   It also means that if it's filled at a 12, the

5    person could get a promotion to 13 without competition,

6    correct?

7    A   Correct.

8    Q   Creates a little career ladder.

9    A   Correct.

10   Q   Okay. So this second situation, what happened

11   there? What happened in that — what was that

12   situation? How did you come to deal with Monty? You

13   were the servicing personnel —

14   A   Again, yes.

15   Q   And what unit was that?

16   A   FOD.

17   Q   And do you recall who the supervisor was who

18   was selecting?

19   A   I think it was Cynthia Adams again.

20   Q   Okay. And what was your dealings about Mr.

21   Montgomery?

22   A   His application came to me and applied for the

## Page 57

1    job. I reviewed his application.

2    Q   And it was another question of qualified?

3    A   He wasn't qualified.

4    Q   You found him not qualified.

5    A   Yes.

6    Q   On what basis?

7    A   24 semester hours.

8    Q   And that's because he didn't submit

9    transcripts?

10   A   Correct.

11   Q   Same thing?

12   A   Same thing.

13   Q   Did you deal with anybody with respect to

14   this? Were you questioned about it?

15   A   No.

16   Q   Were you questioned about the other one?

17   A   No.

18   Q   Were you — did you write — typically when

19   you find somebody not qualified, do you write them a

20   note saying not qualified and the reasons for it?

21   A   When the whole process is over where we've

22   qualified everyone, the ones that are not qualified we

Page 58

1  send letters to and tell them that they weren't
2  qualified based on minimal quals or for whatever other
3  reason they may not be qualified for.
4      Q   Okay. And you would sign that letter.
5      A   Yes.
6      Q   You would send it as the servicing staffing
7  special -- or the servicing personnel H.R. specialist,
8  right?
9      A   Right.
10     Q   Okay. If Gigi was the servicing -- she'd send
11 the letter.
12     A   Correct.
13     Q   But the letter is a form letter.
14     A   Correct.
15     Q   What you say in the form depends on what the
16 reason was that they were not qualified.
17     A   Correct.
18     Q   Do you also send similar letters to people who
19 are qualified but didn't get selected?
20     A   Correct.
21     Q   And you do all of these letters at the end of
22 the process, after the selection is made or the vacancy

Page 59

1  is either filled or the announcement is canceled?
2      A   What I would do with the people that didn't
3  qualify after the first round, after looking at minimal
4  quals And everything else, they would get their letters
5  first. Then after the cert went up and they made a
6  selection or didn't make a selection, that would be the
7  next point where I would either tell somebody that
8  somebody else got selected or the position has been
9  canceled.
10     Q   Okay. So you send out two rounds of letters.
11     A   Yes.
12     Q   Those not qualified --
13     A   Uh-huh.
14     MS. MELNIK:  Is that a yes?
15     THE WITNESS:  Yes. I'm sorry.
16     BY MR. SHAPIRO:
17     Q   Or not eligible.
18     A   Yes.
19     Q   You could also have an eligibility question.
20 People are qualified, but you don't even get that far;
21 they're not eligible.
22     A   Correct.

Page 60

1      Q   Okay. So you send out not eligible, not
2  qualified, one batch, not selected, the other batch.
3      A   Correct.
4      Q   Okay. Anybody ask you about any of this,
5  question you about it after the fact, either the first
6  time or the second time?
7      A   No.
8      Q   Those are the only dealings you had regarding
9  DeLarse Montgomery that you can recall?
10     A   As I remember, yes.
11     Q   Now, did you review any documents in
12 preparation for this deposition? Did anybody show you
13 any documents or did you yourself pull out any
14 documents and look at them?
15     A   I was shown some documents.
16     Q   What documents were you shown?
17     A   They showed me the announcements.
18     Q   For these two jobs.
19     A   Yes.
20     Q   Okay.
21     A   The application.
22     Q   Anything else?

Page 61

1      A   Letters.
2      Q   Letters you sent?
3      A   Yes.
4      Q   Anything else?
5      A   The log sheet where everybody's application
6  was logged in.
7      Q   Okay. For these two applications.
8      A   Yes.
9      Q   These two vacancies.
10     A   Yes.
11     Q   The ones that you've told us about.
12     A   Yes.
13     Q   Anything else?
14     A   I believe they showed me his position
15 description.
16     Q   His position description is what?
17     A   As to his financial specialist position
18 description at the GS-12 level.
19     Q   Okay. Had you seen that before?
20     A   Yes.
21     Q   When did you see that?
22     A   When I worked there.

Page 62

1    Q   How did you come to see that?

2    A   I came to see it when they did a

3  reorganization of FOD And they were reorganizing the

4  whole department And I was redoing the position

5  description books and we were trying to get people in

6  the right either section, branch, whatever, in that

7  department and everything was redone that way and

8  that's when I saw it.

9    Q   And what was he then, a 12 or an 11?

10   A   He was a 12.

11   Q   Okay. And so this was before or after you had

12  dealings with him over these — dealings about him

13  regarding his applications, this reorganization?

14   A   I believe it was before.

15   Q   Before.

16   A   Yes.

17   Q   Okay. So that's another time that you had

18  some dealing with Monty Montgomery as an employee, but

19  it was only in the context of lots of people, right?

20   A   Yes.

21   Q   So you were just sifting through. Did you

22  read his PD?

Page 63

1    A   No.

2    Q   You just saw it and you leafed through it.

3    A   Yes.

4    Q   Any other documents that you saw?

5    A   Not that I know of.

6    Q   So except for his PD as a financial

7  specialist, each document you saw had to do with two

8  processing of vacancy announcements And selection

9  process that you've told us about, correct?

10   A   Correct.

11   Q   Nothing else.

12   A   No.

13   Q   Okay. Did you talk to anybody about this?

14   A   I talked to the two ladies sitting here at

15  this table.

16   Q   Nobody else.

17   A   Nobody else.

18   Q   Okay. When did you talk to them?

19   A   This morning.

20   Q   For how long?

21   A   Up until 15 minutes before we got here.

22   Q   All right. So for how long of a period did

Page 64

1  you speak to them?

2    A   10:00 o'clock to quarter to 12:00.

3    Q   Okay. What was said? Tell me what they told

4  you?

5    A   Basically that I was giving a deposition in

6  Monty's case and it was based on his non-selection on

7  two different positions that I had announced.

8    Q   They told you that.

9    A   Yes.

10   Q   Okay. They tell you anything else about what

11  you had — any other dealings that you had with Mr.

12  Montgomery?

13   A   Not that I -- no.

14   Q   You recalled these two dealings before they

15  told you about them, didn't you?

16   A   Yes.

17   Q   And you don't recall any other dealings.

18   A   No.

19   Q   Okay. Let's look at some documents.

20       MR. SHAPIRO:  Let's mark this.

21           (Exhibit 1 was marked for

22           identification.)

Page 65

1       BY MR. SHAPIRO:

2    Q   I'm showing you what has been marked for

3  identification as Exhibit 1 to this deposition. It

4  says Pension Benefit Guaranty Corporation Delegated

5  Examining Unit Position Vacancy and it's Announcement

6  No. JI04-0105 In 2004. June 1, 2004 is the opening

7  date; closing date is June 30, 2004. It's a bargaining

8  unit position and the position is accountant,

9  GS-510/13.

10       Do you recognize this announcement?

11   A   Yes, I do.

12   Q   This is the announcement that you were shown

13  by counsel for PBGC, correct?

14   A   Correct.

15   Q   And this is the announcement that involved the

16  very first position in time that you told us about,

17  correct?

18   A   Correct.

19   Q   The GS-13 accountant job.

20   A   Correct.

21   Q   The other one being a GS-12/13, which was

22  later in time, as best as you can recall.

Page 66

1   A   Yes.

2   Q   And it's not just based on your memory; you

3   actually saw both announcements. You know the dates.

4   A   Correct.

5   Q   So this is the earliest dealing that you had

6   with Mr. Montgomery, as far as you know.

7   A   As far as I know.

8   Q   Okay. Now, looking on page 2 where it says

9   after the two asterisks "what are the minimum

10  qualifications for the position"?

11  A   Yes.

12  Q   The first one is you must be a U.S. citizen.

13  A   Correct.

14  Q   And then it says "applicants must have the

15  full four-year course of study in an accredited college

16  or university which meets all of that institution's

17  requirements for a Bachelor's degree with an accounting

18  major or a degree in a related field such as business

19  administration, finance or public administration, that

20  includes at least 24 semester hours of accounting". It

21  says "the 24 hours may include up to 6 hours of credit

22  in business law or at least two years experience in

Page 67

1   accounting or an equivalent combination of accounting,

2   college-level education and training that provides

3   professional accounting knowledge. The applicant must

4   also include one of the following. 24 semester hours

5   in accounting or auditing courses of appropriate type

6   and quality. This can include up to 6 hours of

7   business law". Right?

8   A   Correct.

9   Q   If you have that and you don't have a college

10  degree, but you have at least two years of experience

11  in accounting or equivalent combination of accounting,

12  college, so forth and so on, you can qualify without a

13  Bachelor's degree, correct? You don't need a

14  Bachelor's degree to qualify for this job. You need 24

15  hours of accounting courses and some experience,

16  correct?

17  A   Correct.

18  Q   Now, if you have the 24 hours of experience,

19  you don't have to worry about 2 and 3, correct, because

20  you have to have one of the following.

21  A   Correct.

22  Q   So all the stuff about completion of

Page 68

1   requirements for a degree that includes the standard

2   course work in accounting or auditing, 15 semester

3   hours, if it does not fully satisfy the 24 hours, you

4   don't have to worry about any of that under 3, any of

5   it, if you have the 24 hours.

6   A   Correct.

7   Q   So you either have to be a college graduate

8   with 24 hours of accounting or not a college graduate

9   with 24 hours and some experience, two years of

10  experience in accounting — in the accounting field.

11  Is that right?

12  A   Correct.

13  Q   And it's not — let's see. It's actually

14  training — some combination. It doesn't have to be

15  two years of experience. It could be some combination

16  of education and training that provides professional

17  accounting knowledge, right?

18  A   Correct.

19  Q   So it doesn't have to technically be

20  experience in accounting. It can be some experience or

21  training that provides professional accounting

22  knowledge, as long as you have 24 hours in accounting.

Page 69

1   That's what it says.

2   A   Yes.

3   Q   Thank you. Now, it also says at the

4   base — going back to the base, not one of the three

5   factors but going back to the base it says "the

6   candidate must also have one year of specialized

7   experience at or equivalent to the GS-12 grade level

8   that demonstrates the ability to analyze and provide

9   advice regarding accounting programs, financial

10  systems, et cetera, right?

11  A   Correct.

12  Q   That's grade-determining; that little sentence

13  there is the grade determination —

14  A   Correct.

15  Q   — question, not accounting — not

16  qualifications in accounting but that it has to be at

17  the 12 level for a year.

18      MS. MELNIK: Objection as to form and vague.

19      BY MR. SHAPIRO:

20  Q   Correct? In other words, it's

21  grade-determining, not series-determining.

22      MS. MELNIK: Objection as to form —

18 (Pages 66 to 69)

Page 70

1    BY MR. SHAPIRO:

2    Q    Grade-qualifying, correct?

3    MS. MELNIK:  Same objection.

4    THE WITNESS:  You have to have both.

5    BY MR. SHAPIRO:

6    Q    Yeah.  I understand.  But this -- I'm just

7    talking about this sentence.  This sentence goes to

8    qualifications to serve at the 13 level.

