

EXHIBIT 10
Exh. 10
MSJ

RICK LATTIMER

Page 1

1   IN THE MATTER OF:

2   _____

3       DeLarse Montgomery, Jr.

4           Complainant,

5                                    COMPLAINT NO.

6                                    05-04 and 05-07

7   Vs.

8

9       Pension Benefit Guaranty Corporation

10          Respondent.

11  _____

12

13

14

15

16

17                      AFFIDAVIT

18          TRANSCRIPT OF PROCEEDINGS in the

19  above-entitled cause of the examination of Rick

20  Lattimer, before the EEO Investigator, Eddie Neal, on

21  the 22nd day of August, 2005, beginning at the hour of

22  1:33 p.m.

23

24  BY:  Denise M. Tamayo

25

Affidavit 4
Page 1 of 6

Page 2

1  Good afternoon. My name is Eddie Neal, and I am the
2  EEO investigator assigned to investigate the allegations
3  of discrimination filed by Mr. DeLarse Montgomery, Jr.
4     For the record, today is Monday, August 22, 2005, and
5  the time is approximately 1:33 p.m.
6     The claims that I will be investigating are being
7  read from the acceptance letter which is date-stamped
8  June 27, 2005, and the time is approximately 1:33 p.m.
9     Whether PBGC unlawfully discriminated against Mr.
10 Montgomery based on his race, African American; color,
11 Black; sex, male; or age, his date of birth is
12 06/26/1947; or subjected him to reprisal for exercising
13 his rights under the Civil Rights Laws in the selection
14 process for the positions advertised in PBGC vacancy
15 announcements JI04-0138 and JI04-0139.
16    This claim will be consolidated with his claim in
17 PBGC's formal complaint 05-04. In PBGC's formal
18 complaint 05-04, Mr. Montgomery raises a non-selection
19 issue with respect to PBGC's vacancy announcements
20 JI04-0105 and JI04-0143.
21    But what I would like to do before we proceed any
22 further is to first allow you an opportunity to identify
23 yourself for the record, and spell your name as well.
24    Sure. My name is Rick Lattimer, L-a-t-t-i-m (as in
25 "Mike")-e-r. I'm the manager of Services Division in

Page 3

1  the Human Resources Department in the Pension Benefit
2  Guaranty Corporation, and I have held that position
3  about a year-and-a-half now. I have been responsible
4  for, among other things, recruiting and position
5  descriptions.
6     Q. Okay. Mr. Lattimer, Do you swear or affirm under
7  penalty of perjury that the information you are about to
8  provide would be the truth, the whole truth and nothing
9  but the truth to the best of your ability or
10 recollection?
11    A. Yes, I do.
12    Q. Because Mr. Montgomery alleges certain bases, I
13 need to obtain comparable information from you as well
14 for the record. What is your race for the record?
15    A. White.
16    Q. Your skin color?
17    A. White.
18    Q. We know your gender is male. Your age and date
19 of birth?
20    A. December 21, 1961. I am 43 years' old.
21    Q. Okay. And do you have any knowledge of any prior
22 EEO activity that Mr. Lattimer might have been involved
23 in?
24    A. Mr. Montgomery, you mean--Mr. Neal, Excuse me,
25 Mr. Montgomery?-- Mr. Lattimer continues Yes. I am

Page 4

1  aware because I was in the General Counsel's office
2  prior to assuming the position that I have that Mr.
3  Montgomery had filed an EEO complaint, actually, before
4  I got to PBGC. I want to say the complaint was
5  somewhere around 1996 that resulted in a settlement
6  agreement that put him into a GS-12 position.
7     Q. Okay. Now, the reason I am interviewing you is I
8  met with Mr. Montgomery and his lawyer earlier this
9  morning, and you were only mentioned specifically
10 dealing with one allegation. He says that when he
11 applied for vacancy 01-05, which was an accountant
12 position GS-13 that he was found ineligible. Based upon
13 that, he submitted some correspondence to Human
14 Resources, and out of that came a meeting with you. Do
15 you recall having a meeting with him about his position
16 description?
17    A. Yes.
18    Q. Okay. Tell me what occurred with that meeting.
19    A. It's been quite a while ago. But, the best I can
20 recall is that Monty, as he and I know each other fairly
21 well, Monty came in and was concerned about trying to
22 get promoted. He had applied for, as you say, a GS-13
23 accounting position and was not declared eligible for
24 that position. And, so one of the issues that he had
25 raised was whether the duties he was performing,

