UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DELARSE MONTGOMERY, JR.** )<br>)<br>)<br>)<br>     **Plaintiff,**                                )<br>     v.                                                        )<br>)<br>)<br>**ELAINE CHAO, Chairwoman**            )<br>**Pension Benefit Guaranty Corp. et al.,** )<br>)<br>     **Defendants.**                              )<br>_____) | Civil Action No. 05-2157 (RMU) |

**STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 7(h), Defendants respectfully submit this statement of material facts as to which they contend there is no genuine dispute.

**FACTUAL BACKGROUND**

1. Plaintiff was employed at the Pension Benefit Guaranty Corporation ("PBGC") for twenty years, from on or about June 1986, until he retired from federal service on September 30, 2006.  See Exhibit 1 (Deposition of DeLarse Montgomery, Jr.) ("Montgomery Dep.") at 140:13-14.

2. In 1992, Plaintiff became a GS-11 Financial Specialist in the Financial Operations Division's Investment Accounting Branch ("IAB").  See id. at 141:12-18.

3. Plaintiff was promoted in 1998 to a GS-12 Financial Specialist (501) series), the position from which he retired.  See id. at 140:24-141:11.

4. Plaintiff received his GS-12 promotion as a result of a settlement agreement in 1998 with

        PBGC, concerning a prior "EEO claim in federal court litigation (Civil Action No. 96-1333 EGS (D.D.C.))." <u>See</u> Complaint at ¶ 7; Montgomery Dep. at 11:10-12:2.

5.     To implement the promotion, a cover sheet was placed on Plaintiff's existing Position Description with an explanation that the upgrade was due to a "settlement agreement." <u>See</u> Exhibit 31 (Position Description). The PD cover sheet makes no reference to EEO, discrimination, or anything else that would reveal the context or nature of the settlement. <u>See id.</u>

### A.     The Investment Accounting Branch

6.     The Investment Accounting Branch ("IAB") is also referred to as the "Trust Accounting Branch." <u>See</u> Deposition of Cynthia R. Adams ("Adams Dep.") at 13:15-14:3.

7.     The branch is divided into two teams, each headed by a GS-13 accountant (510 series), who is referred to as a team leader. <u>See id.</u> at 17:12-19:11; Exhibit 4 (Deposition of Wayne Morris McKinnon) ("McKinnon Dep.") at 9:12-17.

8.     During the relevant time period, the team leaders were Lisa Cho (Asian female, age: 40s) and Sylvia Shorter (black female, age: 40s). Exhibit 4 (McKinnon Dep.) at 13:20-14:4; 40:16-41:1.

9.     The two teams are comprised of approximately seventeen accountants,[1] including the team leaders, at the GS-11, GS-12 and GS-13 grade levels, and one GS-5 accounting

---

[1] Of the fifteen accountants who comprised the two teams, there were four (4) males and eleven (11) females; ten (10) African Americans, two (2) Caucasians, one (1) Asian, one (1) Middle Eastern, and one (1) unknown; and eight persons older than forty-two, six persons younger than forty-two, and one unknown. (Plaintiff inquired about age by asking Ms. Adams whether each person was older or younger than she). <u>See</u> Exhibit 3 (Adams Dep.) at 25:13-32:15.

technician.[2]  See Exhibit 3 (Adams Dep.) at 18:14-19:1; 20:7-25:1; Exhibit 5 (FOD Organizational chart).

10. Plaintiff, who was assigned to Ms. Shorter's team, was the only Financial Specialist in IAB.  See Exhibit 3 (Adams Dep.) at 50:18-51:11; 75:7-76:3.

