UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DELARSE MONTGOMERY, JR.          )
                                 )
                                 )
          Plaintiff,             )
                                 )
     v.                          )          Civil Action No.  05-2157 (RMU)
                                 )
                                 )
ELAINE CHAO, Chairwoman          )
Pension Benefit Guaranty Corp. et al., )
                                 )
          Defendants.            )
_____ )


PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   Structure of the Investment Accounting Branch ("IAB"). . . . . . . . . . . . . . . . . . 3

III.  PBGC Managers Resent Montgomery's Successful EEO Complaint. . . . . . . . . . 3

      A.    Montgomery Is Promoted to GS-12 After Filing Successful
            EEO Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    Resentful PBGC Managers Refuse to Fully Implement
            the EEO Settlement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   Montgomery's Job As A Financial Specialist Includes Accounting Duties. . . . . . 6

      A.    Accounting Duties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    Montgomery Provides Technical Direction to Contract Accountants . . . . . 8

            1.    The Bert Smith Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            2.    Montgomery assigned as COTR for Bert Smith contract . . . . . . . . . . 8

            3.    As COTR, Montgomery Performs Technical Oversight . . . . . . . . . . 10

      C.    Montgomery Chairs Panel Assigned to Technically Analyze Bids
            from Accounting Firms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.    Despite His Increased Responsibilities, PBGC Frustrate Montgomery's
      Request for Accretion of Duties Promotion . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.    Adams Refuses to Act on Request for an Accretion of Duties
            Promotion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.     PBGC Managers Provide a False Description of Montgomery's Duties to the Desk Auditor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

VI.   Management Misrepresents Montgomery's Qualifications for Accountant Positions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      A.     Adams Interferes in the Qualification Process to Prevent Montgomery from Competing for The JI04-0105 Accountant Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      B.     Adams Prevents Montgomery from Being Considered for the JI04-0143 Accountant Position . . . . . . . . . . . . . . . . . . . . . . . 21

VII.  Montgomery Applies for Collections Analyst Positions [JI04-0138 & JI04-0139] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I.     Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

II.    Principles of Law to Evaluate Summary Judgment Under Title VII and the ADEA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

III.   Montgomery's Evidence Establishes a Prima Facie Case of Discrimination & Retaliation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      A.     Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

               1.     A Jury Could Conclude that Montgomery's Request for an Accretion of Duties Promotion Was Unlawfully Rejected. . . . . . . 28

               2.     A Jury Could Reject Adams's Claim that Montgomery Was Not Qualified for a Grade 12 Accountant Position . . . . . . . . . . . . . 31

               3.     The Collections Analyst Position . . . . . . . . . . . . . . . . . . . . . . . . . 33

      B.     Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

               1.     Exhaustion of Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

               2.     Causal Connection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

      3.    <u>Direct Evidence That PBGC Officials Harbored a Retaliatory Animus</u>.  38

**IV.**    **A Reasonable Juror Could Infer that PBGC Failed to Promote Montgomery Based on His Race, Sex, and Age, and in Retaliation for His Prior Protected Activity.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      1.    <u>HR Officials and PBGC Management Show Antipathy Towards Settlement Agreement</u> . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      2.    <u>Montgomery Was Deemed Unqualified Based on His Supervisors' Misrepresentations of His Qualifications</u> . . . . . . . . . . . 41

**V.**    **Montgomery Paid Less than Female Employee Despite Performance of Same Duties.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

5 U.S.C. 2302(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

5 U.S.C. §2302(b)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Fed.Rules Civ.Proc.Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S.Dist.Ct.Rules D.C., Civil Rules 7.1(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Cases:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Aka v. Wash. Hosp. Ctr.,*
    116 F.3d 876 (D.C.Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Aka v. Washington Hosp. Ctr.,*
    156 F.3d 1284 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33, 40

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242(1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Brown v. Marsh,*
    777 F.2d 8 (D.C.Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Brown v. Brody,*
    199 F.3d  446 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Buggs v. Powell,*
    293 F.Supp.2d 135 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Caldwell v. ServiceMaster Corp.,*
    966 F.Supp. 33 (D.D.C.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Carney v. The American University,*
    151 F.3d 1090 (D.C. Cir 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *34*

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Che v. Mass. Bay Transp. Auth.,*
    342 F.3d 31 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37


*Cones v. Shalala,*

199 F.3d 512 (D.C.Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Czekalski v. Peters,*
   475 F.3d 360 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Deravin v. Kerik,*
   335 F.3d 195 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Diamond v. Atwood,*
   43 F.3d 1538 (D.C.Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*George v. Leavitt,*
   407 F.3d 405 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Gleklen v. Democratic Cong. Campaign Comm.,*
   199 F.3d 1365 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Gregory v. Georgia Dept. of Human Resources,*
   355 F.3d 1277 (11th Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Int'l Bhd. of Teamsters v. United States,*
   431 U.S. 324 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Jenkins v. United States,*
   46 Fed. Cl. 561 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Johnson v. Digital Equip. Corp.,*
   836 F.Supp. 14 (D.D.C.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Johnson v. Digital Equip. Corp.,*
   836 F.Supp. 14 (D.D.C.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Johnson v. Ashcroft,*
   445 F.Supp.2d 45 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Kachmar v. SunGard Data Sys., Inc.,*
   109 F.3d 173  (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Mitchell v. Baldrige,*
759 F.2d 80  (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Molden v. United States,*
        11 Cl. Ct. 604 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Park v. Howard Univ.,*
        71 F.3d 904 (D.C.Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Powell v. Castaneda,*
        390 F.Supp.2d 1 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Reeves v. Sanderson Plumbing,*
        530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 40

*Stella v. Mineta,*
        284 F.3d 135 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Stewart v. Ashcroft,*
        352 F.3d 422 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Thomas v. Nat'l Football League Players Ass'n,*
        131 F.3d 198 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Plaintiff DeLarse Montgomery contends that officials at the Pension Benefit Guaranty Corporation discriminated against him on the basis of his race (African-American), his sex (male), and his age (59 years old), and retaliated against him for his successful settlement of a discrimination claim against them in 1998 and for his filing an EEO complaint in 2003. Montgomery's evidence shows that he successfully served PBGC for 20 years, routinely earning top performance evaluations but that after his 1998 EEO settlement, he locked in at the Grade 12 level and was denied all further promotional opportunities. The evidence also reveals that PBGC managers who were hostile toward Montgomery because of his prior EEO settlement misrepresented his qualifications to deny him an accretion of duties promotion, failed to find him minimally qualified for accountant positions, and refused to consider him for a collection analyst position. These actions frustrated Montgomery to the point that he retired earlier than expected in September of 2006.

In its motion for summary judgment, the PBGC contends that Montgomery's case should be dismissed because he cannot establish a prima facie case of discrimination or retaliation. Defendant further claims that Montgomery cannot rebut its articulated non-discriminatory reasons as pretext. Defendant's arguments must fail for the following reasons:

(1)    A reasonable jury could find that Montgomery's request for an accretion of duties promotion was unlawfully blocked by his supervisor's failure to update his position description and misrepresentation of his duties;

(2)    Based upon evidence that Montgomery was actually doing accounting work, a reasonable juror could conclude that his supervisor was misrepresenting his qualifications and reject his supervisor's claim that he was not qualified for an

-1-

accountant position as a pretext to cover discriminatory and retaliatory

motivations;

(3)    A reasonable jury could reject defendant's claim that it disqualified Montgomery

from selection to accountant positions because he did not turn in transcripts of his

24 hours of accounting classes based on the Director of Human Resources

confirmation that he had the hours and on the fact that HR officials had not

disqualified applicants for this reason in the past;

(4)    A reasonable jury could reject the PBGC's contention that Montgomery did not

apply to the collection analyst position as a mere pretext to explain away its

selection of a lesser qualified applicant; and,

(5)    The hostility of PBGC officials towards Montgomery's 1998 settlement

agreement reflects a retaliatory motive and serves as direct evidence that PBGC's

asserted non-discriminatory reasons are pretextual.

Based upon these considerations, defendant's motion for summary judgment must be

denied and this case should proceed to a jury trial.

## STATEMENT OF FACTS[1]

## I.    Background.

DeLarse Montgomery is a 59-year old, African-American male.  Plaintiff's Exhibit

("PX") 1 (Montgomery Affidavit, June 14, 2004) at 4.  He has an associate's degree in marketing

---

[1]Pursuant to Local Rule 7.1(h), plaintiff has separately submitted a statement of genuine
issues, as well as a response to the "Statement of Material Facts Not in Dispute" filed by
defendant in support of its Motion for Summary Judgment.  *See* Attachment 1 (Plaintiff's
Statement of Genuine Issues).

and has completed 24 hours of college level accounting courses. PX 2 at 145-47; PX 1 at 13. In 1986, Montgomery began his employment at PBGC as a GS-5 Secretary in the Premium Operations Division of the Financial Operations Division ("FOD"). PX 2 at 143. In 1987, he became a Management Analyst. As a Management Analyst, he received promotions to the GS-7 level in 1988, the GS-9 level, and then the GS-11 level around 1991. *Id.* at 141-42. A year later, Montgomery became a GS-11 Financial Specialist. *Id.* at 141.

## II.    Structure of the Investment Accounting Branch ("IAB").

From 1992 until his retirement in 2006, Montgomery served as a Financial Specialist within IAB. *Id.* The IAB is a subdivision of the Controller Operations Division ("COD"), which itself is a subdivision of the Financial Operations Division ("FOD"). During the time relevant to this case, Cynthia Adams (African-American female, DOB 9-12-64) ran the IAB and served as Montgomery's first-level supervisor, Wayne McKinnon (African-American male, DOB 3-31-49) ran the COD and served as Montgomery's second-level supervisor, and Ted Winter (White male, DOB 7-20-52) was the Director of FOD and Montgomery's third-level supervisor. *See* PX 11 (FOD Organizational Chart, dated May 1, 2004). Of the 20 employees in IAB, there were five males, and only two black males, Tajudeen Balogun, a GS-12 accountant and Montgomery, a GS-12 Financial Specialist. PX 12 (Adams Dep.) at 20-32.

