# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DELARSE MONTGOMERY, JR.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 05-2157 (RMU)** |
| **v.** | ) | |
| | ) | |
| | ) | |
| **ELAINE CHAO, Chairwoman** | ) | |
| **Pension Benefit Guaranty Corp. et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## STATEMENT OF GENUINE ISSUES

Pursuant to Local Rule 7.1(h), plaintiff hereby submits his statement of genuine issues in response to the "Statement of Material Facts Not in Dispute" filed by defendant in support of its Motion for Summary Judgment.

**I.    General Response to Defendant's Statements.**

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Mitchell v. DCX, Inc.*, 274 F.Supp. 2d 33, 39 (D.D.C. 2003).  In a discrimination and retaliation action such as this, the material issues are the defendant's motives, whether defendant took adverse employment actions against Montgomery, and the legitimacy of any alleged non-discriminatory reasons for those actions.  Yet, for the most part, the facts recited in defendant's statement are not "material" to these issues.  Thus, even if those facts are accepted, they do not entitle defendant to judgment.  *See United States v. Winstead,* 74 F.3d 1313, 1320 (D.C.Cir 1996) ("material fact" defined as "a fact that would be of importance to a reasonable person in making a decision about a particular matter or transaction.").  As such, defendant's

statements do not satisfy the requirement of Local Rule 7 (h) that defendant provide a "a statement of *material* facts as to which the moving party contends there is no genuine issue." Therefore, defendant's motion for summary judgment must be denied.

## II.   Genuine Issues of Fact

1.    *Whether Montgomery Montgomery performed accounting and accounting related duties.*

Even Montgomery's outdated GS-11 position description stated that his position required "[g]eneral knowledge of accepted accounting principles and practices in order to survey, correlate, interpret, analyze, and review financial and statistical accounting data and records." PX 4 at 5.  There is also evidence that Montgomery performed accounting work regarding the Missing Participants Program – he was responsible for reconciling monthly bank statements of deposits and withdrawals and for making journal entries of cash receipts.  PX 2 at 99; PX 13 at 4. His supervisors have also acknowledged that Montgomery performed accounting duties.  PX 12 at 112 (Adams conceding that the Missing Participant Program was "accounting work"); PX 8 at 81 (McKinnon confirming that Montgomery's work with the vault was accounting, and could be properly classified as series 510 – the accounting series).

2.    *Whether Montgomery was qualified for a Grade 12/13 accounting position.*

While Adams claims that Montgomery was not doing accounting work because his reports were based upon information generated by others, accountants are not valuators.  PX 8 at 83. In fact, IAB accountants often referred to services such as Bloomberg in order to determine asset values – thus, they too used numbers which already existed.  PX 2 at 62-63.  There is also evidence that Adams again offered to have Montgomery "do the work that the other trust accountants were doing in the group."  PX 12 at 156.

2

Moreover, both Adams and McKinnon testified that they were willing to convert Montgomery to the 510 accounting series at a GS-12 level. PX 12 at 102; PX 8 at 59. A jury could reject the claim of Montgomery's supervisors that he was not even minimally qualified for a GS-12/13 accountant position in IAB that could be filled at the GS-12 level, and concluded instead that his supervisors would not have agreed to convert him directly to a GS-12 accountant position in IAB if that were truly the case.

3.      *Whether Montgomery performed accounting duties as the COTR duties associated with the Bert Smith contract.*

As COTR for the Bert Smith contract, Montgomery was the individual with technical knowledge (accounting knowledge in the case of this accounting contract) of the contracted services (in this case, accounting services) responsible for receiving the accounting services provided for in the contract. PX 15 at 31. As COTR Montgomery monitored the performance of the contractor to ensure that the PGBC was actually receiving the services provided for in the contract. PX 15 at 31; PX 16 at 15-16. Moreover, the memorandum appointing Montgomery as COTR specifically acknowledges his duty to perform technical oversight: "As the primary point of contact at PBGC you will be expected to give the contractor technical direction and act as PBGC's liaison to the contractor." PX 17 at 1; *see id.* ("Provide the contractor with technical assistance to ensure that the work progresses on schedule."). The COTR must have technical knowledge about the performed service. PX 15 at 32; PX 17 at 2. Montgomery's accounting experience and technical expertise are also confirmed by his appointment as TEP Chair for the Bert Smith contract. *See* Plf's Opp. to Def's Mot. for Sum. J. at Section IV.C.

There also are issues of fact regarding Adams's claim that his duties were

3

"administrative." Greg Smith, the Deputy Director of Procurement and a former senior contract specialist, explained that the contract specialist is the one who administers the contract. PX 15 at 30; *see* PX 16 at 15.

Morever, while the COTR duties associated with the Bert Smith contract were previously performed by Christine Thomas, a GS-13 Supervisory Accountant (PX 12 at 69-70), "the COTR duties [Montgomery] came to perform were vastly expanded over those performed by Ms. Thomas at GS-13." PX 1 at 6.

Additionally, as Chair of a Technical Review Panel (also known as a Technical Evaluation Panel or "TEP") when the Bert Smith contract was re-competed, and then as the COTR of the new contract after it was awarded, Montgomery performed duties given to "usually the one with a – if not the most significant experience, in this case accounting experience, usually one that has a very high level of subject matter expertise." PX 21 at 93.