9    A    Correct.

10    Q    The other stuff goes to qualification to serve

11    in accounting.

12    A    Correct.

13    Q    Okay.  Now, the quality ranking factors, which

14    is the next section -- you see that?

15    A    Yes.

16    Q    That is what you're going to be judged on,

17    correct?

18    A    Correct.

19    Q    Qualified applicants would be judged on these

20    factors, correct?

21    A    Correct.

22    Q    And they include "skill in the analysis and

Page 71

1    interpretation of financial reports for the purpose of

2    preparing secondary reports and journal entries on a

3    monthly, quarterly basis".

4    MS. MELNIK:  Is that a question?

5    BY MR. SHAPIRO:

6    Q    That's what it says, isn't it?

7    A    Correct.

8    Q    All right.  And then it says "knowledge of

9    derivatives and various complex investment instruments

10    to include the accounting treatment under GAAP".

11    What's the GAAP?

12    A    General accounting -- I know that part of

13    it -- something principles.

14    Q    Okay.  "3. Skill in applying accounting

15    practices and procedures in order to properly account

16    for all financial activity of very large investment

17    holdings held by custodial institutions".

18    A    Correct.

19    Q    "Ability to communicate both orally and in

20    writing with all levels of an organization".

21    A    Correct.

22    Q    "Skill in utilizing various software packages

Page 72

1    including Word, Excel And Dbase to complete work

2    assignments".

3    A    Correct.

4    Q    All right.  So qualified candidates are judged

5    on this basis.

6    A    Correct.

7    Q    And this job, you found Mr. Montgomery not

8    qualified because he didn't have 24 credit hours.

9    A    And he didn't have the one-year specialized

10    experience as accountant.

11    Q    That's what you say now but when I asked you

12    about it, you said just 24 hours; that was the reason.

13    Where did this second --

14    A    That's because I'm looking at this now.  I

15    looked at earlier but I'm looking at it now --

16    Q    So you're saying -- I see.  Well, what was the

17    determination made at the time?

18    A    Both.

19    Q    Both.  He didn't have the one-year experience

20    at the 12 level?

21    A    Correct.

22    Q    So he couldn't apply for 13.

Page 73

1    A    Correct.

2    Q    And he didn't have the 24 credit hours, so he

3    couldn't apply for an accounting job.

4    A    Correct.

5    Q    At any grade.

6    A    Correct.

7    Q    Okay.  And this is all based on, I presume --

8    MR. SHAPIRO:  Let's have this marked.

9    MS. MELNIK:  Is this going to be 2?

10    MR. SHAPIRO:  Yes.

11    MS. MELNIK:  Okay.

12    (Exhibit 2 was marked for

13    identification.)

14    BY MR. SHAPIRO:

15    Q    Now showing you Exhibit No. 2.  This is the

16    OPM qualification standards for general schedule

17    positions for GS 510 accounting series, correct?

18    A    Correct.

19    Q    And this is where you get the qualifications

20    requirements not for grade determination, grade

21    quality, grade eligibility, but for the accounting

22    jobs.

Page 74

1    A   Correct.

2    Q   Okay. And this is where you have to have 24

3  hours – it's the same three categories that we talked

4  about a moment ago from the vacancy announcement,

5  correct?

6    A   Correct.

7    Q   If you don't have a degree, you have to show

8  some combination, correct?

9    A   Correct.

10    Q   Okay. And this is where it comes from.

11    A   Correct.

12    Q   Because OPM requirements apply.

13    A   Correct.

14    Q   Did you ever talk to Ms. Adams about Mr.

15  Montgomery?

16    A   Yes.

17    Q   Well, you didn't tell me that before. You

18  said – where did that come in?

19    A   It was during the request for a desk audit he

20  wanted done on his job.

21    Q   Ah. So you did deal with him on another

22  matter –

Page 75

1    A   I –

2    Q   – not just these two matters.

3    A   I didn't deal with him. I dealt with his

4  supervisor.

5    Q   Well, we were talking about dealing about him.

6  So you did deal about Mr. Montgomery on a third matter.

7    A   I'm sorry; yes.

8    Q   Any other matters that you dealt about Mr.

9  Montgomery?

10    A   Not that I remember.

11    Q   So we now have them all.

12    A   As far as I know.

13    Q   Two staffing matters and a desk audit matter,

14  right?

15    A   Correct.

16    Q   Okay. We'll get to the desk audit matter in a

17  minute. I want to show you – I take it – the

18  second – in the second matter, the second vacancy

19  announcement matter that you dealt with him, the

20  GS-12/13 accountant?

21    A   Yes.

22    Q   Did you also find him not eligible because he

Page 76

1  was not an 11 for a year? Was it experience as well as

2  no –

3    A   It was experience as well as –

4    Q   The 24 credits.

5    A   – 24 credit hours.

6        MR. SHAPIRO:  Okay. May I have this marked

7  for identification?

8            (Exhibit 3 was marked for

9            identification.)

10    BY MR. SHAPIRO:

11    Q   Showing you what has been marked as Exhibit 3

12  to this deposition. This is a letter or a photocopy of

13  a letter that's dated July 6, 2004 to Mr. Montgomery at

14  his home address from you, involving the same job that

15  Exhibit 1 deals with, that is Vacancy JI04-0105,

16  correct?

17    A   Correct.

18    Q   So this is the letter you sent him that you

19  told us about that he's ineligible. "You were rated

20  ineligible as you did not meet the minimum

21  qualifications of the position as required by OPM's

22  qualification standard handbook".

Page 77

1    A   Correct.

2    Q   Which is Exhibit 2, correct?

3    A   Correct.

4    Q   Okay. And you say "thank you for considering

5  PBGC as your new employer". You knew Mr. Montgomery

6  was already a PBGC employee, correct?

7    A   Correct.

8    Q   So this is a form letter that you just didn't

9  change the form, correct?

10    A   Correct.

11    Q   Do you recall being asked by Ms. Pilpovich

12  about what exactly Mr. Montgomery failed to meet here,

13  in a subsequent conversation with her?

14    A   Yes.

15    Q   So that's another piece of information that

16  you dealt with with respect to Mr. Montgomery. Did she

17  ask you about the second time as well, the 12/13, or

18  just this 13?

19    A   I believe she just asked me about the 12/13.

20    Q   The 12/13 or the 13?

21    A   The 12/13.

22    Q   Okay. You don't think she asked you about the

Page 78

1  13?

2      A  I don't remember her asking me about the 13.

3      MR. SHAPIRO:  Okay. May I have this marked

4  for identification, please?

5          (Exhibit 4 was marked for

6          identification.)

7      MR. SHAPIRO:  Will you show the witness the

8  exhibit, please?

9      BY MR. SHAPIRO:

10     Q  Showing you what has been marked as Exhibit 4

11 to this deposition. Did you ever see this document

12 before?

13     A  No, I did not.

14     Q  This is the first time you've seen it.

15     A  Yes.

16     Q  Mr. Montgomery is writing to Ms. Pilpovich

17 just after he got your letter, correct, Exhibit 3.

18     A  Yes. Correct.

19     MS. MELNIK:  And just for the record,

20 Government counsel has never seen it before today.

21     MR. SHAPIRO:  No reason for you to see it

22 before today.

Page 79

1      MS. MELNIK:  Well, we have a document request

2  that's outstanding --

3      MR. SHAPIRO:  Which is not yet due and so --

4      MS. MELNIK:  Just putting it on the record,

5  Mr. --

6      MR. SHAPIRO:  Well, I don't want the --

7      MS. MELNIK:  -- Shapiro. I'm not -- just

8  putting it on the record. I have no other intent other

9  than that.

10     BY MR. SHAPIRO:

11     Q  It says in this letter that he's writing in

12 reference to your letter of July 6, 2004, which would

13 be Exhibit 3, correct?

14     A  Correct.

15     Q  Regarding his application for this job. He

16 says "your letter advised me 'you were rated ineligible

17 because you did not meet minimum qualifications';

18 however, your letter doesn't describe why". It lacked

19 specificity, correct? That's what he says in his

20 letter.

21     A  That's what he says, yes.

22     Q  And your letter doesn't specify the reasons,

Page 80

1  does it?

2      A  Minimum qualifications.

3      Q  Yeah. It doesn't specify why he failed in

4  minimum qualifications, what qualifications he didn't

5  have, correct?

6      A  It's spelled out in the vacancy announcement.

7      Q  Yeah, but it doesn't say which qualifications

8  he failed on, does it, your letter?

9      A  Generic letter.

10     Q  So I'm correct; it doesn't say.

11     A  Correct.

12     Q  And he asks you for -- he asks Ms. Pilpovich

13 for a specific -- more specific reasons, correct?

14     A  Yes.

15     Q  Okay. This is July 12, 2004.

16     MR. SHAPIRO:  Let's have this marked for

17 identification. This will be 5.

18          (Exhibit 5 was marked for

19          identification.)

20     BY MR. SHAPIRO:

21     Q  Now, this is a letter on PBGC stationery

22 signed by Ms. Pilpovich, director of H.R., dated August

Page 81

1  6, 2004 to Mr. Montgomery.

2      A  Correct.

3      Q  And it says it's in response to his question

4  as to why he was not determined to be qualified for a

5  GS-13 accountant position.

6      A  Correct.

7      Q  So it's in response to his letter which was

8  written because of your letter.

9      A  Correct.

10     Q  Okay. Now, here, Ms. Pilpovich -- so Ms.

11 Pilpovich -- you don't recall her speaking to you about

12 why you found him ineligible?

13     A  No.

14     Q  Are you saying she didn't speak to you?

15     A  No. She probably did not.

16     Q  She probably did not. How would she guess

17 why?

18     A  She would have asked --

19     MS. MELNIK:  Objection as to speculation.

20     BY MR. SHAPIRO:

21     Q  How would she have known if she didn't speak

22 to you?

Page 82

1    A   She would have asked my boss, Rick Lattimer.

2    Q   I see. And Mr. Lattimer spoke to you about

3    this?

4    A   Yes.

5    Q   So you did speak to Mr. Lattimer about this

6    particular selection And why you were -- why you found

7    Mr. Montgomery ineligible.

8    A   If he had asked me that Michele was interested

9    in why I found somebody disqualified, I would then

10   explain myself.

11   Q   And you did speak to him about that.

12   A   I don't remember --

13   Q   I see.

14   A   -- speaking to him about it.

15   Q   Okay. She writes that "this is in response to

16   your question as to why you were not determined to be

17   qualified for a GS-13 accounting position. There are

18   two ways to qualify for an accounting position in the

19   federal service. An applicant must have either, 1, a

20   Bachelor's degree in accounting or a related field or,

21   2, a combination of education experience that qualifies

22   him or her for the position. When considering a

Page 83

1    combination of education and experience, the applicant

2    must have 24 semester hours of accounting or related

3    courses and must have at least one year of accounting

4    or related experience at the next lower grade level".

5    A   Correct.

6        MS. MELNIK:  Was there a question?

7        MR. SHAPIRO:  Yes.

8        BY MR. SHAPIRO:

9    Q   I read that accurately?

10   A   Correct.

11   Q   And you agree with what she says here.

12       MS. MELNIK:  Objection. Calls for

13   speculation.

14       BY MR. SHAPIRO:

15   Q   Ma'am?

16   A   Yes.

17   Q   Good. Because you have -- now I'm reading

18   from -- I'm continuing to read. "Because you have an

19   Associates degree, your qualifications are evaluated

20   with respect to number 2 above". That would be a

21   combination of education, correct? That's what number

22   2 above says.