Page 5

1  regardless of the vacancy announcement, were
2  commensurate with GS-13 duties as opposed to the GS-12
3  where he was currently working. So, basically, he was
4  asking for a desk audit of the position that he had.
5  That was part of the issue. I pointed out to him, I
6  believe in that meeting, that as a result of the
7  settlement agreement he was, at the time of the
8  settlement agreement, in a GS-11 position, I believe a
9  financial specialist. And we only have one of those in
10 the corporation. And that is him.
11    He was in that position, and when the settlement
12 agreement was done, the settlement agreement said that
13 he would be promoted to a GS-12. Well, what PBGC failed
14 to do at the time was to ever write a position
15 description that accurately reflected what he was doing
16 at the GS-12 level. Instead, they just put a cover
17 sheet on top of the GS-11 position description and said
18 that he was administratively promoted, if you will, due
19 to the settlement agreement. So, part of the concern
20 that we had in HR once we discovered this is that we
21 ought to put him on a position description that
22 accurately reflects the GS-12 duties that he is supposed
23 to be doing. So we discussed that some. And frankly, I
24 don't remember the outcome of the discussion other than
25 his position did not qualify as a GS-13 position, and

Page 6

whether I told him this at the meeting or whether it was just a matter of back-and-forth e-mails or communications in some form that he was not eligible for the GS-13 accounting position because he did not have the required experience and/or education to get to that level. If I recall correctly because I knew he was very concerned about this. And we had to be careful on how we proceeded.

I like the guy, if for no other reason. So, I wanted to find out if there was a way we could qualify him. One of the ways that the qualification standards the OPM has for accounting positions is to see if the person has been performing that level of duties for a period of time. If some senior-level accountants would certify that the type of work that someone had been performing would qualify in lieu of the education that was required. And so we asked two senior accountants. I want to say, I know one was Cynthia Adams, who is a supervisor. And the other one, I want to say is either Tasha Soloman or June Enis. I don't remember.

But, I asked them if they would take a look at the type of work he was performing and the qualification standard and ask if they could let me know if based on the qualification standard and the type of work he was doing whether they thought he would be properly

Page 7

qualified for promotion. And both of them came back and said no. They didn't think so. I might be able to find that e-mail. I can't remember how long it's been. But I could search through my e-mails and see if I could find that. Maybe, if we were smart, we had put it in the promotion file. I am not sure. But that is really all I can recall about that.

Q. Now, meeting with Mr. Montgomery and Mr. Shapiro, they said that his settlement agreement indicated that he was to receive 24 hours of accounting education. And they said he fulfilled that requirement. Do you recall whether that as being an accurate statement?

A. I'd like to see the settlement agreement if that is the case because I do not recall that being a part of it. But, like I said, I got here in March, either February or March of 1998. And I think the settlement agreement was from '96. But if it says that in the settlement agreement, I'd like to see that before I could comment on it. If it's there, it's there, obviously. If it is not, then maybe their recollection is incorrect. I don't know.

Q. Now, Did anyone ever check the files to see whether he had the education requirements?

A. Oh, yes. Well, whenever we disqualify somebody for failure to meet academic requirements, we

Page 8

(particularly in a case like this when we don't have very many applicants) try to work with the applicant to figure out if there is something in there that they are not submitting, or if their transcripts—sometimes their transcripts are incomplete or something like that. So, I know one of the things that I did, I'm fairly certain, I shouldn't say I know because I did this for quite a few people. But I'm fairly certain that I sat down with Monty and went through the transcripts that he provided and talked about the different courses that he had had to see if we could qualify him for this position.

Q. And once you did that with him, do you recall whether he met the educational requirements after going through his transcript?