11. From 1998 to present, everyone in IAB, including Plaintiff, until his retirement on September 30, 2006, reported to Cynthia Adams (Black female, DOB 9-12-64), IAB Branch Chief, Supervisory Accountant (GS-14).  See Exhibit 3 (Adams Dep.) at 4:18-20; 7:1-8:20; Exhibit 4 (McKinnon Dep.) at 13:20-14:7.[3]

12. Mr. Wayne McKinnon (black male), GS-15, Division Manager/Controller, was Plaintiff's second level supervisor throughout his tenure in IAB.  See Exhibit 4 (McKinnon Dep.) at 5:5-6:13.  In January 2002, Theodore J. Winter, Jr. (Caucasian male, 54 years old), became FOD Director, and was Plaintiff's third line supervisor.  See Exhibit 2 (Winter Dep.) at 4:10-12; 7:3-4; Exhibit 4 (McKinnon Dep.) at 6:22-7:10.

    1.    The Duties of a Trust Accountant

13. The trust accountant reads the Trusteeship Decision Records ("TDR") for content, finding out where the assets of the plan reside, and what the estimated assets are as of the date of plan termination or DOPT.  They obtain bank statements to see if there is something that would substantiate what's in the TDR.  See Exhibit 3 (Adams Dep.) at 142:1-19.

---

[2] In addition, there were "Stay-in Schools," which are student interns.  See Exhibit 2 (Winter Dep.) at 132:9-16.

[3] Plaintiff testified that he had a "good rapport" with Ms. Adams.  See Exhibit 1 (Montgomery Dep.) at 27:18-20.  Ms. Adams testified that she got along well with Plaintiff, liked him, and rated him "outstanding" and "excellent" throughout his career.  See Exhibit 3 (Adams Dep.) at 90:1-8.

14. The trust accountants "input certain data about the plan into PAM [Portfolio Accounting and Management] to set it up, essentially, after which they can prepare the journal entry to record the estimated assets" of the pension plan. See id. at 143:3-10.

15. The trust accountants are responsible for making a request to the custodian or the custodian bank, where the assets reside for the plan, and they obtain the bank statement . . . or they make a request to receive the bank statement as of the date of plan termination through the current period, and they request that the information be sent to them until the bank statement shows zero. See id. at 143:18-144:8.

16. Once the trust accountants receive the banks statements "to develop a balance sheet as of the date of plan termination, they have to determine what the market values are of all of the assets contained in the plan." See id. at 144:16-20.

17. After trust accountant figure out what the exact holdings are in the plan, they use Bloomberg, Wall Street Journal, or another pricing source to find out what the market values of those assets were as of the date of plan termination. See id. at 145:5-22.

18. They prepare worksheets [or spreadsheets] for each asset type, and those asset types are rolled into one big worksheet that summarizes all the assets. See id.

19. Trust accountants "have to prepare the correct journal entries to post it to our general ledger." See id. at 146:13-15.

20. Once the balance sheet is created for the plan as of the DOPT, the trust accountants are responsible for analyzing and recording . . . all of the financial activity that occurs on the plan from the day after DOPT through the time that the plan is trusteed and all of the assets are transferred to the PBGC's custodian bank. See id. at 147:9-16.

21. By recording all the financial transactions, that means they are recording any sales and purchases of additional assets on the sale of the assets that already exist. They have to calculate what the realized gains and losses are. They have to record income that is earned[,] expenses that are paid, and they have to record . . . market changes in the assets for the plan. . . . [J]ournal entries have to be prepared for all of that [activity] to be posted to the general ledger. See id. at 147:17-148:8.

22. When PBGC become trustee of the plan, the trust accountant are responsible notifying the Treasury Division within the Financial Operations Department that the plan has been trusteed, where the assets are located, the contact person, the current asset level, and what the benefit payments are every month. See id. at 148:17-149:2.

23. Once the assets are transferred to the PBGC's custodian bank, the trust accountant "has to record the transfer of the assets from the interim custodian to PBGC's custodian bank, and again they are responsible for . . . calculating any of the associated gains and losses to those specific assets that were transferred." See id. at 149:10-15.

2. Plaintiff's Financial Specialist Duties In IAB

24. Plaintiff did not perform *any* of the above-described accounting duties. See Exhibit 3 (Adams Dep.) at 143:11-17; 144:9-15; 146:3-11; 147:2-7; 148:9-14; 149:16-22.