## III.    PBGC Managers Resent Montgomery's Successful EEO Complaint.

### A.    Montgomery Is Promoted to GS-12 After Filing Successful EEO Complaint.

After his promotion to the GS-11 level, Montgomery began to experience discrimination that impeded his advancement. He was therefore forced to file an EEO complaint alleging, among other things, racial discrimination. In 1998, pursuant to an EEO settlement agreement, he

received a promotion to a GS-12 Financial Specialist position. PX 2 at 11-12. As part of the settlement agreement, Montgomery completed 24 hours of college level accounting courses in order to qualify for accounting positions. PX 3 (Montgomery Aff, Aug. 22, 2005) at 23-24.

**B.    Resentful PBGC Managers Refuse to Fully Implement the EEO Settlement.**

Montgomery's prior EEO activity and his settlement were well known throughout the Agency, and that some officials looked upon it negatively. *See* PX 6 (Lattimer Dep.) at 42 (testifying that "everyone in this Agency relevant to the case knew of his previous EEO activity, aside from what was in the settlement agreement"). Regarding one of Montgomery's applications for a new position, his supervisor Cynthia Adams was concerned that HR manager Richard Lattimer brought the application to her for review prior to the selection, but thought that "Rick must be coming to me about this because of Mr. Montgomery's past history." PX 10 (Adams Aff., Aug. 31, 2005) at 14. Montgomery's second level supervisor confirmed that Montgomery's EEO activity at the time was the source of gossip ("scuttlebutt"), and that he was "surprised" to hear about Montgomery's settlement. PX 8 (McKinnon Dep.) at 50-52. Finally, Jacqueline Isaac, the Human Resources Specialist assigned to handle all FOD vacancy announcements and staffing (PX 7 (Isaac Dep.) at 48-49), stated that she has a problem with promotions obtained through settlement for the following reason:

> Because grades are supposed to be based on your experience and not on a settlement agreement. They are based on you either getting an accretion of duties or applying for a job and getting a promotion that way. But as a settlement agreement, it's not good practice based on the fact that you're rewarding somebody – not saying that it's – it shouldn't be done. It's not what OPM requires you to do. They want you to do it the correct way. They don't believe in settlement agreements for grades.

*Id.* at 145.

Following the settlement agreement, PBGC promoted Montgomery to the GS-12 Financial Specialist position; however, instead of creating a new position description for Montgomery's GS-12 position as required by the settlement agreement, PBGC officials merely placed a cover sheet over his now outdated GS-11 position description, stating, "Position upgraded to GS-12 grade level due to a settlement agreement. Position Description stays the same, given new number." PX 4 at 1; *see* PX 1 at 12 (testifying that the settlement required PBGC to update his position description). PBGC human resources officials testified that they had never seen such a cover sheet on a position description at PBGC other than Montgomery's. *See* PX 5 (Pilipovich Dep.) at 86; PX 6 (Lattimer Dep.) at 39-40; PX 7 (Isaac Dep.) at 163. Richard Lattimer, a former manager within Human Resources, testified that as part of the settlement, Montgomery's "job should have been described in a new position description." PX 6 at 40. Another human resources official agreed that the cover sheet constituted an "abuse of the personnel system." PX 7 at 164.

Despite the settlement agreement's requirement that PBGC promote Montgomery to a GS-12 position, his supervisors now claim that they did not give him enough new duties to make his job a GS-12 position. *See* PX 8 at 52 (McKinnon asserting that it "wasn't the situation" that they gave him enough duties to constitute a GS-12). His supervisors did, however, increase his duties and responsibilities, including accounting duties. *Id.* at 54. It was not until September of 2003 – nearly five years after the settlement and after Montgomery's repeated requests for the update – that PBGC finally updated the position description.

IV.   **Montgomery's Job As A Financial Specialist Includes Accounting Duties.**

A.   **Accounting Duties.**

The 1998 settlement agreement was designed to help Montgomery qualify for future promotional opportunities, including accountant positions. PX 3 at 24. As part of the agreement, PBGC agreed to pay for 24 hours of college level accounting courses so that Montgomery would qualify as an accountant. *Id.*; PX 1 at 13; *see* PX 12 at 101; *see also* PX 25 (Transcripts for Montgomery); PX 26 (Letter from HR Director, Aug. 6, 2004) (acknowledging Montgomery's 24 hours of accounting courses). PBGC paid for these courses and received confirmation that he successfully completed them. PX 2 at 159-60.

As a GS-12 Financial Specialist in the IAB, Montgomery performed a number of accounting and accounting related duties. He completed monthly analysis and reconciliation of over $120 million in financial transactions of commingled trust funds entered in the IAB's Trust Plan Ledger. PX 13 (Montgomery Application for Vacancy No. JI04-0105 Accountant GS-13 Position) at 3 (describing work duties). Accountants in IAB record changes in pension plan assets via the Trust Plan Ledger. *Id.* Montgomery was responsible for ensuring that these entries in the Ledger matched the figures provided by the trust fund custodial bank. *Id.* He had to "identify, investigate, and resolve any out-of-balance transaction entr[ies] and discuss discrepancies and findings with the appropriate trust accountant or contractor." *Id.* This ensured that the plan's cash flow was in balance. PX 2 at 66.

In addition, Montgomery provided a monthly trust activity report for inclusion in operating reports used by departmental and executive staff. PX 13 at 4. To do so, he analyzed reports generated from the trust plan ledger, which helped PBGC "determin[e] the future value of

plan asset[s] of guaranteed benefits" paid out by PBGC.  PX 2 at 76-77; PX 13 at 4.

Montgomery also had responsibility for the Missing Participant Program – a program that PBGC created in 1996 to account for funds unclaimed by employees that were covered by terminated plans.  PX 2 at 79.  Montgomery maintained information from over 2700 terminated plans with a total value of $56 million, and was responsible for the accounting of assets received under the program.  PX 13 at 4, 7; PX 14 (New GS-12 Financial Specialist Position Description, Sept. 9, 2004) at 2.  He reconciled monthly statements summarizing daily deposits into terminated plans on behalf of missing plan participants.  PX 13 at 4.  Using this data, he prepared monthly journal entries to record cash receipts.  *Id.*  He also prepared reports on the program for FOD's Financial Reporting and Account Analysis Group ("FRAAG").  PX 14 at 2.

Montgomery's bosses admit that these duties constituted "accounting work."  *See* PX 12 at 112 (Adams acknowledging that Montgomery's work on the Missing Participant Program was "accounting work"); PX 8 at 33 (McKinnon noting that Montgomery was in charge of the Missing Participant Program, which was an "account"); *see also* PX 13 at 7 (citing his work in the Missing Participant Program as an example of applying accounting practices).

Though Montgomery did not perform the exact same duties of the IAB accountants, trust accounting is only one type of accounting.  PX 8 at 81; *see also* PX 27 (Professional and Administrative Work in the Accounting and Budget Group) (listing a variety of accounting positions).  Further, though Montgomery worked mainly with cash, accountants are not necessarily valuators (PX 8 at 83) – thus, even when IAB accountants determine asset values, they generally resort to numbers supplied by others, such as Bloomberg.  PX 2 at 62-63.  Neither of these facts mean that Montgomery was unqualified to be an IAB accountant.

Indeed, Montgomery's clear qualifications to serve as an accountant led both Adams and McKinnon to offer to convert him to be a GS-12 Accountant within IAB. *See* PX 2 at 164 (confirming that Adams offered to give him a 510 Accounting Series title and grade); PX 12 at 102 (Adams recalling her offer to convert Montgomery); PX 8 at 59 (McKinnon acknowledging that he and Adams supported moving Montgomery to the 510 series). *But see* PX 26 (finding Montgomery not minimally qualified for a GS-12/13 Accountant position). While Adams claims simply that Montgomery "did not want to" convert to the GS-12 Accountant position (PX 12 at 102), he explained that because he was already a GS-12, he wanted a promotion if he was to switch to new duties. PX 2 at 149; *see generally* PX 13 & PX 28 (Montgomery Application for Vacancy No. JI04-0143 Accountant GS-12/13 Position) (Montgomery applying for accountant positions with promotional opportunities, evidencing his desire to serve as an accountant).

**B.     Montgomery Provides Technical Direction to Contract Accountants**

1.     The Bert Smith Contract

Bert Smith & Co. was an accounting firm hired by PBGC to perform accounting work on pension plans that had been terminated by PBGC. *See* Attachment 2 (Declaration of DeLarse Montgomery) at ¶ 3. The PBGC set forth the services to be provided in a Statement of Work in the contract. *Id.* Bert Smith was hired to evaluate plan assets at the time of termination and to make journal entries to reflect asset values at the time of termination and at the time that PBGC took possession of the assets. *Id.* at ¶ 4.

2.     Montgomery assigned as COTR for Bert Smith contract

The Contracting Officer Technical Representative (COTR) serves as the technical liaison

between the contracting office and the contractor.[2]  PX 15 at 31; PX 17 at 1 ("As the primary

point of contact at PBGC you will be expected to give the contractor technical direction and act

as PBGC's liaison to the contractor.").  The COTR monitors the performance of the contractor to

ensure that the Agency receives the services as promised.  PX 15 at 31; PX 16 at 15-16; PX 17 at

1 ("Provide the contractor with technical assistance to ensure that the work progresses on

schedule.").  The COTR must have technical knowledge about the performed service.  PX 15 at

32; PX 17 at 2 (requiring Montgomery to "[i]nspect and accept final installations or work

products").  *But see* PX 18 (Desk Audit Evaluation Report, signed Feb. 19, 2004) at 3 (claiming

that Montgomery's COTR duties cannot be grade controlling because he is not performing

technical guidance).  In the case of an accounting contract, the COTR has to be familiar with

accounting techniques and principles as applied by the contractors.  Attachment 2 at ¶ 1.  COTR

duties may constitute a large amount of work.  PX 15 at 64.