4.    *Whether Montgomery's COTR duties were significant part of his job.*

Richard Lattimer claimed that COTR duties were not a significant portion of Montgomery's duties, PX 31 at 14. Yet, while he and Cynthia Adams both claimed that COTR duties comprised less than 25% of Montgomery's duties (PX 6 at 5, 36; PX 12 at 26), Montgomery testified that he devoted two days a week (or 40% of his work week) to his COTR duties (PX 2 at 26).

5.    *Whether Adams was motivated by discrimination or retaliation when she promised to support Montgomery's request for an accretion of duties promotion and then refused to do so.*

Montgomery was merely "seeking a promotion through accretion of duties that is allowed by the Agency directives and the Collective Bargaining Agreement." PX 2 at 33. Although he

4

had given justification for promotion, his managers took no action.  PX 2 at 33.  Although

Adams promised him that she would "look into it" and discuss it with her superiors McKinnon

and Winter, months went by with no response.  PX 2 at 29, 31.

Further, Richard Lattimer told Montgomery that "management was not interested in

finding a way to create a GS-13 financial specialist."  PX 6 at 49.

6.     *Whether the PGBC properly placed Montgomery in a Grade 12 position as required by the 1998 settlement of Montgomery's prior EEO Complaint.*

Under the settlement agreement, the PBGC was required to promote Montgomery to the

GS-12 Financial Specialist position.  While the PGBC raised Montgomery's pay to the GS-12

level, instead of creating a new position description for Montgomery's GS-12 position, PBGC

officials departed from established procedure by merely placing a cover sheet over his now

outdated GS-11 position description, stating, "Position upgraded to GS-12 grade level due to a

settlement agreement.  Position Description stays the same, given new number."  PX 4 at 1.

PBGC human resources officials testified that they had never seen such a cover sheet on a

position description at PBGC other than Montgomery's.  *See* PX 5 (Pilipovich Dep.) at 86; PX 6

(Lattimer Dep.) at 39-40; PX 7 (Isaac Dep.) at 163.  Richard Lattimer, a former manager within

Human Resources, testified that he found the cover sheet unusual and that as part of the

settlement, Montgomery's "job should have been described in a new position description."  PX 6

at 40.  Another human resources official agreed that the cover sheet constituted an "abuse of the

personnel system."  PX 7 at 164.

Moreover, despite the settlement agreement's requirement that PBGC promote

Montgomery to a GS-12 position, his supervisors now claim that they did not give him enough

new duties to make his job a GS-12 position. *See* PX 8 (McKinnon Dep.) at 52 (asserting that it "wasn't the situation" that they gave him enough duties to constitute a GS-12). This view contrasts with Montgomery's understanding that PBGC had to update his position description as part of the settlement agreement. PX 1 at 12.

On September 9, 2003, Adams told Montgomery that she was willing to rewrite his PD "with the addition of COTR responsibilities." *See* Def. Ex. ("DX") 7a (September 9, 2003 Memorandum). However, the revised PD only lists that the incumbent "may serve" as COTR. In addition, the position description should have been updated earlier. *See* PX 6 at 40 (Richard Lattimer, a former manager within Human Resources, testifing that Montgomery's "job should have been described in a new position description").

7.    *Whether a jury could infer discrimination or retaliation based upon misrepresentations from PBGC officials that caused the desk audit to understate the level of Montgomery's duties.*

The desk audit report based its assessment of Montgomery's duties largely on his former position description that had never been updated after the 1998 settlement to reflect his GS-12 duties. *See* PX 1 at 12 ("PBGC management was supposed to change my position description ('PD') to show that I was promoted to a higher grade of duties."); PX 3 at 24 (confirming that the settlement agreement was geared towards qualifying him for accounting positions); *see also* PX 8 at 54-55 (McKinnon noting that management gave Montgomery accounting duties probably within a year of his settlement to bring his position up to the 12 level).

The report also concluded that his COTR duties were not grade controlling because he only performed administrative oversight. PX 18 at 3. Yet, Montgomery served as the technical liaison on the Bert Smith contract. PX 2 at 19-20. While Greg Smith, the Deputy Director of

6

Procurement and a former senior contract specialist, explained that the contract specialist is the one who administers the contract, he clarified that the COTR monitors the performance of the contractor to ensure that the Agency actually receives the services as promised. PX 15 at 31; PX 16 at 15-16. Moreover, the memorandum appointing Montgomery as COTR specifically acknowledges his duty to perform technical oversight: "As the primary point of contact at PBGC you will be expected to give the contractor technical direction and act as PBGC's liaison to the contractor." PX 17 at 1; *see id.* ("Provide the contractor with technical assistance to ensure that the work progresses on schedule.").

Morever, there is evidence that before the desk audit report was signed, on February 19, 2004, Ms. Isaac discussed the report with Ms. Adams, who was Montgomery's supervisor, and that Adams misrepresented Montgomery's COTR duties. Isaac claims that Adams told her that Montgomery "is not doing any kind of accounting work." PX 32 at 11. *Compare* PX 10 at 7 (Adams telling Lattimer that "Monty had not performed any of the accounting duties that the other members of the staff had performed" and thus could not be qualified), *with* PX 32 at 11 (Isaac claiming that Adams told her that Montgomery "is not doing *any kind* of accounting work") (emphasis added).