Page 84

1    A   Correct.

2    Q   Okay. "In your case, you have 24 semester

3    hours of college credit in accounting or related

4    courses, but the staffing specialist did not see

5    evidence that you had a year or more experience in

6    accounting at the GS-12 level".

7        MS. MELNIK:  Is there a question?

8        MR. SHAPIRO:  Yes.

9        BY MR. SHAPIRO:

10   Q   I read it accurately?

11   A   I can't say that for sure.

12   Q   I didn't read that accurately?

13   A   You read it accurately, yes --

14   Q   Okay. That was the question. I did read it

15   accurately, didn't I?

16   A   Yes.

17   Q   Okay. Ms. Pilpovich says he has 24 hours of

18   accounting, right? That's what this says.

19   A   Yes.

20   Q   Okay. But she says that you -- you're the

21   staffing specialist, right?

22   A   Correct.

Page 85

1    Q   You couldn't find evidence that he had a year

2    or more of experience in accounting at the GS-12 level.

3    Is that right? That's what it says.

4    A   That's what it says.

5    Q   She's wrong?

6    A   Yes, because he didn't have the 24 semester

7    hours also.

8    Q   He didn't have it. You know that. Where did

9    she get the idea that he did have the --

10       MS. MELNIK:  Objection; calls for speculation.

11       BY MR. SHAPIRO:

12   Q   -- 24 hours?

13   A   I have no idea.

14   Q   As between you and Ms. Pilpovich, who speaks

15   for the Corporation in H.R. matters back

16   in -- sorry -- back in 2004?

17   A   Ms. Pilpovich.

18   Q   Okay. Ms. Pilpovich is assumed to have

19   broader knowledge than you in the H.R. field?

20       MS. MELNIK:  Objection as to vague.

21       BY MR. SHAPIRO:

22   Q   Ma'am?

Page 86

1   A   I don't know.

2   Q   Who is presumed to have broader knowledge?

3       MS. MELNIK: Objection to the form.

4       BY MR. SHAPIRO:

5   Q   You or the head of H.R.?

6       MS. MELNIK: Objection as to form.

7       THE WITNESS: I don't know.

8       BY MR. SHAPIRO:

9   Q   Okay. Did you ever speak to Mr. McKinnon

10  about Mr. Montgomery's qualifications?

11  A   I don't remember ever speaking to Mr.

12  McKinnon.

13  Q   And you didn't speak to Ms. Adams about

14  qualifications --

15  A   No.

16  Q   -- at that point. That was later.

17  A   That was later.

18  Q   Involving this desk audit.

19  A   Correct.

20      MR. SHAPIRO: Off the record.

21      (A brief recess was taken.)

22      MR. SHAPIRO: We're back on the record.

Page 87

1       BY MR. SHAPIRO:

2   Q   Now, the next paragraph says "before making

3   this decision, the staffing specialist consulted with

4   your supervisor, Cynthia Adams. Ms. Adams confirmed

5   that the duties you are performing as a GS-05-01/12 are

6   not sufficiently similar to those performed by a GS

7   510/12 accountant to say that you have one year's

8   experience as an accountant". Do you see -- did I read

9   that accurately?

10  A   Correct.

11  Q   And you see it there, right?

12  A   Correct.

13  Q   You never spoke to Ms. Adams.

14  A   I don't remember speaking to her --

15  Q   Well you --

16  A   -- about this.

17  Q   Did you ever tell Mr. Lattimer that you spoke

18  to her, Ms. Adams?

19  A   No.

20  Q   And you never spoke to Ms. Pilpovich about

21  this at all.

22  A   No.

Page 88

1   Q   As far as you remember.

2   A   As far as I remember, I did not speak to

3   Michele about this at all.

4   Q   So where did Ms. Pilpovich get this idea as

5   far as you know?

6       MS. MELNIK: Objection as to speculation.

7       BY MR. SHAPIRO:

8   Q   You were the staffing specialist on this,

9   right?

10  A   Correct.

11  Q   Where did she get this idea as far as you

12  know?

13  A   I don't know.

14  Q   Uh-huh. But it's not accurate, is it?

15  A   No.

16  Q   Okay. You're not an accountant.

17  A   No, I'm not.

18  Q   Right? And you don't -- you've never

19  performed accounting duties?

20  A   No, I have not.

21  Q   Or the duties of a financial specialist?

22  A   No.

Page 89

1   Q   As regards to those duties, who would know

2   more about how they interrelate, you or a person in the

3   field -- in the accounting field?

4   A   The accounting field.

5   Q   And in terms of the actual jobs of -- the

6   actual duties, what is actually done by employees, who

7   would know better what Mr. DeLarse Montgomery actually

8   did as a financial specialist, you or Ms. Adams?

9   A   Ms. Adams.

10  Q   And how that might relate to the duties of an

11  accounting job; you or Ms. Adams?

12  A   Ms. Adams.

13  Q   How about Mr. McKinnon? He's a division

14  director over Ms. Adams. He's a controller, correct?

15  A   Correct.

16  Q   He would also have some knowledge about this.

17  A   Correct.

18  Q   Certainly more than your knowledge.

19  A   Correct.

20  Q   Now, if the managers, those people who I just

21  mentioned, thought Mr. Montgomery qualified as an

22  accountant GS-12, they would know better than you in

Page 90

1  terms of experience. I'm not talking about courses,
2  whether he took courses or not. I'm talking about in
3  terms of his experience as a financial specialist in
4  the division, the controller's division, whether those
5  things that he actually did were qualifying experience
6  for an accountant GS-12, in your view of it, their view
7  of it would be more accurate, correct?
8     A  They would know better what an accountant
9  would have to do at the GS-12 level than I would.
10    Q  And also what he had actually done as a
11 financial specialist at the 12 level, correct?
12    A  Correct.
13    Q  Okay. OPM mandates that vacancy announcements
14 should be as specific as possible, correct?
15    A  Correct.
16    Q  And not vague, correct?
17    A  Correct.
18    Q  Who is FOD's point of contact regarding
19 vacancy announcements?
20    A  Debbie Jones.
21    Q  And who is she?
22    A  She is the executive type of assistant person

Page 91

1  in FOD.
2     Q  So she works for Winter.
3     A  Yeah.
4     Q  She works at the department level --
5     A  Yes.
6     Q  -- under Mr. Winter.
7     A  She works under Tanya Jones in the admin
8  section.
9     Q  Who works for Mr. Winter.
10    A  Correct.
11    Q  So, in other words, her chain is the head of
12 the admin section and then the head of FOD.
13    A  Correct.
14    Q  Not Mr. McKinnon and Ms. Adams.
15    A  No.
16    Q  Correct?
17    A  Correct.
18    Q  Okay. By the way, did you see this
19 document -- were you shown this document --
20    A  No, I was not.
21    Q  You were not.
22    A  I've never seen this document before.

Page 92

1     Q  Okay. You recognize Ms. Pilpovich's
2  signature, though, don't you?
3     A  Yes.
4     Q  That is it, isn't it?
5     A  That is it.
6        MR. SHAPIRO:  Let's mark this.
7           (Exhibit 6 was marked for
8           identification.)
9        MR. SHAPIRO:  This is 6?
10       MS. MELNIK:  It's 6.
11       BY MR. SHAPIRO:
12    Q  I'm showing you now the copy of a PD, correct?
13    A  Correct.
14    Q  Now, if you look at the PD, it's position
15 number 8940.
16    A  Correct.
17    Q  That's a PBGC number, correct?
18    A  Correct.
19    Q  All right. Now, it says that it's a financial
20 specialist job GS 501 grade level 12, correct?
21    A  Correct.
22    Q  S.R. is the initials of the head of the -- of

Page 93

1  your division, right? Stephanie Russell.
2     A  Correct.
3     Q  And the date of this is August 2, 1998,
4  correct?
5     A  Correct.
6     Q  And we see Mr. McKinnon has signed on that
7  date, Ms. Adams has signed on that date and Ms. Russell
8  signed on that date, correct?
9     A  Correct.
10    Q  Now, the section for remarks are where
11 anything peculiar or especially noteworthy that's not
12 otherwise part of the form is to be placed, correct?
13    A  It can be placed there, yes.
14    Q  Well, that's what it's there for, correct?
15    A  Yes.
16    Q  Okay. There's nothing in the remarks section,
17 is there?
18    A  No.
19    Q  Now, if you turn the page, there's a otherwise
20 blank page. I think you can ignore the handwritten 17
21 at the bottom. But other than that, it's an otherwise
22 blank page except for the following typed information.

Page 94

1 It says "information for record. Position upgraded to
2 GS-12 grade level due to a settlement agreement.
3 Position description stays the same, given new number".
4      Did I read that accurately?
5   A  Correct.
6   Q  Okay. This is the kind of thing that you'd
7 expect to find in the remark section, correct?
8      MS. MELNIK: Objection, form. Vague.
9      BY MR. SHAPIRO:
10  Q  Ma'am?
11  A  Not necessarily.
12  Q  In fact, you wouldn't want to find this in a
13 PD at all, would you —
14  A  No.
15  Q  — a reference to a settlement agreement,
16 would you?
17  A  No.
18  Q  Now, during this period, 1998, you said you
19 weren't there but you know that they hadn't gone
20 through their PDs, correct? They didn't regularly
21 review the PDs.
22  A  When I got there, they had not been going

Page 95

1 through the PDs.
2   Q  So you got there in 2000.
3   A  Correct.
4   Q  So in some time they hadn't gone through their
5 PDs.
6   A  Correct.
7   Q  Now, look at the third page. Now, this is a
8 cover page for a 501 grade 11 job, correct, financial
9 specialist?
10  A  Correct.
11  Q  And there's a different cast of characters who
12 signed this. Lori Frye, position classification
13 specialist, And for the program office, that is the
14 office where this position occurred, the investment
15 accounting branch and the controller operations
16 division, again, it's different people, correct?
17  A  Correct.
18  Q  The fact that a position classification
19 specialist signed this, does that indicate that this
20 is — this position was classified without an
21 incumbent? It was a new job?
22      MS. MELNIK: Objection as to speculation.

Page 96

1      THE WITNESS: I don't know.
2      BY MR. SHAPIRO:
3   Q  Is that what it generally indicates?
4      MS. MELNIK: Objection as to form.
5      THE WITNESS: I don't know.
6      BY MR. SHAPIRO:
7   Q  Okay. Now, we see duties And responsibilities
8 here for a GS-11 financial specialist, correct? That's
9 what it says right at the top.
10  A  Correct.
11  Q  Do you know if this accurately described the
12 duties performed by Mr. Montgomery —
13      MS. MELNIK: Objection as to --
14      BY MR. SHAPIRO:
15  Q  — when he was a GS-12?
16      MS. MELNIK: Calls for speculation; objection.
17      THE WITNESS: I don't know.
18      BY MR. SHAPIRO:
19  Q  You don't know. This is the position
20 description that you saw, that they showed you last
21 week.
22  A  They showed me, yes, this morning.

Page 97

1   Q  This morning. And this is a position
2 description that you said you saw when you were in the
3 job, when you were going through PDs.
4   A  Correct.
5   Q  Before the first time you dealt with Mr.
6 Montgomery, correct?
7   A  Correct.
8   Q  So this would have been sometime between 2000
9 and 2004.
10  A  Correct.
11  Q  And you just leafed through this at the time,
12 correct?
13  A  Correct.
14  Q  Do you recall seeing page 2?
15  A  Yes.
16  Q  Did you make any comment about there being
17 this page 2, the one that says for — information for
18 record and makes reference to a settlement agreement?
19      MS. MELNIK: Objection as to form.
20      BY MR. SHAPIRO:
21  Q  Do you recall seeing that back when you first
22 saw this PD?