A. Yes. My answer is the same. No, he didn't meet the educational requirements so far as I can recall.

Q. Now, what about once his position description was altered—Not altered but once it was updated to reflect his GS-12 duties, did he then qualify based on the duties that he was performing?

A. Well, I think that the GS-12 position description has just recently been done. I don't know why it has taken this long to be honest. I would have to go back and look at the paper work to so. No, so far as I understand it, based on what I've talked with his

Page 9

supervisors about and the type of work he is doing, he is not doing accounting work that would make him a GS-12 accountant. He is still a GS-12 financial specialist, and there are significant differences in what he does and what he is responsible for, from what I understand. Now, I'm not an accountant, so the only way I could look at that and give you any sort of definitive answer would be to get the standards out and get all his applications out and go through the paper work and give you a better answer than that. But my recollection is that I've had this discussion. I've looked at the resources that I need to look at. I've had the discussion with his supervisor. And, he is still, despite performing at the GS-12 level, not qualified to be a GS-12 or GS-13 accountant.

Q. Okay. Now, during your meeting, was he informed what he would need to do in order to be eligible to move into the accounting series?

A. I would imagine so. I can't swear to it at this point because it has been a long time. We both read the standard together, and it says you have to have 24 semester hours of accounting and/or a combination of experiences as I've explained before. And so, I'm sure we talked about him going back to school to get the required accounting classes. But, again, I would like

Page 10

1  to see the documentation just laid out if you want a
2  more definitive answer than that.
3  Q. Okay. Now, once you and Mr. Montgomery had this
4  conversation, did you reduce it to writing or did the
5  two of you have any written correspondence concerning
6  it?
7  A. We've exchanged a couple of e-mails. I don't
8  think there are any memos on this. But like I said, if
9  you'd like, I can go back and look through my e-mail
10 records and see if I can do a search under his name and
11 see if I can find an exchange of documents. If I have
12 them, I'd be happy to give them to you.
13 Q. Okay. Now, during your interaction with Mr.
14 Montgomery as well as his supervisor and any other human
15 resources staff, did you discover anything that would
16 lead you to believe that he was being treated
17 differently because of his race?
18 A. No.
19 Q. How about his skin color?
20 A. No.
21 Q. His gender?
22 A. No.
23 Q. His age?
24 A. No.
25 Q. Anything associated to his settlement agreement

Page 11

1  or any of his prior EEO activity?
2  A. No. Like I said, I've dealt with Monty in an
3  union capacity because I was also in General Counsel for
4  quite a while. And I found him to be a pretty stand-up
5  guy, so I certainly didn't do any of those things. And
6  no one on my staff did that I know of. And I can't
7  believe his supervisors would do that either. So far as
8  I know they think he does a good job with what he does.
9  Q. Okay. Now, did he bring anything else to your
10 attention that maybe I didn't reference that would be of
11 relevance to my investigation?
12 A. No. Not that I can think of.
13 Q. Okay. Based upon my questions, is there anything
14 you would like to add that I didn't ask or anything I
15 did ask that you would like to elaborate upon that you
16 think would be of assistance to me?
17 A. Not necessarily that would be of assistance, I
18 guess. The hard part about this case is trying to
19 recall accurately all the different pieces of the puzzle
20 and when they fit together. And how they fit together,
21 I should say. So, I would hope that the documents would
22 point out a better trail than my recollection does in
23 terms of exactly what happened and when it happened.
24 But what I've said is what I can recall to the best of
25 my knowledge at this point.

Page 12

1  Well, based upon that comment, the time is now
2  approximately 1:47 p.m. and that would conclude this
3  portion of the interview.
4  Q. Okay. The time is approximately 1:51 p.m. and
5  while we were concluding, there was a little bit of
6  information that was mentioned that I neglected to raise
7  with you. One thing that Mr. Montgomery and Mr. Shapiro
8  raised with me was the fact that there were some
9  concerns about -- duties. I would like to ask. Do you
10 have any information dealing with anything about
11 anything he may have raised with you concerning --
12 duties.
13 A. Yes. Like I said, I'm not sure it's germane to
14 this complaint, the particular one you are
15 investigating. But I know that at one point, and off
16 the top of my head I would say it was 12-15 months ago,
17 Mr. Montgomery became concerned about basically the
18 quality of positions, his and another position that we
19 had just announced in the Financial Operations
20 Department. Like I said, Mr. Montgomery is a GS-12
21 financial specialist. And we had just opened up a GS-13
22 position in (the CCD Collections and Controls Division,
23 I think is what that stands for) another division within
24 FOD. Among other things in the vacancy announcement
25 mentioned that this GS-13 would be performing