25. To the extent Plaintiff's duties included using an "accounting treatment,"[4] it was strictly

---

[4] Accounting treatment for the trust accountants "has to do with determining how you go about recording changes in value, sales, gains, and losses, purchases on specific assets." See Exhibit 3 (Adams Dep.) at 138:7-12. The assets that trust accountant use accounting treatments on are "[c]orporate stock, corporate bonds, derivatives, asset-backed securities, in addition to how to accrue income on the corporate stocks and bonds, dividends, how to record expenses, and recording accruals or accounts payable for expenses incurred and not yet paid . . ." See id. at 138:13-21. It is undisputed that Plaintiff *never* used accounting treatments for these kinds of

limited to cash assets.

26. With respect to the Missing Participant Program, Plaintiff had "to prepare the journal entries to record the cash being received at State Street Bank . . ." See id. at 135:13-17.

27. To the extent there is accounting involved in Plaintiff's duties, it consists of addition and subtraction. See id. at 137:14-17.

28. With respect to monthly reports, Plaintiff "downloads information from the general ledger. It's in Dbase, and he uses Report Writer [software that used to create reports from Dbase] to create various reports, one of which was the non-commingled asset report." See id. at 133:19-134:4.

29. The numbers Plaintiff downloaded to create his report already existed, so that all he was required to do is basic addition and subtraction. See id. at 134:11-22.

30. Plaintiff admits that the numbers he used in various reports were supplied by the trust accountants or determined by him using addition or subtraction. See Exhibit 1 (Montgomery Dep.) at 67:1-11; 76:19-77:20.

31. Plaintiff was "responsible for preparing a quarterly report that - - actually, he was verifying what was in the Controller Operations Division's safe, and what that entailed was, he went into the safe, there's a log maintained in the safe with a list of items in the safe. He removed the log. He removed the contents of the safe, [a]nd he verified that . . . what is on the log is actually in the safe." See Exhibit 3 (Adams Dep.) at 132:20-133:6.

32. Ms. Adams offered Plaintiff the opportunity to do some of the trust accountant's duties,

---

assets. See Exhibit 1 (Montgomery Dep.) at 78:11-79:1; Exhibit 3 (Adams Dep.) at 138:22-139:3.

but he was not interested in her offer. See Exhibit 3 (Adams Dep.) at 102:1-10; 154:11-157:6; see also Exhibit 4 (McKinnon Dep.) at 58:21-59:7.

33. Ms. Adams again offered Plaintiff "an opportunity for him to do some of the work, or do the work that the other trust accountants were doing in the group." See Exhibit 3 (Adams Dep.) at 156:16-22.

34. Plaintiff admits having this conversation with Ms. Adams, and telling her that since he "was already a the [GS]-12, how I wanted a promotion, and without a promotion I didn't see any merit in doing the work." See Exhibit 1 (Montgomery Dep.) at 149:9-18.

      3. Plaintiff's COTR Duties

35. On or about March or October 2002, Plaintiff started performing COTR responsibilities under the Bert Smith professional accounting service contract.[5] See Exhibit 1 (Montgomery Dep.) at 14:10-13; 15:19-21; 20:23-25.

36. He was officially appointed as COTR by PBGC's Contracting Officer, Robert Herting, on July 1, 2002. See Exhibit 5 (July 1, 2002 Memorandum).

37. The COTR duties associated with the Bert Smith contract were previously performed by Christine Thomas, a GS-13 Supervisory Accountant. See Exhibit 3 (Adams Dep.) at 69:5-70:3.

38. When Ms. Thomas left PBGC, Ms. Adams asked Plaintiff to take over the COTR duties, and he did not object. See Exhibit 1 (Montgomery Dep.) at 14:10-13; 16:11-23.