Montgomery received COTR training and served as the COTR for the Missing

Participant Program prior to 2002.  PX 2 at 15.  In 2002, his supervisor Cynthia Adams asked

him to assume the COTR responsibilities for the Bert Smith & Company professional accounting

service contract with IAB.  PX 2 at 15-16; *see* PX 17 (appointing Montgomery to Bert Smith

contract).  Christine Thomas, a white female GS-13 had served as COTR for the Bert Smith

contract prior to Montgomery.  PX 1 at 6; PX 15 at 60.  Adams, an African-American female

GS-14, had also briefly served in that role.  PX 1 at 8.  Montgomery was the only COTR in the

---

[2] While COTRs provide technical direction, contract specialists administer the contract by
modifying the contract, adding money to the contract, or changing the terms of the contract if
necessary.  PX 15 at 30; PX 16 at 15.  The contract specialist does not serve as the technical
liaison to the contractor, and had nothing to do with the day to day work being done on the
contract.  *See* Attachment 2 at ¶ 2.

entire Financial Operations Division who was not at least a GS-13. *Id.* at 16; PX 19 (Annotated

List of PBGC COTRs, Feb. 11, 2004).

3.    <u>As COTR, Montgomery Performs Technical Oversight</u>

As COTR for the Bert Smith contract, Montgomery had to use his accounting knowledge

to "reconcile the expenses from the invoices, to receive monthly reports from the contractor of

jobs or tasks that they performed, to make reports to the Procurement Office about the contract,

[and] to inquire with the contract employees of issues concerning performance of the contract."

PX 2 at 17; *see* Attachment 2 at ¶ 1 (stating that his education and experience provided him with

knowledge of necessary accounting techniques and principles).  He also monthly reconciled the

plan's assets and liabilities, by applying accounting treatments to numbers supplied by the

Accounting Branch. PX 2 at 19-20.  When Montgomery inherited this responsibility, he

discovered that Christine Thomas had left files not reconciled for months. *Id.* at 20-21.  In

addition, he followed the progress of the contractor's work.  If the contract accountants work did

not reconcile correctly and a discrepancy was noted, Montgomery would meet with the contractor

to ensure that necessary corrections were made.  Attachment 2 at ¶ 6.

During Montgomery's time as COTR, the Bert Smith contract grew considerably.    When

he started, there were only three contract accountants on the project. PX 2 at 21.  The contract

grew to include eight contract accountants, one accounting technician, and a project manager. *Id.*

at 23; *see* PX 1 at 6 ("[T]he COTR duties I came to perform were vastly expanded over those

performed by Ms. Thomas at GS-13.").  Further, while the contract began as a $230,000 contract,

it grew to a total funding amount of between $1.2 million and $1.5 million. *See* PX 15 at 64-65;

PX 16 at 25-26.  To accommodate the demands of his new task, Montgomery devoted two days a

-10-

week (or 40% of his work week) to his COTR duties. PX 2 at 26. *But see* PX 31 at 14 (claiming

that COTR duties were not a significant portion of Montgomery's duties). According to Greg

Smith, the Deputy Director of Procurement at PBGC, Montgomery performed his COTR duties

ably. PX 15 at 61.

C.      **Montgomery Chairs Panel Assigned to Technically Analyze Bids from Accounting Firms.**

When PBGC solicits bids for a contract, the program office or branch (*e.g.*, IAB) within

PBGC that is actually requesting the contract assistance must analyze various contract proposals.

PX 20 (Herting Dep.) at 27-28. To do this, the program office creates a Technical Evaluation

Panel ("TEP"). *Id.* at 28. Panel members must be technically qualified to evaluate the proposals.

*Id.* at 34. For example, if the contract involves accounting services, TEP members must

understand accounting principles as they are responsible for "looking at the technical aspects and

providing an opinion." PX 15 at 28; PX 20 at 34; *see* PX 16 at 39 (confirming that panel

members must be familiar with the services to be performed). The contract specialists rely on the

TEP for technical insight. PX 15 at 28.

The program office appoints a Chair to lead the panel. PX 20 at 36-37 (confirming that

the Chair coordinates the panel, helps it reach consensus, and serves as a liaison to the

Procurement Office); *Id.* at 37-38. The Chair "is usually the one with a – if not the most

significant experience, in this case accounting experience, usually one that has a very high level

of subject matter expertise." PX 21 (Winter Dep.) at 93.[3]

---

[3] Ted Winter, the white male Director of the FOD testified that it would be highly unlikely that Montgomery would have served as the Chair of a TEP because the Chair. PX 21 at 93. Yet, when asked if the fact that Montgomery was the Chair meant that someone had a high confidence level in him, Winter responded, "not necessarily." *Id.*

-11-

For the Bert Smith contract (a contract exceeding $1 million), the TEP consisted of Montgomery, Cynthia Adams, and two other individuals. PX 16 at 22. Though it is rare to have a TEP of more than three people (PX 20 at 34), the complexity of the Bert Smith contract required four people. PX 16 at 39. Despite his GS-12 grade level and despite the Agency's preference to not have the COTR of a contract serve on the TEP, Montgomery was nominated and chosen to serve as the TEP Chair for the Bert Smith contract. PX 15 at 43; PX 16 at 28. *But see* PX 21 at 93 (stating his belief that it would be highly unlikely for Montgomery to have served as Chair of a TEP because the Chair is usually the member with the most significant expertise in the subject of the contract – in this case, accounting). Montgomery performed ably and reached consensus on the re-compete of the Bert Smith contract. PX 15 at 62; PX 16 at 30-31. In contrast to Montgomery's success, his GS-14 supervisor Cynthia Adams had difficulty performing her duties. PX 16 at 31-32; *see* PX 12 at 85 (acknowledging that her documentation for the panel was inadequate). As a result, Adams was removed from the TEP. PX 16 at 35-37. Despite this setback, Montgomery steered the TEP to a consensus. *Id.* at 30-31.

## V.    Despite His Increased Responsibilities, PBGC Frustrate Montgomery's Request for Accretion of Duties Promotion

By 2003, Montgomery had successfully performed his GS-12 Financial Specialist role for close to five years. *See generally* PX 22 (Montgomery Performance Evaluations from Fiscal Years 2000 to 2004) (receiving evaluations of excellent and outstanding) and PX 23 (Documentation of Montgomery's Performance-Based Awards).[4] Indeed, his superiors routinely

---

[4] For FY 2001, Montgomery's performance evaluation indicates that he was initially given a rating of "Outstanding" as evidenced by the initials of Director Ted Winter; however, those initials were struck out and his rating was reduced to "Excellent." PX 22D. Later, in FY 2003, despite Montgomery's performance of substantial COTR duties that were not described in

-12-

commended him as performing work exceeding that of his grade level. *See* PX 22A (FY 2004 Performance evaluation noting that "Montgomery's planning decisions indicate a level of judgment and independence which exceed his current grade" and that his "research skills indicate a level of judgment and independence that *far exceed* his current grade") (emphasis added); PX 22B (FY 2003 stating same). Montgomery's evaluations also reveal his continual steps to develop professionally. *See* PX 22E (FY 2000 Performance Evaluation) at 2 (describing how Montgomery pursued professional development by studying professional journals and achieving professional certifications).

When Montgomery received his promotion to be a GS-12 Financial Specialist in 1998, he did not perform COTR duties. *See* PX 2 at 14 (noting that his position description did not contain COTR duties). Cynthia Adams assigned these additional duties, which constitute a large amount of extra work, to Montgomery in 2002. *Id.* at 15-16; PX 17. As noted above, Montgomery served as COTR for the Missing Participants program and the Bert Smith & Company professional accounting services contract. PX 2 at 24. He also briefly served as COTR for the State Street Bank. *Id.* at 25. Further, the Bert Smith contract expanded significantly during Montgomery's time as COTR. PX 1 at 8. In order to successfully perform his new duties, he structured his work week so that he could devote two full days (of 40% of his work week) to COTR work. PX 2 at 26.

---

his position description along with successful performance of all his other duties, he only received a rating of "Excellent." PX 22B. Winter denied Montgomery's appeal for an "Outstanding" without a detailed explanation. *See* PX 38 (Nov. 26, 2003 appeal letter from Montgomery and email discussing Winter's rejection of Montgomery's appeal).

-13-

A.    **Adams Refuses to Act on Request for an Accretion of Duties Promotion.**

In light of his significant new responsibilities, Montgomery requested a promotion based on accretion of duties from Adams, his supervisor, in approximately March or April of 2003. PX 1 at 5; PX 2 at 29-30. He also requested that his position description be formally updated to incorporate the COTR duties. PX 1 at 5; *see* PX 2 at 14 (noting that neither his performance standards nor his position description mention COTR duties). Montgomery was performing COTR duties that had previously been performed by a white female, graded GS-13 (Christine Thomas), and an African-American female, graded GS-14 (Cynthia Adams). PX 1 at 6, 8; PX 2 at 14; *see* PX 1 at 8 ("So when the COTR duties were performed by females, they supported grades GS-13 and even GS-14, but when a Black man is assigned those duties they support only a GS-12 level (even only a GS-11 level), even where the COTR duties are expanded when in the hands of a Black man."). Further, Montgomery's duties expanded far beyond those that Thomas performed at the GS-13 level. PX 1 at 6. Moreover, he was the only COTR in the entire FOD who was not graded at least at the GS-13 level. *Id.* at 16; PX 19.