8.    *Whether Isaac was motivated by discrimination or retaliation when she claimed that Montgomery could not satisfy the one-year minimum requirement for "specialized experience at or equivalent to the GS-12 grade level that demonstrates the ability to analyze an provide advice regarding accounting programs, financial systems, etc."*

Montgomery had successfully served as a GS-12 Financial Specialist in the IAB for over five years (PX 2 at 107), which more than qualified him under the standard set forth in the vacancy announcement. The inclusion of "etc." in the listing of specialized experience is broad

and could thus encompass many accounting or accounting related tasks. PX 2 at 107. Indeed, at the time of his application, he had worked within the Investment Accounting Branch for ten years. PX 2 at 107.

9.    *Whether Isaac was motivated by discrimination or retaliation when she improperly disqualified Montgomery fro the Accounting positions.*

A failure to document academic achievement was not included in the initial explanation for the PBGC contention that Montgomery was not qualified for the Accounting positions. When asked to explain why Montgomery was not qualified for the position, Michele Pilipovich, the Director of Human Resources, confirmed that they knew he had completed 24 hours of accounting. *See* PX 26 ("In your case, you have 24 semester hours of college credit in accounting or related courses"). Pilipovich cited only the alleged lack of specialized experience as grounds for disqualifying him and mentioned nothing about a failure to document academic requirements. PX 26.

While Isaac now claims that human resources "never" alerts an applicant about an application deficiency (PX 7 at 115), she had assisted a white female (Lynn Christopher) in resubmitting her incomplete application (PX 2 at 112, 120). This raises a factual issue, as does her previous testimony. *See* PX 32 (Isaac Aff., Aug. 22, 2005) at 7 (Isaac acknowledging that "in case somebody does not [provide] their resume or transcripts when they submit their resume, we can always put a little asterisk next to the person's name and request that they submit it at a later [time] before we would bring them on board and hire them."). Moreover, Richard Lattimer, Isaac's superior, confirmed that the human resources office actively assists applicants with their applications and that he "did this for quite a few people." PX 31 at 7-8.

8

10.    *Whether Adams was motivated by discrimination and retaliation when she selected someone from the other applicant pool without considering Montgomery's application.*

There are issues of fact regarding whether PBGC followed internal procedures. Pilipovich, the HR Director, testified that there is no policy at PBGC regarding preference to promote from within or to seek new candidates from outside the agency.  PX 5 at 107.  Isaac, however, claims that according to the Agency's contract with the union, they must first look to the most qualified in-house candidates before looking at status candidates or non-status candidates.  *See* PX 7 at 159; PX 32 at 19-20 ("What happens is the first cert that goes up to any selecting officials is always, if we have *anybody from PBGC*, that cert goes first, always because of our union contract.") (emphasis added).  While Isaac goes on to qualify this statement by saying that the union agreement only applies to status candidates (PX 32 at 21), the union contract states that it applies to PBGC employees.  *See* PX 36 (Article 13 regarding Merit Promotions) at 2, §13.3(B) ("When there are qualified PBGC candidates, the Employer will follow the procedures specified in Sections 13.7 and 13.8."); *id.* at 2, §13.3(C) ("To be eligible for treatment as a PBGC employee, an individual must be on the rolls of the Employer up to and including the date of selection.").  The contract states that "[t]he Employer will refer the PBGC candidates with the 5 highest scores (first certificate of eligibles), except as provided in 13 8.G, before any other certificates of eligibles are referred to the selecting official."  PX 36 at §13.8(E); *see id.* at §13.8(G) (dealing with situations where there is more than one position).

Moreover, there are issues of fact regarding what happened to Montgomery's application. While Montgomery attests to the fact that he applied for the vacancy,  PX 2 at 123, 126; PX 3 at 15, PBGC denies receiving his application asserting that all *all* job applications received by HRD

9

are logged into a computer system called "POLARS.", *see* Exhibit 8 (Isaac Dep.) at 133-134.

However, Michele Pilipovich testified that applications have been lost. PX 6 at 115, 118.

## III.    Specific Responses to "Defendant's Statement of Material Facts as to Which There Is No Genuine Issue."

Most of the statements listed in "Defendant's Statement of Material Facts as to Which There Is No Genuine Issue" do not address these material questions, but merely restate the claims of defense witnesses. To the extent that defendant's statements touch on the material facts in this case, there is ample evidence to dispute those.

<u>Statement No. 3</u>:    Plaintiff was promoted in 1998 to a GS-12 Financial Specialist (501 series), the position from which he retired. <u>See id.</u> at 140:24-141:11.

**Response: In dispute**. Following the settlement agreement, PBGC promoted Montgomery to the GS-12 Financial Specialist position; however, instead of creating a new position description for Montgomery's GS-12 position, PBGC officials merely placed a cover sheet over his now outdated GS-11 position description, stating, "Position upgraded to GS-12 grade level due to a settlement agreement. Position Description stays the same, given new number." PX 4 (Montgomery Position Description with Cover Sheet) at 1. PBGC human resources officials testified that they had never seen such a cover sheet on a position description at PBGC other than Montgomery's. *See* PX 5 (Pilipovich Dep.) at 86; PX 6 (Lattimer Dep.) at 39-40; PX 7 (Isaac Dep.) at 163. This was a departure from usual PBGC practice because as part of the settlement, Montgomery's "job should have been described in a new position description." PX 6 (Depo. of HR manager Richard Lattimer) at 40. This constituted an "abuse of the personnel system." PX 7 (Depo. of HR specialist Jacqueline Isaac) at 164.