**Page 98**

1  A  Yes.

2  Q  Did you make any notation —

3  MS. MELNIK:  Objection as to form.

4  BY MR. SHAPIRO:

5  Q  — as to it properly being out of the PD?

6  A  No.

7  Q  Why not?

8  A  There was no need for me to.

9  Q  Why?

10  A  This was signed off by my supervisor.

11  Q  Did you point out to your supervisor that this

12  kind of thing shouldn't be in a PD?

13  A  No.

14  Q  Why not?

15  A  That was not my call.

16  Q  Aren't you supposed to advise your supervisor

17  about such things?

18  A  This happened before I arrived at PBGC.

19  Q  I understand that, but you're reviewing the

20  PDs because there was a reorganization coming, right?

21  A  I was not reviewing PDs. I was putting PDs

22  into a book to go into the sections that the

**Page 99**

1  reorganization came about on.

2  Q  And you happened to see this PD with this page

3  on it, correct, this being the second page, the one

4  that says position description to 12 grade level -- of

5  12 grade level due to a settlement agreement —

6  A  Correct.

7  Q  — et cetera.  You didn't mention it at all to

8  your boss.

9  A  No.

10  Q  Who was your boss at the time?

11  A  Stephanie Russell.

12  Q  Uh-huh.  Is it unusual for PDs to have two

13  cover pages, one at one grade and one at another grade?

14  MS. MELNIK:  Objection as to form, vague.

15  THE WITNESS:  Yes.

16  BY MR. SHAPIRO:

17  Q  Have you ever seen one before like this?

18  A  No, I have not.

19  Q  Have you seen a notation in a page like this

20  on a PD, that is, page 2 of this PD?

21  A  No, I have not.

22  Q  I take it as a 201 employee — both a 201

**Page 100**

1  employee and also as a 235 employee, you've seen a lot

2  of PDs.

3  A  Correct.

4  Q  Thousands of them, correct?

5  A  Correct.

6  Q  Not just at PBGC but at the Veterans

7  Administration and elsewhere.

8  A  Correct.

9  Q  All Right.  This 12/13 job that you said

10  happened afterwards, do you recall how soon after this

11  13 job that we've been discussing that this other

12  vacancy came up?

13  A  I don't believe it was too long after but I

14  don't remember exactly a time frame.

15  Q  Okay.  But what does too long mean to you?

16  A  Less than a year.

17  Q  Less than a year later.

18  A  Yes.

19  Q  And you found him not qualified based

20  on — not eligible based on lack of 24 hours?

21  A  Minimum qualifications and experience.

22  Q  Okay.  But — so it's both — and you didn't

**Page 101**

1  speak to anybody about that.

2  A  No.

3  Q  Okay.  And you don't recall speaking to

4  anybody in the program office, that is, FOD, about

5  that —

6  A  No.

7  Q  — before you made that determination.

8  A  No.

9  Q  And you made the determination based on a

10  review of the PD -- of his financial specialist PD?

11  A  I made a review of his application.

12  Q  Did you look at the financial specialist PD?

13  A  I reviewed what he submitted for his

14  announcement that he was applying for.

15  Q  I see.  And on that basis you found that he

16  didn't qualify even at the 12 level for accounting job

17  because he wouldn't have had 11 experience sufficiently

18  linked to accounting.

19  A  Correct.

20  Q  And you did that from his application.

21  A  Correct.

22  Q  Okay.  In the application, they have

26 (Pages 98 to 101)

Page 102

1   the — they address the actual factors, right?

2       A   Correct.

3       Q   And that's — did you look at that part or you

4   didn't even look at that part?

5       A   I looked at the questions, yes.

6       Q   Okay. And his responses to them.

7       A   Yes.

8       Q   Okay. So — and you didn't consult with

9   anybody from FOD.

10      A   I didn't have to.

11      Q   I'm asking you whether you did or not.

12      A   No, I did not.

13      Q   And did you mention — were you queried about

14  this by anybody in your office? Your boss, your boss's

15  boss, the head of the office, anybody?

16      A   I don't remember that I was.

17      Q   Okay. So it was just a routine finding

18  somebody ineligible.

19      A   Correct.

20      Q   Because he didn't have 24 hours of accounting.

21      A   Correct.

22      Q   And he didn't have sufficient experience in

Page 103

1   the accounting field.

2       A   Correct.

3       Q   Or a related field.

4       A   Correct.

5       Q   How soon after that did you have this third

6   dealing about Mr. Montgomery in this third matter, the

7   audit — desk audit?

8       A   He had requested a desk audit on his job and

9   it was not — I don't believe it came to me. I believe

10  it came to Gigi because she was in charge of the

11  contractors at that time who did the classification.

12  They assigned it to, if I remember correctly, Janet

13  Brikey. Janet did the desk audit on his job and found

14  that he didn't have enough to go to the next grade

15  level.

16      Q   As a financial specialist.

17      A   Correct.

18      Q   Okay. And you said that you dealt with Ms.

19  Adams on this.

20      A   Yes.

21      Q   And how did you come to deal on this at all?

22      A   I just wanted to make sure that when I read

Page 104

1   over what she had found in her findings that it

2   was — we were talking about — because I don't know

3   what a financial specialist does at the higher grade

4   levels, I discussed it with Cynthia to see if

5   everything was right and see if that was her findings.

6   She wrote over the report to — as much as I can

7   remember and she agreed with the findings also.

8       Q   She agreed with the finding that it wasn't a

9   13 job.

10      A   Correct.

11      Q   Did the findings find that it was a 12 job?

12      A   Yes. And the reason it was desk audited to

13  begin with was because of the PD that he was sitting

14  on. It should have been classified when they had the

15  settlement agreement; he should have had an all new PD

16  And they didn't do it at that time. And so then after

17  the fact, he was asking for a desk audit to see if it

18  would actually go higher and he needed a actual

19  functioning PD to be on as a 12.

20      Q   So you did a new PD —

21      A   Yes --

22      Q   — as a result of the desk audit or before the

Page 105

1   desk audit?

2       A   As a result of the desk audit.

3       Q   So the result of the desk audit was the desk

4   audit found that he was doing 12 duties —

5       A   Correct.

6       Q   -- but the PD should be upgraded to be a real

7   12 PD.

8       A   Correct.

9       Q   And that's what you took care of, updating the

10  PD.

11      A   Correct.

12      Q   So he now doesn't have the PD that I showed

13  you. He has a new 12 PD.

14      A   As much as I remember, yes. He should have a

15  new PD as a 12.

16      Q   And you wrote the PD.

17      A   I did not write the PD.

18      Q   You supervised the writing of it.

19      A   All I do -- the contractor was the one that

20  wrote the PD based on what she found in the desk audit.

21      Q   Ms. Brikey.

22      A   Yes.

## Page 106

1  Q  But it was a 12 — he was found a 12.

2  A  He was found to be a 12.

3  Q  Properly a 12 but a bad PD, needed a new PD.

4  A  Yes.

5  Q  Did you deal with Ms. Brikey on this? Did you

6  talk to Ms. Brikey on this?

7  A  Yes.

8  Q  You did.

9  A  Yes.

10  Q  And you talked to Ms. Adams about this.

11  A  Yes.

12  Q  Now, one level of duty that Mr. Montgomery had

13  was COTR duties, correct? That was new.

14  A  Correct.

15  Q  The new PD reflects COTR duties?

16  A  Yes, it does.

17  Q  But the old PD doesn't talk about it at all.

18  A  No.

19  Q  Are you aware of accountants who have COTR

20  duties and that's what they do, who are 13s?

21    MS. MELNIK: Objection. Calls for

22  speculation.

## Page 107

1    THE WITNESS: COTR duties are considered

2  collateral duties.

3    BY MR. SHAPIRO:

4  Q  Unless they make up a big chunk of the job,

5  correct?

6    MS. MELNIK: Objection as to form.

7    THE WITNESS: It could.

8    BY MR. SHAPIRO:

9  Q  I mean, collateral means that it's a minor

10  side aspect of the job, correct?

11  A  Correct.

12  Q  Falling under other duties as assigned.

13  A  Correct.

14  Q  Right. But if it's a more major time

15  commitment and attention span commitment, then it might

16  not be collateral.

17    MS. MELNIK: Objection as to vague.

18    THE WITNESS: I can't answer that.

19    BY MR. SHAPIRO:

20  Q  The duties themselves are not collateral by

21  nature; they're collateral to particular jobs, correct?

22  A  COTR duties — they have people in COTR duties

## Page 108

1  doing their regular job and they add in COTR duties

2  because the procurement department needs subject matter

3  experts in a certain area that's going to handle the

4  contract.

5  Q  And that's what subject mat — that's what

6  COTRs are; they're subject matter experts.

7  A  Correct, for a contract that they are COTRing

8  for.

9  Q  Right. And it's the subject of the contract

10  that they're experts on, not being a COTR, although

11  there is some COTR training, right?

12  A  Correct. Everyone has to go through COTR

13  training in order to be a COTR.

14  Q  And what you're looking for in a COTR is

15  somebody who has expertise in the area that the

16  contract is being performed — on what's being

17  performed, correct?

18  A  Correct.

19  Q  That's the point of having a COTR.

20  A  Correct.

21  Q  But sometimes COTR duties can take up a lot of

22  time if it's a growing contract, it's substantial

## Page 109

1  funds, correct?

2    MS. MELNIK: Objection as to vague and form.

3    THE WITNESS: I don't —

4    MS. MELNIK: Let me make my objection, if you

5  don't mind, first. Thank you.

6    BY MR. SHAPIRO:

7  Q  This business of collateral duties, I mean, if

8  they assigned you some classification duties but it was

9  not a main function of your job, it was just something

10  that they needed you to do, that could be collateral to

11  your main job, correct?

12    MS. MELNIK: Objection; calls for speculation.

13    BY MR. SHAPIRO:

14  Q  Other duties as assigned.

15  A  Correct.

16  Q  Okay. But somebody could be doing

17  classification and that could be their main job. Then

18  it's not collateral for them, correct?

19  A  They would be classified as a classified

20  specialist.

21  Q  Or they were doing a lot of classification

22  duties as a 201.

## Page 110

1   A   Correct.

2   Q   So it wouldn't be collateral to them.

3   A   I can't answer that.

4   Q   Here's what I'm trying to tell -- trying to

5   figure out with you, is this. A duty is not collateral

6   by nature. It only depends on what the job is and how

7   much of the duty you perform, correct?

8   A   Correct.

9   Q   All right. So what is collateral to one

10  person, to one job, might be central to another job,

11  same duty. Correct?

12  A   I can't answer that.

13  Q   Well, for example, I type sometimes when I

14  do -- but I'm a lawyer. It's a collateral thing that I

15  do. But my secretary types all the time. It's central

16  to her job. Same duty, typing; but to me, it's

17  collateral, to her, it's essential and central,

18  correct?

19  A   Correct.

20  Q   And that's the same in the government. The

21  duty itself is not necessarily collateral. It's only

22  collateral in relation to the job. Correct? To the

## Page 111

1   position.

2   A   Correct.

3   Q   Okay. So if a duty takes up 25 percent of

4   your time, is that a collateral duty?

5       MS. MELNIK: Objection as to vague and form

6   and calls for speculation.