Page 13

1  contracting officers, technical representative --
2  duties. And Mr. Montgomery was concerned that he too
3  was performing -- duties. And so if this person was
4  going to be performing -- duties, his analogy went that
5  he ought to be promoted to a GS-13 as well because he,
6  too, did perform -- duties.
7  So I had a meeting, separate meetings I believe,
8  with his department director. I also talked to the
9  division manager at the time whose name was Hollis
10 Harrold (he has since retired) about the -- duties that
11 were involved in both positions. And first of all, the
12 GS-13 that was being advertized mentioned -- duties as
13 one of the things that would be required of the
14 position, but it was not dispositive of the grade. In
15 other words, it was just something that was required.
16 But it would have been a GS-13 all on its own without
17 the -- duties being attached to it. And the duties that
18 Mr. Montgomery was performing, you mentioned something
19 during our conversation that was not on the tape, about
20 a GS-14 having performed the -- duties before. And then
21 they were assigned to Mr. Montgomery. I think that was
22 another reason why he thought his grade should have been
23 increased. And, again, I talked to the department
24 director about that. I looked at the position
25 description, and the type of duties that Mr. Montgomery

1  was performing as a -- don't rise to the level that
2  would increase or effect his grade at all. They are not
3  a significant portion of what he does.
4      They don't require significant judgement above
5  the level that he is performing at now. So, they had no
6  impact on his grade. And like I said, the distinction
7  between the position that he occupies as a GS-12 and the
8  GS13 position that was being advertised was a
9  distinction based completely on things other than the --
10 duties. And I believe I explained that to Mr.
11 Montgomery. Now whether he is satisfied with the
12 explanation or not, I cannot say. But that is my
13 recollection of those events.
14     Q. Okay. Now, other than that, is there anything
15 else that you would like to add that maybe I didn't ask?
16     A. No. I don't think so.
17         Well, based upon that comment, the time is now
18 approximately 1:54 p.m., and that would conclude this
19 portion of the interview.
20
21
22
23
24
25

# ERRATA SHEET FOR THE TRANSCRIPT OF:
# RICK LATTIMER
### Case Name: Delarse Montgomery
### Case Numbers: 05-04 and 05-07

## CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 13 | 10 | HARROLD | HARRELL | SPELLING |
| 14 | 1 | AS A | AND THEY | TYPO |
| 14 | 9 | THE DUTIES | THE COTR DUTIES | OMITTED WORD |
| 13 | 3 | — | COTR | OMITTED WORD |
| 13 | 4 | — | COTR | OMITTED WORD |
| 13 | 6 | — | COTR | OMITTED WORD |
| 13 | 17 | — | COTR | OMITTED WORD |
| 13 | 20 | — | COTR | OMITTED WORD |
| 8 | 24 | TO SO | TO DO SO | OMITTED WORD |

**Privacy Act Notice**

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records. The authority to collect the information is derived from one or more applicable Federal laws. The information supplied will be used along with data developed to resolve or otherwise determine the merits of this complaint of discrimination in the delivery of federal conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government to resolve or otherwise determine the merits of the complaint of discrimination. Disclosure of the information sought is voluntary. However, failure on the part of employees of the applicable agency will result in a direction by the head of the agency, or his or her designated representative, to produce or provide such information as is available. Failure to provide the information for Complainants may result in dismissal of the case. Failure to provide the information for witnesses may result in disciplinary actions.

I affirm/swear under penalty of perjury that the information contained in these _4_ pages is accurate and truthful to the best of my ability.

Signature of Witness

9/23/05
Date