---

[5] Plaintiff testified that he started performing COTR duties under the Bert Smith contract in October of 2002. See Exhibit 1 (Montgomery Dep.) at 15:19-24. However, in his Complaint, Plaintiff provides that Ms. Adams asked him to assume the duties in October 2001, and that he took COTR training, and assumed the COTR duties in March 2002. See Complaint at ¶ 8.

39. As COTR, Plaintiff duties were "to reconcile the expenses from the invoices, to receive monthly reports from the contractor of jobs or task they performed, to make reports to the Procurement Office about the contract, [and] to inquire with the contract employees of issues concerning performance of the contract." See Exhibit 1 (Montgomery Dep.) at 16:24-17:22.

40. Plaintiff's COTR duties did not include reviewing the accounting work generated by the contract accountants "[b]ecause he's not an accountant." See Exhibit 3 (Adams Dep.) at 141:13-22;110:2-9; see also Exhibit 4 (McKinnon Dep.) at 97:9-16.

41. The substantive review of the work performed by the contract accountants was done by Lisa Cho, because "she's an accountant and all of the accounting work has to be reviewed by the lead accountant before it's posted to the ledger." See Exhibit 3 (Adams Dep.) at 152:17-153:1.

42. Plaintiff served as Chair of a Technical Review Panel (also known as a Technical Evaluation Panel or "TEP") when the Bert Smith contract was re-competed, and then he continued as the COTR of the new contract after it was awarded.[6]  See Exhibit 3 (Adams Dep.) at 83:1-13; 89:3-13.

43. When Plaintiff first took over as COTR, there were three contract accountants. See Exhibit 1 (Montgomery Dep.) at 21:5-7. In October 2003, after a new contract was awarded, the staffing increased to six contractors - - five accountants and one project manager. See id. at 21:15-22:1.

---

[6] The new contract was awarded to the same company - Bert Smith. See Exhibit 3 (Adams Dep.) at 89:7-13.

44. In 2004, two additional temporary accountants were added, for a total of seven contract accountants and one project manager. See id. at 22:9-21.

45. In 2005, another contract accountant and an accounting technician were added. See id. at 22:22-23:2.

46. When Plaintiff retired in 2006, there were a total of nine contract employees, these included seven accountants, one accounting technician, and one project manager. See id. at 24:14-20.

47. Plaintiff was COTR for the Missing Participant Program from 2002 until his retirement. See Exhibit 1 (Montgomery Dep.) at 25:2-20.

48. Missing Participant Program, however, "was not a contract in the sense of other contracts, where you had . . . a set order of duties, reporting and responsibility. The Missing P[articipant] had reporting, but is was an account, more of a depository." See Exhibit 4 (McKinnon Dep.) at 33:16-20.

49. Plaintiff was COTR for less than one month on the State Street Custodian Bank contract. See Exhibit 1 (Montgomery Dep.) at 25:13-18.

50. Plaintiff admits that his COTR duties did not take up the majority of his time during every day of every week. See Exhibit 1 (Montgomery Dep.) at 26:16-23.

**B.    Plaintiff's Request For Promotion Based Upon Accretion Of Duties**

    1.    Plaintiff's Discussions with Cynthia Adams

51. On or about March 2003, during a quarterly performance review with Ms. Adams, Plaintiff requested that his Position Description ("PD") be updated to reflect his COTR duties. See Exhibit 1 (Montgomery Dep.) at 27:14-25; 28:1-11; 29:21-25; 30:1-12;

Exhibit 3 (Adams Dep.) at 78:2-73:3.

52. Plaintiff wanted an accretion of duties promotion because of the increased workload of COTR duties." See Exhibit 1 (Montgomery Dep.) at 28:1-3.

53. In April 2003, Plaintiff gave Ms. Adams a written request for promotion based on an accretion of COTR duties. See Exhibit 6 (April 28, 2003 Memorandum).

54. In support of this request, Plaintiff provides that his assumption of COTR duties under the Bert Smith professional accounting contract had "increased both the scope and complexity of [his] work assignments." See id.