Montgomery requested the promotion from Adams around March or April of 2003. PX 2 at 30. She initially indicated her support – "I don't blame you, Monty. I would do the same also." *Id.* at 28; *see* PX 12 at 90 (Adams confirming that she thought Montgomery was an able employee and that she had always rated him highly). Although she promised him that she would "look into it" and discuss it with her superiors McKinnon and Winter, months went by with no response. PX 2 at 29, 31. Montgomery finally contacted the EEO office to discuss his mistreatment. *Id.* at 32. Montgomery was merely "seeking a promotion through accretion of duties that is allowed by the Agency directives and the Collective Bargaining Agreement." *Id.* at

-14-

33. Although he had given justification for promotion, his managers took no action. *Id.* The

excessive inaction contrasted with the Agency's actions in promoting other employees:

> There were promotions going on in FOD – accretion of duties promotions going
> on in FOD for other employees, and my attempt to get accretion of duties
> promotion was stifled and I felt that was being discriminatory.

PX 2 at 33; *see id.* at 33-39 (listing a number of non-Black male FOD employees who received

accretion of duties promotions, including Franklin Tate, Sam Yeng, Melinda Fitzpatrck, Shirley

Jones, and Tonya Jones). This reinforced a pattern at PBGC: "Black males in FOD were not

receiving promotions in comparison to other groups of employees." *Id.* at 39.

Following Montgomery's discussion with the EEO office, the Agency initiated a desk

audit on Montgomery. PX 12 at 94. Montgomery did not request the audit *See* PX 1 at 5; PX 12

at 94. *But see* PX 24 (Adams Affidavit, Aug. 2, 2004) at 3 (claiming Montgomery requested the

audit); PX 6 at 26 (same); PX 21 at 107 (same). This was the first time one of Adams's

employees had ever been subjected to a desk audit. PX 12 at 96.

## B.    PBGC Managers Provide a False Description of Montgomery's Duties to the Desk Auditor.

On December 31, 2003, Cynthia Kyle performed a desk audit on Montgomery's work

station. PX 18 at 1. During the audit, the auditor reviewed Montgomery's outdated and incorrect

GS-11 position description (complete with its improper cover sheet explaining that his GS-12

promotion was based upon a settlement agreement), and requested information from Adams. *Id.*

at 1-2. The evaluation concluded that despite the increased COTR duties, Montgomery's

position was properly classified as a GS-11 Financial Specialist. *Id.* at 8 (signed by Jacqueline

Isaac). *But see* PX 6 at 44 (noting that Montgomery's 2004 properly graded GS-12 PD was

-15-

based on the duties he was performing (with COTR listed only as a possible duty)).  The audit,

however, suffered from a number of problems.  First, the report (signed by Isaac) states:

> Montgomery's "regular duties are outlined in position description #8940, which is
> attached to the duties described in the old PD #8435, a classified PD at the GS-11
> level.  Management *agrees with the duties and responsibilities* outlined in PD
> #8435, and have added a new duty as Contracting Officer Technical
> Representative, or "COTR."

PX 18 at 2 (emphasis added).  Thus, the auditor based her assessment of Montgomery's duties

largely on his former GS-11 position description that had never been updated after the 1998

settlement to reflect his GS-12 duties.  *See* PX 1 at 12 ("PBGC management was supposed to

change my position description ('PD') to show that I was promoted to a higher grade of duties.");

PX 3 at 24 (confirming that the settlement agreement was geared towards qualifying him for

accounting positions); *see also* PX 8 at 54-55 (McKinnon noting that management gave

Montgomery accounting duties probably within a year of his settlement to bring his position up

to the 12 level).  Yet, "since the 1998 settlement agreement [Montgomery] continued to assume

additional higher level duties that would have increased the level of [his] job's duties and

responsibilities *beyond* the level that was suppose[d] to justify [his] promotion to GS-12."  PX 1

at 12 (emphasis added).

     Further, the auditor's report acknowledges Montgomery's performance of COTR duties

and concedes that "these tasks can appear to be 'grade controlling', in some cases."  PX 18 at 2.

The auditor concluded, however, that Montgomery's COTR duties did not qualify him for a

higher grade based on more information from Adams.  Adams told the auditor that Montgomery

is not an accountant, and that he only performed administrative oversight in his COTR position.

*Id.* at 3 ("[N]o grade can be attached to what Mr. Montgomery is doing since he is providing

'administrative' oversight over the work of the contractors. Thus, any real 'technical or professional' guidance is not provided by this employee."). Yet, Montgomery performed a number of accounting and accounting-related duties, and served as the technical liaison on the Bert Smith contract. PX 2 at 19-20; *see* PX 8 at 80 (McKinnon confirming that Montgomery's inventory of the vault "would be an accounting responsibility"). Despite having told the auditor that Montgomery was not an accountant, Adams conceded in her deposition that his work with the Missing Participants Program was "accounting work." PX 12 at 112. Moreover, she claims that she told Isaac that he performed accounting and accounting related duties. *Id.* at 112-13.

Though Montgomery's position description was finally updated (*see* PX 14), he did not receive an accretion of duties promotion. Notably, HR manager Richard Lattimer told Montgomery that "management was not interested in finding a way to create a GS-13 financial specialist" and suggested that he seek GS-13 accountant positions. PX 6 at 49.

## VI.    Management Misrepresents Montgomery's Qualifications for Accountant Positions

### A.    Adams Interferes in the Qualification Process to Prevent Montgomery from Competing for The JI04-0105 Accountant Position

Between June 1 and June 30 of 2004, PBGC advertised a GS-13 Accountant position within the IAB. PX 29 (Vacancy Announcement for No. JI04-0105 Accountant GS-13 Position). Montgomery applied on June 30, 2004. PX 13. The vacancy announcement sets forth the general duties, the minimum qualifications, a set of selective factors, and the quality ranking factors for the position. *See* PX 29 at 2-3. Montgomery's application sets forth his work history and details his specific experience that qualifies him for the selective and quality ranking factors called for in the vacancy announcement. *See* PX 13.

-17-

Of the six duties listed in the vacancy announcement, he already performed four of the same or related duties as a Financial Specialist. PX 3 at 7. The second duty listed involves reconciling "investment balances between PBGC's custodian bank and individual investment managers," which is similar to Montgomery's experience in reconciling investment balances. PX 2 at 89. He already performed the third duty, calling for the preparation of monthly and quarterly reports "reflecting financial activity and balances of the commingled fund as reported by PBGC's custodian bank." PX 29 at 2; PX 2 at 92. Montgomery performed that task by performing "analy[sis] and reconciliation of over $120 million in financial transactions of commingled funds, and . . . prepar[ation of] all monthly/quarterly reports reflecting financial activity and balance of the commingled funds." PX 2 at 92. He had also performed the fifth duty of serving as the lead in contacting PBGC's custodian bank, as he had already been designated as IAB's lead in dealing with the custodian bank. *Id.* at 93. Finally, by preparing entries for the Missing Participants Program, Montgomery had effectively performed the sixth duty, the "prepar[ation of] accounting entries for input into the accounting system." *Id.* at 94.

Despite Montgomery's qualifications, Jacqueline Isaac, the HR member charged with evaluating applications for the certificate of eligibles, determined that he was not even minimally qualified for the position for two reasons: (1) Montgomery had not submitted transcripts confirming his 24 hours of college level accounting courses, and (2) she did not believe he had the necessary "one year of specialized experience at or equivalent to the GS-12 grade level that demonstrates the ability to analyze and provide advice regarding accounting programs, financial systems, etc." PX 29 at 3.

Regarding his 24 hours of college accounting course work, Montgomery confirmed on his

application that he had successfully completed it.  PX 13 at 2.  Further, in signing his application

with this information, he affirmed that all of his statements were "true, correct, complete, and

made in good faith."  *Id.* at 5.  In addition, PBGC had paid for Montgomery to take the courses

and received confirmation of his successful completion of them.  PX 2 at 159-60; PX 7 at 54.

His supervisor, Cynthia Adams, also knew that he had completed the 24 hours (PX 12 at 101),

and Isaac had consulted Adams about his qualifications for the position.  PX 26.

       Isaac disqualified Montgomery based on this technicality, even though she had notified

other applicants of such an oversight.  *See* PX 32 (Isaac Aff., Aug. 22, 2005) at 7 (Isaac

acknowledging that "in case somebody does not [provide] their resume or transcripts when they

submit their resume, we can always put a little asterisk next to the person's name and request that

they submit it at a later [time] before we would bring them on board and hire them.");  PX 2 at

112, 120 (contending that Isaac had assisted a white female (Lynn Christopher) in resubmitting

her incomplete application).  *But see* PX 7 at 115 (Isaac now claiming that human resources

"never" alerts an applicant about an application deficiency).  Moreover, Richard Lattimer, Isaac's

superior, confirmed that the human resources office actively assists applicants with their

applications:

> [W]henever we disqualify somebody for failure to meet academic requirements,
> we (particularly in a case like this when we don't have very many applicants) try
> to work with the applicant to figure out if there is something in there that they are
> not submitting, or if their transcripts – sometimes their transcripts are incomplete
> or something like that.

PX 31 (Lattimer Aff., Aug. 22, 2005) at 7-8; *see id.* at 8 (noting that he "did this for quite a few

people").  Finally, when asked to explain why Montgomery was not qualified for the position,

Michele Pilipovich, the Director of Human Resources, confirmed that they knew he had

completed 24 hours of accounting. *See* PX 26 ("In your case, you have 24 semester hours of college credit in accounting or related courses"). Pilipovich cited only the alleged lack of specialized experience as grounds for disqualifying him. *Id.*

During review of Montgomery's application, an HR official took his application to Adams, who was both Montgomery's supervisor and the selecting official for the position, and asked her if he had performed the type of experience that the position required. PX 3 at 8. This was irregular, as human resources should establish an applicant's minimal qualifications without the participation of the selecting official. *Id.* Adams admitted that it was unusual for human resources to ask her to review a candidate's qualifications. PX 10 at 14. Adams thought that Lattimer brought the application to her for review "because of Mr. Montgomery's past history." *Id.* Adams claims that she responded that she was looking for an applicant with "experience with accounting for investment instruments . . . but I also needed someone that had more experience in the way of dealing with more complex investment instruments as in derivatives and futures and options and that kind of thing." *Id.* at 6; *see id.* (stating she was looking for someone to perform duties that "were a little bit more complex than your normal accounting position"). This kind of experience, however, is not set forth in the vacancy announcement under the minimal qualifications. *See* PX 29. Moreover, when Lattimer asked Adams if they could qualify Montgomery based on his performance of accounting related duties, Adams told him that "Monty had not performed any of the accounting duties that the other members of the staff had performed" and thus could not be qualified. PX 10 at 7; *see also* PX 32 at 11 (Isaac claiming that Adams told her that Montgomery "is not doing *any kind* of accounting work") (emphasis added). As discussed above, however, he had performed accounting and accounting related duties in his

-20-

Financial Specialist position. *See supra* Section VI.A; *see also* PX 12 at 112 (Adams conceding that Montgomery performed accounting work).