10

Despite the settlement agreement's requirement that PBGC promote Montgomery to a GS-12 position, his supervisors now claim that they did not give him enough new duties to make his job a GS-12 position. *See* PX 8 (McKinnon Dep.) at 52 (asserting that it "wasn't the situation" that they gave him enough duties to constitute a GS-12). However, under the settlment agreement, PBGC was required to update his position description. PX 1 at 12.

Statement No. 5:    To implement the promotion, a cover sheet was placed on Plaintiff's existing Position Description with an explanation that the upgrade was due to a "settlement agreement." See Exhibit 31 (Position Description). The PD cover sheet makes no reference to EEO, discrimination, or anything else that would reveal the context or nature of the settlement. See id.

**Response: In dispute.** Richard Lattimer testified that everyone in human resources knew about Montgomery's settlement even without regard to the cover sheet. PX 6 at 42. Regardless, the three human resources officials who testified in this matter all confirmed that they had never seen this type of cover sheet on a PD before at PBGC. PX 5 at 86; PX 6 at 39-40; PX 7 at 163. One agreed that it was "an abuse of the personnel system." PX 7 at 164. Further, Jacqueline Isaac's testimony makes it clear that she responded negatively to learning about his settlement, noting that getting a promotion through a settlement "shouldn't be done." PX 7 at 145. Moreover, by failing to provide an upgraded PD, PBGC managers impeded Montgomery's promotional opportunities. Indeed, his outdated PD contributed to the improper failure to grant him an accretion of duties promotion.

Statement No. 24:    Plaintiff did not perform *any* of the above-described accounting duties. See Exhibit 3 (Adams Dep.) at 143:11-17; 144:9-15; 146:3-11; 147:2-7; 148:9-14; 149:16-22.

**Response: In dispute.** Montgomery performed accounting and accounting related duties as a GS-12 Financial Specialist. Even his outdated GS-11 position description noted that his position

11

required "[g]eneral knowledge of accepted accounting principles and practices in order to survey, correlate, interpret, analyze, and review financial and statistical accounting data and records." PX 4 at 5. Montgomery performed accounting work regarding the Missing Participants Program, for which he made journal entries and reconciled accounts. PX 2 at 99; PX 13 at 4. His supervisors have also acknowledged that Montgomery did perform accounting duties. PX 12 at 112 (Adams conceding that the Missing Participant Program was "accounting work"); PX 8 at 81 (McKinnon confirming that Montgomery's work with the vault was accounting, and could be properly classified as series 510 – the accounting series). Moreover, as COTR for the Bert Smith contract, Montgomery provided technical direction to contract accountants.

| | |
|---|---|
| Statement No. 25: | To the extent Plaintiff's duties included using an "accounting treatment," it was strictly limited to cash assets. |

**Response: Not material.** There is more than one type of accounting. PX 8 at 81.

| | |
|---|---|
| Statement No. 29: | The numbers Plaintiff downloaded to create his report already existed, so that all he was required to do is basic addition and subtraction. See id. at 134:11-22. |

**Response: Not material.** Accountants are not valuators. PX 8 at 83. IAB accountants often referred to services such as Bloomberg in order to determine asset values – thus, they too used numbers which already existed. PX 2 at 62-63. This does not mean Montgomery was not qualified to be an accountant.

| | |
|---|---|
| Statement No. 32: | Ms. Adams offered Plaintiff the opportunity to do some of the trust accountant's duties, but he was not interested in her offer. See Exhibit 3 (Adams Dep.) at 102:1-10; 154:11-157:6; see also Exhibit 4 (McKinnon Dep.) at 58:21-59:7. |

**Response: In dispute.** Adams's claim is a distraction. Montgomery "did not want to" convert

to the GS-12 Accountant position (PX 12 at 102). Because he was already a GS-12,

Montgomery wanted a promotion if he was to switch to new duties. PX 2 at 149. In fact, he

applied for accountant positions with the prospect of promotional opportunity, thus

demonstrating that he wanted to perform accounting duties. *See* PX 13 & PX 28.


Statement No. 33:    Ms. Adams again offered Plaintiff "an opportunity for him to do some of
the work, or do the work that the other trust accountants were doing in the
group." See Exhibit 3 (Adams Dep.) at 156:16-22.

**Response: In dispute**. *See* Response to Statement No. 32.


Statement No. 34:    Plaintiff admits having this conversation with Ms. Adams, and telling her
that since he "was already a the [GS]-12, how I wanted a promotion, and
without a promotion I didn't see any merit in doing the work." See
Exhibit 1 (Montgomery Dep.) at 149:9-18.

**Response: In dispute.** Montgomery applied for accountant positions with promotional

opportunities. *See* Response to Statement No. 32.


Statement No. 37:    The COTR duties associated with the Bert Smith contract were previously
performed by Christine Thomas, a GS-13 Supervisory Accountant. See
Exhibit 3 (Adams Dep.) at 69:5-70:3.

**Response: In dispute.** "[T]he COTR duties [Montgomery] came to perform were vastly

expanded over those performed by Ms. Thomas at GS-13." PX 1 at 6.