7       THE WITNESS: Yes.

8       BY MR. SHAPIRO:

9   Q   You will agree with me, won't you, that the

10  more a duty makes up a central -- the more time it

11  takes of your job, the less it's collateral and the

12  more it's the essential part of your job, correct?

13  A   Correct.

14  Q   And what is the break point? Is there a

15  specific break point?

16  A   75 percent of your time.

17  Q   So if something is not 75 percent of your time

18  it's collateral?

19  A   I can't answer that.

20  Q   There is no thing on any particular duty, is

21  there?

22      MS. MELNIK: Objection as to vague.

## Page 112

1       THE WITNESS: I'm not sure I'm following you

2   on this.

3       BY MR. SHAPIRO:

4   Q   Uh-huh. Okay. Was there a PBGC Inspector

5   General finding that PBGC does not oversee its

6   contractors -- its contracts properly because its COTRs

7   are not allowed sufficient time for their COTR

8   responsibilities? Do you recall that?

9   A   I don't recall that.

10  Q   Uh-huh. Did PBGC -- what is OID?

11  A   OID? I don't --

12  Q   Insurance operations department?

13  A   It could be.

14  Q   That was not one of yours that you serviced.

15  A   Unless it came under the reorganization, I

16  don't remember the -- I don't remember.

17  Q   Do you recall PDs that had COTR duties as

18  grade controlling?

19  A   There is no classified PD in the federal

20  government that has COTR duties that are grade

21  controlling.

22  Q   You're sure?

## Page 113

1   A   Positive.

2   Q   And how do you know that?

3   A   Because OPM does not recognize COTR duties as

4   grade controlling.

5   Q   I see. But if you're operating at a 12 and

6   they add to you 25 percent more work And they're COTR

7   duties, do you not get a 13 because of that?

8   A   No, you do not.

9   Q   No chance.

10  A   No chance.

11  Q   I see. COTR duties are now part of PDs,

12  though.

13      MS. MELNIK: Objection as to vague.

14      BY MR. SHAPIRO:

15  Q   They're mentioned in PDs as duties.

16  A   As long as the position is going to be

17  handling contracts that are going to be dealing with

18  that particular area, they might add it to the PD.

19  Q   So it wouldn't be just other duties as

20  assigned. It would actually be a specific mention.

21  A   Yes.

22  Q   But it can be grade determining then, can't

## Page 114

1  it?

2  A  No, it cannot.

3  Q  It cannot be grade -- even though it's

4  mentioned.  Is that right?

5  A  No, that's right.  It's not grade controlling.

6  Q  I see.  Have you now told us everything you

7  can recall about this -- your dealings with this desk

8  audit?

9  A  Yes.

10  Q  Now, who rewrote the PD --

11  A  The con --

12  Q  -- for GS-12?

13  A  The contractor.

14  Q  Ms. Bakey?

15  A  Brikey.

16  Q  Ms. Brikey.

17  A  Yes.

18  Q  And you supervised that?

19  A  No.

20  Q  You reviewed it?

21  A  I reviewed it.

22  Q  And it was okay.

## Page 115

1  A  Yes.

2  Q  Did it mention COTR duties?

3  A  I believe it did.

4  MR. SHAPIRO:  We're almost done.  I want to

5  take five.

6  MS. MELNIK:  All right.

7  (A brief recess was taken.)

8  BY MR. SHAPIRO:

9  Q  When you notice some application is deficient

10  in some respects, do you alert the applicant?

11  A  No.

12  Q  Never?

13  A  Never.

14  Q  Do you alert the administrative people in the

15  department that they could do something about getting

16  more information?

17  A  No.

18  Q  Never do that.

19  A  No.

20  Q  Do you know a Debbie Christensen?

21  A  No.

22  Q  Never heard of her?

## Page 116

1  A  No.

2  Q  I'm sorry; a Lynn Christensen.

3  A  Name doesn't ring a bell.

4  Q  Uh-huh.  But you do know a Debbie Jones.

5  A  Correct.

6  Q  She's your main contact at FOD?

7  A  Yes.

8  Q  And you continued to be the servicing

9  personnel specialist for FOD until you left, right?

10  A  No.

11  Q  When did you stop being --

12  A  2005.

13  Q  When in 2005?

14  A  I believe it was in January.

15  Q  So 2005 you stopped servicing FOD.

16  A  Correct.

17  Q  And who took over?

18  A  I want to say Gigi McDaniel took over FOD.

19  Q  But it's also inappropriate for Ms. McDaniel

20  to contact the office about an applicant being light in

21  something.

22  A  Correct.

## Page 117

1  Q  You're not supposed to do that.

2  A  The theory is -- and we've always followed

3  this practice -- if there's one person missing

4  information, you have to contact everybody.  And it

5  gets to be a mind-boggling --

6  Q  You mean everybody who's missing information.

7  A  Right, because you have to treat everybody the

8  same.  So it doesn't matter if it's one announcement;

9  it's got to be every announcement.  And when you're

10  dealing with hundreds of applications, you really don't

11  have time to go back and say I'm missing this, I'm

12  missing that.  That's why we request all the

13  information up-front in the vacancy announcement.

14  Q  I see.  And this was a policy of the HRD under

15  Ms. Pilpovich, correct?

16  A  Correct.

17  Q  Now, Ms. Jones would know an application was

18  not complete, had things missing, unless somebody from

19  H.R. told her because Ms. Jones doesn't get the

20  applications until they're deemed eligible, right?

21  MS. MELNIK:  Objection as to form.  Objection

22  as to -- calls for speculation.

Page 118

1    BY MR. SHAPIRO:
2    Q    Right, ma'am?
3    A    That's correct.
4    Q    And at the point in time you passed them on
5    back to the program office, in this case FOD, you'd
6    already made your determinations on eligibility.
7    A    I don't understand —
8    Q    In other words, you'd give the app -- the
9    applications actually follow the cert, right?
10   A    When we --
11   Q    If a job is being filled at FOD, right, during
12   the time that you were the person in H.R. who serviced
13   FOD — if a job is being filled, the application would
14   come to HRD, correct?
15   A    Correct.
16   Q    You would make your determinations on
17   eligibility And basic qualification, right?
18   A    Correct.
19   Q    And then you would put the cert together.
20   A    Not necessarily.
21   Q    Why not necessarily?
22   A    If there were more than a certain number of

Page 119

1    candidates and it had to be paneled --
2    Q    Okay. But you would send it to the program
3    officer paneling, correct?
4    A    They would have three panel members who would
5    review the applications, rate them and rank them and
6    then when they came back to me, I would then put the
7    top three candidates or the top five candidates,
8    depending on --
9    Q    Okay. I got you, but that's —
10        MS. MELNIK:  Well, could you —
11        BY MR. SHAPIRO:
12   Q    — but that's not what I'm interested in, so
13   let's turn to a — let's expedite here.
14        You would not send it to Ms. Jones until
15   eligibility And qualification determinations had been
16   made.
17   A    Correct.
18   Q    She wouldn't know if a candidate didn't make
19   eligibility until you had made that eligibility
20   determination.
21   A    Correct.
22   Q    And the qualification determination.

Page 120

1    A    Correct.
2    Q    Unless you told her.
3    A    Correct.
4    Q    Which you never did.
5    A    No.
6    Q    And it was a rule not to, correct?
7    A    Correct.
8    Q    Do you have copies of the documents that you
9    were shown?
10   A    Not with me.
11   Q    But they gave you copies of these documents to
12   keep?
13   A    No.
14   Q    No.
15   A    They just showed them to me.
16   Q    Do you have documents about Mr. Montgomery at
17   all?
18   A    No.
19   Q    Okay. Now, I asked you before about the
20   meeting that you had and you said you met for close to
21   two hours with counsel.
22   A    Correct.

Page 121

1    Q    But you only told me that they — you told me
2    in about 15 seconds what they talked about when I asked
3    you what you talked about. So can you tell me
4    everything that you can recall from that conversation?
5    A    No, I can't.
6    Q    Well, tell me what you can recall.
7    A    They told me that I was going to be giving a
8    deposition, which I knew, that we were going over
9    certain documentation, the vacancy announcement, why he
10   didn't qualify. They showed me his application. They
11   asked me to explain why he didn't qualify and I
12   explained that to them.
13   Q    So you actually did a review of the
14   application And explained to them now, today, why you
15   didn't — he didn't qualify?
16   A    Yes.
17   Q    So you didn't go back and think about what
18   your reasoning was back in 2004, you actually did it
19   again for them this morning. Is that what you're
20   telling me?
21   A    I knew what was my reasoning was in 2004 and
22   when they showed me his application, I just verified

Page 122

1  that I was correct back then.
2  Q  I see. They didn't suggest to you the reasons
3  why you found that.
4  A  No.
5  Q  Uh-huh. Okay. Anything else that you can
6  recall? I mean, there was a two-hour meeting this
7  morning.
8  A  I --
9  Q  I'm not taxing your memory, am I?
10  A  Yes, you are.
11  Q  I am.
12  A  I'm sorry to say.
13  Q  Okay.
14  A  I just -- they just talked about this case and
15  what was happening, the vacancy announcements, did I
16  remember those announcements, I said yes, I did; did I
17  remember his application, I said yes, I did. We went
18  over the application. Why didn't I find him qualified.
19  I went over the reasons again as to why I didn't find
20  him qualified. We talked about the position
21  description he was on, did I remember this position
22  description, and I said yes, I did and I remember that

Page 123

1  he got it for a settlement agreement, he got the grade.
2  Did I remember issuing the certs, I said yes,
3  I did. I showed them where I had -- showed them where
4  the logs were when I -- when you have people log into
5  the system for these announcements, you had a log of
6  everybody who's been applying for a certain
7  announcement number, showed them that, I said yes,
8  everything is here.
9  They asked me if I remembered had he applied
10  for one announcement and not the other, did he apply
11  for the status, the non-status announcement. I said I
12  remember that he did not apply for the status one
13  because he only submitted one application for the
14  non-status and there was no record of him ever applying
15  for the status vacancy.
16  Q  That was the -- that was a third job?
17  A  No, that was the 12/13.
18  Q  Accounting job.
19  A  Yes.
20  Q  I see. And you've now told us what you can
21  recall from that meeting.
22  A  Yes.

Page 124

1  Q  Okay. And did you ever do a -- any other
2  dealings with Mr. Montgomery for any other job?
3  A  Not that I remember.
4  Q  Two accounting jobs in Ms. Adams' branch,
5  both, right?
6  A  Correct.
7  Q  And this desk audit and new PD as a result of
8  the desk audit, also for a job -- for the financial
9  specialist job in Ms. Adams' shop.
10  A  Correct.
11  Q  And that's all that you dealt with with
12  respect to Mr. Montgomery.
13  A  As far as I remember.
14  Q  Now, what's this thing about a status,
15  non-status? That was the 12 accounting job?
16  A  The 12/13 job.
17  Q  12/13 accounting job.
18  A  Yes.
19  Q  Okay. And you recall that he only
20  applied -- this was announced both status and
21  non-status?
22  A  Correct.

Page 125

1  Q  But he only applied for one?
2  A  Correct.
3  Q  How do you know that?
4  A  He --
5  Q  That's -- go ahead.
6  A  He wasn't listed on the log sheet for the
7  status position.
8  Q  Did you do the logging in?
9  A  No, I did not.
10  Q  Okay. So you only know that his -- he didn't
11  get an application in because the log sheet said they
12  didn't log it. That's all you can say is that it
13  wasn't logged.
14  A  When the application came to me -- when the
15  woman logs them in the system, she puts them in a
16  separate folder for each vacancy announcement. When
17  she gave me the folder, the status one, he had -- there
18  was not an application there.
19  Q  Okay. I understand that. And you checked the
20  logs back then or did you check them only this morning?
21  A  I checked them back -- just this morning, in
22  looking at them -- I can't get into our systems

Page 126

1    anymore. I do not work for PBGC.