55. Ms. Adams, who was supportive of Plaintiff's request, told him that she would raise the issue with her supervisors. See Exhibit 3 (Adams Dep.) at 91:9-15.[7]

56. In June 2003, before PBGC had made a decision about whether to perform a desk audit, Plaintiff "contacted an EEO counselor concerning his claim of discriminatory failure to promote based on accretion of duties." See Exhibit 1 (Montgomery Dep.) at 31:25-32:6.[8]

57. On September 9, 2003, Ms. Adams advised Plaintiff in writing that she was willing to rewrite his PD "with the addition of COTR responsibilities." See Exhibit 7a (September 9, 2003 Memorandum). In that same memorandum, she asks Plaintiff update his PD to include "any additional duties and responsibilities not covered," and to provide the update

---

[7] Ms. Adams remembers discussing Plaintiff's accretion of duties promotion request with FOD Director, Ted Winter, however, she could not recall the substance of that specific conversation. See Exhibit 3 (Adams Dep.) at 92:10-93:11.

[8] Plaintiff sought EEO counseling because "no action had been taken" on his request for an accretion of duties promotion, see Exhibit 1 (Montgomery Dep.) at 33:1-5, and he believed the reason for this inaction was discrimination based on his race (black), gender (male), age, and participation in prior EEO activities. See id. at 39:13-17; 44:10-17; 48:15-21; 51:22-25.

to her, so that she could incorporate the changes and forward it to HRD for classification. See id.

58. On October 14, 2003, Plaintiff provided Ms. Adams with an updated description of his duties. See Exhibit 7b (October 14, 2004 Memorandum).

   2. The Desk Audit

59. On December 31, 2003, a desk audit was performed at Plaintiff's work station. See Exhibit 7c (Desk Audit Evaluation Report) ("Report") at Section V.

60. The audit was conducted by Cynthia Kyle, a contract position classification specialist in PBGC's Human Resources Department ("HRD"). See Exhibit 5 (Lattimer Dep.) at 20:18-19; 24:9-14; 35:1-8.

61. Ms. Kyle interviewed Plaintiff as well his supervisor, Ms. Adams. See Exhibit 7c (Report) at 3 and Employee Interview Questionnaire (attached thereto).

62. Ms. Kyle prepared a Report, which she submitted to Jacqueline Isaac (white female), PBGC Human Resource Specialist. See Exhibit 8 (Deposition of Jacqueline Isaac) ("Isaac Dep.") at 8:17-9:7; 138:1-8;[9] Exhibit 9 (Affidavit of Jacqueline Isaac) ("Isaac Affidavit") at 3:21-4:1.

63. Before signing the Report on February 19, 2004, see Exhibit 7 at 3, Ms. Isaac, who is a qualified classification specialist, discussed it with Plaintiff's supervisor, Ms. Adams, to make sure that Ms. Kyle had accurately reported Plaintiff's duties. See Exhibit 8 (Isaac Dep.) at 103:21-104:7; 143:14-144:3.

---

[9] During her deposition, Ms. Isaac incorrectly identified Janet Brickey (instead of Cynthia Kyle) as the contractor who conducted the desk audit. See Exhibit 8 (Isaac Dep.) at 103:12-15.

64. Ms. Adams told Ms. Isaac that the duties Plaintiff performed were "[n]ot trust accounting." See Exhibit 3 (Adams Dep.) at 107:13-108:16.

65. Ms. Isaac's supervisor, Mr. Lattimer (white male), thereafter transmitted the Report to Plaintiff. See Exhibit 10 (Affidavit of Rick Lattimer) ("Lattimer Affidavit") at 3:12-17; Exhibit 5 (Lattimer Dep.) at 38:12-15; Exhibit 11 (March 11, 2004 Memorandum).

66. The Report concludes that Plaintiff's Financial Specialist position is a GS-11. See Exhibit 7 (Report) at Section IV, VII.