> **B.    Adams Prevents Montgomery from Being Considered for the JI04-0143 Accountant Position**

Adams claims that she was dissatisfied with the applicant pool (PX 10 at 4), and the JI04-0104 position was cancelled. PX 32 at 9. Later, PBGC advertised the same position, but graded it as a GS-12/13 under vacancy announcements JI04-0143 and JI04-0144. PX 30. Montgomery applied for this position as well. PX 28. Once again, Isaac claimed that Montgomery was not minimally qualified for the position because of (1) the lack of a transcript; and (2) the assurance from Adams that Montgomery did not have the requisite experience. PX 7 at 76.

This time, the application could be filled at the GS-12 grade level (PX 30 at 2), and the announcement confirms that the year of specialized experience must be "at or equivalent to the next lower grade level that demonstrates the ability to analyze and provide advice regarding accounting programs, financial systems, etc." *Id.* Isaac thus claims (based on Adams's information) that Montgomery was not minimally qualified for a GS-12 accountant position. Yet, both Adams and McKinnon testified that they were willing to convert Montgomery straight into the 510 accounting series at the GS-12 level. *See* PX 2 at 164 (confirming that Adams offered to give him a 510 Accounting Series title and grade); PX 12 at 102 (Adams recalling her offer to convert Montgomery); PX 8 at 59 (McKinnon acknowledging same).

This experience again comported with what Montgomery had witnessed often before at PBGC: "Black males in FOD were not receiving promotions in comparison to other groups of people." PX 2 at 39. Jacqueline Isaac had similarly concluded that Robert Shepard, an African-

American male, was not qualified for a position despite having a master's degree in finance. *Id.*
at 119. *Compare id.* at 110 (stating that Isaac had discriminated against him, Robert Shepard,
and other Black males), *with id.* at 112, 120 (noting that Isaac assisted Lynn Christopher, a white
female, resubmit a previously deficient application). Here, Lafaye Graham (African-American
female) was ultimately selected to fill the GS-12/13 position.

**VII.    Montgomery Applies for Collections Analyst Positions [JI04-0138 & JI04-0139]**

From August 30 through September 29 of 2004, PBGC posted two vacancy
announcements for a GS-12/13 Collections Analyst position within the FOD's Collections and
Compliance Division, Premium Investigations Unit. PX 33 (Vacancy Announcement for No.
JI04-0138 Collections Analyst GS-12/13 Position) & 34 (Vacancy Announcement for No. JI04-
0139 Collections Analyst GS-12/13 Position). The 0138 vacancy announcement was for status
candidates only, while the 0139 announcement was open to all candidates. *See* PX 33 at 1; PX
34 at 1. "Status" applicants "are individuals who have competitive status within the government
and do not have to recompete essentially under the DEU procedures of [the] Delegated
Examining [*i.e.*, the Human Resources Department]." PX 5 at 101. However, status applicants
cannot benefit from veteran's preference status. *Id.* at 100. PBGC does not have to post separate
announcements for status and non-status candidates – in fact, they no longer follow that practice.
*Id.* at 133.

Montgomery applied for the position under both vacancy announcements. PX 2 at 123,
126; PX 3 at 15; *see also* PXs 28 & 30 (applying under the JI04-0143 status vacancy
announcement). *But see* PX 7 at 136 (stating that Montgomery did not apply for the 0138
position). Montgomery specifically recalls filling out both applications, taking them to human

resources between 4:30 and 5:00 PM on the last day of the announcement, and turning them both

in to the receptionist. PX 2 at 123, 126. He was a status employee at PBGC, but he also decided

to apply under the other vacancy announcement because he had previously applied for a PBGC

job solely on the status list that was filled by someone on the non-status list. PX 2 at 127. In

addition, Montgomery, a Navy veteran, could get additional points for his veteran's status on the

non-status list. PX 7 at 127, 132; PX 32 at 18. In order to ensure that his non-status application

was considered, he requested a date stamped receipt of that application. PX 2 at 126. He did not

feel this was necessary for the status application because he was clearly a status employee:

> I'm a career status employee. For each position I've applied for I've always
> wanted to get the application in, not worry about getting a receipt for an
> application, but because of the previous incident in applying for a position that
> was non-status selection, I wanted to cover my – that I did have a receipt that I
> applied for the non-status position.

*Id.* at 126-27. HR claims that Montgomery's status application was never reviewed. *Id.* at 128-

29. While the Director of Human Resources claims that applications have been lost in the past,

she does not know the procedures for dealing with that situation. PX 5 at 116, 118.

Isaac does not confirm whether Montgomery was certified as qualified for the position or

not. PX 32 at 17. According to Isaac, they never looked at the non-status list because they

found a qualified candidate on the status list. *Id.* at 17, 19. The goal, however, is to get the best

qualified candidate for the job. PX 5 at 107. Isaac stated that according to the Agency's contract

with the union, they must first look to the most qualified in-house candidates before looking at

status candidates or non-status candidates. *See* PX 7 at 159; PX 32 at 19-20 ("What happens is

the first cert that goes up to any selecting officials is always, if we have *anybody from PBGC*,

that cert goes first, always because of our union contract.") (emphasis added). While Isaac goes

-23-

on to qualify this statement by saying that the union agreement only applies to status candidates (PX 32 at 21), the union contract states that it applies to PBGC employees. *See* PX 36 (Article 13 regarding Merit Promotions) at 2, §13.3(B) ("When there are qualified PBGC candidates, the Employer will follow the procedures specified in Sections 13.7 and 13.8."); *id.* at 2, §13.3(C) ("To be eligible for treatment as a PBGC employee, an individual must be on the rolls of the Employer up to and including the date of selection."). The contract states that "[t]he Employer will refer the PBGC candidates with the 5 highest scores (first certificate of eligibles), except as provided in 13 8.G, before any other certificates of eligibles are referred to the selecting official." PX 36 at §13.8(E); *see id.* at §13.8(G) (dealing with situations where there is more than one position).

PBGC hired Rebecca Pavone, a 36 year old white female employee from the Environmental Protection Agency, as the new GS-12 Collections Analyst. PX 37 (Pavone Dep.) at 7-8, 10; PX 3 at 24-25. Pavone had been a GS-12 Financial Specialist at the EPA for two years. PX 37 at 10. Her main responsibility had been to perform payroll reconciliation. *Id.* at 10. Pavone is not a college graduate and does not have an associate's degree, but had taken some community college classes. *Id.* at 7. At the time of her application, she had taken nine hours of accounting course work. *Id.* at 25. She was not a certified COTR, nor had she taken COTR training. *Id.* at 39. As Collections Analyst, Pavone began by working strictly debt recovery work. *Id.* at 37. She later progressed to perform cash reconciliation. *Id.* at 38. Pavone was promoted to be a GS-13 after six months. *Id.* at 30.

In contrast, Montgomery had an associate's degree, had successfully completed 24 semester hours of accounting, was a certified COTR, had performed accounting and accounting

-24-

related duties within FOD, performed cash reconciliation of large accounts, and had been a successful PBGC employee for 18 years.

## ARGUMENT

### I.     Summary Judgment Standard.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir.1995), *Johnson v. Ashcroft*, 445 F.Supp.2d 45, 49 (D.D.C. 2006). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Johnson,* 445 F.Supp.2d at 49 (*citing Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the D.C. Circuit has directed that because it is difficult for a plaintiff to

-25-

establish proof of discrimination, the court should view summary-judgment motions in such

cases with special caution. *See Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C.Cir.1997)

*overturned on other grounds*, 156 F.3d 1284 (D.C.Cir.1998) (en banc); *see also Johnson v.*

*Digital Equip. Corp.*, 836 F.Supp. 14, 18 (D.D.C.1993); *Johnson,* 445 F.Supp.2d at 49.

## II.    Principles of Law to Evaluate Summary Judgment Under Title VII and the ADEA.

In *McDonnell Douglas Corp. v. Green*, the Supreme Court enunciated a burden shifting

paradigm to evaluate circumstantial evidence of employment discrimination in disparate

treatment cases.  411 U.S. 792 (1973).   First, the complainant must establish a *prima facie* case

that raises an inference of discrimination.  *See Int'l Bhd. of Teamsters v. United States*, 431 U.S.

324, 358 and n.44 (1977). The burden then shifts to the defendant to articulate a legitimate, non-

discriminatory reason for its action.  *Thomas v. Nat'l Football League Players Ass'n*, 131 F.3d

198, 202, 327 U.S. App. D.C. 348, 352 (1997) (*citing McDonnell Douglas*, 411 U.S. at 802,

804)).