Statement No. 40:    Plaintiff's COTR duties did not include reviewing the accounting work
generated by the contract accountants "[b]ecause he's not an accountant."
See Exhibit 3 (Adams Dep.) at 141:13-22;110:2-9; see also Exhibit 4
(McKinnon Dep.) at 97:9-16.

**Response: In dispute.** Despite having told the auditor that Montgomery was not an accountant, Adams conceded in her deposition that his work with the Missing Participants Program was "accounting work." PX 12 at 112. Moreover, she claims that she told Isaac that Montgomery performed accounting and accounting related duties. PX 12 at 112-13.

There are issues of fact regarding Adams's claim that Montgomery's role as COTR for the Bert Smith contract was administrative. Greg Smith, the Deputy Director of Procurement and a former senior contract specialist, explained that the contract specialist is the one who administers the contract. PX 15 at 30; *see* PX 16 at 15. In contrast, the COTR (the Contracting Officer *Technical* Representative), is an individual with technical knowledge of the contracted services (in this case, accounting services) who can ensure that the Agency is actually receiving the services provided for in the contract. PX 15 at 31. As such, the COTR monitors the performance of the contractor to ensure that the Agency actually receives the services as provided in the contract. PX 15 at 31; PX 16 at 15-16. Moreover, the memorandum appointing Montgomery as COTR specifically acknowledges his duty to perform technical oversight: "As the primary point of contact at PBGC you will be expected to give the contractor technical direction and act as PBGC's liaison to the contractor." PX 17 at 1; *see id.* ("Provide the contractor with technical assistance to ensure that the work progresses on schedule."). The COTR must have technical knowledge about the performed service. PX 15 at 32; PX 17 at 2. Montgomery's accounting experience and technical expertise are also confirmed by his appointment as TEP Chair for the Bert Smith contract. *See* Plf's Opp. to Def's Mot. for Sum. J. at Section IV.C.

14

Statement No. 42:    Plaintiff served as Chair of a Technical Review Panel (also known as a
                     Technical Evaluation Panel or  "TEP") when the Bert Smith contract was
                     re-competed, and then he continued as the COTR of the new contract after
                     it was awarded.  See Exhibit 3 (Adams Dep.) at 83:1-13; 89:3-13.

**Response: In dispute.**  Ted Winter, the white male Director of the FOD testified that the Chair

of a TEP "is usually the one with a – if not the most significant experience, in this case

accounting experience, usually one that has a very high level of subject matter expertise."  PX 21

at 93.  Yet, when asked if the fact that Montgomery was the Chair meant that someone had a high

confidence level in him, Winter responded, "not necessarily." *Id.*

Statement No. 48:    Missing Participant Program, however, "was not a contract in the sense of
                     other contracts, where you had . . . a set order of duties, reporting and
                     responsibility.  The Missing P[articipant] had reporting, but is was an
                     account, more of a depository."  See Exhibit 4 (McKinnon Dep.) at 33:16-
                     20.

**Response: In dispute**.  Montgomery performed accounting work regarding the Missing

Participants Program – he was responsible for reconciling accounts and for making journal

entries of cash receipts.  PX 2 at 99; PX 13 at 4.  His supervisors have also acknowledged that

Montgomery did perform accounting duties for the Missing Participant Program.  PX 12 at 112

(Adams conceding that the Missing Participant Program was "accounting work").

Statement No. 50:    Plaintiff admits that his COTR duties did not take up the majority of his
                     time during every day of every week.  See Exhibit 1 (Montgomery Dep.) at
                     26:16-23.

**Response: In dispute.**  There is a dispute regarding the amount of time he performed his duties

and how significant they were to his job.  While Montgomery testified that he devoted two days a

week (or 40% of his work week) to his COTR duties (PX 2 at 26), Richard Lattimer claimed that

COTR duties were not a significant portion of Montgomery's duties.  PX 31 at 14.  Lattimer and

Cynthia Adams claimed that COTR duties comprised less than 25% of his duties.  PX 6 at 5, 36;

PX 12 at 26.

<u>Statement No. 55</u>:    Ms. Adams, who was supportive of Plaintiff's request, told him that she
                          would raise the issue with her supervisors.  <u>See</u> Exhibit 3 (Adams Dep.) at
                          91:9-15.

**Response: In dispute.**  Although she promised him that she would "look into it" and discuss it

with her superiors McKinnon and Winter, months went by with no response.  PX 2 at 29, 31.

Further, Richard Lattimer told Montgomery that "management was not interested in finding a

way to create a GS-13 financial specialist."  PX 6 at 49.  Montgomery was merely "seeking a

promotion through accretion of duties that is allowed by the Agency directives and the Collective

Bargaining Agreement."  PX 2 at 33.  Although he had given justification for promotion, his

managers took no action.  PX 2 at 33.

<u>Statement No. 57</u>:    On September 9, 2003, Ms. Adams advised Plaintiff in writing that she
                          was willing to rewrite his PD "with the addition of COTR
                          responsibilities."  <u>See</u> Exhibit 7a (September 9, 2003 Memorandum).  In
                          that same memorandum, she asks Plaintiff update his PD to include "any
                          additional duties and responsibilities not covered," and to provide the
                          update to her, so that she could incorporate the changes and forward it to
                          HRD for classification.  <u>See</u> <u>id</u>.

**Response: In dispute.**  The PD only mentions that the incumbent "may serve" as COTR.  In

addition, the position description should have been updated earlier.  *See* PX 6 at 40 (Richard

Lattimer, a former manager within Human Resources, testifing that Montgomery's "job should

have been described in a new position description").