2      Q    Right. And you didn't check them back in the

3    time.

4      A    Yes, I did.

5      Q    You checked the logs. Why did you check the

6    logs?

7      A    I had to make sure who was applying. You have

8    to pull the log sheet to see who has applied for the --

9      Q    So you do that generally.

10     A    All --

11     Q    Every job.

12     A    Every job.

13     Q    Okay. So all you know is there was no

14   application in one of the folders and there was no

15   record in the log sheet that they received an

16   application.

17     A    For the status position.

18     Q    Right. All you know is that somebody didn't

19   log it and there was no application there.

20     A    I can't say whether they logged it in. All I

21   can say is when I got it, there was no application for

22   him on the status --

Page 127

1      Q    And there was no log entry.

2      A    His name was not listed.

3      Q    Why would he apply non-status?

4        MS. MELNIK: Objection as to speculation.

5        BY MR. SHAPIRO:

6      Q    Why would anybody just apply non-status for a

7    job in your career field in your Agency?

8      A    To use your veterans preference.

9      Q    I see. But you could apply for both, couldn't

10   you?

11     A    As long as you were a status candidate

12   somewhere in the past, yes.

13     Q    Right. Monty could have applied for both --

14     A    Yes, he --

15     Q    -- for this job, right?

16     A    Yes, he could have.

17     Q    This accounting job.

18     A    Yes.

19     Q    And he would have been rated as he was rated,

20   ineligible, anyway.

21     A    Correct.

22     Q    So it was in the non-status job that

Page 128

1      you -- for accountant GS-12/13 that you rated him

2    non -- ineligible.

3      A    Correct.

4      Q    Just like you had for the 13 accounting job

5    where he had applied at first as a status?

6      A    Correct.

7      Q    Okay. And you reviewed this just this

8    morning.

9      A    I reviewed it, yes.

10     Q    Just this morning.

11     A    Yes.

12     Q    So did you ever involve yourself in filling

13   any other job involving Monty, non-accounting job?

14     A    I don't remember.

15     Q    You don't remember having done so; is that

16   correct?

17     A    That's correct.

18     Q    All right. How did the -- when you announce a

19   vacancy with both status and non-status, why would the

20   Agency do that?

21     A    At the time we did it, it was easier for the

22   H.R. specialist to control the job, meaning when you

Page 129

1    put out a vacancy announcement, say if you're applying

2    for the status, this is the announcement number you

3    apply under. If you're applying under non-status, you

4    apply under this number, and that way we could actually

5    qualify the people based on that. They would apply for

6    two different jobs.

7      Q    You could have one vacancy announcement and

8    non-status and status could both apply, correct?

9      A    They do that now. At the time we were -- back

10   then, we were not doing that. We announced two jobs.

11     Q    But you could have done it that way back then.

12     A    That wasn't my call.

13     Q    But you could have. I mean --

14       MS. MELNIK: Objection. Calls for

15   speculation.

16       BY MR. SHAPIRO:

17     Q    In other words, it was legal to do it that way

18   with one announcement.

19     A    Yes.

20     Q    So why would you announce a job that had

21   status -- non-status? To get a broader range of

22   candidates?

## Page 130

1    A   That and to cut our veterans preference.

2    Q   But you found Mr. Montgomery not qualified so

3  he wasn't on the status — the non-status cert.

4    A   Correct.

5    Q   Okay. And since you found that he hadn't

6  applied status, he wasn't on that cert either.

7    A   Correct.

8    Q   But he wouldn't have been on that cert because

9  you would have found — if he'd been in that packet,

10  you'd have found him ineligible.

11    A   Correct.

12    Q   Because it was an accounting job.

13    A   Correct.

14    Q   Even though it was a 12.

15    A   Correct.

16    MR. SHAPIRO: Okay. All right. I don't have

17  anything further.

18    MS. MELNIK: Okay. We'd like to take just

19  about five minutes.

20    MR. SHAPIRO: You're not going to talk to the

21  witness, though, right?

22    MS. MELNIK: No, I'm going to talk to Ms.

## Page 131

1  Esser.

2    MS. ESSER: We're going to talk to each other

3  if that's okay with you.

4    MR. SHAPIRO: It's fine with me. As long as

5  you don't talk to the witness.

6    (A brief recess was taken.)

7          CROSS EXAMINATION

8  BY MS. MELNIK:

9    Q   Ms. Isaac, the last subject that Mr. Shapiro

10  was asking you about had to do with status and

11  non-status applications. Do you recall him just asking

12  you questions about that before the break?

13    A   Yes.

14    MS. MELNIK: Okay. I am having marked as an

15  exhibit A and B.

16    MR. SHAPIRO: Which one is A and which one is

17  B?

18    MS. MELNIK: Well, I don't know until he marks

19  them.

20          (Exhibits A and B,

21          respectively, were marked for

22          identification.)

## Page 132

1    BY MS. MELNIK:

2    Q   Ms. Isaac, do you recognize —

3    MR. SHAPIRO: Do you mind telling me which one

4  it's going to be —

5    MS. MELNIK: I'm going —

6    MR. SHAPIRO: -- so I — I still need to know

7  which one is A and which one is B.

8    MS. MELNIK: Okay. Exhibit A is Announcement

9  No. JI04-0139 and B is JI04-0138.

10    BY MS. MELNIK:

11    Q   And, Ms. Isaac, do you recognize Exhibit A and

12  Exhibit B?

13    A   Yes, I do.

14    Q   And do you recognize them as vacancy

15  announcements for collection analyst GS-501-12/13?

16    A   Yes, I do.

17    Q   Okay. And what's the JI stand for?

18    A   It's my initials; Jackie Isaac.

19    Q   And with respect to the issue of Mr.

20  Montgomery applying under status and non-status

21  applications, do you recall that with respect to these

22  two vacancy announcements?

## Page 133

1    A   No, I don't.

2    Q   Okay.

3    A   I don't remember him applying for either one

4  of these.

5    Q   Okay. Is one status and one non-status?

6    A   Yes. 138 is the status announcement; 139 is

7  the non-status announcement.

8    Q   And you talked very briefly about this log in

9  process with respect to applications. Can you describe

10  for me in some detail what the procedure is if an

11  applicant walks into HRD with applications?

12    MR. SHAPIRO: Objection. I think it's a

13  question of competence and level of knowledge here.

14  She doesn't do this sort of thing. She's not the

15  receptionist. She doesn't sit out there.

16    BY MS. MELNIK:

17    Q   You can answer.

18    A   What would happen is someone would get a

19  vacancy application for a particular vacancy

20  announcement. The person that would log it in the

21  system would clock the application in. We had a time

22  clock which had the date and the time as to when the

Page 134

1  person handed the receptionist or whoever was sitting
2  there at the desk, and then she would then log it into
3  the POLARS system which is at this time the system we
4  were using for our vacancy announcements.
5      They would log in the person's name and
6  address and what vacancy announcement they applied for.
7  It would then go into a folder corresponding to that
8  vacancy announcement number and then after it was
9  closed, I would get all of the applications and then I
10  would proceed to pull up the log sheet from the POLARS
11  system and start going through the applications to see
12  if they were qualified, not qualified, so on and so
13  forth.
14      Q   Okay. And I'm now showing you what has been
15  marked as — or will be marked as Defense Exhibits C
16  and D.
17      MR. SHAPIRO:  Let's have them marked before
18  you show them to her:
19      MS. MELNIK:  I know how to do this, Mr.
20  Shapiro.
21      MR. SHAPIRO:  Copies?  And which one is C and
22  which one is D?

Page 135

1      MS. MELNIK:  I'll know as soon as he marks
2  them.
3          (Exhibits C and D,
4          respectively, were marked for
5          identification.)
6      BY MS. MELNIK:
7      Q   Do you recognize Exhibit C as the POLARS
8  listing for JI04-0139?
9      A   Yes, I do.
10      Q   And do you recognize Exhibit D as the
11  POLARS — and that's P — all
12  caps — P-O-L-A-R-S — for vacancy announcement
13  JI04-0138?
14      A   Yes, I do.
15      Q   Okay. And are these the listings — the
16  POLARS listing that you've been referring to during our
17  discussion about logging in applications?
18      A   Yes.
19      Q   And with respect — I'll draw your attention
20  to Exhibit C, which relates to 0139, which is the
21  non-status — first the non-status vacancy
22  announcement, correct?

Page 136

1      A   Correct.
2      Q   Letter A. Exhibit A.
3      A   Correct.
4      Q   And directing your attention to the middle of
5  Exhibit C, do you see Mr. DeLarse Montgomery's name on
6  that POLARS listing?
7      A   Yes, I do.
8      Q   And with respect to Exhibit D, which refers to
9  vacancy announcement JI04-0138, referring back to
10  Exhibit B, which is the status candidates only, do you
11  see a — is Mr. DeLarse Montgomery on that list?
12      A   No, he's not.
13      Q   Okay. Now, when you — well, let me ask you
14  this. Since it's — each vacancy announcement has the
15  JI in front of it, would you be the person who dealt
16  with this vacancy?
17      A   Correct.
18      Q   And since Mr. Montgomery's name does not
19  appear on the Exhibit D, the POLARS listing for
20  04-0138, what conclusion do you draw based on the fact
21  that his name does not apply on this list?
22      A   He didn't apply for 138.

Page 137

1      Q   And the fact that it does appear on Exhibit C,
2  04-1039, what conclusion do you draw?
3      A   That he applied under the non-status vacancy
4  announcement 139.
5      Q   You were asked some questions about the desk
6  audit. Do you recall being asked questions about that?
7      A   Yes.
8      MS. MELNIK:  Okay.  I'd like this marked as
9  Exhibit E.
10          (Exhibit E was marked for
11          identification.)
12      BY MS. MELNIK:
13      Q   And, having been shown Exhibit E, do you
14  recognize Exhibit E as the desk audit for incumbent
15  DeLarse Montgomery?
16      A   Yes.
17      Q   And if you turn to page 3 of the document,
18  does your signature appear at the bottom?
19      A   Yes, it does.
20      Q   And the fact that your signature appears on
21  the bottom, what does that mean to you in terms of your
22  contact or your knowledge of this document?

Page 138

1    A   It means that when the desk audit was
2   finished, I was the one that reviewed it and talked to
3   the classifier at the time that did this particular
4   desk audit and we talked over everything And going over
5   her stuff, looking at the new PD, yes, I agreed with
6   it.
7    Q   And what's the date of the desk audit?
8    A   February 19, 2004.
9    Q   I'm now referring you back to Plaintiff's
10  Exhibit 1, the J104-0105 vacancy announcement for the
11  accountant GS-510-13. Do you recall looking at this
12  earlier in your deposition?
13   A   Yes, I did.
14   Q   And what's the opening and closing dates for
15  that?
16   A   The opening date was June 1 of '04 and the
17  closing date was June 30 of '04.
18   Q   Okay. And was this vacancy announcement
19  issued before or after the completion of the desk
20  audit?
21   A   It was issued after the desk audit.
22   Q   And so with respect to your testimony when Mr.