67. With respect to COTR duties, the Report states that all PBGC employees assigned as COTRs have the same tasks or responsibilities, regardless of their position or grade level. See Exhibit 7 (Report) at Section VI.

68. The Report states that Plaintiff's COTR duties are not "grade-controlling." See id.

69. The Report provides that Plaintiff is not directly involved in the day-to-day oversight of the contractor's work because he is not an Accountant. In order for the work to rise to the level of actually affecting the grade of his position, he would have to possess the qualifications to "oversee" the work from a completely "technical" aspect or be an Accountant which according to his supervisor of record, Ms. Adams, he is "not." See id.

70. No grade can be attached to what Plaintiff is doing since he is providing "administrative" oversight over the work of the contractors. Thus, any real "technical or professional" guidance is not provided by Plaintiff. See id. at 3, Section VI.

**C. The Accountant Positions For Which Plaintiff Applied**

    1. GS-13 Accountant Position (Vacancy Announcement JI04-0105)

71. The GS-13 Accountant position was advertised from June 1, 2004 through June 30, 2004,

by Vacancy Announcement No. JI04-0105.[10]  See Exhibit 12 (Vacancy Announcement JI04-0105) at 1.

72. Ms. Jacqueline Isaac, an HRD specialist, evaluated Plaintiff's application to determine if he was minimally qualified for the position.  See Exhibit 8 at 51:19-20:5.

73. To be found minimally qualified under OPM's Accountant standard, applicants, like Plaintiff, who do not have a four-year degree,[11] need "at least 4 years experience[12] in accounting or an equivalent combination of accounting, college level education, and training that provided professional accounting knowledge," plus one of the following: (1) twenty-four semester hours in accounting or auditing courses; (2) A certificate as Certified Public Accountant; or (3) substantial course work in auditing or accounting which does not fully satisfy the 24 semester-hour requirement, provided that (a) the candidate has success filed, (b) a panel of at least two higher level professional accountants or auditors has determined that the candidate has demonstrated a good knowledge of accounting and of related and underlying fields that equals in breadth, depth, currency, and level of advancement that which is normally associated with successful completion of the 4-year course of study; and (c) except for literal nonperformance to the requirement of 24 semester hours in accounting, the applicant's

---

[10] The "JI" in JI04-0105 stands for "Jacqueline Isaac," who was the Human Resources Department staffing specialist assigned to do all FOD vacancy announcements and staffing.  See Exhibit 8 (Isaac Dep.) at 48:5-49:18.

[11] Since Plaintiff did not have a four-year college degree, he sought to qualify for the accounting position by demonstrating that he completed 24 credit hours in accounting.  See Exhibit 1 (Montgomery Dep.) at 102:5-7; 158:7-159:19.

[12] The Vacancy Announcement only required at least 2 years experience.  See Exhibit 12 at 2.

education, training, and experience fully meet the specified requirements. See Exhibit 13 (OPM Qualification Standards for GS-510: Accounting Series); Exhibit 8 (Isaac Dep.) at 73:15-74:13.

74. This OPM standard appears in Vacancy Announcement JI04-0105. See Exhibit 12.

75. Another minimum qualification for the position is "one year of specialized experience at or equivalent to the GS-12 grade level that demonstrates the ability to analyze an provide advice regarding accounting programs, financial systems, etc." See id.

76. The Vacancy Announcement provides that college transcripts must be submitted with the application "if you wish college work to be considered in qualifying you for this position." See Exhibit 12 (Vacancy Announcements for JI04-0105) at 5.

77. Plaintiff did not submit any college transcripts with his application. See Exhibit 1 (Montgomery Dep.) at 102:21-103:13; 105:6-19.

78. Ms. Isaac reviewed Plaintiff's application, found no evidence that he completed 24 semester hours in accounting, and determined that he was not minimally qualified. See Exhibit 8 (Isaac Dep.) at 52:2-20.