If the defendant comes forward with a reason that, if believed, would support a finding

that the challenged action was nondiscriminatory, then the burden shifts back to the complainant

to demonstrate that the articulated reason is a pretext for prohibited discrimination.  *Cones v.*

*Shalala*, 199 F.3d 512, 518-19 (D.C. Cir. 2000); *Thomas*, 131 F.3d at 202.  On this final step in

the analysis, the Supreme Court has unanimously held that a complainant may survive a motion

for summary judgment and prevail at trial by offering evidence that the supposed non-

discriminatory reason articulated by the defendant was false.  *Reeves v. Sanderson Plumbing*, 530

U.S. 133, 147-48 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer

from the falsity of the explanation that the employer is dissembling to cover up a discriminatory

purpose. Such an inference is consistent with the general principle of evidence law that the fact

finder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of

guilt.'"); *accord Aka*, 156 F.3d at 1292 (holding that discrimination plaintiffs are not required to

produce evidence over and above a rebuttal of defendant's articulated reasons for the adverse

action to survive a motion for summary judgment).

### III.    Montgomery's Evidence Establishes a Prima Facie Case of Discrimination & Retaliation.

#### A.    Discrimination

A plaintiff establishes a prima facie case of discrimination by meeting the following

elements: 1) he is a member of a protected class; 2) he was subjected to an adverse employment

action; and 3) the adverse action gives rise to an inference of discrimination. *McDonnell Douglas*

*Corp.*, 411 U.S. at 802; *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007); *George v.*

*Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005); *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir.

2002). Here, it is undisputed that Montgomery belongs to protected classes based on his race

(African-American), sex (male), and age (over 40). Further, Plaintiff suffered a number of

adverse actions, as he requested but was denied an accretion of duties promotion, he applied for

but was rejected from GS-13 and a GS-12/13 Accountant positions, and applied for but was

rejected from a GS-12/13 Collections Analyst position. *See Brown v. Brody*, 199 F.3d 446, 457

(D.C. Cir. 1999) (holding that a plaintiff suffers an actionable injury when an employer's decision

causes some "materially adverse consequences . . . such that a reasonable trier of fact could

conclude that the plaintiff has suffered objectively tangible harm"). Defendant contends that

Plaintiff's claims should fail, however, based upon the following assertions: (1) that two of the

positions Montgomery applied for were cancelled; (2) that Montgomery cannot raise an inference

of discrimination because he cannot show that he was qualified for the positions; (3) that

Montgomery cannot show that similarly situated employees outside of his protected class

received favorable treatment; and (4) that Montgomery cannot show defendant's alleged non-

discriminatory reason to be pretext for discrimination.  For the reasons that follow, defendant's

assertions must be rejected.

1.    A Jury Could Conclude that Montgomery's Request for an Accretion of
      Duties Promotion Was Unlawfully Rejected.

"Although 'one method by which a plaintiff can satisfy the third prong of [the prima

facie] test is by demonstrating that [he] was treated differently from similarly situated employees

who are not part of the protected class . . . this is not the only way.'"  *See Czekalski*, 475 F.3d at

365-66 (*quoting George*, 407 F.3d at 412).  A plaintiff may also raise an inference of

discrimination by demonstrating that the rejection of a job applicant was not due to the two most

common reasons: (1) lack of qualifications in the job; or (2) lack of vacancy in the job.  *Stewart*

*v. Ashcroft*, 352 F.3d 422, 428 (D.C. Cir. 2003).  In this case, Montgomery has offered evidence

on both accounts: (1) non-Black male employees within the Financial Operations Division

received accretion of duties promotions, and (2) he had the necessary qualifications and increased

workload to receive an accretion of duties workload.

At PBGC, "Black males in FOD were not receiving promotions in comparison to other

groups of employees."  PX 2 at 39.  Specifically, "[t]here were promotions going on in FOD –

accretion of duties promotions going on in FOD for other employees, and my attempt to get

accretion of duties promotion was stifled and I felt that was being discriminatory."  *Id.* at 33.

-28-

Indeed, several non-Black male FOD employees received accretion of duties promotions: (1) Franklin Tate, a White male GS-12 Financial Analyst in the Treasury Division was promoted to the GS-13 level; (2) Sam Yeng, an Asian male was promoted from a GS-12 Accountant to a GS-13 Accountant; (3) Melinda Fitzpatrick, a Black female was promoted from a GS-7 to a GS-8 Secretary; (4) Shirley Jones, a Black female was promoted from a GS-12 to a GS-13 Quality Assurance Analyst; and (5) Tonya Jones, a Black female was promoted from GS-13 to GS-14 Administrative Officer. PX 2 at 33-39. Meanwhile, Montgomery was the only COTR in the entire Financial Operations Division who was not paid as a GS-13, despite the fact that he was handling COTR duties previously performed by a white female GS-13 and a black female GS-14. PX 1 at 16; PX 19. Indeed, Montgomery performed more extensive duties than his predecessor, as the contract had significantly expanded.

Montgomery also presented evidence that he was performing duties at a higher grade level, and that the desk audit's contrary conclusion was based on misleading information supplied by his supervisors. First, the desk auditor based its assessment of Montgomery's duties upon his outdated GS-11 position description that had been created in 1994 and was not updated as anticipated under the 1998 settlement agreement. *See* PX 18 at 2 (noting that Montgomery's duties are outlined by his old position description). Further, the desk audit report demonstrates that the auditor conferred with Montgomery's supervisors and that "management agrees with the duties and responsibilities outlined" in the old position description. *Id.* However, Montgomery had been given additional duties following the 1998 settlement agreement to bring him up to the GS-12 level. PX 1 at 12; *see* PX 8 at 54-55 (McKinnon confirming that management gave Montgomery accounting duties probably within a year of his settlement to bring his position up

-29-

to the GS-12 level).

Regarding the addition of time-consuming COTR duties, the desk audit report acknowledges that COTR duties can be grade controlling, where the COTR performs technical oversight of the project. *See* PX 18 at 2. The report, however, concluded that Montgomery's COTR duties are not grade controlling based on his supervisor's statement that Montgomery was only providing administrative oversight and could not provide technical oversight because he was not an accountant. *See id.* ("[A]ny real 'technical or professional' guidance is not provided by this employee."). A jury could reasonably conclude that this information, provided by Montgomery's supervisor, is false. The evidence shows that PBGC contract specialists performed administrative oversight on contracts, while COTRs provided technical oversight. *See* PX 15 at 31 (stating that the COTR is an individual with technical knowledge who monitors the performance of the contractor to ensure that the Agency actually receives the contracted services). Moreover, Montgomery's COTR appointment memorandum specifically spells out his duty to perform technical oversight: "As the primary point of contact at PBGC you will be expected to give the contractor technical direction and act as PBGC's liaison to the contractor." PX 17 at 1; *see id.* ("Provide the contractor with technical assistance to ensure that the work progresses on schedule."). Montgomery's technical oversight of the Bert Smith contract is also evident from the fact that he was selected to Chair the TEP that evaluated the re-submission of the contract. *See* PX 21 at 93 (stating that the Chair "is usually the one with a – if not the most significant experience, in this case accounting experience, usually one that has a very high level of subject matter expertise").

By informing the desk auditor that Montgomery's old position description accurately

described his duties and that he did not perform technical oversight of the Bert Smith contract accountants, his supervisor clearly misstated his duties. This misstatement raises an inference of discrimination. *See Aka*, 156 F.3d at 1295 ("[A] plaintiff can attempt to show that the employer's explanation misstates the candidates' qualifications . . . . Adequate evidence of this type may suffice to permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination). If this evidence suffices to show pretext, it certainly raises an inference of discrimination.

> 2.    A Jury Could Reject Adams's Claim that Montgomery Was Not Qualified for a Grade 12 Accountant Position

Defendant claims that Montgomery cannot raise an inference of discrimination regarding his application for the GS-12/13 Accountant Position [Vacancy Announcement JI04-0143] because he failed to establish that he was minimally qualified. Montgomery, however, presented evidence that he was sufficiently qualified for the position and that Isaac treated him differently when she improperly disqualified him for the position after seeking and crediting Adams's clear misstatement regarding his performance of accounting duties.

Isaac asserts that Montgomery was not minimally qualified for the position for two reasons: (1) he did not provide a transcript confirming his 24 hours of accounting classes; and (2) he did not have one year of specialized experience because he had not performed accounting duties. First, Isaac's claim that it disqualified Montgomery due to a lack of a transcript is contradicted by the evidence and by PBGC's past practice. The Director of Human Resources confirmed that Montgomery did have 24 hours of accounting classes in her letter explaining why Montgomery was not selected. PX 26. Further, while Isaac claimed at her deposition that human

resources "never" contacts an applicant who failed to submit a transcript, that testimony

contradicts her earlier affidavit stating that "in case somebody does not [provide] their resume or

transcripts when they submit their resume, we can always put a little asterisk next to the person's

name and request that they submit it at a later [time]." PX 32 at 7; *see also* PX 31 at 7-8

(Richard Lattimer acknowledging that human resources tries to work with applicants regarding

incomplete applications, "particularly in a case like this when we don't have very many

applicants"); *id.* at 8 (confirming that he "did this for quite a few people"). Indeed, Isaac assisted

Lynn Christopher, a white female, by allowing her to resubmit what had been an incomplete

application. PX 2 at 112, 120.

Regarding the year of specialized experience, Isaac or Lattimer (after consulting Adams)

disqualified Montgomery, asserting that he was "not doing *any kind* of accounting work." PX 32

at 11 (emphasis added); *see* PX 10 at 7 (claiming Montgomery had not performed the work of

other IAB accountants). *But see* PX 30 (failing to list performance of IAB accountant duties as a

minimal qualification). Yet, Adams and Montgomery's second level supervisor, Wayne

McKinnon, both admitted that Montgomery had performed a number of accounting and

accounting related duties in his position within IAB for a number of years. *See* PX 12 at 112

(confirming that Montgomery's work on the Missing Participant Program was "accounting

work"); PX 8 at 81 (acknowledging Montgomery's accounting work). Moreover, both Adams

and McKinnon testified that they were willing to convert Montgomery to the 510 accounting

series at a GS-12 level. PX 12 at 102; PX 8 at 59. Based upon his supervisors' willingness to

convert Montgomery directly to a GS-12 accountant position in IAB, a reasonable jury could

reject the assertion that he was not even minimally qualified for a GS-12/13 accountant position

in IAB that could be filled at the GS-12 level. A reasonable jury could also conclude that Adams misstated Montgomery's qualifications to Isaac when she said that he was not performing accounting duties so that he would be disqualified from consideration. Based on this misstatement, a jury could infer that she was motivated by a discriminatory or retaliatory motive. *See Aka*, 156 F.3d at 1295.