<u>Statement No. 60</u>:      The audit was conducted by Cynthia Kyle, a contract position
classification specialist in PBGC's Human Resources Department
("HRD").  <u>See</u> Exhibit 5 (Lattimer Dep.) at 20:18-19; 24:9-14; 35:1-8.

**Response: In dispute.**  While Kyle conducted the desk audit, she based many of her conclusions

on misrepresentations from PBGC officials, and the final report was signed by Jacqueline Isaac.

The desk audit report based its assessment of Montgomery's duties largely on the description of

his duties contained in his former position description that had never been updated after the 1998

settlement to reflect his GS-12 duties.  *See* PX 1 at 12 ("PBGC management was supposed to

change my position description ('PD') to show that I was promoted to a higher grade of duties.");

PX 3 at 24 (confirming that the settlement agreement was geared towards qualifying him for

accounting positions); *see also* PX 8 at 54-55 (noting that management gave Montgomery

accounting duties probably within a year of his settlement to bring his position up to the 12

level).

The desk audit report also stated that Montgomery's COTR duties were not grade

controlling because he only performed administrative oversight.  PX 18 at 3.  Yet, Montgomery

served as the technical liaison on the Bert Smith contract.  PX 2 at 19-20; *see* PX 8 at 80

(McKinnon confirming that Montgomery's inventory of the vault "would be an accounting

responsibility").  Greg Smith, the Deputy Director of Procurement and a former senior contract

specialist, explained that the contract specialist (not the COTR) is the one who administers the

contract.  PX 15 at 30; *see* PX 16 at 15.  In contrast, the COTR monitors the performance of the

contractor to ensure that the Agency actually receives the services provided in the contract.  PX

15 at 31; PX 16 at 15-16.  Moreover, the memorandum appointing Montgomery as COTR

specifically acknowledges his duty to perform technical oversight: "As the primary point of

contact at PBGC you will be expected to give the contractor technical direction and act as

PBGC's liaison to the contractor." PX 17 at 1; *see id.* ("Provide the contractor with technical

assistance to ensure that the work progresses on schedule."). In the context of a contract for

accounting services, technical direction means that Montgomery was directing accounting

services as provided under the contract.

| Statement No. 63: | Before signing the Report on February 19, 2004, <u>see</u> Exhibit 7 at 3, Ms. Isaac, who is a qualified classification specialist, discussed it with Plaintiff's supervisor, Ms. Adams, to make sure that Ms. Kyle had accurately reported Plaintiff's duties. <u>See</u> Exhibit 8 (Isaac Dep.) at 103:21-104:7; 143:14-144:3. |
|---|---|

**Response: In dispute.** Whether Adams misrepresented Montgomery's duties and exactly what

she told human resources officials are both in dispute. Regarding Adams's misrepresentations

of Montgomery's COTR duties, see response to statement no. 60. Regarding what exactly

Adams told human resources officials, compare PX 10 at 7 (Adams telling Lattimer that "Monty

had not performed any of the accounting duties that the other members of the staff had

performed" and thus could not be qualified), with PX 32 at 11 (Isaac claiming that Adams told

her that Montgomery "is not doing *any kind* of accounting work") (emphasis added).

| Statement No. 64: | Ms. Adams told Ms. Isaac that the duties Plaintiff performed were "[n]ot trust accounting." <u>See</u> Exhibit 3 (Adams Dep.) at 107:13-108:16. |
|---|---|

**Response: In dispute.** Isaac claims that Adams told her that Montgomery "is not doing any kind

of accounting work." PX 32 at 11. Moreover, whether Montgomery was performing the same

duties as trust accountants is immaterial to whether he was providing technical oversight for

contract accounting services.

Statement No. 66:     The Report concludes that Plaintiff's Financial Specialist position is a GS-11.  See Exhibit 7 (Report) at Section IV, VII.

**Response: In dispute.**  While the report concludes that his position was a GS-11, there are

issues of fact regarding the basis for this decision.  *See* responses to statements no. 60 and 63.

Statement No. 67:     With respect to COTR duties, the Report states that all PBGC employees assigned as COTRs have the same tasks or responsibilities, regardless of their position or grade level.  See Exhibit 7 (Report) at Section VI.

**Response: In dispute.**  This statement is contradicted by defendant's claim that some COTR

duties are grade controlling and some are not, that some are administrative and some are

technical.  *See, e.g.*, Statement Nos. 68, 69, & 70.

Statement No. 68:     The Report states that Plaintiff's COTR duties are not "grade-controlling."  See id.

**Response: In dispute.**  While the report contains this conclusion, there are issues of fact

regarding the basis for this decision.  *See* responses to statements no. 60 and 63.

Statement No. 69:     The Report provides that Plaintiff is not directly involved in the day-to-day oversight of the contractor's work because he is not an Accountant.  In order for the work to rise to the level of actually affecting the grade of his position, he would have to possess the qualifications to "oversee" the work from a completely "technical" aspect or be an Accountant which according to his supervisor of record, Ms. Adams, he is "not."  See id.

**Response: In dispute.**  While the report contains this conclusion, there are issues of fact

regarding the basis for this decision.  *See* responses to statements no. 60 and 63.