Page 139

1   Shapiro was asking you in terms of your recollection of
2   the order of events, was it correct or
3   incorrect — just in terms of the order of events?
4    A   It was incorrect.
5    Q   Okay. And then with respect to the
6   next — the other accounting position which was
7   discussed during your deposition, the GS-510-12/13, was
8   that before or after the desk audit of February '04?
9    A   It was after the desk audit.
10   Q   And with respect to the conclusions that were
11  drawn in the desk audit — and again I'm on page 3 of
12  Exhibit E — what was the conclusion that was drawn
13  with respect to the desk audit?
14   A   The classifier found that the position that
15  Mr. Montgomery was holding at the time was just
16  classified as an 11.
17   Q   And with respect to your recollection during
18  examination by Mr. Shapiro as it being concluded that
19  he was a GS-12, was that a -- was your recollection
20  correct or incorrect?
21   A   Incorrect. This was done based on Mr.
22  Montgomery feeling that the COTR duties And

Page 140

1   responsibilities were grade controlling and that is why
2   he filed the desk audit.
3    Q   Now, you recall that you — when you saw his
4   PD — Mr. Montgomery's position description, that you
5   saw the — I guess it was the page 2, the blank page,
6   except for the one sentence that referred to a
7   settlement agreement -- do you recall testifying that
8   you saw that?
9    A   Yes.
10   Q   Okay. Did that influence or affect your
11  decision in whether or not Mr. Montgomery was qualified
12  for the accounting positions?
13   A   No, it did not.
14   Q   During your tenure at PBGC, did you have any
15  personal animosity or dislike or axe to grind against
16  Mr. Montgomery?
17   A   No, I did not.
18   Q   Now, with respect to you not finding Mr.
19  Montgomery minimally qualified for the GS-13 04-105
20  accountant position, at that time did you know of Mr.
21  Montgomery?
22   A   Yes, I knew of him.

Page 141

1    Q   So why not — and you could reach him by a
2   four-digit extension — people within PBGC can call
3   each other just using a four-digit extension, right?
4    A   Right.
5    Q   Why not just pick up the phone, hit his
6   four-digit extension and say, you know, Mr. Montgomery
7   or Monty, you know, your transcripts aren't here. Why
8   don't you get those in and, you know, you'll — we'll
9   see what we can do?
10   A   In order to do that, I would have had to do it
11  with everybody who ever applied for a job in PBGC for
12  the positions that I was handling. If you treat one
13  person that way, you have to treat them all that way
14  and it's a daunting task. We get anywhere from 20
15  applications to 500 applications depending on the job
16  and it was just feasibly impossible to contact
17  everybody. That's why on the information it says you
18  need to submit this, this and this in the vacancy
19  announcement there.
20   Q   And then when Mr. Montgomery subsequently
21  applied to the 12/13 accountant position, which I
22  believe was J104-143, why not then, you know — it came

36 (Pages 138 to 141)

Page 142

1  up again a second time. Why not hit Mr. Montgomery's
2  four-digit extension and say, you know, you still
3  didn't hand in transcripts, you know. Hand those in
4  and we'll move the process along.
5    A  Same situation.
6    Q  Why not contact your — the training office or
7  whatever office keeps tabs on or monitors that — when
8  personnel take college level courses that are paid for
9  by PBGC — why not just give them a call and verify it?
10   A  Because I would have to verify it with
11  everybody else's college, university, not just PBGC's
12  training institute. It is up to the employee to submit
13  all the documentation needed through what it says in
14  the vacancy announcement.
15   Q  You also testified about how you had
16  contractors doing classification work. Do you recall
17  talking about that earlier today?
18   A  Yes, I do.
19   Q  How do you know those folks are qualified to
20  do that job?
21   A  They are — when they submit — the
22  contracting company submits the resumes for us to

Page 143

1  review to pick certain contractor. We look at all
2  their qualifications, just like we would anybody else
3  who's applying. And if they have the qualification
4  we're looking for, which is if they've done
5  classification in the past, if they've
6  done — depending on the positions we're looking for,
7  then we hire them.
8      We usually interview them also to make sure
9  that they're qualified to be doing the job and not
10  just — the contracting company isn't just throwing
11  things in there that says this person has done such and
12  such. We have to make sure that they're actually
13  qualified also.
14   Q  You also testified that you're qualified to be
15  a classification — to do classifications.
16   A  That's correct.
17   Q  And what do you base your assessment of
18  your — that conclusion?
19   A  Before I came to PBGC where they had a
20  classifier as a contractor, my job as an H.R.
21  specialist is considered a generalist and we have to be
22  able to do everything, including classification. And I

Page 144

1  have done classification in the past, not only on
2  clerical positions but all the way up through and to
3  senior level.
4    Q  Was that at PBGC or your work in the federal
5  government prior to PBGC?
6    A  Work in the federal government prior to PBGC.
7  Smithsonian, at the VA Hospital.
8    Q  And at those locations, were OPM standards
9  applicable?
10   A  Yes.
11   Q  I'm showing you what Plaintiff had marked as
12  Exhibit 4, which was the letter from Mr. Montgomery to
13  Ms. Pilpovich. Do you remember seeing this earlier in
14  the deposition?
15   A  Yes, I did.
16   Q  Had you ever seen it before?
17   A  No, I had not.
18   Q  And Plaintiff's Exhibit 5 was a letter to Mr.
19  Montgomery from Michele Pilpovich. Do you recall
20  seeing this earlier in your deposition?
21   A  Yes.
22   Q  Had you ever seen it before?

Page 145

1    A  No, I had not.
2    Q  Do you recall testifying earlier today about
3  how you — I think your words were you wouldn't want to
4  see — words to the effect you wouldn't want to see
5  something like the increase in grade because of the
6  settlement agreement — words to that effect. Do you
7  recall what I'm talking about?
8    A  Yes, I do.
9    Q  Okay. Why did you have a problem with that?
10   A  Because grades are supposed to be based on
11  your experience and not on a settlement agreement.
12  They are based on you either getting an accretion of
13  duties or applying for a job and getting a promotion
14  that way. But as a settlement agreement, it's not good
15  practice based on the fact that you're rewarding
16  somebody — not saying that it's — it shouldn't be
17  done. It's not what OPM requires you to do. They want
18  you to do it the correct way. They don't believe in
19  settlement agreements for grades.
20   Q  But what if a grade does go up from an 11 to
21  12? What should happen with the position description?
22   A  It should be written as a new position

## Page 146

1  description.

2  Q  In this case, Mr. Montgomery is alleging

3  discrimination and retaliation, discrimination based

4  upon his race, his gender, his age, his color and

5  retaliation for prior EEO activity.

6  In your decision-making with respect to not

7  finding Mr. Montgomery qualified -- minimally qualified

8  for the 04-105 position, accountant, GS-12/13, which

9  was 04-143, and for your signatory approval of the desk

10  audit, did Mr. Montgomery's race play any role in those

11  decisions that you made?

12  A  No.  Not at all.

13  Q  Did his gender play any role?

14  A  No, not at all.

15  Q  Did his color affect any of those decisions?

16  A  No, it did not.

17  Q  Did his age affect any of those decisions?

18  A  No, it did not.

19  Q  And if I could just actually get your date of

20  birth.

21  A  12/5 1954.

22  Q  And are you a white female?

## Page 147

1  A  Yes, I am.

2  Q  Did the -- did your -- having seen the second

3  page of Mr. Montgomery's position description that had

4  that notation about a settlement agreement, did your

5  decisions in finding him not minimally qualified for

6  the two accountant positions And in your

7  signatory -- or signature approval of the findings of

8  the desk audit, did your knowledge of his -- of that

9  settlement agreement affect your decision in any way?

10  Any of your decisions?

11  A  No, not at all.

12  Q  Did you ever receive any direction from Ms.

13  Pilpovich which suggested that she made any decision

14  with respect to Mr. Montgomery based upon his race, his

15  age, his gender, his color, or in retaliation for prior

16  EEO activity?

17  A  Not that I know of.

18  Q  Did you ever receive any direction or learn

19  from Mr. Lattimer that any decisions -- or receive any

20  direction from which suggested that he made any

21  decisions based upon Mr. Montgomery's race or gender or

22  age or color or in retaliation for EEO activity?

## Page 148

1  A  No, I didn't.

2  Q  Did you have any personal -- and by that I

3  mean either face-to-face or through

4  memoranda -- contact with Mr. Winter regarding anything

5  having to do with Mr. Montgomery?

6  A  No, I did not.

7  MS. MELNIK:  I believe that's all we have, Mr.

8  Shapiro.

9  MR. SHAPIRO:  Perfect.

10  REDIRECT EXAMINATION

11  BY MR. SHAPIRO:

12  Q  Now, looking at -- you've got to tell me about

13  these -- this A and B.  I want you to look back at A

14  and B.  So you were the servicing H.R. person on this.

15  A  Yes, I was.

16  Q  So you forgot about that when you answered my

17  questions?

18  A  Yes, I did.

19  Q  Right.  And you saw these documents this

20  morning.

21  A  Yes, I did.

22  Q  Correct.  She showed -- counsel showed them to

## Page 149

1  you and discussed them with you this morning.

2  A  Yes.

3  Q  And yet this afternoon at your deposition, you

4  couldn't recall this incident, this whole incident

5  about a non -- a non-accounting job?

6  A  That's correct.

7  Q  And I asked you about it, remember?

8  A  Yes, I do.

9  Q  And you didn't recall it then?

10  A  At the time I was doing this vacancy

11  announcement and everything else in 2004, I was

12  handling also about another 250 announcements at the

13  same time.

14  Q  Yes, I understand.  But you saw this this

15  morning and went over it with counsel and you couldn't

16  recall it this afternoon?

17  A  I thought they had showed me the one for the

18  accountant 12/13.

19  Q  But it wasn't just showing you.  They went

20  over it with you.

21  A  They showed me an announcement.  I didn't

22  remember seeing the title of collection analyst.

Page 150

1    Q   I see. This is a 501 job.
2    A   Yes, it is.
3    Q   Not a 510 job.
4    A   That's correct.
5    Q   And Mr. Montgomery was a 501.
6    A   That's correct.
7    Q   I see. And -- but you couldn't remember that
8  so you were wrong about that this morning, right?
9        MS. MELNIK: Objection. That misrepresents
10 the testimony.
11       BY MR. SHAPIRO:
12   Q   You were wrong about not -- about only dealing
13 with three matters. There was a fourth matter, right?
14   A   I did not remember --
15   Q   Yes. So you were wrong in answering my
16 questions, correct?
17   A   I did not remember.
18   Q   Well, isn't that being wrong?
19       MS. MELNIK: Objection. Badgering the
20 witness. Asked and answered.
21       BY MR. SHAPIRO:
22   Q   Is it being wrong or not?