79. It is insufficient simply to type on the application that one has 24 credit hours, when the vacancy announcement requires the submission of transcripts. See Exhibit 5 (Lattimer Dep.) at 70:21-71:11; Exhibit 14 (Application for JI04-0105) at Section 29.

80. Plaintiff did not "have the one-year [of] specialized experience as [an] accountant" at the GS-12 grade level. See Exhibit 8 (Isaac Dep.) at 72:7-73:1; Exhibit 12 at 3; Exhibit 20 (July 6, 2004 Letter).

81. To fill the GS-13 Accountant position, Ms. Adams wanted an applicant "that had experience with accounting for investment instruments . . . like common stocks, bonds,

14

and that kind of thing." See Exhibit 15 (Affidavit of Cynthia Adams ("Adams Aff.") at 6:17-20. [13]

82. Ms. Adams "needed someone that had more experience . . . with more complex investment instruments as in derivatives and futures and options" as well as "financial statement preparation." See id. at 6:20-25.

83. Ms. Adams was not "satisfied with the experience level" of the applicants, and did not select anyone for the position. See id. at 4:1-19.

84. Vacancy Announcement 04-0105 was cancelled and no one was hired for that position. See Exhibit 9 (Isaac Aff. at 9:6-11; Exhibit 14a.

    2. GS-12/13 Accountant Position (JI04-0143 and JI04-0144)

85. The GS-12/13 Accountant Position was advertised from September 8, 2004 to October 7, 2004, under two different vacancy announcements, one for status candidates (No. JI04-0143) and one for non-status candidates (No. JI04-0144).[14] See Exhibit 16 (Vacancy Announcement JI04-0143); Exhibit 17.

86. Plaintiff submitted an application for Vacancy Announcement JI04-0143. See Exhibit 18 (Application for JI04-0143); Exhibit 1 (Montgomery Dep.) at 102:8-13. The difference between this vacancy announcement, and the one described above, JI04-0105, is the change in grade level from GS-13 to GS-12/13. See Exhibits 16 and 17.

---

[13] Since Plaintiff was not minimally qualified, his application was not forwarded to Ms. Adams. See Exhibit 15 (Adams Aff.) at 4:20-22.

[14] "Status" applicants are current or former permanent federal employees who have completed a probationary period on career or career-conditional appointments. "Non-Status" applicants are other applicants (i.e. those who have not worked for the federal government on a career or career-conditional appointment). 5 C.F.R. Sec. 212.301 (Competitive Status Defined).

87. Ms. Isaac evaluated eight applications, including Plaintiff's, to determine if the applicants met the minimum qualifications for the position. See Exhibit 19 (POLARS list of applicants); Exhibit 8 (Isaac Dep.) at 55:6-57:1.

88. Ms. Isaac found Plaintiff not minimally qualified for the position because: (1) he did not submit college transcripts with his application, as the vacancy announcement required, see Exhibits 16 and 18; Exhibit 8 (Isaac Dep.) at 57:2-12; Exhibit 21 (November 1, 2004 Letter); and (2) he did not have the requisite experience. See Exhibit 8 (Isaac Dep.) at 75:16-76:3.

89. No selection was made under Vacancy Announcement 04-0143. See Exhibit 9 (Isaac Aff.) at 10:2-16; Exhibit 14a.

90. Ms. Adams selected an accountant from a separate group of applicants from the non-status vacancy announcement, JI04-0144. See Exhibit 3 (Adams Dep.) at 119:9-18; Exhibit 15 (Adams Aff.) at 11:8-21.

91. The selectee, Ms. Lafaye Graham (Black female), had a four-year degree in finance, a Masters in accounting, 15 years of experience in the accounting field, and specific accounting experience in investment accounting, none of which Plaintiff had. See Exhibit 3 (Adams Dep.) at 120:1-8; 160:11:20; 161:16-17.

**D. The GS-12/13 Collection Analyst Position**

92. The Collections Analyst position was advertised from August 30, 2004 to September 29, 2004, under two vacancy announcements, one for status candidates, No. JI04-0138, and one for non-status candidates, No. JI04-0139. See Exhibit 22 (Vacancy Announcements Nos. JI04-0138) and Exhibit 23 (Vacancy Announcement JI04-0139).