3.    The Collections Analyst Position

Regarding the Collections Analyst position, Montgomery raises an inference of discrimination/retaliation through his demonstration of the way his application was handled and because of his superior qualifications for the GS-12/13 Collections Analyst position. Montgomery testified that he applied under both the JI04-0138 and JI04-0139 vacancy announcements (PX 2 at 123, 126; PX 3 at 15), but PBGC claims it never received his application for the 0138 status position (PX 7 at 136). As such, there is an issue of fact regarding whether Montgomery submitted the status application. Considering facts in the light most favorable to Montgomery, the Court must conclude that he submitted the application.

Further, while defendant argues that it selected a qualified applicant off of the status list first, Isaac's inconsistent testimony raises a question of fact regarding whether the Agency failed to consider the most qualified internal candidates first. Isaac stated that the Agency is required under their union contract to submit the most qualified PBGC candidates before considering either status or non-status candidates. *See* PX 32 at 19-20 ("[I]f we have anybody from PBGC, that cert goes first"). But Isaac then qualified that statement by claiming that only the most qualified PBGC status candidates are forwarded first. *Id.* at 31. The union contract , however, states that PBGC employee applications should be forwarded first. *See* PX 36 at §§13.3, 13.7,

-33-

13.8). Regardless, the goal is to hire the most qualified candidate. PX 5 at 107.

A comparison of the relative qualifications of the selectee (Rebecca Pavone, a younger white female) and of Montgomery demonstrates his superior qualifications. Pavone does not have any type of college degree, had only taken nine hours of accounting courses (even though the job requires accounting skills), and had only been a GS-12 Financial Specialist at the EPA for the two years prior to her employment at PBGC. *See* PX 37 at 7-8, 10, 25, 37. Her main responsibility at EPA had been to perform payroll reconciliation. *Id.* at 10. In contrast, Montgomery had an associate's degree, had successfully completed 24 semester hours of accounting, was a certified COTR who oversaw an accounting contract, had performed accounting duties within FOD for years, reconciled large accounts, and had been a successful PBGC employee for 18 years.

### B.    Retaliation

To establish a *prima facie* case of unlawful retaliation a plaintiff must show that: (1) he engaged in statutorily protected activity; (2) his employer took an adverse personnel action against her; and (3) a causal connection exists between the two. *Carney v. The American University*, 151 F.3d 1090, 1095 (D.C. Cir 1998); *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985). Defendant disputes whether Montgomery exhausted his administrative remedies regarding his claim that PBGC's denial of an accretion of duties promotion was retaliatory. Defendant further claims that Montgomery cannot establish a causal connection between any protected activity and his non-promotion claims. These arguments are unavailing.

### 1.    Exhaustion of Remedies

Defendant contends that while Montgomery exhausted his administrative remedies for

-34-

retaliation claims related to his applications for the accountant positions and collections analyst position, he failed to do so regarding the accretion of duties promotion. Because Montgomery put the Agency on notice of his belief that the Agency was retaliating against him over his 1998 settlement agreement, this claim must fail.

It is well established that the Court has authority over discrimination and retaliation claims that are "(1) contained in the plaintiff's administrative complaint or claims 'like or reasonably related to' those claims in the administrative complaint and (2) claims for which the plaintiff exhausted administrative remedies." *Powell v. Castaneda,* 390 F.Supp.2d 1, 8 (D.D.C. 2005) *(quoting Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C.Cir.1995)); *Caldwell v. ServiceMaster Corp.*, 966 F.Supp. 33, 49 (D.D.C.1997). Moreover, meager, conclusory allegations that the plaintiff failed to exhaust his administrative remedies will not satisfy the defendant's burden. Rather, it is the defendant's burden to prove by a preponderance of the evidence that the plaintiff failed to exhaust administrative remedies. *Powell*, 390 F.Supp.2d at 8, *citing Brown v. Marsh*, 777 F.2d 8, 13 (D.C.Cir.1985) (stating that "because untimely exhaustion of administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it").

In *Deravin v. Kerik*, 335 F.3d 195, 200-01 (2nd Cir. 2003), the Court discussed the circumstances under which claims that were not specifically raised at the administrative level "may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency." The Court explained that a "claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." Here, the conduct complained

of is the failure to grant an accretion of duties promotion which was, in fact, the focus of the EEO

complaint.  As such, Montgomery's retaliation complaint regarding the same adverse action falls

within this exception to the exhaustion requirement as "an allowance of loose pleading" based on

the fact that charges frequently are filled out by employees without the benefit of counsel and that

their primary purpose is to frame the EEO investigation.  *Id.*

      In *Gregory v. Georgia Dept. of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004),  the

Eleventh Circuit expressly held that an employee's claim was not administratively barred by her

failure to check the box on the EEOC charge because she alleged "facts in her EEOC charge that

could have reasonably been extended to encompass a claim for retaliation because they were

inextricably intertwined with her complaints of race and sex discrimination."  In particular, the

*Gregory* plaintiff "stated facts from which a reasonable EEOC investigator could have concluded

that what she had complained about is retaliation because of her complaints of ... disparate

treatment to the hospital's administration."  The Court therefore concluded that an "EEOC

investigation of her race and sex discrimination complaints leading to her termination would

have reasonably uncovered any evidence of retaliation." *Id.* (citation omitted).

      The proper inquiry here therefore is whether Montgomery's retaliation claim is like or

related to, or grew out of, the allegations contained in his EEO complaint.  Although the reprisal

box is unchecked on the EEO counselor's report, Montgomery's EEO complaint states, "[t]he

Pension Benefit Guaranty Corp. has committed prohibited personnel practice in violation of 5

U.S.C. 2302(a) and (b)."  5 U.S.C. §2302(b)(8) prohibits retaliatory acts by employers.

Moreover, Montgomery discusses retaliation in the affidavit he provided to the EEO investigator:

"I believe that this is an ongoing issue with the agency failing to promote me.  I had a previous

complaint against the agency concerning its failing to promote me when I was a GS-11." PX 1 at

12." Because Montgomery put the Agency on notice of the alleged violation – the failure to

update his position description and the continual refusal to promote him – his retaliation

complaint should not be dismissed for a failure to exhaust administrative remedies.

        2.    <u>Causal Connection</u>.

     A plaintiff may establish a causal connection by showing that the employer knew of the

employee's protected activity and that the adverse personnel action took place shortly after that

activity. *See Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1368 (D.C. Cir.

2000) ("Temporal proximity is often found sufficient to establish the requisite causal connection

for [retaliation] claims."). However, "'temporal proximity is but one method of proving

retaliation.'" *Buggs v. Powell*, 293 F.Supp.2d 135, 149 (D.D.C. 2003) (*quoting Che v. Mass. Bay

Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003)). Indeed, even where a plaintiff fails to

demonstrate close temporal proximity, "evidence of 'a pattern of antagonism' following the

protected conduct" may raise an inference of retaliatory motive. *Id.* (*quoting Kachmar v.

SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)); *see Kachmar*, 109 F.3d at 177

("These are not the exclusive ways to show causation, as the proffered evidence, looked at as a

whole, may suffice to raise the inference.").

     In *Buggs v. Powell*, this Court held that the plaintiff had shown a causal connection

despite the seven-month lapse between the protected activity and the adverse action. 293

F.Supp.2d at 149-50. While noting that the seven-month gap "is not, *by itself*, sufficient to

establish an inference of discrimination," the Court found that the combination of the temporal

proximity with the fact that the target of the protected activity served as a deciding official in the

decision not to select the plaintiff for a new position sufficed to raise an inference of discrimination. *Id.* at 149 (emphasis in original).

Defendant claims that Montgomery's complaint is based solely on the 1998 settlement; however, in Montgomery's affidavit to the EEO investigator on August 22, 2005, he states that PBGC was retaliating due to all of his complaints: "I believe that because of my previous complaints, the agency is making all efforts to deny my potential promotion abilities and I believe it's based on previous complaints filed against PBGC." PX 3 at 30.

Montgomery requested an accretion of duties promotion in March or April of 2003. After seeing no substantive results for months, he sought EEO counseling in June of 2003. PX 2 at 32. Following his participation in protected activity, management imposed a desk audit on Montgomery's position.[5] PX 12 at 94. Notably, none of Adams's employees had ever been subjected to a desk audit. *Id.* at 96. Further, Adams, his supervisor and a target of his June 2003 complaint, then provided false information regarding Montgomery's duties to the desk auditor. This resulted in his request being denied. Though PBGC did not officially deny the accretion of duties promotion until February of 2004, they instigated the process that led to that decision in November of 2003 at a meeting to discuss his EEO complaint. PX 39. Here, just as in *Buggs*, the targets of the protected activity played key roles in the adverse action. *See* F.Supp.2d at 149.

      3.    <u>Direct Evidence That PBGC Officials Harbored a Retaliatory Animus.</u>

PBGC officials also made clear that Montgomery's prior EEO activity and his settlement

---

[5]Montgomery's managers (Adams, McKinnon, and Winter) met to discuss Montgomery's June 2003 EEO complaint on November 10, 2003. The supervisors decided to impose the desk audit and discussed (prior to the audit) how Montgomery's COTR duties may not support a promotion. *See* PX 39 (Nov. 10, 2003 Email from Noisette Smith to Joseph Grant).

were well known throughout the Agency, and that some officials looked upon it negatively.