Statement No. 70:     No grade can be attached to what Plaintiff is doing since he is providing "administrative" oversight over the work of the contractors.  Thus, any real "technical or professional" guidance is not provided by Plaintiff.  See id. at

3, Section VI.

**Response: In dispute.** While the report contains this conclusion, there are issues of fact

regarding the basis for this decision. *See* responses to statements no. 60 and 63.

Statement No. 75:    Another minimum qualification for the position is "one year of specialized
experience at or equivalent to the GS-12 grade level that demonstrates the
ability to analyze an provide advice regarding accounting programs,
financial systems, etc." See id.

**Response: In dispute.** What exactly qualifies as one year of specialized experience as described

is in dispute. Regarding his specialized experience, Montgomery had successfully served as a

GS-12 Financial Specialist in the IAB for over five years (PX 2 at 107), which more than

qualified him under the standard set forth in the vacancy announcement. The inclusion of "etc."

in the listing of specialized experience is broad and could thus encompass many accounting or

accounting related tasks. PX 2 at 107. Indeed, at the time of his application, he had worked

within the Investment Accounting Branch for ten years. PX 2 at 107.

Statement No. 76:    The Vacancy Announcement provides that college transcripts must be
submitted with the application "if you wish college work to be considered
in qualifying you for this position." See Exhibit 12 (Vacancy
Announcements for JI04-0105) at 5.

**Response: In dispute.** There are issues of fact regarding whether human resources always

disqualifies applicants who do not submit transcripts, and whether Isaac could have requested

this from Montgomery. While Isaac now claims that human resources "never" alerts an applicant

about an application deficiency (PX 7 at 115), she had assisted a white female (Lynn

Christopher) in resubmitting her incomplete application (PX 2 at 112, 120). This contrasts with

her previous testimony. *See* PX 32 (Isaac Aff., Aug. 22, 2005) at 7 (Isaac acknowledging that "in

case somebody does not [provide] their resume or transcripts when they submit their resume, we

can always put a little asterisk next to the person's name and request that they submit it at a later

[time] before we would bring them on board and hire them."). Moreover, Richard Lattimer,

Isaac's superior, confirmed that the human resources office actively assists applicants with their

applications and that he "did this for quite a few people." PX 31 at 7-8.

Statement No. 78:    Ms. Isaac reviewed Plaintiff's application, found no evidence that he
                     completed 24 semester hours in accounting, and determined that he was
                     not minimally qualified. See Exhibit 8 (Isaac Dep.) at 52:2-20.

**Response: In dispute**. Montgomery stated on his application that he had successfully completed

it. PX 13 at 2. Further, in signing his application with this information, he affirmed that all of

his statements were "true, correct, complete, and made in good faith." PX 13 at 5. In addition,

PBGC had paid for Montgomery to take the courses and received confirmation of his successful

completion of them. PX 2 at 159-60; PX 7 at 54. His supervisor, Cynthia Adams, also knew that

he had completed the 24 hours (PX 12 at 101), and Isaac had consulted Adams about his

qualifications for the position. PX 26.

Statement No. 79:    It is insufficient simply to type on the application that one has 24 credit
                     hours, when the vacancy announcement requires the submission of
                     transcripts. See Exhibit 5 (Lattimer Dep.) at 70:21-71:11; Exhibit 14
                     (Application for JI04-0105) at Section 29.

**Response: In dispute.** When asked to explain why Montgomery was not qualified for the

position, Michele Pilipovich, the Director of Human Resources, confirmed that they knew he had

completed 24 hours of accounting. See PX 26 ("In your case, you have 24 semester hours of

college credit in accounting or related courses"). Pilipovich cited only the alleged lack of

specialized experience as grounds for disqualifying him.  PX 26.  *See* also responses to statement

nos. 76 & 78.

Statement No. 80:    Plaintiff did not "have the one-year [of] specialized experience as [an]
                     accountant" at the GS-12 grade level.  See Exhibit 8 (Isaac Dep.) at 72:7-
                     73:1; Exhibit 12 at 3; Exhibit 20 (July 6, 2004 Letter).

**Response: In dispute.** *See* response to statement no. 75.  There are also issues of fact regarding

whether Adams misrepresented the nature of Montgomery's accounting duties.  Adams told

Lattimer that "Monty had not performed any of the accounting duties that the other members of

the staff had performed" and thus could not be qualified.  PX 10 at 7; *see also* PX 32 at 11 (Isaac

claiming that Adams told her that Montgomery "is not doing *any kind* of accounting work")

(emphasis added).

Statement No. 81:    To fill the GS-13 Accountant position, Ms. Adams wanted an applicant
                     "that had experience with accounting for investment instruments . . . like
                     common stocks, bonds, and that kind of thing."  See Exhibit 15 (Affidavit
                     of Cynthia Adams ("Adams Aff.") at 6:17-20.

**Response: In dispute.**  Investment instrument accounting experience was not contained in the

minimum qualifications of the vacancy announcement.  PX 29.  Further, Montgomery addressed

how he was qualified to perform each of the duties of the position.  PX 13.

Statement No. 82:    Ms. Adams was not "satisfied with the experience level" of the applicants,
                     and did not select anyone for the position.  See id. at 4:1-19.

**Response: In dispute.**  This statement is conclusory, and does not address whether Montgomery

was actually qualified for the position.  Further, this statement is undermined by the fact that she

re-issued a new vacancy announcement of the same position at a lower grade level, thus allowing

for even less experienced applicants.  *Compare* PX 29, *with* PX 30.