Page 151

1    A   No.
2    Q   Okay. I see. Well, you were certainly wrong
3  about the order of the dealings, right? You got that
4  completely backwards, correct?
5    A   They're out of date, yes.
6    Q   Yes. So your testimony about which happened
7  first and when you saw this was completely wrong,
8  correct?
9        MS. MELNIK: Objection to the
10 characterization.
11       BY MR. SHAPIRO:
12   Q   Completely wrong, correct?
13   A   It was wrong. I did not have them in the
14 correct date order.
15   Q   But completely wrong. Every one was out of
16 sequence, correct?
17       MS. MELNIK: Same objection, that it
18 mischaracterizes the testimony.
19       BY MR. SHAPIRO:
20   Q   Ma'am?
21   A   I don't remember.
22   Q   Right. Uh-huh. And you told me directly that

Page 152

1  the desk audit found that he was properly a 12 this
2  morning, correct?
3    A   That's correct.
4    Q   And you were wrong about that, weren't you?
5    A   Yes.
6    Q   And you looked at this desk audit report this
7  morning and went over it with counsel, correct?
8    A   Yes.
9    Q   In detail.
10   A   Yes.
11   Q   And you got that wrong when you were answering
12 my questions, correct?
13       MS. MELNIK: Asked and answered.
14       BY MR. SHAPIRO:
15   Q   Correct?
16   A   Yes.
17   Q   I see. I got you. Okay. Now, about these
18 POLAR business. This looks like it's for online
19 announcement applications And -- was this an online
20 application?
21   A   No.
22   Q   I see. So it's not an online application;

Page 153

1  it's only that the vacancy announcement was online.
2    A   Correct.
3    Q   The applications were actually physically
4  delivered --
5    A   Correct.
6    Q   -- or mailed to HRD.
7    A   Correct.
8    Q   And received by support staff there.
9    A   Correct.
10   Q   And logged in. So it was a physical -- this
11 isn't like a machine recording. This is a
12 physical -- somebody said I got this in, right?
13   A   Correct.
14   Q   And put it in an envelope.
15   A   Correct.
16   Q   Like a manila folder. A folder, right?
17   A   Yes.
18   Q   Right. And those that came in under one
19 vacancy announcement went into one folder and those
20 that came into another vacancy announcement went into
21 another folder, correct?
22   A   Correct.

Page 154

1    Q   After being logged in the appropriate POLAR

2    log for the appropriate vacancy announcement, right?

3    A   Correct.

4    Q   So here we have a list -- and we have somebody

5    whose name is Haynes. Allen Haynes. Do you see Allen

6    Haynes?

7    A   Yes.

8    Q   I'm looking at C right now. See Mr. Haynes?

9    A   Yes.

10   Q   Mr. Haynes is also on D, isn't he? He's on

11   both POLAR logs for both vacancies.

12   A   Correct.

13   Q   But a notation is made next to Mr. Haynes's

14   name in ink, not in type, only applied for status. Do

15   you see that?

16   A   Yes.

17   Q   So it was an error that he appeared on Exhibit

18   C, right?

19   A   Correct.

20   Q   His name should not have been logged into

21   that, correct?

22   A   Correct.

Page 155

1    Q   But whoever did the logging logged him in both

2    as if he applied under both, correct?

3    A   Correct.

4    Q   Somebody made a mistake.

5    A   Correct.

6    Q   But it wasn't you, right?

7    A   No.

8    Q   You happened to catch the mistake, correct?

9    A   Correct.

10   Q   But the person who received the applications

11   made a mistake, correct?

12   A   Correct.

13   Q   I see. Now, the same mistake was made

14   apparently with Joseph Newman. You see that?

15   A   Correct.

16   Q   Mr. Newman is -- his name appears under both

17   POLARS logs, right?

18   A   Correct.

19   Q   So whoever received it typed his name in and

20   the application number under both and you saw when you

21   got the thing that he didn't apply for the non-status.

22   A   Correct.

Page 156

1    Q   Correct? And you made that notation, only

2    applied for status.

3    A   Correct.

4    Q   So the people who received this, whoever it

5    was -- we don't know who it was, right?

6    A   Uh-huh.

7    MS. MELNIK:  Is that a yes?

8    THE WITNESS:  Yes. I don't know who --

9    BY MR. SHAPIRO:

10   Q   Made mistakes from time to time.

11   A   Correct.

12   Q   I see. And if a person got an application but

13   mislaid it and didn't type it in, it wouldn't be your

14   doing; it would come up wrong on the POLARS, correct?

15   A   Correct.

16   Q   And you would never know to make the finding,

17   correct, because if there's no application there you

18   wouldn't know whether it came in or not. Correct?

19   A   Correct.

20   Q   Are you a COTR?

21   A   Yes, I am.

22   Q   I see. And what contract are you COTR for?

Page 157

1    A   I'm not assigned one yet.

2    Q   But you just took COTR training?

3    A   Yes.

4    Q   Were you a COTR at PBGC?

5    A   Yes.

6    Q   All right. And what contract did you operate

7    as COTR for?

8    A   I was in charge of all the contracts for human

9    resources.

10   Q   I see. So that's because you know about human

11   resources.

12   A   Correct.

13   Q   Somebody who wasn't in the 200 series, wasn't

14   a 201 or --

15   A   Right.

16   Q   -- couldn't have done your job as COTR.

17   A   Correct.

18   Q   Because you have to monitor -- you have to

19   make sure that you're getting what you're supposed to

20   be getting, that the contractor is delivering, right?

21   A   Correct.

22   Q   And you have to make sure that the contracting

Page 158

1 officer who's not familiar with H.R., he's familiar
2 with procurement or she's familiar with procurement,
3 gets liaisoned somehow to somebody who is familiar,
4 right?
5    A    Correct.
6    Q    Have you served on a TEP — a advisory
7 committee on a contract when a new contract is let,
8 they look over the bids?
9    A    Yes, I have.
10    Q    And that was also for a contract that provided
11 services — H.R. services?
12    A    Yes, it was.
13    Q    Including classification services?
14    A    I believe it was for staffing and
15 recruitment —
16    Q    Okay.
17    A    — it wasn't for classification.
18    Q    But you're a COTR for all the contracts. You
19 were.
20    A    Correct.
21    Q    Uh-huh. So what happened to vacancy
22 announcement Exhibit A, the non-status?

Page 159

1    A    The non-status vacancy announcement, as far as
2 I can remember, was canceled because they made a
3 selection off the status announcement.
4    Q    They didn't consider the people at all on the
5 non-status announcement?
6    MS. MELNIK: Objection; calls for speculation.
7    THE WITNESS: I don't remember.
8    BY MR. SHAPIRO:
9    Q    You forwarded both certs up.
10    A    PBGC's policy was to send, at that time,
11 in-house candidates first, which meant that if someone
12 was in-house, we would send that cert first based on
13 the union contract.
14    Q    In-house meaning an employee of PBGC.
15    A    Right.
16    Q    Okay. But there are people on this cert
17 who — on A who are in-house, correct?
18    A    Yes.
19    Q    Monty, for example.
20    A    Monty wasn't on the status.
21    Q    I'm not talking about the status one. On
22 Exhibit A, which is the non — sorry. On Exhibit C,

Page 160

1 there are non-status — there are in-house employees.
2    A    That's for status only. Only the PBGC
3 employees who applied under the status side went first.
4 Then the rest of the status applicants went and then
5 the non-status went. Usually the status and the
6 non-status went together depending on if you had to
7 have it paneled or not.
8    Q    Okay. So was this paneled?
9    A    I don't remember. Looking at the number of
10 candidates, it probably was. I can't say for certain.
11 I don't have the whole vacancy package in front of me.
12    Q    Okay. But usually you would send non-status
13 and status together, as long as there wasn't a in-house
14 candidate who got selected.
15    MS. MELNIK: Objection as to the form. It
16 misstates the testimony.
17    BY MR. SHAPIRO:
18    Q    I'm trying to understand what you said. You
19 said first you would send status in-house candidates
20 forward.
21    A    Correct, based on the union contract.
22    Q    Okay.

Page 161

1    A    Then, depending on who was left over and then
2 if these were being paneled, we would try and send the
3 other two together. We did not —
4    Q    The other two being —
5    MS. MELNIK: Let her finish.
6    BY MR. SHAPIRO:
7    Q    What are the other two?
8    A    The non-status certs And the rest of the
9 status candidates —
10    Q    Who were not in-house.
11    A    Right. Correct.
12    Q    So that was the general practice back then.
13    A    Yes.
14    Q    So if a non-employee but a status candidate's
15 name was forwarded, it's likely it was forwarded with
16 any qualified non-status people.
17    A    It was qualified on a separate cert.
18    Q    But both certs were forwarded.
19    A    Yes.
20    Q    So they could be considered.
21    A    Yes.
22    Q    Both people could be considered.

Page 162

1  A  Correct.

2  Q  No matter which cert you were on.

3  A  That's correct.

4      MR. SHAPIRO:  Good.  Nothing further.

5      It's five to 4:00.  I just want to point that

6  out to you.

7      RECROSS EXAMINATION

8  BY MS. MELNIK:

9  Q  Ms. Isaac, if a applicant submits, say, two

10 applications and you receive the paper, both

11 applications, one in your folder for status, one in

12 your folder for non-status and then you get your POLARS

13 printout and you see that their name — you have the

14 physical application but say, for example, the name

15 didn't appear on POLARS for whatever reason, would you

16 do anything about that with respect to the list in

17 POLARS?

18 A  I would log them in the system.

19 Q  And in terms of the sort of chain of custody

20 of the applications, after the person who's at the

21 front desk on that particular day receiving the

22 applications, who is the next person that those

Page 163

1  physical applications go to?

2  A  They come to me or the staffing specialist

3  who's handling that particular vacancy.

4  Q  But if they say JI in front of them, would

5  they be handled by you?

6  A  It would be mine.

7      MS. MELNIK:  I think we're done.

8      MR. SHAPIRO:  I have one more question.

9      MS. MELNIK:  Based on no questions?

10     MR. SHAPIRO:  Sorry.  I have one more

11 question.

12     FURTHER REDIRECT EXAMINATION

13 BY MR. SHAPIRO:

14 Q  When you saw this second page in this — when

15 you were going through the — putting the

16 vacancy — the position descriptions in the proper

17 place on the reorganization and you saw this promotion

18 to 12 based on settlement, to you, that was an abuse of

19 the personnel system, wasn't it?

20 A  I had never seen anything like that in my

21 career.

22 Q  Right.  But what you said to counsel was it's

Page 164

1  not supposed to happen this way, OPM is against this;

2  right?

3  A  That's correct.

4  Q  And so you considered it like an abuse of the

5  personnel system.

6  A  Yes.

7  Q  Uh-huh.

8      MS. MELNIK:  I have a follow-up question to

9  that, then.

10     FURTHER RECROSS EXAMINATION

11 BY MS. MELNIK:

12 Q  Did your personal feeling that you just

13 relayed to counsel, that it was an abuse of the OPM

14 system — did that cause you to have a personal

15 animosity or professional animosity against Mr.

16 Montgomery?

17 A  No, it did not.

18 Q  Did that cause you to — did your personal

19 feeling about the increase in grade based on a

20 settlement cause you or affect your decision to find

21 him not minimally qualified for the accounting

22 positions or approve the desk audit?

Page 165

1  A  No, it did not.

2  Q  As you sit here now, do you have any

3  recollection of whether or not a certificate of

4  eligibles was issued for the status vacancy

5  announcement for the collection analyst position?

6  A  Yes.  There was a status announcement

7  issued -- a status cert issued.

8  Q  And then as a result of a selection being

9  made — no, wait.  I'm confusing myself.  Give me one

10 second.

11     And as a result of a selection — do you know

12 if one was made in the collection analyst — for the

13 collection analyst vacancy with respect to non-status?

14 Do you know if a cert was done?

15 A  I don't remember.

16     MS. MELNIK:  And just for the record, that was

17 JI-04-0139.

18     MR. SHAPIRO:  Are we done?

19 BY MS. MELNIK:

20 Q  I just want this to be — just that it's clear

21 that 04-0139 was for the non-status.

22 A  That's correct.

42  (Pages 162 to 165)

Page 166

1          MS. MELNIK: Okay. Yes, we're done.

2          MR. SHAPIRO: Thank you very much, ma'am.

3          (Whereupon, at 4:03 p.m., the deposition was

4    concluded.)

5                    * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22