93. All job applications received by HRD are logged into a computer system called "POLARS." See Exhibit 8 (Isaac Dep.) at 133:18-134:4.

94. The HRD receptionist who receives the application, first, time and dates stamps the application, and then logs into POLARS the applicant's name, address, and vacancy announcement for which they applied." See id. at 133:21-134:6.

95. Applications are then placed into folders "corresponding to [the] vacancy announcement number." See id. at 134:7-8.

96. When an announcement closes, the staffing specialist pulls the log sheet from the POLARS System, and reviews the corresponding applications to determine who has met the minimum qualifications for the position. See id. at 134:9-13.

97. Plaintiff's name appears on the POLARS log sheet for the non-status vacancy announcement ( JI04-0139), but not for the status vacancy announcement (JI04-138). See Exhibit 25 (Log Sheet for JI04-0139); Exhibit 26 (Log Sheet for JI04-0138); Exhibit 8 (Isaac Dep.) at 135:19-136:22.

98. The non-status vacancy announcement for which Plaintiff applied was cancelled. See Exhibit 25; Exhibit 26 (November 8, 2004 Letter); Exhibit 9 (Isaac Aff.) at 19:1-19.

99. The non-status certificate of eligibles never reached the selecting official because an in-house, qualified, status applicant had already been selected. See Exhibit 9 (Isaac Aff.) at 17:8-18.

### E. Equal Pay Act

100. Plaintiff is seeking back pay of more than $10,000 for his Equal Pay Act claim. See

Exhibit 33.

101. Plaintiff admits that the two women who previously performed COTR duties under the same contracts as he, were Christine Thomas, a GS-13 Supervisory Accountant, and his immediate supervisor, Ms. Adams, a GS-14 accountant and Chief of the Investment Accounting Branch. Complaint at ¶ 8; Exhibit 8 (Adams Dep.) at 7:1-5; 69:11-15.

## PROCEDURAL HISTORY

102. Formal Complaint 03-10, filed October 1, 2003, alleges that PBGC discriminated against Plaintiff based on race, color, sex, and age, by not promoting him to the GS-13 grade level after he was assigned additional COTR duties. See Exhibit 27 (EEO Complaint 03-10).

103. Plaintiff does not identify "reprisal" as a basis for the complaint. See id.

104. By letter dated April 2, 2004, Plaintiff was notified that the complaint had been accepted for investigation. See Exhibit 28 (4/2/04 Letter).

105. Reprisal was not included as a basis for investigation. See id.

106. There is no evidence that Plaintiff disagreed with the characterization of his claims.

107. In early 2005, while Formal Complaint 03-10, was still in the administrative investigation stage, Plaintiff filed two additional complaints.

108. In Formal Complaint 05-04, filed January 3, 2005, Plaintiff alleged PBGC discriminated and retaliated against him by not selecting him for Vacancy Announcements JI104-0105 (GS-13 Accountant) and JI04-0143 (GS-12/13 Accountant). See Exhibit 29 (EEO Complaint 05-04).

109. In Formal Complaint 05-07, filed March 1, 2005, Plaintiff alleged that PBGC

discriminated and retaliated against him by not selecting him for Vacancy Announcements JI104-0138 (GS-12/13 Collections Analyst) and JI104-0139 (GS-12/13 Collections Analyst).  See Exhibit 30 (EEO Complaint 05-07).

110.   On November 3, 2005, Plaintiff filed the instant Civil Complaint alleging discrimination (based on race, sex, and age) and retaliation in connection with the non-promotion and non-selection claims raised in all three Formal Complaints (03-10, 05-04, and 05-07).  See Complaint at ¶ 2.

Respectfully submitted,

/s/
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


/s/
KAREN L. MELNIK D.C. Bar #436452
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 307-0338