Richard Lattimer testified that "everyone in this Agency relevant to the case knew of his previous

EEO activity, aside from what was in the settlement agreement." PX 6 at 42.  Indeed, Jacqueline

Isaac, who played a decisive role in the rejection of all of Montgomery's requests or applications

for promotions made it clear that she disapproves of promotions obtained through settlements,

stating that she has a problem with it for the following reason:

> Because grades are supposed to be based on your experience and not on a
> settlement agreement.  They are based on you either getting an accretion of duties
> or applying for a job and getting a promotion that way.  But as a settlement
> agreement, it's not good practice based on the fact that you're rewarding
> somebody – not saying that it's – *it shouldn't be done*.  It's not what OPM
> requires you to do.  They want you to do it the correct way.  They don't believe in
> settlement agreements for grades.

PX 7 at 145 (emphasis added).  This comment, combined with her finding Montgomery

unqualified for all of the positions that he sought, raises an inference of a retaliatory motive.

**IV.     A Reasonable Juror Could Infer that PBGC Failed to Promote Montgomery Based
        on His Race, Sex, and Age, and in Retaliation for His Prior Protected Activity.**

PBGC offered as its alleged non-discriminatory reasons for not promoting or selecting

Montgomery (1) that he was not performing duties that would support an accretion of duties

promotion; (2) that he was not qualified for the GS-12/13 accountant position; and (3) that they

selected a more qualified candidate off of the status list for the Collection Analyst position.  A

reasonable jury could conclude that these explanations are simply not true.  Montgomery's

performance of time consuming COTR duties and his successful performance of accounting

duties qualified him for each of the positions sought.  Moreover, he has offered evidence

disproving defendant's evidence that he was not minimally qualified.  As a consequence, he is

entitled to a finding of discrimination and retaliation. *See Reeves*, 530 U.S. at 147-48 ("[T]he trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); *see also Burdine*, 450 U.S. at 259 (explaining that a finding that an employer misjudged the qualifications of the applicants is "probative of whether the employer's reason is pretext"); *Aka*, 156 F.3d at 1295 ("[A] plaintiff can attempt to show that the employer's explanation misstates the candidates' qualifications . . . . Adequate evidence of this type may suffice to permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination).

1.    HR Officials and PBGC Management Show Antipathy Towards Settlement Agreement

In this case, Montgomery has offered substantial evidence demonstrating that PBGC has repeatedly set up roadblocks to his career progression. Despite obtaining a settlement agreement from PBGC in 1998 requiring the Agency to promote Montgomery to a GS-12 position with an updated position description, the Agency failed to update his PD until six years later – and then only because he brought another EEO complaint in response to their efforts to thwart his promotional opportunities. Human resources officials testified that they had never seen a position description cover sheet mention a settlement agreement at PBGC and that it was an abuse of the personnel system. PX 5 at 86; PX 6 at 39-40; PX 7 at 163-64. Further, Jacqueline Isaac, the specialist who repeatedly found Montgomery unqualified, testified regarding her belief that it is "incorrect" to "reward" someone with a promotion via a settlement. According to Isaac, it "shouldn't be done" and that positions should only be gained meritoriously. PX 7 at 145. Based on these statements, a juror could easily conclude that Isaac's view of Montgomery had

been tainted and that this bias led her to doubt his qualifications.

Other officials involved in these non-selections voiced similar thoughts regarding the settlement. Wayne McKinnon, stated that Montgomery's complaint was the source of gossip and that he was "surprised" to learn that Montgomery had obtained a settlement. PX 8 at 50-52. Richard Lattimer testified that everyone within Human Resources relevant to the case knew about the settlement, regardless of the position description cover sheet. PX 6 at 42. And Cynthia Adams believed that Montgomery's settlement affected how PBGC officials handled his applications. *See* PX 10 at 14 (thinking that Lattimer took the unusual step of bringing Montogmery's application to her for review "because of [his] past history").

  2. <u>Montgomery Was Deemed Unqualified Based on His Supervisors'<br>Misrepresentations of His Qualifications</u>

Furthermore, the evidence shows that Montgomery's supervisors Cynthia Adams, Wayne McKinnon, and Ted Winter repeatedly misstated Montgomery's qualifications, and that these statements directly caused his disqualification for the positions sought. Regarding the accretion of duties promotion, his supervisors falsely indicated that his outdated position description (from 1994) accurately described his duties as of 2003. PX 18 at 2. This statement fails to account for the additional duties given to Montgomery to bring him up to the GS-12 level, it fails to acknowledge his accounting duties in IAB, and it fails to fully account for the depth and complexity of his COTR duties. Cynthia Adams's statement to the desk auditor that Montgomery did not provide any technical oversight of the contract accountants is directly contradicted by the memorandum appointing Montgomery to the position (PX 17), as well as by testimony from contracting specialists that they administer the contracts while the COTRs

provide technical oversight. PX 15 at 30. Adams's misinformation is also contradicted by

Montgomery's service as TEP Chair for the Bert Smith contract – which evidenced his high level

of technical expertise on the contract. Notably, Ted Winter (FOD Director) testified that the TEP

Chair "is usually the one with a – if not the most significant experience, in this case accounting

experience, usually one that has a very high level of subject matter expertise." PX 21 at 93.

Montgomery has also provided evidence refuting the claim that he was unqualified for the

GS-12/13 Accountant position. As noted above, defendant's claims that the lack of a transcript

confirming his 24 hours of accounting courses was one of the reasons for disqualification is

contradicted by the Director of Human Resources's letter to Montgomery (PX 26), as well as by

testimony showing that both Richard Lattimer and Jacqueline Isaac had assisted other applicants

in completing their applications in the past. PX 31 at 7-8; PX 32 at 7.

Similarly, there is a genuine factual dispute regarding the second proffered reason for his

disqualification. Isaac claims that Montgomery was not minimally qualified for the GS-12/13

Accountant position because he did not have a year of specialized experience. PX 7 at 72. She

based this finding on Adams's claim that Montgomery had not performed any accounting work,

or at least any accounting work performed by IAB accountants. PX 10 at 7; PX 32 at 11. Yet,

IAB accounting experience is not one of the minimal qualification standards. PX 30. Moreover,

there is record evidence that Montgomery had performed accounting and accounting related

duties for well over a year.

Based on these facts, a reasonable jury could also reject defendant's rationale for not

hiring Montgomery for the Collections Analyst position. First, Montgomery's testimony that he

submitted an application under the 0138 status vacancy announcement raises a factual dispute

-42-

regarding the PBGC's claim that it did not receive the application. Further, Montgomery's qualifications are clearly superior to Rebecca Pavone, the younger white female selectee. In addition, the decision to hire someone from outside the agency despite the presence of a better qualified internal applicant raises doubts about the veracity of defendant's claims and about whether PBGC followed internal procedures regarding consideration of the most qualified applicants first.

Given the substantial doubt regarding defendant's explanations for refusing to promote Montgomery, a reasonable jury could conclude that the reasons are pretext for discriminatory or retaliatory motives based on the following evidence:

- The pattern of failing to promote black males within FOD (PX 2 at 39);

- Only non-Black males received accretion of duties promotions (*Id.* at 33-39);

- Montgomery was the only COTR in FOD below grade 13 despite handling duties that had been performed by a white female GS-13 and a black female GS-14 (PX 1 at 16; PX 19);

- Isaac helped a white female resubmit an incomplete application, while she claimed Montgomery had to be disqualified for his incomplete application (PX 2 at 112, 120);

- Isaac found Robert Shepard, another black male PBGC employee unqualified for a position despite his master's degree in finance (PX 2 at 110, 119);

- Selectees for both the GS-12/13 Accountant position and the GS-12/13 Collection Analyst position were female;

- IAB is 75% female and only has two black males (PX 12 at 20-32);

- McKinnon had made comments regarding age and retirement to Montgomery (PX 2 at 57);

- Most of the COTRs were younger than Montgomery (*Id.* at 49);

- The clear antipathy towards Montgomery's 1998 settlement agreement, including Isaac's statement that promotions through settlements "shouldn't be done" (PX 7 at 145);

- The meeting of Montgomery's supervisors regarding his EEO complaint, their decision to request the desk audit, and their statement prior to the audit that his performance of COTR duties might not support a promotion (PX 39); and,

- The close proximity between the adverse actions and his 2003 EEO complaint.

## V.    Montgomery Paid Less than Female Employee Despite Performance of Same Duties.

Montgomery also brought a claim under the Equal Pay Act because PBGC paid Christine Thomas a higher salary than Montgomery despite the fact that they both performed COTR duties for the same contract.  Regarding this claim only, Montgomery limits his requested recovery under this law to $9,999.00.[6]

"To establish a prima facie case under the Act a plaintiff has the burden of proving that work has been performed similar to that performed by employees of the opposite sex involving equal skill, effort, and responsibility, that the work was performed under similar working conditions and that the employer paid different wages to employees of opposite sexes for such work." *Molden v. United States*, 11 Cl. Ct. 604, 610 (1987). Plaintiff is not required to show that he was performing identical work as his female comparator -- just that their work was

---

[6]Montgomery still seeks remedies under Title VII as set forth in his complaint.

"substantially equal." *Jenkins v. United States*, 46 Fed. Cl. 561, 563 (2000).

Here, Montgomery has demonstrated that he inherited COTR duties for the Bert Smith contract from Christine Thomas, a white female GS-13 within IAB. After receiving these duties, Montgomery requested an accretion of duties promotion that would have made him a GS-13 – in line with Thomas. Montgomery's request, however, was denied.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that defendant's motion for summary judgment be denied.

Respectfully submitted,


_____/S/_____
David H. Shapiro
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W., Suite 1290
Washington, D.C. 20005
(202) 842-0300

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this  17  day of April, 2007, the foregoing Exhibits to Plaintiff's

Opposition to Summary Judgement was served by hand delivery to:


Karen L. Melnik
Assistant United States Attorney
555 4th Street, N.W. Rm. E-4112
Washington, D.C.  20530
email - karen.melnik@usdoj.gov




_____

Taisha Hayes