Statement No. 88:    Ms. Isaac found Plaintiff not minimally qualified for the position because:
(1) he did not submit college transcripts with his application, as the
vacancy announcement required, see Exhibits 16 and 18; Exhibit 8 (Isaac
Dep.) at 57:2-12; Exhibit 21 (November 1, 2004 Letter); and (2) he did not
have the requisite experience.  See Exhibit 8 (Isaac Dep.) at 75:16-76:3.

**Response: In dispute.**  *See* responses to statement nos. 76, 78, 79, & 80.  Moreover, both Adams

and McKinnon testified that they were willing to convert Montgomery to the 510 accounting

series at a GS-12 level.  PX 12 at 102; PX 8 at 59.  Thus, it is highly suspect that his supervisors

would agree to convert him directly to a GS-12 accountant position in IAB, yet argue that he was

not even minimally qualified for a GS-12/13 accountant position in IAB that could be filled at

the GS-12 level.

Statement No. 90:    Ms. Adams selected an accountant from a separate group of applicants
from the non-status vacancy announcement, JI04-0144.  See Exhibit 3
(Adams Dep.) at 119:9-18; Exhibit 15 (Adams Aff.) at 11:8-21.

**Response: In dispute.**  While Adams selected someone from the other applicant pool, this was

contrary to internal PBGC policy.  Regarding the Collection Analyst position, Jacqueline Isaac

claims that internal candidates comprise the first certificate of eligibles, meaning that had

Montgomery been properly qualified, then his name should have gone to Adams prior to

Graham's.  *See* response to statement no. 98.

Statement No. 91:    The selectee, Ms. Lafaye Graham (Black female), had a four-year degree
in finance, a Masters in accounting, 15 years of experience in the
accounting field, and specific accounting experience in investment
accounting, none of which Plaintiff had.  See Exhibit 3 (Adams Dep.) at
120:1-8; 160:11:20; 161:16-17.

23

**Response: In dispute.** *See* responses to statement nos. 90, 98.

Statement No. 93:    All job applications received by HRD are logged into a computer system called "POLARS."  See Exhibit 8 (Isaac Dep.) at 133:18-134:4.

**Response: In dispute.**  Michele Pilipovich testified that applications have been lost.  PX 6 at

115, 118.  Further, Montgomery testified that he submitted an application for the 0138 position,

yet his name failed to appear on the list.  PX 2 at 123, 126; PX 3 at 15.

Statement No. 98:    The non-status vacancy announcement for which Plaintiff applied was cancelled.  See Exhibit 25; Exhibit 26 (November 8, 2004 Letter); Exhibit 9 (Isaac Aff.) at 19:1-19.

**Response: In dispute.**  There are issues of fact regarding whether PBGC followed internal

procedures is in dispute.  Pilipovich, the HR Director, testified that there is no policy at PBGC

regarding preference to promote from within or to seek new candidates from outside the agency.

PX 5 at 107.  Isaac, however, claims that according to the Agency's contract with the union, they

must first look to the most qualified in-house candidates before looking at status candidates or

non-status candidates.  *See* PX 7 at 159; PX 32 at 19-20 ("What happens is the first cert that goes

up to any selecting officials is always, if we have *anybody from PBGC*, that cert goes first,

always because of our union contract.") (emphasis added).  While Isaac goes on to qualify this

statement by saying that the union agreement only applies to status candidates (PX 32 at 21), the

union contract states that it applies to PBGC employees.  *See* PX 36 (Article 13 regarding Merit

Promotions) at 2, §13.3(B) ("When there are qualified PBGC candidates, the Employer will

follow the procedures specified in Sections 13.7 and 13.8."); *id.* at 2, §13.3(C) ("To be eligible

for treatment as a PBGC employee, an individual must be on the rolls of the Employer up to and

including the date of selection."). The contract states that "[t]he Employer will refer the PBGC

candidates with the 5 highest scores (first certificate of eligibles), except as provided in 13 8.G,

before any other certificates of eligibles are referred to the selecting official." PX 36 at §13.8(E);

*see id.* at §13.8(G) (dealing with situations where there is more than one position).

Statement No. 99:    The non-status certificate of eligibles never reached the selecting official
                because an in-house, qualified, status applicant had already been selected.
                See Exhibit 9 (Isaac Aff.) at 17:8-18.

**Response: In dispute.** See response to statement no. 98.

Statement No. 103:    Plaintiff does not identify "reprisal" as a basis for the complaint. See id.

**Response: In dispute.** In his EEO complaint, Montgomery states that PBGC violated 5 U.S.C. §

2302(b), which specifically includes retaliation for protected activity. See 5 U.S.C. § 2302(b)(8)-

(9). Further, though the reprisal box is unchecked on the EEO counselor's report, Montgomery

discusses retaliation in the affidavit he provided to the investigator: "I believe that this is an

ongoing issue with the agency failing to promote me. I had a previous complaint against the

agency concerning its failing to promote me when I was a GS-11." PX 1 at 12." Thus,

Montgomery put the Agency on notice of the alleged violation – he identified the failure to

update his position description and the continual refusal to promote him.

Statement No. 106:    There is no evidence that Plaintiff disagreed with the characterization of
                his claims.

**Response: In dispute.** See response to statement no. 103.